No. 25-1034

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

---

LAITH SAUD,

*Plaintiff-Appellant*

v.

DEPAUL UNIVERSITY,

*Defendant-Appellee.*

---

Appeal from the United States District Court
For the Northern District of Illinois, Eastern Division
Case No. 19-cv-3945
The Honorable Judge Lindsay C. Jenkins, Judge Presiding

---

## BRIEF OF THE APPELLANT KARA MITCHELL

Christina Abraham
Attorney No. 6298946
Abraham Law & Consulting
161 N. Clark Street, Suite 1600
Chicago, Illinois 60601

*Attorney for Plaintiff-Appellant Laith Saud*

---

## ORAL ARGUMENT REQUESTED

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: <u>25-1034</u>

Short Caption: <u>Saud v. DePaul University</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

<u>Laith Saud, Plaintiff</u>

_____

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

<u>Abraham Law & Consulting</u>

_____

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        <u>N/A</u>

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        <u>N/A</u>

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

<u>N/A</u>

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

<u>N/A</u>

Attorney's Signature: <u>/s/Christina Abraham</u>    Date: <u>4/30/2025</u>

Attorney's Printed Name:  <u>Christina Abraham</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  **Yes** [✔]  **No** [ ]

Address:  <u>161 N. Clark Street, Suite 1600</u>

        <u>Chicago, IL 60601</u>

Phone Number: <u>312-588-7150</u>    Fax Number: _____

E-Mail Address: <u>chrisitna.w.abraham@gmail.com</u>

rev. 12/19 AK

## **Table of Contents**

*JURISDICTIONAL STATEMENT* ..................................................................... 1

*STATEMENT OF THE ISSUES* ...................................................................... 2

*STATEMENT OF THE CASE* ......................................................................... 3

    Campus Watch Article ........................................................................ 3

    Saud's employment history, the Enhanced Pay Request and Comparators ............... 6

    Procedural History ............................................................................ 11

*SUMMARY OF THE ARGUMENT* .................................................................. 12

*ARGUMENT* ......................................................................................... 14

    A.    **Standard of Review** ...................................................................... 14

    i.    **Summary Judgment Standard** ........................................................... 14

    ii.    **Legal Standard for Race discrimination Claims** .................................... 15

    1.    **Prima Facie Race Discrimination** ..................................................... 15

    B.    **Plaintiff's Comparator Evidence was Improperly Dismissed** ...................... 16

    i.    **On the issue of Saud's non-rehire, Lysik is a proper comparator and the evidence shows Lysik was treated more favorably than Saud** ....................................................... 19

    ii.    **On the issue of the Title IX investigation, Lysik and Suglia are proper comparators, and the evidence shows they were treated more favorably** ..................................... 24

    1.    **Tamburro's discriminatory Title IX investigation was, in itself, an adverse employment action** ..................................................................................... 27

    C.    **The District Court Erred by Concluding Saud Did Not Show Evidence of Pretext** ........... 28

    i.    **The Evidence of Disparate Treatment Supports a Finding of Pretext** ............................ 29

    ii.    **The Evidence that Saud was Punished for Conduct Not in Violation of DePaul's Policy Supports a Finding of Pretext** ........................................................... 30

    iii.    **The Evidence that Keshk Fabricated Reports Against Saud Supports a Finding of Pretext** 31

    iv.    **The Evidence that Saud's Classes were Canceled in May 2017 Supports a Finding of Pretext** 31

    v.    **The Evidence of Shifting Justifications Supports a Finding of Pretext** ............................ 33

    D.    **The District Court Failed to Apply the Totality of the Evidence Standard Required by Ortiz** 36

    E.    **Weighing of Evidence and Credibility Determinations by the District Court Require Reversal** ...................................................................................... 39

**F.   The District Court Gave Improper Deference to DePaul's Proffered Reason for the Adverse Actions and Improperly Drew Inferences in DePaul's favor** .................................................. 41

***CONCLUSION*** ............................................................................. **44**

***CERTIFICATE OF COMPLIANCE WITH F.R.A.P. 32(A)(7)*** ......................................... **45**

***CERTIFICATE OF SERVICE*** ................................................... **46**

***INDEX TO SHORT APPENDIX*** ............................................... **47**

***CIRCUIT RULE 30(d) STATEMENT*** ....................................... **47**

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ......................................... 14

*Appelbaum v. Milwaukee Metro. Sewerage Dist.*, 340 F.3d 573, 579 (7th Cir. 2003) ................ 34

*Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 873 (7th Cir. 2016) ......... 14, 35, 36

*Bostock v. Clayton County*, 590 U. S. 644, 681 (2020) ................................................. 27

*Bullard v. Sercon Corp.*, 846 F.2d 463, 466 (7th Cir. 1988) ......................................... 29

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) ................................................ 16

*Chavez v. Ill. State Police*, 251 F.3d 612, 636 (7th Cir.2001) ....................................... 18

*Cole v. Board of Trustees of Northern Illinois University*, 838 F.3d 888, 895 (7th Cir. 2016).... 14

*Coleman v. Donahoe*, 667 F.3d 835, 841 (7th Cir. 2012) ............................................... 18

*Duncan v. Fleetwood Motor Homes of Indiana, Inc.*, 518 F.3d 486, 490 (7th Cir. 2008) .... 14, 29

*Ezell v. Potter*, 400 F.3d 1041, 1049 (7th Cir. 2005) .................................................. 23

*Freeman v. Package Mach. Co.* 865 F.2d 1331, 1341 (1st Cir. 1988) ......................... 42

*Gerhartz v. Richert*, 779 F.3d 682, 685 (7th Cir.2015) ............................................... 14

*Harvey v. Office of Banks and Real Estate*, 377 F.3d 698, 713 (7th Cir. 2004) .......................... 40

*Hasham v. Cal. State Bd. of Equalization*, 200 F.3d 1035, 1047 (7th Cir.2000) ...................... 40

*Hitchcock v. Angel Corps, Inc.*, 718 F.3d 733, 738 (7th Cir. 2013) ............................. 36

*Hudson v. Chicago Transit Auth.*, 375 F.3d 552, 561 (7th Cir. 2004) ...................... 16

*Hull v. Stoughton Trailers, LLC*, 445 F.3d 949, 952 (7th Cir.2006) ............................. 18

*Humphries v. Cbocs West*, 474 F.3d 387, 404-405 (7th Cir. 2007) ...................... passim

*Jolll v. Valparaiso Cmty. Schs.*, 953 F.3d 923, 929 (7th Cir. 2020) .............................. 30

*Logan v. City of Chicago*, 4 F. 4th 529, 536 (7th Cir. 2021) .......................... 14

*Marshall v. Indiana Dep't of Correction*, 973 F.3d 789, 791-92 (7th Cir. 2020) ........................ 29

*McDonnell Douglas v. Green*, 411 U.S. 792, 801 (1973) ............................................................... 15

*Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 825 (1st Cir. 1991) ..................................................... 42

*Muldrow v. City of St. Louis*, 601 U.S. 346, 354 (2024)............................................................... 27

*Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016)........................................... passim

*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 135 (2000)............................ passim

*Rizzo v. Sheahan*, 266 F.3d 705, 717 (7th Cir. 2001) ................................................................... 27

*Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 726 (7th Cir. 2005) ........................................ 16

*Sylvester v. SOS Children's Villages Illinois, Inc.*, 453 F.3d 900, 904 (7th Cir. 2006) .... 15, 35, 39

*Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981) ........................ 15

*Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994) ....................................... 16, 32

*Wichmann v. Bd. of Trs. of S. Ill. Univ*,180 F.3d 791, 804–05 (7th Cir. 1999) ........................... 29

## STATUTES

28 U.S.C. § 1291 .............................................................................................................................. 1

28 U.S.C. § 1331 .............................................................................................................................. 1

42 U.S.C. § 1981.............................................................................................................................. 11

## TREATISES

Wright & Miller 299 ....................................................................................................................... 15

## JURISDICTIONAL STATEMENT

The District Court had subject matter jurisdiction pursuant to 28 U.S.C. § 1331, as Plaintiff-Appellant, Laith Saud ("Saud") asserted claims under 42 U.S.C. § 1981, as amended by the Civil Rights Act of 1991, against Defendant-Appellee, DePaul University ("DePaul"). This court has appellate jurisdiction pursuant to 28 U.S.C. § 1291. Saud appeals from a final judgment entered by the District Court in favor of DePaul on December 6, 2024 (Dkt. 275). In an order dated December 6, 2024, the court granted summary judgment on all claims. Saud filed a timely Notice of Appeal on January 3, 2025.

## STATEMENT OF THE ISSUES

1. Whether the district court erred in dismissing Plaintiff's comparator and procedural evidence, thereby denying the Plaintiff the opportunity for a jury trial.

2. Whether the district court erred by concluding Plaintiff had not shown evidence of pretext.

3. Whether the district court misapplied the totality-of-the-evidence standard under *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016), by evaluating Plaintiff's evidence in isolation.

4. Whether the district court improperly resolved material disputes of fact and made credibility determinations on summary judgment.

## STATEMENT OF THE CASE

This case arises from DePaul University's discriminatory treatment of Plaintiff Laith Saud ("Saud"), an Arab-American academic and longtime Religious Studies instructor, whose career was derailed after he was subject to a *Campus Watch* article and subsequently falsely accused of misconduct. Dkt. 248, ¶¶ 9-10. Despite a decade of exemplary teaching and student engagement, DePaul employees with a history of discrimination took the false accusations as an opportunity to destroy his career. These opportunities included disparate treatment, a highly irregular Title IX investigation and ultimately banishment from all future employment opportunities at DePaul. *Infra,* pp. 4-5, 7-10. The university's adverse actions were set in motion after external actors launched a campaign targeting Saud's ethnicity, religion, and political speech—culminating in a denial of teaching opportunities without due process, even after investigations failed to substantiate any policy violations. *Infra*, pp. 4, 7-11.

### Campus Watch Article

In mid-April of 2017 Saud was targeted by *Campus Watch*, a publication that targets Arab-American faculty. There is a pattern where faculty are targeted with misconduct allegations following such articles. Dkt. 248, ¶ 9-10, 73. Shortly after the article, Saud's chair Khaled Keshk, canceled his upcoming adjunct classes and then two allegations were brought to Title IX by third parties. *Id.* ¶ 11. When Saud addressed the cancellations to Keshk, Keshk lied to Saud and claimed he canceled all former term courses (which would include David Lysik, comparator A) and would reschedule them, but that was untrue, Keshk only canceled Saud's. *Id.*, ¶ 26. At the time, both Saud and Lysik were in good standing, had clear Title IX records and were subject to the downgrade of adjunct-from-term faculty due to budget cuts. *Id* ¶ 22. But Keshk actually canceled Saud's classes, only Saud's and lied to Saud about it. *Id.* ¶ 26.

3

An investigation stemming from the two allegations, only two days apart, ensued—witness A.R. exonerated Saud and C.M. refused to cooperate with Title IX—Keshk and Title IX investigator Karen Tamburro persisted in trying to find others to accuse Saud, but failed. *Infra*, pp. 4-5.

This environment prompted C.M. to file an unverified complaint against Saud and DePaul (C.M. trial) in late June of 2017. Dkt. 248, ¶ 37. Saud, a 38 year old graduate student at The University of Chicago at the time, did date C.M. who was a 25 year old student at the time. Dkt. 232, Pl. MSJ Ex. 1 (13:20-15:9). The relationship was entirely consensual and not in violation of DePaul's policy. The Illinois trial court would later reject the accuser's claims, rule the encounter consensual, and award Saud judgment on a defamation counterclaim. *Infra,* p. 11. In the period between May and early July, Saud cooperated with Title IX, fully disclosed the nature of the relationship, was cleared by Title IX and requested his own Title IX investigation. Dkt. 253, ¶ 27, Pl. Add. SMF ¶¶ 15-16, Dkt. 248, ¶ 58. During that same time, Keshk was actively trying to find other women to accuse Saud and failed (DePaul now claims, in fact, there were other complaints, it is simply untrue, it is unsubstantiated and diametrically contradicted by Keshk's sworn testimony). Dkt. 248, ¶¶ 41-43, Dkt. 253, Pl. Add. SMF ¶ 32.

Keshk has never actively tried to investigate or find accusers of his white faculty. Dkt. 253, Pl. Add. SMF, ¶ 34, Dkt. 253, Pl. Add. SMF, ¶ 37; Dkt. 248, ¶¶ 71-72. Tamburro, during that same time, worked with Keshk to find other accusers and ignored Saud's request for a cross-complaint. Saud was completely unaware that this behind the scenes investigation was occurring. Dkt. 248, ¶ 45. Tamburro's process deviated sharply from how similarly situated white faculty were treated—raising serious concerns of race-based and retaliatory discrimination. *Infra*, p. 10-11.

Finally, in August, Tamburro reached out to Saud to inform him the original investigation based on C.M.'s allegations was being reopened based on "new evidence." Dkt. 248, ¶ 45.  There was no new evidence, just more colluding between Keshk and Tamburro (the collusion was embarrassingly exposed at the C.M. trial in 2019, highlighted shortly). *Id.* ¶¶ 41-43, 45. Saud's attorneys discouraged him from participating, he compromised with them by sending Tamburro information and expressing his willingness to answer any questions, preferring correspondence on record. *Id.* ¶ 45. Tamburro never took him up on his offer to answer more questions.  *Id.* ¶ 46. C.M. never cooperated. *Id.* ¶ 40.

In October of that year, Tamburro concluded Saud had violated DePaul's policy, it remains unclear how.  Dkt. 248, ¶¶ 49-50. Tamburro did not speak to anyone with specific knowledge about C.M.'s allegations. Dkt. 248, ¶ 47. Tamburro concluded that C.M.'s complaint was "credible", and that Saud had provided "inconsistent information as to when the sexual relationship began." Dkt. 248, ¶ 49. She based her new finding on Saud's answers and information Keshk claimed to have, which Keshk denied having. Dkt. 253, ¶ 48, 55. Tamburro and Keshk then proceeded to meet with Dean Velasco and convince Velasco that Saud should be banned.  Why Keshk was there is unclear or why Tamburro went to Velasco at all, which was not her previous practice remains unclear. Dkt. 248, ¶ 58. Further, Velasco was convinced after meeting Keshk and Tamburro that Saud was guilty of assaulting C.M., which was never even the conclusion of the second iteration of the Title IX investigation, but it seems to be what Keshk and Tamburro were committed to convincing the Dean. *Id.* ¶ 53. Velasco subsequently banned Saud for life from teaching at DePaul or even co-sponsored events, effectively blacklisting Saud as an academic. *Id.* ¶ 54. Saud attempted to appeal, but the Dean claimed he could not appeal as an adjunct; even though the alleged conduct occurred when he was term faculty. *Id.* ¶¶ 55-56.

Between the actions of Keshk and Tamburro and their communication with the Dean, all procedurally available options to Saud to find relief within DePaul were closed off.

### Saud's employment history, the Enhanced Pay Request and Comparators

Laith Saud is an Arab-American academic who taught religious studies at DePaul University for over a decade. Dkt. 248, ¶ 4-5. During his tenure, he earned praise for his teaching, was repeatedly rehired, and his classes were so full there were often waitlists to join. *Id.* However, beginning in 2017, Saud became the target of a coordinated campaign that culminated in DePaul denying him further teaching opportunities and banning him from future employment.

On April 6, 2017, the Middle East Forum published an article on its website "Campus Watch" about Saud. *Id.* ¶¶ 9-10.

This was happening while budget cuts were affecting Saud and Lysik's term faculty positions. *Id.* ¶ 11. Both received a letter from the Dean informing them their term positions would not be available the following year due to budget cuts on April 10th. *Id.* Keshk offered both Saud and Lysik the opportunity to reduce their coursework by one course per quarter and teach as adjuncts. *Id.* But he never fulfilled that offer with Saud. *Id.* ¶ 35.

On May 2, 2017, Keshk's assistant notified the administration that the Religious Studies department wanted to cancel all three of Saud's upcoming courses. Two of these courses were relisted and reassigned to "STAFF". Dkt. 248, ¶ 26. Lysik's courses were not canceled; his courses were reduced from three courses to two courses and the courses were assigned to Lysik on the course listings. *Id.* Keshk could not explain why Saud and Lysik received different treatment in the handling of the Fall course assignments. *Id.*

Keshk was aware that Saud was a popular instructor and there were waitlists for students to enroll in his courses. Dkt. 248, ¶ 5. Saud contacted Keshk on May 3, letting him know that

students were trying to enroll in his course but did not see them posted. Dkt. 248, ¶ 27. Keshk told Saud that he "canceled the term faculty classes now so that we don't have to do it at the last minute." This was not true, because it was not done for Lysik. Dkt. 248, ¶ 27. On May 17, Saud's courses had still not been listed to him, and Keshk told Saud they were "trying to reschedule" him. Dkt. 248, ¶ 28.

On May 24, Keshk told Saud that his courses were "on the books", but Saud's courses had been assigned to "STAFF". Dkt. 2431, ¶ 30. On June 26, a member of the LAS Dean's office informed Keshk that she created an adjunct position for Lysik, so he could be terminated in the system from his full-time role, and that Saud's "adjunct position was terminated" and would be reinstated so that Keshk could "terminate him in the system with an effective date of 7/1/17". Dkt. 248, ¶ 31.

On June 28, Keshk invited Saud and Lysik to request enhanced pay for their adjunct contracts, which he would "solicit" from the Dean. Dkt. 248, ¶ 32. Enhanced pay is issued to adjunct faculty on a discretionary basis. Dkt. 248, ¶ 33. Lysik requested $6,254.83 per course. Saud requested $6,000 per course. Dkt. 248, ¶ 32. Keshk forwarded Lysik's request to Dean Velasco, but did not communicate Saud's enhanced pay request to the Dean. Dkt. 248, ¶ 32.

Lysik's enhanced pay request was not approved by Dean Velasco due to budgetary reasons, but he was offered to teach at the base salary of $4,800 per course. Dkt. 248, ¶ 36. Keshk informed Saud that he would not be offered an adjunct position because "In addition to low projected course enrollments, and thus uncertainties about final course offerings, your compensation requirements far exceed what I am able to pay adjunct instructors." Dkt. 248, ¶ 35. Saud was never offered the opportunity to take the $4,800 that Lysik was and Saud's request for

7

less was taken as a pretext to deny him courses, while Lysik was treated in good faith and his request for more did not disqualify him from future teaching.

On June 29, C.M., through her attorney, filed an unverified complaint in Cook County Court, alleging claims against both Saud and DePaul. Dkt. 248, ¶ 37. DePaul became aware of the lawsuit as early as the next day. Dkt. 248, ¶ 38.

Following the filing of C.M.'s complaint, Tamburro reopened her Title IX investigation. C.M. alleged in her complaint that on a specific night, Saud took her out for drinks, "plied her with alcohol" and took her back to his apartment where he "aggressively" pursued sex with her. Dkt. 248, ¶ 37. As would become clear later, while C.M. and Saud did go out for dinner and drinks one evening during the course (as Saud had told Tamburro in May), her claim that she was "plied with alcohol" and later taken back to Saud's apartment for sex was fabricated. Dkt. 248, ¶ 68; Dkt. 253, Pl. Add. SMF ¶ 30. Saud filed a defamation counterclaim against C.M. Dkt. 248, ¶ 63.

Keshk has a history of both fearing discrimination at DePaul and thus whitewashing it. Saud testified that Keshk repeatedly complained to him about discrimination at DePaul. Dkt. 232, Pl. MSJ Ex. 1 (183:15-17). Keshk ignored prior reports from members of his department about discrimination or bias. This includes that Saud once complained to Keshk about a white faculty member who claimed Saud had an "allegiance" to Saudi Arabia; Keshk brushed off the comment as a joke. Dkt. 253, Pl. Add. SMF, ¶ 34. Keshk also failed to respond to discrimination complaints raised by faculty members, including on at least one occasion when an African American faculty member received death threats. Dkt. 253, Pl. Add. SMF, ¶ 37; Dkt. 248, ¶¶ 71-72.

Lysik had been the subject of a Title IX investigation in 2014. His accuser posted a comment on a Facebook page called "DePaul Confessions" stating "PROFESSOR LISAK a DePaul Catholick [sic] studies Teacher RAPED ME[.]" Dkt. 253, ¶ 74. Schaffer was assigned to investigate. Dkt. 253, ¶ 76. Lysik provided Schaffer with information about a "David Lisak", a professor at another university "whose specialty is rape". Dkt. 253, ¶ 77. Shaffer closed the investigation because she was "unable to turn up any other information", and thanked Lysik for his "help" and "sleuthing". Dkt. 253, ¶ 78. Schaffer had been accused of racial bias by another faculty member. Dkt. 248, ¶ 75.

In 2015, Tamburro conducted a Title IX investigation into another adjunct faculty member from the English Department, Joseph Suglia. Like Saud, Suglia was accused of violating DePaul's ADAH policy. Like Saud, he was investigated by Tamburro. Dkt. 248, ¶ 58.  Unlike Saud, Tamburro's investigation included conducting interviews of witnesses, including Suglia's accuser, who had cooperated with the investigation. Unlike Saud, Tamburro proactively told Suglia that he could file a cross-complaint against his accuser, and Suglia declined to do so. Dkt. 248, ¶ 58. Tamburro found Suglia violated the ADAH policy. Dkt. 248, ¶ 58. Unlike Saud, Tamburro only notified the chair of Suglia's department, and not the Dean of LAS. The chair of Suglia's department determined the discipline against him. Unlike Saud, Suglia was not banned from participating in DePaul activities. Unlike Saud, Suglia was provided the reasons for the adverse finding. Dkt. 248, ¶ 58.

Tamburro herself was the subject of a discrimination complaint by a Title IX investigator, Cheryl Wayne (African American). Wayne complained Tamburro credited a white employee's statements, Title IX investigator Barbara Schaffer, over hers. Dkt. 248, ¶ 25. According to Wayne, Tamburro treated white faculty more favorably during OIDE investigations by offering

"more protection and benefit of the doubt than faculty of color" and that Tamburro would provide "more supervision" of Wayne's cases when the case involved a "white faculty or staff member". Dkt. 248, ¶ 76.

    *The DePaulia* is the university's newspaper. *The DePaulia* is financed by DePaul. This includes the salary of the faculty advisor, the wages of the student journalists, and the office space. *The DePaulia* does not notify readers of this conflict of interest when it reports on lawsuits involving DePaul. Dkt. 248, ¶ 59. In 2017, the faculty advisor for *The DePaulia* was Marla Krause (white). *Id.* Krause encouraged student journalists to pursue the story, telling them it could be the "biggest story" they would work on at the school. Dkt. 248, ¶ 60. When Krause learned the accused faculty member in CM's lawsuit had an Arabic name and that he taught Islamic studies, she commented "the irony is priceless" and noted he was "likely easy to fire". Dkt. 248, ¶ 61. Krause could not explain this comment at her deposition. *Id.* Krause obtained a copy of Saud's curriculum vitae from the Dean of the School of Communications. Dkt. 248, ¶ 61.

    Tamburro told *The DePaulia* that DePaul's ADAH policy does not expressly prohibit relationships between faculty and students, even where the student is enrolled in the faculty member's class. Dkt. 253, ¶ 3. When the paper published an article about C.M.'s lawsuit, it did not include that Saud had filed a defamation claim, it published Saud's name (which the Chicago Sun Times, when it reported on the lawsuit, did not do). Dkt. 253, ¶ 44.

    The C.M. trial court found C.M.'s alleged incident did not occur because the evidence established Saud and C.M. went for dinner and drinks in the Gold Coast, there was a record of when they paid their tab and the time C.M. returned to DePaul that evening, and there was "insufficient time to travel from the Gold Coast to Hyde Park and then from Hyde Park to

10

Lincoln Park in the time allotted." Pl. MSJ Ex. 35, ¶ 5. The trial court also concluded that, given the timeline and evidence, C.M.'s claims of assault could not have happened, the relationship she had with Saud was consensual as C.M. continued to see him well after the class, and that no *quid pro quo* occurred. Pl. MSJ Ex. 35 ¶¶ 1-14. The judge also determined C.M. lied about Saud and awarded him his defamation claim. *Id*. C.M. did not appeal. Dkt. 253, Pl. Add. SMF ¶ 30.

## Procedural History

Saud filed this civil rights action on June 12, 2019, asserting claims under 42 U.S.C. § 1981 against DePaul University and key administrators. Dkt. 1. Following discovery, both parties filed cross-motions for summary judgment. The district court ruled on the cross motions for summary judgment on December 6, 2024. The district court granted DePaul's motion for summary judgment and denied Saud's motion, entering judgment in favor of DePaul and terminating the case [Dkts. 274–276].This appeal challenges the district court's ruling on those motions and the underlying legal and factual determinations that failed to acknowledge the clear record of differential treatment and discriminatory intent.

Saud now seeks vindication for the university's unlawful conduct—conduct that cost him his academic career and continues to cast a shadow over his professional reputation. The undisputed facts, viewed in the light most favorable to the plaintiff, support a finding that DePaul's actions were driven not by policy or performance, but by impermissible bias and discriminatory motive.

## SUMMARY OF THE ARGUMENT

The district court erred in granting summary judgment to DePaul University by failing to view the evidence as a whole, as required under *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016). Plaintiff Laith Saud, an Arab-American academic, provided extensive circumstantial and comparator evidence showing that DePaul's decision to terminate and permanently ban him from teaching was motivated by racial discrimination. The court improperly evaluated each piece of evidence in isolation, overlooked material factual disputes, and made credibility determinations in favor of the Defendant—errors that require reversal.

Saud demonstrated a prima facie case of race discrimination under *McDonnell Douglas* and offered compelling evidence of pretext. He identified white comparators—David Lysik and Joseph Suglia—who were treated more favorably during similar disciplinary investigations despite facing credible allegations. The district court misapplied the similarly situated standard by demanding exact identity, contrary to *Humphries v. CBOCS West*, 474 F.3d 387 (7th Cir. 2007).

Saud also showed that DePaul offered inconsistent and shifting justifications for its actions, and that his Title IX investigation deviated from university norms. The university reopened an investigation after clearing him, despite no new evidence and without complainant participation—unlike how white faculty were treated. Evidence showed that Saud's accuser's claims were fabricated and rejected by a court in a defamation judgment, yet DePaul relied on them to impose severe sanctions.

12

Further, the district court ignored powerful testimony from Cheryl Wayne, a former investigator, detailing racial bias within the office that investigated Saud. It also failed to weigh institutional bias and procedural anomalies that cumulatively point to a discriminatory motive. These errors culminated in a failure to apply the proper summary judgment standard, which requires construing all evidence in the light most favorable to the non-moving party.

Taken together, the evidence presents a compelling narrative of disparate treatment, pretext, and institutional bias. A reasonable jury could conclude that race was the but-for cause of DePaul's adverse actions. Summary judgment must be reversed.

# ARGUMENT

## A. Standard of Review

The Appellate Court reviews a grant of summary judgment de novo. *Duncan v. Fleetwood Motor Homes of Indiana, Inc.*, 518 F.3d 486, 490 (7th Cir. 2008). Because the district court entered summary judgment for the defendant, the Court must view the facts in the light most favorable to Saud, the nonmoving party." See, e.g., *Gerhartz v. Richert*, 779 F.3d 682, 685 (7th Cir.2015); *Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 873 (7th Cir. 2016).

### i. Summary Judgment Standard

Summary judgment is inappropriate if there are any disputed issues over material facts. The court must review the evidence in the record drawing all reasonable inferences in favor of the nonmoving party and making no credibility determinations or weighing any evidence. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 135 (2000); *Cole v. Board of Trustees of Northern Illinois University*, 838 F.3d 888, 895 (7th Cir. 2016). Although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe. *Reeves,* 530 U.S. at 151.

It is axiomatic that the evidence on a summary judgment motion must be viewed in favor of the nonmovant. *Logan v. City of Chicago*, 4 F. 4th 529, 536 (7th Cir. 2021). Credibility determinations, weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. *Reeves*, 530 U.S. at 133 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). That is, the court should "give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is

uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" *Reeves,* 530 U.S. at 150 (quoting Wright & Miller 299).

### ii. Legal Standard for Race discrimination Claims

To survive summary judgment on a race discrimination claim, a plaintiff must provide evidence from which a reasonable jury could conclude the plaintiff would not have suffered the adverse action if he had a different race. *Ortiz v. Werner Enterprises, Inc.* 834 F.D 760, 764 (7th Cir. 2016).

A case of discrimination can be made by assembling a number of pieces of evidence "none meaningful in itself, consistent with the proposition of statistical theory that a number of observations each of which supports a proposition only weakly can, when taken as a whole, provide strong support if all point in the same direction." *Sylvester v. SOS Children's Villages Illinois, Inc.*, 453 F.3d 900, 904 (7th Cir. 2006) (quoting *Mataya v. Kingston,* 371 F.3d 353, 358 (7th Cir. 2004) ("a number of weak proofs can add up to a strong proof"). The question is whether the totality of the evidence shows discrimination, eschewing any framework or formula. *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).

### 1. Prima Facie Race Discrimination

A prima facie case of discrimination is shown where a plaintiff can establish 1) he is a member of a protected class, 2) he was meeting his employer's legitimate business expectations, 3) he suffered an adverse employment action, and 4) he was treated less favorably than similarly situated employees. *McDonnell Douglas v. Green*, 411 U.S. 792, 801 (1973); *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981). If a plaintiff establishes a prima facie claim, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its action. *McDonnell Douglas*, 411 U.S. 792, 82-803. If the employer does so, the burden shifts back to the plaintiff to show evidence of pretext. *Id.* To demonstrate a material

issue of fact with respect to pretext, a plaintiff must show that the explanations given are not credible. *Hudson v. Chicago Transit Auth.*, 375 F.3d 552, 561 (7th Cir. 2004).

If there is a genuine issue of material fact as to any element of the claim, summary judgment must be denied. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

If there is a question of fact as to the believability of an employer's purported reasons for an employment decision then, "even if the evidence presented by [the plaintiff] does not compel the conclusion that [the employer] discriminated against [him] when making its . . . decision, at a bare minimum it suffices to defeat [the employer's] summary judgment motion." *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 726 (7th Cir. 2005). Employers long ago "taught their supervisory employees not to put discriminatory beliefs or attitudes into words oral or written." *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994).

"[A]t summary judgment the Plaintiff is not required to establish pretext *and* provide evidence of a discriminatory motive by the Defendant. . . . This level of proof is only required when a Plaintiff's case is submitted to a finder of fact." *Rudin*, 420. A plaintiff's prima facie case of discrimination (as defined in *McDonnell Douglas*, and subsequent decisions), combined with sufficient evidence for a reasonable factfinder to reject the employer's nondiscriminatory explanation for its decision, is sufficient for a jury to reasonably infer intentional discrimination. *Reeves v. Sanderson Plumbing Products*, 530 U.S. 133, 133 (2000).

## B.  Plaintiff's Comparator Evidence was Improperly Dismissed

The district court claimed that Lysik and Suglia were not similarly situated, but the record clearly shows they were. With respect to Lysik, both he and Saud were term faculty under Keshk, had their term faculty contracts canceled in April of 2017 and were in talks with DePaul to return under an adjunct teaching contract. Infra, pp. 5-7. Lysik faced a rape accusation, which DePaul dismissed with minimal investigation because it could not contact his accuser. *Supra*, p.

16

9. In the case of Saud, his accuser did not cooperate with the investigation, yet Saud was subjected to an aggressive Title IX investigation which led to a finding that resulted in Saud's permanent ban. *Supra,* pp. 4-5, 8-9. When comparing how Tamburro treated Suglia versus how she treated Saud, the record clearly shows that Tamburro provided Suglia with a fairer process and outcome than Saud, and that she treated white faculty under investigation more favorably than non-white faculty. *Supra,* pp. 8-9. The court failed to apply the material similarity test set out in *Humprhies*, instead applying a stricter-than-required standard and effectively demanding one-to-one mapping, which the Seventh Circuit expressly prohibits. See *Humphries v. Cbocs West*, 474 F.3d 387, 404-405 (7th Cir. 2007).

The district court acknowledged that Saud met the first three elements of a prima facie case on both the issues of the failure to re-hire (Dkt. 275, p. 21); and the ban that resulted from Tamburro's second iteration of her Title IX investigation (Dkt. 275, p. 29). He has shown 1) he is a member of a protected class, 2) he was subject to an adverse employment action, and 3) he was meeting the employer's legitimate expectations and was qualified for employment at DePaul. *Id.* the district court held that on both the non-rehire and the employment ban, Saud failed to establish a genuine issue of material fact as to the fourth prong: whether he was treated less favorably than similarly situated employees. On this, the district court failed to correctly apply the comparator analysis and summary judgment should be reversed. The district court also failed to consider whether Tamburro's second iteration of her Title IX investigation itself constituted an adverse employment action. On this as well the district court should be reversed.

There is no "magic formula for determining whether someone is similarly situated." *Chavez v. Ill. State Police*, 251 F.3d 612, 636 (7th Cir.2001). "[T]he similarly-situated inquiry is flexible, common-sense, and factual. It asks 'essentially, are there enough common features

between the individuals to allow a meaningful comparison?'" *Coleman v. Donahoe*, 667 F.3d 835, 841 (7th Cir. 2012). Comparators "need not be identical in every conceivable way", the Court looks "for comparators, not clones." *Id*. at 846. The similarly-situated requirement "should not be applied mechanically or inflexibly." *Humphries v. Cbocs West*, 474 F.3d 387, 404-405 (7th Cir. 2007) (quoting *Hull v. Stoughton Trailers*, LLC, 445 F.3d 949, 952 (7th Cir.2006).

The similarly situated requirement "normally entails a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Humphries*, 474 F.3d at 405. In other words, this Court has emphasized that the similarly situated inquiry is a flexible one that considers "all relevant factors, the number of which depends on the context of the case." *Id*. An employee need not show complete identity in comparing himself to the better treated employee, but must show "substantial similarity." *Id*.

"It is important not to lose sight of the commonsense aspect of this inquiry. It is not an unyielding, inflexible requirement that requires near one-to-one mapping between employees — distinctions can always be found in particular job duties or performance histories or the nature of the alleged transgressions." *Id*. The comparator inquiry:

> [S]imply asks whether there are sufficient commonalities on the key variables between the plaintiff and the would-be comparator to allow the type of comparison that, taken together with the other prima facie evidence, would allow a jury to reach an inference of discrimination or retaliation — recall that the plaintiff need not prove anything at this stage.

*Id*. This is not meant to be an onerous requirement. *Id*. The evidence presented by a plaintiff need not be "overwhelming" or "destined to prevail." *Id*. The plaintiff only needs to present "some

evidence from which one can infer that the employer took adverse action against the plaintiff on the basis of a statutorily proscribed criterion." *Id.*

The district court found Lysik and Suglia dissimilar due to minor distinctions. Because the district court applied an overly stringent comparator analysis that ignored commonsense in the case of both of Saud's comparators, summary judgment should be reversed.

### i. On the issue of Saud's non-rehire, Lysik is a proper comparator and the evidence shows Lysik was treated more favorably than Saud

Seventh Circuit precedent only requires that comparators be similarly situated in material respects. *Humphries*, 474 F.3d at 405. The district court erred by determining Lysik was not a proper comparator because: (1) like Saud, Lysik was a term faculty member under Keshk's supervision; (2) his term contract was canceled at the same time as Saud's; (3) he faced a similar report of a potential ADAH violation; and (4) he requested enhanced pay to teach as an adjunct above Saud's requested amount. Saud and Lysik are comparable. *Supra* pp. 7-8. Lysik was treated more favorably because he was brought back under an adjunct contract, and Saud was not. Despite their similarities, Lysik's teaching job was protected, while Saud's was not.

The district court concluded that because "Lysik did not engage in similar conduct and mitigating circumstances explain DePaul's different treatment of him" (Dkt. 275, p. 22), Saud could not establish the fourth prong of the prima facie case. The district court held there were "material differences" between the allegations against Lysik and Saud that "taken together, confirm Lysik is not a valid comparator." Dkt. 275, p. 23. The district court held this was because Lysik's accuser made the allegation on a Facebook page, while "the allegation against Saud was made by an attorney representing the complainant." *Id.* The district court further held that DePaul "could not identify the person" who made the accusation about Lysik, whereas it was able to identify Saud's accuser. *Id.* Further, the district court held that "because of the

[accuser's] misspelling" of Lysik's name, the allegation against Lysik was unclear, whereas C.M. had "unequivocally" identified Saud, "and Saud admitted to having sex with C.M. during his interview with Tamburro – substantiating part of C.M.'s claim." *Id.* The district court concluded that "a more appropriate comparator would be an identifiable faculty member who was accused of misconduct by a known or identified student but who was nonetheless permitted to teach as an adjunct." *Id.* Here, the district court applies an unreasonably stringent application of the comparator analysis and must be reversed.

First, the district court drew distinctions between Lysik and Saud which are immaterial to the question of whether one was treated more favorably than the other. Second, the "mitigating circumstances" the district court identifies are *evidence* that Lysik was treated more favorably in the Title IX investigation process than Saud, and the district court failed to consider this. In so doing, the district court violated the summary judgment standard by drawing inferences in DePaul's favor, which a jury is not required to believe. The district court also violated the summary judgment standard in the comparator analysis because it weighed the evidence, which is the province of the jury.

The comparator analysis "is not an unyielding, inflexible requirement that requires near one-to-one mapping between employees — distinctions can always be found in particular job duties or performance histories or the nature of the alleged transgressions." *Humphries*, 474 F.3d at 405. Lysik was accused of rape. As the district court acknowledges, the accusation was made on a Facebook page specific to **DePaul**. Dkt. 275, p. 22 (the name of the Facebook page is "DePaul Confessions"). The subject of the complaint was not unclear; the comment read "PROFESSOR LISACK a DePaul Catholick [sic] studies Teacher RAPED ME." *Id.* There is nothing unclear about this accusation, and rape is indisputably a violation of DePaul's ADAH

20

policy. In Saud's case, the lien letter sent by C.M.'s attorney in April of 2017 accused Saud of "repeated acts of sexual misconduct and reckless behavior". Dkt. 253, ¶ 21. In both cases, the OIDE office was sent the accusation by an external department and opened an investigation. Dkt. 253, ¶ 24, 76.

Neither Lysik's accuser nor Saud's accuser reported their accusation to DePaul's OIDE office, and neither accuser cooperated in a Title IX investigation. It is immaterial that C.M. was represented by an attorney and the Facebook accuser was not. It is immaterial that OIDE could not identify "Donny Juan" but could identify C.M., it is only relevant that neither participated in the investigation. OIDE received the reports alleging a member of faculty violated the ADAH policy with respect to a student, which prompted an investigation.

The district court points out that Lysik's accuser misspelled his name, giving credence to DePaul's proffered reasons for not fully investigating the rape accusation. Dkt. 275, p. 22-23. Lysik's accuser addressed him by job title and only slightly misspelled his name. The information was sufficient for OIDE to understand at the time it received the information that Lysik was the person accused, as OIDE contacted Lysik (and only Lysik) about the accusation. Dkt. 253, ¶¶ 74-78. Thus, the district court's conclusion that this was a "mitigating" factor preventing a proper comparison between Lysik and Saud is the sort of "one-to-one" mapping the Seventh Circuit cautioned against in *Humphries*, supra.

Lysik denied the allegation, and OIDE believed him. OIDE conducted no substantive investigation, nor was a report ever issued with formal findings, as was done with Saud. It did not ask Keshk, Lysik's supervisor, to gather information about Lysik to assist its investigation, as it did with Saud. It did not reach out to other students to inquire about Lysik's conduct, as it did with Saud. *Id.* It is immaterial that "Donny Juan" was not identified, and C.M. was, because

neither communicated with OIDE about their accusation. What matters is that OIDE ended its investigation in Lysik's case when it couldn't reach the accuser. The reason for the lack of communication is immaterial; OIDE's inconsistent response in such situations is what's significant.

In the case of C.M., OIDE could not communicate with her because she refused to cooperate with the investigation. Tamburro still proceeded to fully investigate Saud.

The district court also ignored evidence Saud presented through the testimony of Cheryl Wayne, which establishes that it was not part of OIDE's practice to investigate a report if the accuser did not cooperate in the investigation. Dkt. 248, ¶ 13. This is the operative comparison. In Lysik's case, a white faculty member was not investigated because OIDE could not talk to "Donny Juan", whereas with Saud, it investigated him even though it could not talk to C.M.

Furthermore, at the time the employment decisions were made with respect to both Lysik and Saud, both were in the same situation: Both had no record of an ADAH policy violation. *Id.* ¶ 22. The district court incorrectly concludes that "the differences between Saud, who was found to have violated the policy, and Lysik, who was not, 'render[s] the comparison effectively meaningless." Dkt. 275, p. 30 (quoting *Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 405 (7th Cir. 2007)). At the time the decision not to rehire Saud was made, neither he nor Lysik had a record of a policy violation, nor an open investigation. Accordingly, not only can Saud show that Lysik is a proper comparator, but he can show that Lysik was treated more favorably than Saud during his OIDE investigation and during contract negotiations.

*Ezell v. Potter*, is instructive here. The *Ezell* Court noted that in employment discrimination cases involving disciplinary action, plaintiffs can establish a prima facie case under the *McDonnell Douglas* framework by showing that similarly situated employees outside

their protected class engaged in similar misconduct but were treated more leniently. *Ezell v. Potter*, 400 F.3d 1041, 1049 (7th Cir. 2005). The district court had rejected Ezell's comparators, finding their misconduct too dissimilar. The Seventh Circuit disagreed with the district court's narrow interpretation of "similarly situated," emphasizing that comparators need only have engaged in *similar*, not identical, conduct. *Id.*, at 1050. The appellate court found that misplacing certified mail and falsifying time records could reasonably be considered comparable in seriousness to Ezell's alleged infraction. *Id.* This raised a triable issue as to whether Ezell was treated more harshly than others who engaged in similar misconduct. *Id.*

Having provided sufficient evidence to show that they were similar enough, the district court erred by disregarding the evidence that Lysik was treated more favorably when budgetary cuts led to both he and Saud's term faculty contracts being canceled. The district court failed to grapple with clear evidence that DePaul treated Lysik more favorably than Saud. Both were invited by Keshk to request increased adjunct pay; Lysik asked for more money than Saud. Yet Saud's request was used as a justification to block him from teaching altogether, while Lysik was simply offered the standard rate and allowed to teach. *Supra*, pp. 5-8. The court acknowledged these facts but failed to draw the obvious inference of disparate treatment, instead accepting DePaul's justification at face value.

The district court failed to draw a reasonable inference from undisputed evidence of disparate treatment between Saud and Lysik. Although the court acknowledged that Lysik was permitted to teach despite requesting higher pay, it dismissed the significance by noting that he "ultimately accepted just $4,800 per course" (Dkt. 275, 26). This reasoning misses the point: unlike Saud, Lysik's request did not result in a categorical denial. The court's conclusion ignores

the disparate outcomes and fails to construe the facts in the light most favorable to Saud, as required at summary judgment.

In a footnote, the District Court acknowledges that, whereas Lysik's enhanced pay request was communicated to the Dean's office, Saud's was not. Dkt. 273, p. 15, FN 9. This is evidence that Lysik was treated more favorably than Saud. It also contradicts DePaul's claim that it had been working in good faith to bring Saud back to teach until the C.M. lawsuit was filed. It demonstrates that Keshk never intended to bring Saud back to adjunct and was not engaging in good faith when discussing with Saud plans to return him to teach in the Fall. A reasonable jury could find pretext because Keshk never relayed Saud's request to the Dean, yet falsely blamed "salary demands" when rejecting him.

Because the district court improperly applied the comparator analysis, and because Saud can show Lysik was treated more favorably, summary judgment must be reversed.

### ii. On the issue of the Title IX investigation, Lysik and Suglia are proper comparators, and the evidence shows they were treated more favorably

The district court erred by concluding that neither Lysik nor Suglia were proper comparators and that Saud did not show he was treated worse. After Saud was cleared in Tamburro's first iteration of the Title IX investigation in May 2017, DePaul reopened the investigation without new evidence, again without C.M.'s participation, and relied solely on disputed interpretations of prior statements. *Supra,* pp. 4-5. Tamburro also failed to notify Saud that she was investigating him in connection to "reports" made by Keshk. Dkt. 248, ¶ 45. That alone raises procedural red flags and illustrates Saud was treated less favorably during the Title IX investigative process than either Lysik or Suglia.

In the case of Lysik, as discussed *supra*, DePaul did not proceed further with the investigation into whether Lysik had raped a student because it could not contact the accuser.

24

This was consistent with its practice. Dkt. 248, ¶ 13. Because Lysik was treated more favorably in the process than Saud, he experienced a favorable outcome, whereas Saud did not. The district court failed to draw this reasonable inference in favor of Saud.

In the case of Suglia, who also faced similar allegations of misconduct, Tamburro did not try to manipulate his investigation to produce an adverse finding, as she did with Saud. Tamburro also did not involve Suglia's supervisor in the investigation, as she did with Saud. Tamburro did not report her findings to the Dean, as she did with Saud. Dkt. 248, ¶ 58; Dkt. 256, p. 13. During her investigation of Suglia, Tamburro also proactively informed Suglia that he could make a countercomplaint against his accuser. Dkt. 248, ¶ 58. Tamburro did not do this for Saud, and when Saud asked to make a countercomplaint against his accuser, Tamburro did not respond to him. *Id.* ¶ 45. Suglia was not banned from participating in DePaul-sponsored or co-sponsored events. Dkt. 248, ¶ 54. Importantly, Suglia's negative finding of an ADAH violation was the product of a robust investigation that involved Tamburro interviewing the accuser and reviewing other physical evidence.

By contrast, Tamburro never spoke with Saud's accuser, did not collect any other evidence regarding C.M.'s claims, and no student she spoke with corroborated that Saud violated any part of the ADAH policy. Dkt. 248, ¶¶ 40, 47. Tamburro, an attorney, relied on C.M.'s *unverified* complaint and an *omission* in Saud's verified Answer to C.M.'s complaint to string together the conclusion that Saud had lied about when his sexual relationship with C.M. began. Dkt. 248, ¶ 49. This is problematic because Tamburro credited unsworn allegations made in C.M.'s complaint, without ever speaking with C.M. The record shows she did not do this with Suglia and this was not the practice for Title IX investigations.

25

The district court failed to account for key undisputed facts that undermine its reasoning and support an inference of pretext. Although the court acknowledged that Tamburro never contacted Saud to clarify any perceived discrepancies between his written statements and his May interview (Dkt. 275, p. 17), it failed to consider that Saud explicitly invited Tamburro to reach out to him with questions. This omission was particularly consequential in the court's analysis of whether Suglia was a proper comparator, as it disregarded evidence suggesting a lack of investigative fairness and consistency—core to Saud's claim of discriminatory treatment.

In considering whether Tamburro's stated Title IX conclusion was "honestly" believed, the district court failed to consider that Tamburro purposefully did not address this perceived "inconsistency" by asking Saud to clarify the question directly, as he invited her to do. The district court also failed to consider that Tamburro fabricated the "inconsistency" altogether, because Saud testified, and Tamburro's notes corroborate, that Saud told Tamburro he and C.M. socialized during the class. This is significant, because the district court acknowledged the domino effect that Tamburro's investigation had on Saud's career (Dkt. 275, p. 32). Tamburro did not do this with Suglia, but rather, Suglia was provided a fair process to defend himself, and one consistent with OIDE's typical practice. *Supra*, pp. 9.

The district court accepted DePaul's claim that Keshk "received" reports, rather than that Keshk fabricated additional reports to aid Tamburro's Title IX investigation, drawing inferences in DePaul's favor. Keshk acknowledged he was instructed to provide information regarding Saud to Tamburro. Dkt. 248, ¶ 41. There is no record suggesting Tamburro did the same for Suglia. *Id* ¶ 58. Moreover, Suglia was not banned from participating in DePaul-sponsored or co-sponsored activities, Saud was. *Id.* Finally, Tamburro did not report Suglia's violation to the Dean, but did so with Saud. *Id*. On this last point, the district court used this fact to distinguish Saud from

Suglia, and hold that they could not therefore be proper comparators because a different decisionmaker "meted out his punishment". Again, failing to view the evidence in the light most favorable to Saud, the district court failed to consider that Tamburro is the reason that the Dean "meted out" punishment in Saud's case, as opposed to his direct supervisor, as she did in Suglia's case.

The district court failed to properly apply the comparator analysis with respect to the Title IX investigation. There is a genuine issue of material fact as to whether Saud was treated less favorably in the Title IX process than other similarly-situated white male faculty, and summary judgment should be reversed.

### 1. Tamburro's discriminatory Title IX investigation was, in itself, an adverse employment action

The district court entirely ignored Saud's well-supported argument that Tamburro's Title IX investigation was independently an adverse employment action. Dkt. 275, p. 20, FN 11. The district court only addressed Tamburro's Title IX investigation in the context of its pretext analysis. *Id.*, pp. 32-33. For the reasons discussed *Infra*, Sec. C, the district court failed to properly apply the summary judgment standard or legal standard in its analysis of Tamburro's Title IX investigation, and its failures warrant reversal.

Tamburro's Title IX investigation was an independent adverse action. *Rizzo v. Sheahan*, 266 F.3d 705, 717 (7th Cir. 2001); *Muldrow v. City of St. Louis*, 601 U.S. 346, 354 (2024). The words "discriminate against," refer to "differences in treatment that injure" employees. *Id.* (quoting *Bostock v. Clayton County*, 590 U. S. 644, 681 (2020)). Tamburro's Tile IX investigation resulted in the determination that Saud was ineligible for rehire and banned from participating in DePaul events. The district court should have considered Tamburro's Title IX investigation as an independent adverse action. For the same reasons addressed *Supra*, Sec. B

27

and *Infra,* Sec. C, Saud has provided evidence from which a reasonable jury could infer Tamburro discriminated against him during her investigation.

### C.  The District Court Erred by Concluding Saud Did Not Show Evidence of Pretext

The district court improperly granted summary judgment despite a substantial factual record from which a reasonable jury could infer that DePaul's stated reasons for not rehiring Saud were pretextual. In May 2017—before any lawsuit by C.M. was filed and after Saud had been cleared in an initial investigation—Keshk canceled all of Saud's courses, assigned them to "STAFF," and effectively blocked his return, while allowing a white comparator to continue teaching under more favorable terms. *Supra,* p. 7. Although DePaul claimed Saud violated university policy, its own officials, including the key decisionmaker, admitted the policy did not prohibit the conduct in question. Dkt. 248, ¶ 3. Evidence also showed that Keshk fabricated reports at the urging of DePaul's investigator, offered inconsistent explanations for the employment decision, and appeared motivated by self-interest to align with university leadership amid faculty complaints of discrimination and his own reappointment process. *Supra,* pp. 7-8. The district court overlooked these facts, failed to consider them collectively, and resolved disputes in DePaul's favor—contrary to the requirement that all reasonable inferences be drawn in Saud's favor at summary judgment. When viewed holistically, the record supports a finding that DePaul's shifting, unsupported justifications were a cover for discrimination, and summary judgment must be reversed.

Pretext, *i.e.* a lie, is an essential part of the analysis for employment discrimination cases and can be drawn out in a number of ways. See *Marshall v. Indiana Dep't of Correction*, 973 F.3d 789, 791-92 (7th Cir. 2020). For example, pretext is shown if the decision was foolish or unfair. *Wichmann v. Bd. of Trs. of S. Ill. Univ*,180 F.3d 791, 804–05 (7th Cir. 1999) *vacated on other grounds*, 528 U.S. 1111 (2000) ("[A] defendant cannot escape the fact that a jury must use

28

its good common sense in addressing how much, if at all, the foolishness or unfairness of the employer's decision weighs in the evidence of pretext."). Pretext is shown if an employment decision was riddled with error. *Duncan v. Fleetwood Motor Homes*, 518 F.3d 486, 492 (7th Cir. 2008) ("We are mystified, then, that Fleetwood would say Duncan could not perform the job of material handler when he was doing exactly that on a daily basis without incident or criticism.") Pretext is also shown if the employment decision was unreasonable. *Duncan*, 518 F.3d at 492 ("We have explained that the honesty of an employer's statement is often revealed by analyzing its reasonableness; the more objectively reasonable the explanation, the more likely it honestly motivated the challenged employment action."). Pretext can also be shown when a decision lacked good cause. *Bullard v. Sercon Corp.*, 846 F.2d 463, 466 (7th Cir. 1988) ("The fact that a black worker is fired or laid off without good cause does not establish racial discrimination. It may in some cases be evidence of discrimination").

Rather than evaluate simply whether there is evidence of pretext, the district court resolved each piece of evidence pointing to pretext by deferring to DePaul's justifications and weighing evidence in its favor. The legal precedent on this issue affords no such deference to a defendant-employer as was given to DePaul in this case. See *Reeves*, supra, at 151 ("although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe"). Summary judgment should be reversed.

### i.    The Evidence of Disparate Treatment Supports a Finding of Pretext

The district court ignored caselaw that holds that evidence of disparate treatment can be used to show pretext. *Jolll v. Valparaiso Cmty. Schs.*, 953 F.3d 923, 929 (7th Cir. 2020). As discussed *Supra*, Sec. B, Saud provided evidence of disparate treatment from which a reasonable jury could infer race discrimination. This is the case with respect to each of his alleged adverse actions.

### ii.    The Evidence that Saud was Punished for Conduct Not in Violation of DePaul's Policy Supports a Finding of Pretext

The district court failed to grapple with the contradiction at the heart of DePaul's justification for its adverse actions: it acknowledged that university policy does not prohibit faculty-student relationships—even when the student is currently enrolled in the faculty member's course (Dkt. 275, p. 9)—but nonetheless accepted that Saud was punished for allegedly violating that very policy. (Dkt. 275, p. 9). While the court briefly noted it would view this fact in the light most favorable to Saud (Dkt. 275, p. 9, FN 6), it ultimately dismissed its significance, asserting that the relevant question was whether decisionmakers "honestly believed" Saud violated the policy (Dkt. 275, p. 36). In doing so, the court failed to draw a reasonable inference of pretext from the policy and the evidence showing that key decisionmakers, including Tamburro, publicly acknowledged the policy did not apply as it was later enforced against Saud. Dkt. 248 ¶ 3 (Pl. MSJ Ex. 18-19). This omission undermined the court's pretext analysis and improperly insulated DePaul's rationale from scrutiny.

The district court concluded Saud did not provide evidence that "the relevant actors and decisionmakers believed his conduct did not violate the policy" (Dkt. 275, p. 37), but this conclusion belies the evidence in the record, which amply shows Tamburro was aware the policy did not provide a blanket prohibition. Tamburro was interviewed by the school newspaper, *The DePaulia*, after C.M. filed her complaint, and in that interview Tamburro confirmed the policy does not prohibit relationships between faculty and students. Dkt. 248 ¶ 3 (Pl. MSJ Exs. 15, 18-19).

The district court failed to draw a reasonable inference in Saud's favor that he was punished for conduct that was not prohibited at DePaul, that Tamburro was aware of this when

she issued her finding, and that her conclusion that Saud had violated the policy was evidence of

a mask for unlawful discrimination.

### iii.    The Evidence that Keshk Fabricated Reports Against Saud Supports a Finding of Pretext

Showing again a propensity to favor DePaul's evidence in this case, the district court

accepts as true that Keshk received reports "made by others" (Dkt. 275, p. 36, FN 21). Keshk

explicitly testified at C.M.'s trial there were no other complaints against Saud and his non-rehire

was solely due to budget reasons. See *Infra*, Sec. E. There is no evidence that Keshk received

reports "made by others". Rather, the evidence shows that Keshk fabricated the reports because

he was prompted by Tamburro to help with her investigation. *Supra*, pp. 4-5. No student or

former student corroborated Keshk's claims, and those "reports" did not lead to information of a

policy violation. Dkt. 248, ¶¶ 41-44. Moreover, Saud was never made aware that Tamburro was

investigating him for these additional "reports" (Dkt. 248, ¶ 45), thus furthering the evidence of

pretext.

### iv.    The Evidence that Saud's Classes were Canceled in May 2017 Supports a Finding of Pretext

DePaul canceled Saud's courses and blocked his adjunct position in May 2017, before the

C.M. lawsuit was filed. *Supra,* pp. 6-7. Yet, DePaul repeatedly invoked that lawsuit as the reason

for Saud's exclusion.  The court failed to draw a reasonable inference that the decision was pre-

determined, or at least not honestly motivated by the lawsuit — which hadn't yet been filed.

The district court acknowledged that in May 2017, before C.M. filed her lawsuit and after

he was cleared from Tamburro's first iteration of the investigation, Keshk canceled all three of

Saud's courses for the fall 2017 semester and relisted two as assigned to "STAFF", whereas

Lysik only had one of his courses canceled and the other two were assigned to him. Dkt. 275, p.

27. The district court also acknowledges Keshk could not explain this discrepancy when asked about it during his deposition. *Id.*

The district court goes on to disregard the evidence, because the "unusual deviation from the standard procedure[]" was not accompanied by evidence  that Keshk's "statements" would permit a reasonable inference of discriminatory motive." Dkt. 275, p. 27. The district court concluded "[a]ssuming that the decision to cancel Saud's courses for the upcoming quarter deviated from the ordinary procedures or resulted in unfair treatment, they have nothing to do with race. Nor is there evidence suggesting that the differences were intended to 'cover up more nefarious motives.'" Dkt. 275, p. 27.

The district court narrowly requires evidence of "statements" by Keshk that would point to a discriminatory motive, when such evidence is not required to show pretext or survive summary judgment. Employers long ago "taught their supervisory employees not to put discriminatory beliefs or attitudes into words oral or written." *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994). The district court violated the legal standard for race discrimination claims at summary judgment.

The district court ignored other evidence of discriminatory motive. It ignored evidence that Keshk never intended to return Saud to teach, including his shifting justifications and the disparate manner in which he treated Saud and Lysik at the same time. *See supra*, pp. 6-8 (Lysik requested higher pay than Saud, and while both were denied their enhanced pay requests, Lysik was offered the base salary for adjunct contracts and Saud was not. Rather, Keshk told Saud his "salary demands" were too high). Moreover, Saud was "terminated" in the system as "adjunct" faculty, whereas Lysik's "term faculty" position was terminated so that an adjunct faculty status could be created for him. *Id.* When viewing the evidence holistically, Keshk's "deviation" when

he canceled all of Saud's courses but did not do so with Lysik is evidence that Keshk intended not to return Saud to teach as early as May 2017. This is evidence that Keshk's stated reason, that "low projected course enrollments" were part of the reason for his decision, was pretext, because he created the conditions for the low enrollments when he assigned Saud's courses to "STAFF", even though he acknowledged Saud was a popular instructor and had waitlists to enroll in his courses. Dkt. 248, ¶ 5 (Pl. MSJ Ex. 2).

The May 2017 cancellation of Saud's courses is also evidence that Keshk's later assertion, raised for the first time during this litigation, was pretext. Keshk testified at his deposition that the C.M. lawsuit was a "black cloud" over Saud and after learning of the allegations, he decided not to bring Saud back to teach. Dkt. 275, p. 16, 25, 27. But the C.M. lawsuit had not been filed when Keshk canceled Saud's courses for the Fall, terminated him in the system, or stalled on his adjunct contract negotiations. *Supra,* pp. 6-8. The district court was required at the summary judgment stage to disregard evidence favoring DePaul and to construe the evidence of the May cancellation of courses and faculty status records, along with the circumstances surrounding Lysik and Saud's enhanced pay requests, in Saud's favor. *See Reeves*, supra, at 151 ("although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe"). A reasonable jury could infer from this evidence that the decision to remove Saud occurred in May 2017, and the "black cloud" justification was pretext.

### v.    The Evidence of Shifting Justifications Supports a Finding of Pretext

DePaul's reasons for not rehiring Saud have shifted repeatedly over time. This lends an inference to pretext that the district court failed to properly consider. "One can reasonably infer pretext from an employer's shifting or inconsistent explanations for the challenged employment decision." *Appelbaum v. Milwaukee Metro. Sewerage Dist.*, 340 F.3d 573, 579 (7th Cir. 2003).

Each justification that DePaul has proffered has been contradictory or disproven by comparators or facts.

In this case, DePaul's justifications shifted accordingly: DePaul first claimed it would not rehire Saud because he requested too much money and there were low projected enrollments for his courses. When Keshk testified at C.M.'s trial, he stated Saud was let go due to budget cuts and he explicitly testified there were no other complaints against Saud and that the lawsuit was not the reason he was not rehired. Dkt. 253, Pl. Add. SMF ¶ 32. After this lawsuit commenced, and for the first time ever, Keshk testified that the lawsuit was a "black cloud" over Saud and it was for this reason he did not rehire Saud. Dkt. 253, ¶¶ 51-52. As discussed in the sections, *Supra,* Sec. B-C, Saud was able to show that these justifications were pretext. But in addition to the reasons discussed *supra*, the shifting nature of the justifications permit a reasonable inference of pretext.

The district court disregarded DePaul's shifting explanations because it concluded Saud "fail[ed] to meaningfully develop any argument or point to any evidence from which a jury could infer dishonesty from the differing testimony." Dkt. 275, p. 34. This is incorrect. The district court failed to consider evidence addressed by Saud that would allow a reasonable jury to infer the explanations were dishonest and a mask for unlawful discrimination. This includes that Keshk told Saud at the outset that DePaul would discriminate against him. Dkt. 248, ¶ 17. Saud put forth evidence that Keshk ignored faculty complaints of discrimination or racism, including death threats. *Supra,* p. 8. Keshk was up for reappointment by the Dean during this timeframe and testified Saud was going to "throw him under the bus" (*Supra,* p. 7), lending inference that he was trying to curry favor with DePaul; Keshk helped Tamburro with her investigation by fabricating additional reports (*Supra,* pp. 4-6). Keshk testified inconsistently about the reasons

34

Saud was not brought back to adjunct. Dkt. 253, Pl. Add. SMF ¶ 32. The district court addresses

this as "passing references" under the section "Other Disparities", failing to consider it

holistically, or in the context of pretext. Dkt. 275, p. 38. Looking at this evidence holistically and

in the light most favorable to Saud, as the district court was required to do, a reasonable

inference can be drawn that Keshk was aware that DePaul would discriminate against Saud and

helped it because he wanted to curry favor with DePaul so that he could protect his position. See

*Sylvester v. SOS Children's Villages Illinois, Inc.*, 453 F.3d 900, 904 (7th Cir. 2006).

The district court concluded that, despite the evidence of pretext, Saud did not present

evidence that would permit an inference of mendacity. Dkt. 275, p. 25. The court cites to *Bagwe*

*v. Sedgwick Claims Management Services, Inc.* for this proposition, but *Bagwe*'s holding

supports Saud's argument. In *Bagwe*, the Seventh Circuit held the plaintiff did not show

evidence of pretext permitting "an inference of mendacity" when she argued that the employer's

statement that her termination was not related to performance, but later stated she was fired for

interpersonal reasons. *Bagwe v. Sedgwick Claims Management Services, Inc.*, 811 F.3d 866, 881

(7th Cir. 2016). The Seventh Circuit held the inconsistency did not show pretext, because the

company did not dispute that the plaintiff had met her metrics, and the distinction was

"semantic." *Bagwe*, 811 F.3d at 881.

The *Bagwe* Court recognized, however, that "[w]here decisionmakers' stated rationales

are 'sufficiently inconsistent or otherwise suspect,' a summary judgment cannot stand." *Id.*

(quoting *Hitchcock v. Angel Corps, Inc.*, 718 F.3d 733, 738 (7th Cir. 2013)). Where the

explanations are "actually [] shifting and inconsistent", an inference of mendacity can be made.

*Id.* In this case, the district court treated a showing of "mendacity" as an additional requirement,

rather than a synonym for lying, which is what the term means. Saud provided ample evidence from which a reasonable jury could infer mendacity, and summary judgment should be reversed.

### D. The District Court Failed to Apply the Totality of the Evidence Standard Required by Ortiz

The district court erred by failing to assess the totality of the evidence, fragmenting Saud's claims and analyzing each piece in isolation rather than considering their cumulative force as required under *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016). Saud presented a robust factual record that included comparative evidence of differential treatment and pretext, sworn testimony from Cheryl Wayne and others corroborating institutional racial bias, and indications of investigative prejudice, such as A.R.'s testimony that Tamburro's questioning suggested a pre-determined effort to incriminate Saud. Dkt. 275, p. 12. The court acknowledged but failed to meaningfully consider this evidence, along with contextually significant events such as an article in Campus Watch, and the targeted publication in the DePaul school paper after administrators learned Saud's Arabic name and that he taught Religious Studies, and evidence that high-ranking officials flagged Saud for his political views—something not done with other faculty. *Supra,* p. 3m 248, ¶¶ 58-61. This was all presented against a backdrop of widespread faculty concerns over racial bias at DePaul. Dkt. 248, ¶¶ 69-76. Taken together, these facts would allow a reasonable jury to conclude that Saud's race was a motivating factor in the adverse actions taken against him, and the district court's failure to view this evidence holistically warrants reversal of summary judgment.

The Seventh Circuit in *Ortiz v. Werner Enterprises, Inc.* did not set out to create a separate test for discrimination cases, but rather to remind and admonish courts that the legal standard "is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race … or other proscribed factor caused the discharge or other adverse

employment action." *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). The Court stated:

> Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself—or whether just the "direct" evidence does so, or the "indirect" evidence. Evidence is evidence. Relevant evidence must be considered and irrelevant evidence disregarded, but no evidence should be treated differently from other evidence because it can be labeled "direct" or "indirect."

*Id.*

The Seventh Circuit took issue with the district court's treatment of each method as having its own elements and rules. Applying *Ortiz* correctly, it is inappropriate for a district court to remove or separate evidence in separate "boxes." *Id.* at 764. Recognizing that "[f]ew discrimination cases are so straightforward – indeed they are often factually complex and require sifting through ambiguous pieces of evidence," applying separate tests "complicates matters by forcing parties to consider the same evidence in multiple ways (and sometimes to disregard evidence that does not seem to fit one method rather than the other)." *Id.* at 765. The Court held that "district courts must stop separating 'direct' from 'indirect' evidence and proceeding as if they were subject to different legal standards." *Id.* "Instead, all evidence belongs in a single pile and must be evaluated as a whole." *Id.* at 766.

Here, while the district court paid lip service to the standard set out in *Ortiz*, it failed to apply it. The district court evaluated Saud's claims in isolation—dismissing procedural irregularities, comparator inconsistencies, inconsistent statements and institutional bias without recognizing their combined probative value.

Some of the evidence the district court failed to view holistically has been addressed, *Supra,* Secs. B-C. There is more. The district court failed to consider the testimony of Cheryl Wayne, who corroborated the practice of OIDE of *not* pursuing an investigation where the

accuser did not participate in the investigation. Wayne also testified white faculty were treated more favorably, and that she herself made a report about Tamburro treating her with racial bias. Dkt. 248, ¶¶ 25, 76.

The district court acknowledged several critical facts supporting Saud's claim of discriminatory intent but failed to meaningfully consider their significance. It failed to consider that high-level administrators flagged Saud as "anti-Trump" for organizing a Muslim civil rights event, despite no similar scrutiny of other faculty, and that this occurred amidst widespread faculty complaints of racial bias at DePaul. Dkt. 248, ¶¶ 69-76. It also acknowledged that Saud was targeted in a Campus Watch article—known for attacking Middle Eastern academics—just days before C.M.'s attorney sent a lien letter, but failed to draw any inference from the timing or context. Dkt. 275, pp. 10, 28. It also noted that A.R. perceived Tamburro's tone and questioning during her interview as an effort to elicit incriminating information about Saud, yet gave this testimony no weight. *Id.* p. 12. The court disregarded evidence that DePaul's student newspaper, *The DePaulia*, publicly identified Saud only after its faculty advisor commented on the "irony" of his Arabic name and religious studies role—facts suggesting racial and religious bias. Dkt. 248, ¶ 61. By omitting these facts from its analysis, the court ignored powerful context from which a reasonable jury could infer discriminatory motive.

These facts were not isolated, they were part of a larger pattern that a jury is entitled to weigh. By failing to view the evidence holistically, the district court failed to consider that each of these smaller proofs, together, point to unlawful discrimination. *Sylvester v. SOS Children's Villages Illinois, Inc.*, 453 F.3d 900, 904 (7th Cir. 2006). Because the district court failed to analyze the evidence holistically, summary judgment should be reversed.

38

### E. Weighing of Evidence and Credibility Determinations by the District Court Require Reversal

The district court improperly weighed evidence and resolved credibility issues in favor of Defendant. This is the domain of the jury.

The most poignant example of this is the district court's treatment of Keshk's inconsistent sworn testimony. Testifying under oath at the C.M. trial, Keshk provided specific relevant testimony: Keshk explicitly denied there had been other reports of misconduct regarding Saud. Dkt. 253, ¶ 51; Keshk explicitly denied that the C.M. lawsuit had anything to do with Saud no longer teaching at DePaul. Dkt. 253, ¶ 52; Keshk also denied participating in the OIDE investigation. Dkt. 253, p. 21, ¶ 48. At the C.M. trial, Keshk claimed he relied on Tamburro, while Tamburro claimed she relied on Keshk to reach the conclusion Saud violated policy. Dkt. 248, ¶ 44. Keshk's testimony shifted under pressure; Saud's remained consistent. *Id.* These contradictions create material fact disputes that must go to a jury. This is damning and sufficient in and of itself to deny summary judgment, as these were DePaul's most salient claims.

It was only after Saud brought the instant race discrimination claim that Keshk changed his story. Testifying under oath at his deposition for this case, Keshk testified that the C.M. lawsuit was the "biggest issue" at the time he decided not to rehire Saud. Dkt. 253, ¶ 51. But Keshk canceled Saud's classes in May, before the lawsuit. Keshk testified that Tamburro told him to bring any information he came across regarding Saud. Dkt. 253, p. 23, ¶ 48. Keshk also testified he was instructed to provide information for the second iteration of Tamburro's investigation. Dkt. 253, ¶ 54. The district court resolved these credibility issues by determining there was no evidence of dishonesty, but the inconsistent sworn statements are evidence of dishonesty. *See* Fed. R. Evid. 613. These are inconsistent statements from which a jury could have determined Keshk not credible. Keshk's "'failure to express consistent explanations at trial

39

or deposition could compel a jury to find that his proffered reasons ... were pretextual for something much more invidious.'..." *Harvey v. Office of Banks and Real Estate*, 377 F.3d 698, 713 (7th Cir. 2004) (quoting *Hasham v. Cal. State Bd. of Equalization*, 200 F.3d 1035, 1047 (7th Cir.2000)).

As discussed, *Supra* Sec. C.ii, the district court also credits that Tamburro "honestly" believed she was applying the ADAH policy as to Saud correctly, even though Saud provided evidence, including Tamburro's own statements, rebutting this assertion.

The district court improperly weighed the evidence. For example, the district court acknowledges that Suglia was treated more favorably during his OIDE investigation because:

> Suglia was notified that he could file a counter-complaint against his accuser and was given greater detail about the nature of his policy violation. Additionally, Saud was barred from participating in DePaul-sponsored events when Suglia was not. Better treatment of people similarly situated but for the protected characteristic is one way to establish pretext. The Court agrees that Saud his identified some evidence of discrimination through different treatment of Suglia, a white professor, following his OIDE investigation. This is not enough to sustain an inference of racial discrimination on its own, but something to add to the pile for consideration as a whole.

Dkt. 275, p. 35. The district court acknowledges the disparity, but rather than acknowledging Saud met his burden of establishing disparate treatment on the fourth prong of the prima facie elements or pretext, the court determines it was "not enough". *Id.* While the court stated it would add the evidence "to the pile for consideration as a whole", it goes on to disregard Saud's other evidence in piecemeal fashion, as discussed *Supra*, Secs. B-D.

The district court weighs evidence or resolves credibility issues in other places. It determined Tamburro's typed notes were "trustworthy", despite Saud's testimony contradicting some of the information in the notes. Dkt. 274, p. 4.

The court also weighed evidence when it concluded "there is no evidence that Keshk's assertion about low projected course enrollments was a lie," even though Saud provided evidence that Keshk manufactured this result. Dkt. 275, p. 26. As discussed, *Supra*, Sec. C-iv. Saud presented evidence that Keshk's assignment of Saud's courses to "STAFF" were meant to lower course enrollment because Keshk was aware Saud was a popular instructor with waitlists to attend his courses. On this, Keshk also lied to Saud when Saud reached out to let Keshk know that students were contacting him to enroll in his courses. Keshk told Saud that he had temporally canceled all term faculty courses in the system, but the evidence shows Keshk only did this to Saud and not to Lysik. *Id.*

As discussed *Supra*, p. 23, the court also weighed evidence when it ignored the fact that Saud was never offered the base salary for adjuncts, whereas Lysik, who requested more money than Saud, was offered the base salary.

Accordingly, the district court violated the summary judgment standard by resolving credibility issues and weighing evidence, and should therefore be reversed.

## F.  The District Court Gave Improper Deference to DePaul's Proffered Reason for the Adverse Actions and Improperly Drew Inferences in DePaul's favor

The district court improperly accepted DePaul's justifications for its adverse actions against Saud without weighing contrary evidence. Saud presented facts showing inconsistent testimony from Keshk, more favorable treatment of similarly situated faculty (Lysik and Suglia), deviations from standard Title IX procedures by Tamburro, and pretextual shifts in DePaul's rationale for not rehiring Saud. Evidence also showed Tamburro misapplied university policy and treated Saud differently than others under investigation. These factual disputes, which a jury could reasonably view as evidence of pretext and racial bias, were disregarded by the court, warranting reversal of summary judgment.

In the employment discrimination context, if an employer can proffer a "legitimate business reason" for the adverse action, the burden shifts to the plaintiff to show the proffered reason was pretext. In its earliest expression, the rule was merely meant to articulate that an employer is free to terminate an employee for any reason or for no reason at all, just not a discriminatory reason:

> The [statute] does not stop a company from discharging an employee for any reason (fair or unfair) or for no reason, *so long as the decision to fire does not stem from the person's age.* Courts may not sit as super personnel departments, assessing the merits – or even the rationality – of employers' *nondiscriminatory* business decisions.

*Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 825 (1st Cir. 1991) (emphasis added and internal citation and quotation marks omitted) (quoting *Freeman v. Package Mach. Co.* 865 F.2d 1331, 1341 (1st Cir. 1988). Properly understood, this axiom merely iterates the basic principle that, where it is undisputed that no discrimination occurred, an employer's irrational decision will not render it liable under anti-discrimination laws. *Id.*

This does not mean that an employer's proffer of a "legitimate business reason" for a termination cannot come under scrutiny.  To hold otherwise would be to run afoul of the summary judgment standard and to render the legal framework for discrimination claims circular and meaningless.  "It is incongruous to cite to a principle that assumes an employer has an earnest belief in a legitimate reason for termination in a summary judgment decision intended to ferret out what the employer believed in the first place."[1]  This is especially so when considering Supreme Court cases that articulate that at summary judgment, it is incumbent on the court to disregard the testimony of the employer's witnesses regarding what they "believed," because a jury would be free to discredit that evidence.  *Reeves*, supra, 150-151.

---

[1] Robert S. Mantell, "The Misuse of the Business Judgment Rule", 37 ABA Journal of Labor & Employment 53, page 61 (2023).

Here, the district court improperly deferred to DePaul's justifications and drew other improper inferences in DePaul's favor. Much of this has been discussed, *Supra*, Secs. B-E. This includes inferences regarding Tamburro's Title IX investigation findings, DePaul's shifting justifications for its adverse actions, and during the court's analysis of Saud's comparators. On each issue, Saud presented evidence to rebut or discredit the asserted justification and the district court deferred back to DePaul's asserted justification.

The district court was required to disregard all evidence favorable to the moving party that the jury is not required to believe. *Reeves,* 530 U.S. at 151. A reasonable jury might not believe the C.M. lawsuit was the reason for Saud's non-rehire, given the issues discussed above regarding Keshk's inconsistent sworn testimony, better treatment of Lysik, cancelation of Saud's classes well before the C.M. lawsuit, acknowledgement that DePaul would discriminate against Saud, ignoring faculty complaints about discrimination, and his belief Saud would "throw him under the bus" during the time he was up for renewal as chair of the department. Dkt. 248, ¶¶ 41-42, Dkt. 253, Pl. Add. SMF ¶ 33. A reasonable jury might not believe Tamburro honestly believed Saud violated the policy when she concluded (with out confirming with Saud) that he had sex with C.M. while she was a student in his class, because Tamburro made public statements that the policy was not applied that way. Dkt. 253, ¶ 3. A jury might not believe Tamburro honestly believed her conclusions because of the way she treated Saud during the process as compared to how she treated Suglia. *Supra,* p. 9. Finally, a reasonable jury could determine that, whatever minor differences between the cases of Suglia and Lysik, they were proper comparators and were treated more favorably.

Because the district court misapplied the summary judgment and legal standard, summary judgment should be reversed.

# CONCLUSION

Accordingly, Plaintiff LAITH SAUD respectfully requests the Honorable Court reverse the district court's dismissal on summary judgment and remand the matter to the district court for trial.

 Respectfully Submitted,

s/Christina Abraham

_____

Attorney for the Plaintiff-Appellant

Christina Abraham
Abraham Law & Consulting, LLC
161 N. Clark Street, Suite 1600
Chicago, IL 60601
(312) 588-7150

# CERTIFICATE OF COMPLIANCE WITH F.R.A.P. 32(A)(7)

The undersigned, counsel of record for the Plaintiff-Appellant, furnishes the following in compliance with F.R.A.P. Rule 32(a)(7). I hereby certify that this brief conforms to the rules contained in F.R.A.P. Rule 32(a)(7) for a brief produced with a proportionately spaced font.  The length of this brief is <u>12,999</u> words.

Respectfully Submitted,

s/Christina Abraham

_____

Attorney for the Plaintiff-Appellant

Christina Abraham
Abraham Law & Consulting, LLC
161 N. Clark Street, Suite 1600
Chicago, IL 60601
(312) 588-7150

# CERTIFICATE OF SERVICE

The undersigned, counsel for Plaintiff-Appellant, hereby certifies that she caused a copy of the foregoing **Brief of Plaintiff-Appellant and Short Appendix** to be served upon the parties listed below through the Seventh Circuit's CMS/ECF electronic system on April 30, 2025. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the Seventh Circuit CM/ECF system.

s/Christina Abraham
_____
Attorney for the Petitioner

Christina Abraham
Abraham Law & Consulting, LLC
161 N. Clark Street, Suite 1600
Chicago, IL 60601
(312) 588-7150

# INDEX TO SHORT APPENDIX

**Required Short Form Appendix**

| Document | Docket Number | Short Appendix Pages |
|---|---|---|
| Plaintiff's Second Amended Complaint | Dkt. 40 | S.A. 001-28 |
| Defendant's Answer | Dkt. 66 | S.A. 029-61 |
| Def. Statement of Material Facts | Dkt. 253 | S.A. 062-111 |
| Pl. Statement of Material Facts | Dkt. 248 | S.A. 112-139 |
| Order on Summary Judgment | Dkt. 275 | S.A. 140-177 |

# CIRCUIT RULE 30(d) STATEMENT

Pursuant to Circuit Rule 30(d), counsel certifies that all material required by Circuit Rule 30(a) and (b) are included in the appendix.

s/Christina Abraham
_____
Attorney for the Petitioner

Christina Abraham
Abraham Law & Consulting, LLC
161 N. Clark Street, Suite 1600
Chicago, IL 60601
(312) 588-7150

IN THE FEDERAL DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

LAITH SAUD,

Plaintiff,

v.                                              Case No.: 19-cv-3945

DEPAUL UNIVERSITY, KAREN
TAMBURRO, and MARLA MORGEN          Hon. Judge Robert M. Dow, Jr.

Defendants.

## SECOND AMENDED COMPLAINT

NOW COMES Plaintiff LAITH SAUD ("Plaintiff"), by and through undersigned
counsel, complaining of Defendants DEPAUL UNIVERSITY ("DePaul"), KAREN
TAMBURRO ("Tamburro"), and MARLA MORGEN ("Morgen"), for the following: violations
of Plaintiff rights under 42 U.S.C. § 2000e *et seq.*, for gender, race, national origin, religious
discrimination, harassment and retaliation for Plaintiff engaging in protected activity; 20 U.S,C.
§ 1681 *et seq.* for gender discrimination; 42 U.S.C. § 1981 for race discrimination; and
supplemental state law claims for breach of contract, breach of fiduciary duties, promissory
estoppel, and false light invasion of privacy.  In support of these claims, Plaintiff states as
follows:

## INTRODUCTION

1.     This case is about DePaul, Morgen and Tamburro throwing an unprotected
employee under the bus to further the university's own legal and public relations interest.

Defendants in this case, at every stage of the facts in question, misled the Plaintiff, deprived him of good faith fair dealing and cooperation, colluded with one another to ruin his reputation, discriminated against him on the basis of his gender, race, national origin and religion, retaliated against him for engaging in protected activity, and abused his due process rights.

2.      Plaintiff was a popular lecturer at DePaul for approximately twelve (12) years.  In 2017, Plaintiff was falsely accused of sexual assault.  The accusations were proven false such that Plaintiff was exonerated in court and won a defamation claim against his accuser.  The accuser's pleadings were contrived in such a way so as to make DePaul a party to the suit. DePaul's General Counsel exploited the Plaintiff's reliance on their legal counsel.  In the process of litigating that suit, DePaul, through Morgen, promised to indemnify and defend Plaintiff, only to use the arrangement as a means to coerce the Plaintiff and to retaliate against him should he not comply with their wishes.  DePaul, Morgen and Tamburro also contrived a false Title IX report in order to protect the legal and public relations interests of DePaul, in direct violation of federal guidelines on such investigations.  In fact, in the process of contriving this report, Defendants did not once speak with Plaintiff's accuser, nor with anyone with direct knowledge of her allegations.  Further, the accuser never filed a Title IX complaint at all, and Defendants suppressed a claim of sexual misconduct made by Plaintiff in this case.  Finally, Defendants placed Plaintiff in false light by publishing an article in DePaul's newspaper that recklessly repeated the false accusations Defendants knew or should have known were false from their own records and other information at their disposal. These and other actions described more fully below indicate Defendants acted with improper motivations, including discriminatory motives on the basis of Plaintiff's gender,

race/ethnicity, national origin, religion and in retaliation for Plaintiff's making a complaint of sexual misconduct and maintaining his innocence throughout the accusations.

3.    While Plaintiff was ultimately exonerated by a trial court in the Circuit Court of Cook County, significant damage was done to him as a direct and proximate cause of Defendants' acts and omissions.  Defendants, both individually and together in collusion, worked to undermine and deprive Plaintiff of his rights, at the expense of their duties to Plaintiff, and at expense of the truth.  DePaul and Morgen first used Plaintiff's job status to mislead him, Plaintiff was informed in July of 2017 that he may be able to return to work at some future date.  Within that context, the Plaintiff assumed DePaul's good faith.  DePaul and Morgen used that leverage to have Plaintiff enter into a joint defense agreement.  DePaul and Morgen used these circumstances to further mislead, leverage and control Plaintiff, communicating to him that if Plaintiff did not comply, he would face detrimental consequences (they also used the arrangement to communicate to him misleading assurances).  When the Plaintiff refused to be coerced into a settlement arrangement that was against his interest, DePaul took its first step in retaliating against him by depriving him of attorneys.  When the Plaintiff communicated to DePaul that he felt his rights were violated, DePaul punished him again by publishing an article they informed him should not be published.  DePaul also used the joint defense agreement up to and through trial, only to attempt to subvert his defense at trial.

**JURISDICTION & VENUE**

4.    This court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367.  This action is brought in part pursuant to 42 U.S.C. § 2000e *et seq.* for sex, race and national origin discrimination, harassment, and retaliation, 20 U.S.C. § 1681 for sex discrimination during

the course of a Title IX investigation, and 42 U.S.C. § 1981 for racial discrimination in employment, among other counts asserted.  Plaintiff filed a continuing action charge of discrimination with the Equal Employment Opportunity Commission on November 5, 2019 and was issued a Right to Sue on November 14, 2019.

5.      Venue is proper under 28 U.S.C. § 1391(b).  The parties reside and/or conduct business in this judicial district, and the events giving rise to the claims asserted herein occurred in this judicial district as well

## THE PARTIES

6.      Plaintiff LAITH SAUD ("Plaintiff") was employed in the Religious Studies department at Defendant DePaul University for twelve years.

7.      Defendant DEPAUL UNIVERSITY ("DePaul") is a private university organized under the Illinois General Not for Profit Corporation Act, 805 ILCS 105/ *et seq*.  DePaul is being sued under all counts of this complaint.

8.      Defendant MARLA MORGEN ("Morgen"), at all times relevant hereto, was employed as Senior Associate General Counsel at DePaul.  In this capacity, Morgen advised DePaul on certain matters pertaining to Plaintiff, which, as elaborated upon below, breached contractual and fiduciary duties owed to him.  Morgen is being sued under Counts IX, XI and XIII of this complaint.

9.      Defendant Karen Tamburro ("Tamburro"), at all times relevant hereto, Tamburro was employed as the Title IX Coordinator at DePaul.  In this capacity, Tamburro was responsible for overseeing DePaul's Title IX compliance, which included conducting investigations of complaints of alleged violations of DePaul's Title IX enforcement policy. Tamburro is being sued under Count XIII of this complaint.

4

## FACTUAL ALLEGATIONS

### *Background*

10.     Plaintiff is male of Arab heritage.  He is Iraqi-American and Muslim.

11.     Plaintiff was hired as an adjunct lecturer at DePaul in or around 2005.  Plaintiff taught primarily in the Religious Studies Department.  Plaintiff's classes were extremely popular, and there were often a number of students on a waitlist to enroll into his courses.

12.     In part because of his success in bringing up enrollment in the Religious Studies Department, in or around 2010, Plaintiff was promoted to Visiting Assistant Professor ("VAP").  The VAP contract was renewed each academic term after a review of Plaintiff's performance.  Plaintiff routinely received exceptional student and faculty evaluations.

13.     In the Spring of 2017, Plaintiff and the only other VAP in the Religious Studies Department were informed that their positions were being shifted due to "budgetary constraints".  The other VAP was a white, non-Muslim, male.

14.     Meanwhile, because he was so economically important to the Religious Studies department, teaching the most popular classes in the department, the chair of the department, Khaled Keshk, invited Plaintiff to adjunct in Religious Studies.  Plaintiff accepted at the amount of $4,800 per course, and arrangements were being made for him to teach in the Fall.

15.     Plaintiff accepted the offer to adjunct in Religious Studies.  At minimum, Plaintiff would receive the base salary for adjuncts of his seniority at DePaul, $4,800 per course taught.

16.     In June of 2017, in an email to Plaintiff and the other VAP in the department, Keshk invited them to propose bonus pay on the basis of "Enhanced Pay" – a program

commonly used for senior adjunct faculty - and told them he would solicit those amounts from the dean of the college.

17.    Plaintiff responded to Keshk, proposing Enhanced Pay and providing his justifications for the proposed amount.  Plaintiff's proposal also did not reject the $4,800 base salary for adjuncts, nor did he ever make Enhanced Pay a condition of his employment.

18.    Adjunct positions at DePaul (as with most universities) are limited-term contracts that expire at the end of the quarter or semester.  They are renewed as an adjunct begins teaching in a new quarter or semester.  Adjuncts at DePaul are paid per course.

19.    Upon information and belief, the other VAP in the department returned to work the next academic year as an adjunct.

### *Former Student Falsely Accuses Plaintiff, Sparking Title IX Investigation*

20.    During the Spring of 2017, Plaintiff received a lien letter from an attorney representing a former student.  The former student is a white woman.  The letter advised there was a claim against Plaintiff "with regards to repeated acts of sexual misconduct and reckless behavior involving a student taking one of [Plaintiff's] classes."  The letter did not provide any detail regarding the alleged acts of the Plaintiff.  A letter was also sent to DePaul.

21.    Sometime in or around May of 2017, Plaintiff was informed that DePaul was investigating him for the alleged sexual misconduct.  The investigation was conducted by DePaul's Title IX Coordinator, Defendant Karen Tamburro.

22.    Plaintiff immediately informed his department chair, Keshk, that he was being investigated.  Keshk warned Plaintiff that he did not think Plaintiff would be treated fairly because he is a male of Arab heritage, considering DePaul's history.

6

23.     In early May of 2017, Plaintiff met with Tamburro.  Plaintiff was not informed of any specific allegations against him.  During this meeting, Plaintiff informed Tamburro that he had a social relationship with the former student that later evolved into a romantic relationship, and that the former student had gotten upset with him in February of 2017 (nearly a year after she had taken his course) when he didn't respond to her text messages within a day.  He further informed Tamburro that he never used his position for sexual favors, and that he gave out A's to all students who attended and participated in his course.

24.     Tamburro attempted to contact the former student, both directly and through her attorneys.  Neither the former student, nor her attorneys, cooperated with the investigation nor provided further detail regarding the alleged sexual misconduct.

25.     Sometime in May 2017, Tamburro completed her investigation and issued a report finding Plaintiff did not violate any of DePaul's policies.

26.     At all times relevant, DePaul did not have a policy prohibiting romantic relationships between students and faculty; DePaul's policy prohibited the abuse of power in the event of such relationships.

27.     Plaintiff informed Keshk regarding the findings.  Keshk congratulated Plaintiff in a text message.  Keshk again congratulated Plaintiff the next time they saw one another in person.

28.     Plaintiff also emailed Tamburro sometime in or around June of 2017, saying he believed he was the victim of sexual misconduct by the former student.  Tamburro never responded to the email, nor did she open an investigation into Plaintiff's claim.  Plaintiff also later emailed Morgen, also stating he believed he was the victim of sexual misconduct by the former student.  Morgen also did not acknowledge the complaint.

*Former student files lawsuit against Plaintiff and DePaul, DePaul withdraws adjunct offer,*
*DePaul begins to defend and indemnify Plaintiff*

29.    On June 29, 2017, the former student filed a lawsuit naming DePaul and Plaintiff

as defendants.  Against Plaintiff, she alleged common law battery and violation of the Illinois

Gender Violence Act ("GVA").  Against DePaul, she alleged negligent hiring and

supervision.

30.    The *Chicago Sun-Times* published an article about the lawsuit, not naming

Plaintiff by name, but noting the case involved DePaul University.  This sparked a petition

from students, widely circulated on social media, in which comments were made regarding

Plaintiff's gender.  Upon information and belief, DePaul was aware and was motivated by the

petition and these comments.  Tamburro, along with several other DePaul administrators,

were sent the petition and had access to the comments made in it.

31.    The former student's lawsuit alleged that Plaintiff had been the subject of "many

complaints of harassment" at DePaul, and that DePaul knew or should have known that

Plaintiff was engaging in sexual misconduct.  In fact, this claim was completely false,

DePaul knew it was false, and it was her failure to provide specifics for this claim that later

led to DePaul's dismissal from the case.

32.    Against Plaintiff, the former student alleged that on a certain night, Plaintiff

picked her up from the DePaul campus, took her out for dinner and drinks, "plied her with

alcohol", and then took her back to his apartment where he "forcibly" pursued sex with her,

twice.  She also alleged a separate incident in Plaintiff's office at DePaul, where she claimed

Plaintiff coerced her into touching herself.  The only fact alleged in support of her coercion

claim was that Plaintiff was her instructor.

33.     Approximately a week or so later, DePaul's Senior Associate General Counsel, Defendant Marla Morgen, contacted Plaintiff and informed him that, pursuant to the terms of DePaul's Bylaws, DePaul would indemnify and defend Plaintiff.  Morgen told Plaintiff that DePaul would select his attorneys for him.

34.     DePaul selected Plaintiff's attorneys for him and began paying for his defense.

35.     DePaul and Plaintiff's attorneys entered into a Joint Defense Agreement ("JDA"). Among the terms was a requirement of written notice to the other party when one party intended to terminate the JDA.

36.     DePaul pressured Plaintiff to agree to the JDA.  The JDA gave DePaul access to influence his defense and gain privy to otherwise privileged information, and to manage and control Plaintiff.  Defendant took advantage of the JDA, all the way up until trial.

37.     Throughout the course of the lawsuit, DePaul, through its attorneys at Michael Best, warned or implied to Plaintiff that if he did not go along with its wishes, he could face detrimental consequences.  DePaul would later make good on these threats.  This sent a clear signal to Plaintiff that, against the most serious accusations a person could face in life, DePaul would interfere with or refuse to provide information vital to his defense.

### *DePaul re-opens investigation*

38.     After the former student filed her lawsuit, Tamburro reopened her investigation regarding the former student's claims.  Once again, neither the former student nor her attorneys cooperated with the investigation.  Upon information and belief, Tamburro was given access to information and documents from the case through Morgen, in violation of the JDA.

39.    Upon information and belief, during her investigation Tamburro contacted Arab and Muslim students that were not enrolled in Plaintiff's classes to discuss the investigation of Plaintiff.

40.    Tamburro issued a second report in October of 2017.  Without any change in the evidence, Tamburro changed her findings in the second report.  While she still maintained that a preponderance of the evidence did not support a finding that Plaintiff committed battery or abused his position, she changed her findings regarding sexual harassment. Specifically, Tamburro found that Plaintiff had sexually harassed the former student. Tamburro's methods and findings failed to adhere to federal guidelines on conducting Title IX investigations or DePaul procedures.

41.    Following Tamburro's report, DePaul sent Plaintiff a letter stating that he was not eligible for future employment at DePaul, and no longer allowed to participate in any DePaul sponsored events, nor in any events co-sponsored by DePaul.

42.    Plaintiff was told that the investigation was closed and would not be reopened in spite of the fact evidence was incoming and overwhelmingly in support of the Plaintiff. Additionally, universities often do not conclude Title IX investigations as litigation is ongoing, but DePaul actively discarded that practice precisely because they had a predetermined conclusion in mind.

43.    Upon information and belief, other similarly situated non-Arab, non-Iraqi, non-Muslim and non-male faculty are treated more favorably during Title IX investigations, and are not subjected to the same punishment for alleged violations of DePaul's sexual harassment policy.

*DePaul is dismissed from the lawsuit*

10

44.    Plaintiff filed his verified Answer to the former student's complaint.  Specifically, he denied ever using his position or grades for sexual favors, and denied that the encounters alleged by the former student ever took place.  Plaintiff also countersued the former student for defamation.

45.    DePaul was first dismissed without prejudice from the lawsuit on the basis that, without more, an employer could not be held vicariously liable for sexual assault by an employee.  The former student was given leave to file an Amended Complaint to plead more sufficient facts regarding the negligence claim against DePaul, and did.  In February of 2018, DePaul was again dismissed on the same basis, this time with prejudice, because the former student could not plead sufficient facts that Plaintiff had been the subject of any complaints of harassment at all.

### *DePaul stops defending/indemnifying Plaintiff, and the case proceeds to trial*

46.     Following DePaul's dismissal in February of 2018, the former student filed a Notice of Appeal.

47.    Following the former student's notice of appeal, DePaul entered into settlement negotiations with the former student.  DePaul also pressured Plaintiff to pay money to his false accuser to settle the case.  Plaintiff did not want to pay his accuser, maintaining that the lawsuit was baseless and had been filed in bad faith.

48.    DePaul then informed Plaintiff, via Morgen, that it would no longer defend or indemnify him.  DePaul provided no explanation to Plaintiff for its action.

49.    Plaintiff communicated to DePaul, through Morgen, that he believed his rights were being violated. Morgen responded, stating she disagreed with Plaintiff's

11

characterizations but that Plaintiff should communicate with her regarding any issues he had. These communications occurred prior to the publication of the article about Plaintiff.

50.    DePaul entered into an agreement in principle with the former student.  After this agreement in principle was reached, after it stopped indemnifying and defending Plaintiff, and after Plaintiff complained to Morgen about his treatment, DePaul published an article about Plaintiff in *The DePaulia*, as further elaborated upon below.  Within 24 hours of the publication, the former student voluntarily dismissed her appeal against DePaul pursuant to a settlement agreement with them.

51.    DePaul never notified Plaintiff that it was terminating the JDA.

52.    The case proceeded to trial.  Because he could not afford to pay the attorneys DePaul had obtained for him, Plaintiff was forced to proceed *pro se* until he found counsel to represent him *pro bono*.

53.    DePaul's attorneys later contacted Plaintiff's attorney to obtain updates and information on the case, including when it was preparing to represent two of DePaul's faculty (Tamburro and Keshk) in depositions.  Upon information and belief, DePaul maintained the JDA in order to keep leverage over the Plaintiff and to mislead him into providing them with information on the case.

54.    Throughout the course of the litigation, Plaintiff maintained that the former student's complaint was baseless, the events alleged never occurred, he never abused his position, and the pair had a consensual relationship.

55.    Plaintiff obtained evidence that negated the former student's version of events entirely, showing through phone records, receipts and bank records that the events she had alleged could not have occurred.  A bench trial was held on the matter on April 15-16, 2019.

An attorney from Michael Best and someone from DePaul's Office of General Counsel were present on behalf of DePaul on the first day of trial. The trial judge denied the former student's claims and granted Plaintiff's defamation claim.

56.    Despite the former student's denial there had been a consensual relationship, the trial court found there to have been one due to numerous phone and text messages (most occurring after the course was over), and the former student's own admissions at trial.

57.    More importantly, the trial court found that the former student's allegations could not have happened and the Plaintiff never plied her with alcohol.

58.    The former student also admitted Plaintiff never offered her anything, nor threatened her, nor that there was ever a *quid pro quo* arrangement between them. Text messages between them showed the former student had gotten angry with the Plaintiff a few months before filing her lawsuit (and nearly a year after the course was over) when he did not respond to her text messages quickly enough. This, among other testimony and evidence, allowed the trial court to enter its finding against the former student and for Plaintiff.

59.    Not only did the trial court find the alleged assault never occurred, the trial court found that the Plaintiff never abused his position in pursuit of any relationship. Tamburro's Title IX investigation report was never reopened or updated to reflect the trial court's findings.

60.    On day one of the bench trial, Tamburro and Keshk testified. Their testimonies deviated from their depositions. Keshk and Tumburro contradicted one another regarding sources of information used in Tamburro's October 2017 report, in which she changed her finding with respect to whether Plaintiff violated DePaul's policy on sexual harassment. Among other inconsistencies, Keshk testified he learned of Plaintiff's alleged misconduct

through Tamburro's report, whereas Tamburro testified she obtained information from Keshk to substantiate her findings.

61.     During discovery in the case, Plaintiff issued a subpoena to DePaul requesting, among other things, the former student's sign-in records at the dormitory where her friend lived.  The former student testified that, following the alleged assault, she went to her friend's dorm and was signed in at approximately 1am.  DePaul produced the requested sign-in records in response to the subpoena, which confirmed her sign in at that time. At trial, the former student's attorneys objected to the admission of the sign-in records as evidence, arguing they were not self-authenticating.  The trial judge agreed and noting DePaul's attorney and someone from DePaul's Office of General Counsel were present in the courtroom, the judge requested Plaintiff to ask DePaul if they would authenticate the sign-in records.  Plaintiff's attorney made the request to DePaul's attorney and DePaul refused to cooperate.  The trial judge ultimately allowed the evidence in with Plaintiff's own testimony authenticating the document.

62.     At trial the Plaintiff realized that any belief in good faith he had in DePaul was completely misplaced and that DePaul had deliberately misled him in order to avoid a lawsuit against themselves.

63.      The trial judge denied all of the former student's claims against Plaintiff, finding the sexual encounter she had alleged never took place and Plaintiff did not abuse his position. The trial judge also granted Plaintiff's defamation claim against the former student.

### The DePaulia article

64.     *The DePaulia* is DePaul's school newspaper, published through DePaul's College of Communication.  While the articles are written by student journalists, they are advised by

faculty at DePaul's College of Communication.  DePaul's College of Communication also offers a course, Writing for *The DePaulia* (JOUR390), in which students enroll in a course for credit and write stories for publication in the paper.

65.     The journalists contacted Plaintiff in January of 2018 for a comment on the case. Plaintiff's attorneys advised him that DePaul did not want him to provide a comment to *The DePaulia*.  DePaul conveyed to Plaintiff that the article would likely not be published if he did not provide a comment because the journalists would have had no new information to publish.  Plaintiff, relying on Depaul, provided no statement to *The DePaulia*.  Nor did his attorneys.

66.     On April 2, 2018, as DePaul was executing its agreement with the former student, *The DePaulia*, published an article about the former student's allegations.  The article was entitled, "Power Player: Former DePaul student sues ex-professor for sexual coercion."

67.     Upon information and belief, *DePaulia* journalists or advising faculty were in communication with DePaul administration regarding what content to include in the article, whom to speak with, and when to publish it.

68.     DePaul was responsible for the article's publication and exercised control over its contents and when it would be published.  *DePaulia* journalists wanted to publish the story as early as January but were delayed by DePaul.

69.     DePaul communicated to the Plaintiff they had no influence over the article, however, journalists were given access to Plaintiff's student lists and student contact information by DePaul.

70.     The article repeated the completely baseless allegations contained in the former student's lawsuit, including that Plaintiff had been the subject of "many complaints of

harassment" at DePaul, that he had "plied" the former student with alcohol, and that he used his position to coerce the former student into having sex with him.

71.     The article misrepresented Plaintiff's denials and statements in his filed pleadings.

72.     Upon information and belief, one of the journalists working on the piece told one of the students interviewed that she believed DePaul was discriminating against Plaintiff because he was Arab and male.

73.     The article was posted on *The DePaulia* website.  The article was also "pinned" on *The DePaulia's* Twitter account for several months, which meant that it appeared at the top of the Twitter page regardless of more recent articles published and "tweeted" by the paper.  DePaul actively promoted the article until September of 2018.

74.     The article claimed to have interviewed classmates of the former student, but in fact never did so.  It is a blatant misrepresentation.

75.     The article also inexplicably discusses Plaintiff's personal background, including his religion and his religiosity.

76.     Upon information and belief, the journalists were directed to change the subject of the article to faculty student dating.  In spite of the presence of such relationships at DePaul, the article never discussed a single other faculty members' personal dating life.

77.     The students' investigation into the litigation was stopped in February and inexplicably no updates were provided in the intervening months before the article's publication on April 2.

78.     The article quoted Tamburro and Carol Hughes, Executive Director of Strategic Content and Media at DePaul, who told *The DePaulia* that Plaintiff was "not currently employed at DePaul" and would not comment on the reason he had left.  DePaul

16

administrators also made no comment in the article regarding the fact that Plaintiff was never the subject of "many complaints" of harassment at the university, as had been alleged by the former student. This and several of the former student's other false allegations were merely repeated throughout the article without rebuttal, even though DePaul knew or had reason to know of their falsity.

79.    The article made no mention of Plaintiff's countersuit for defamation.The article about the Plaintiff was pinned on *The DePaulia* twitter account for several months after it was published. Upon information and belief, no other article posted on the DePaulia's Twitter page was pinned for that length of time. The article remains on *The DePaulia* website today.

### *Plaintiff's damages*

80.    Plaintiff has not been permitted to return to teach at DePaul. He has also not been permitted to participate in any activities sponsored or co-sponsored by the university. This ban has not been lifted by the university.

81.    *The DePaulia* article remains on the first page of search results when conducting a Google search of Plaintiff's name. The result of this has been devastating upon the Plaintiff, as it has rendered him unemployable to any employer with an internet search engine.

82.    Plaintiff had been invited to lecture at classes at DePaul, but could not, due to the restrictions imposed on him by DePaul.

83.    Plaintiff has applied for other academic positions but has not received requests for interviews or any offers of employment. In some cases, Plaintiff has been directly told that

17

news of the former student's lawsuit is the reason that he has not been considered for employment.

84.    Sometime in 2017, Plaintiff had a one-man show in production with a Chicago theater company.  Following the publication of *The DePaulia* article, the theater company informed Plaintiff that it learned of the lawsuit through *The DePaulia* article and could not work with Plaintiff as a result.

85.    Throughout his career at DePaul, Plaintiff was also a frequent guest on local news and radio.  Following *The DePaulia* article, the Plaintiff's relationships with local news contacts were damaged, and he was no longer sought out for his commentary.

86.    In 2016, Plaintiff performed a TedX talk at DePaul.  Following publication of *The DePaulia* article, DePaul removed Plaintiff's TedX talk from its YouTube channel and other media platforms.

87.    The aforementioned caused Plaintiff to be without employment for over two (2) years and counting, severely impacting his ability to provide for his daughter as a single father.  Despite the fact that Plaintiff, after spending ten (10) years pursuing his PhD at the University of Chicago, the aforementioned also negatively impacted Plaintiff's professional standing and reputation, destroying his academic career.

**COUNT I**
**Title VII – Race**

88.    Plaintiff reasserts and realleges all previously pled paragraphs as if incorporated fully herein.

89.    Plaintiff is an Arab American.  He was qualified and performed his job excellently, as observed in student and faculty teaching evaluations over the years.  Plaintiff was the most popular teacher in the department, his courses were almost always full and

18

students were waitlisted to attend his course. Plaintiff and the only other VAP in the Religious Studies department, a white male, were both offered adjunct positions after they were informed of the budget cuts, and both were invited to request Enhanced Pay. Plaintiff was treated disparately in that he was abruptly informed that he would not be brought back to adjunct, when the other similarly situated colleague was brought back as an adjunct.

90.     Among other acts and omissions, DePaul also discriminated against Plaintiff when, after the conclusion of the second Title IX investigation, he was prohibited from future employment at DePaul, and from participating in DePaul sponsored or co-sponsored events. The process and basis upon which DePaul imposed this penalty was arbitrary and capricious, and not routinely imposed in all cases involving faculty accused of sexual harassment at DePaul. DePaul also published an article about Plaintiff that remains on *The DePaulia* website today, which, among other things, disparages Plaintiff's professional reputation. Plaintiff was treated disparately from his white female accuser and also disparately from other similarly situated non-Arab faculty.

91.     Defendant's discriminatory conduct caused Plaintiff damages as more fully described above.

**COUNT II**
**Title VII - National Origin Discrimination**

92.     Plaintiff reasserts and realleges all previously pled paragraphs as if incorporated fully herein.

93.     Plaintiff's nation of origin is Iraq. He was qualified and performed his job excellently, as observed in student and faculty teaching evaluations over the years. Plaintiff was one of the most popular teachers in the department, his courses were always full and students were waitlisted to attend his course. Plaintiff and the only other VAP in the

19

Religious Studies department, a white non-Iraqi male, were both offered adjunct positions after they were informed of the budget cuts, and both were invited to request Enhanced Pay. Plaintiff was treated disparately in that he was abruptly informed that he would not be brought back to adjunct, when the other similarly situated colleague was brought back as an adjunct.

94.     Among other acts and omissions, Defendant also discriminated against Plaintiff when, after the conclusion of the second Title IX investigation, he was prohibited from future employment at DePaul and from participating in DePaul sponsored or co-sponsored events. The process and basis upon which DePaul imposed this penalty was arbitrary and capricious, and not routinely imposed in all cases involving faculty accused of sexual harassment at DePaul.  DePaul also published an article about Plaintiff that remains on *The DePaulia* website today, which, among other things, disparages Plaintiff's professional reputation. Plaintiff was treated disparately from his white female accuser, and also disparately from other similarly situated non-Iraqi faculty.

95.     Defendant's discriminatory conduct caused Plaintiff damages as more fully described above.

**COUNT III**
**Title VII - Gender Discrimination**

96.     Plaintiff reasserts and realleges all previously pled paragraphs as if incorporated fully herein.

97.     DePaul discriminated against Plaintiff on the basis of his gender, male.  This includes, but is not limited to: DePaul did not investigate, nor even respond to Plaintiff's report that he felt he had been the victim of sexual misconduct by the former student. Plaintiff was also treated disparately in that DePaul issued a credibility determination in

favor of the former student, and against Plaintiff, when it never actually spoke to the former student and she never actually filed a Title IX claim at all.  In addition, during the process of the Title IX investigation, DePaul violated Plaintiff's right to due process.  Plaintiff was prohibited from future employment at DePaul, and prohibited from participating in any DePaul-sponsored, or co-sponsored, events.  DePaul later imposed another punishment: under its direction and control, *The DePaulia* published an article discussing Plaintiff by name and disparaging his professional reputation.  DePaul also undermined Plaintiff at his trial.  Plaintiff was treated disparately from his white female accuser, and also disparately from other similarly situated non-male faculty.

98.    DePaul's termination and refusal to rehire Plaintiff was also motivated by gender bias.  DePaul's stated reason for terminating and refusing to hire Plaintiff were pretext for the unlawful discrimination.

99.    Defendant's discriminatory conduct caused Plaintiff damages as more fully described above.

## COUNT IV
## Title VII – Retaliation

100.    Plaintiff reasserts and realleges all previously pled paragraphs as if incorporated fully herein.

101.    Plaintiff engaged in protected activity when he made complaints to Tamburro and Morgen, and when he exercised his right to maintain his innocence.  Among other acts and omissions, DePaul retaliated against Plaintiff when it refused to bring him back to teach, banned him from future employment and from participating in events, stopped defending him, caused the article to be published in *The DePaulia* regarding him and acted to undermine Plaintiff's trial.

102.    DePaul's retaliatory conduct caused Plaintiff damages as more fully described above.

## COUNT V
## Title VII – Harassment

103.    Plaintiff reasserts and realleges all previously pled paragraphs as if incorporated fully herein.

104.    Among other acts or omissions, DePaul's (continued) publication/posting of the article in *The DePaulia* and on Twitter, DePaul faculty's conduct at trial (including providing false testimony and refusing to authenticate documents as requested by the trial court) and DePaul's (continued) ban prohibiting Plaintiff from seeking employment or from participating in DePaul sponsored or co-sponsored events constitute harassment.  Said harassment is motivated by discriminatory bias and in retaliation, as more fully described above.

105.    Said harassment caused Plaintiff damages as more fully described above.

## COUNT VI
## Title IX – Gender Discrimination

106.    Plaintiff reasserts and realleges all previously pled paragraphs as if incorporated fully herein.

107.    DePaul discriminated against Plaintiff on the basis of his gender, male.  This includes, but is not limited to: DePaul did not investigate, nor even respond to, Plaintiff's report that he felt he had been the victim of sexual misconduct by the former student. Plaintiff was also treated disparately in that DePaul issued a credibility determination in favor of the former student, and against Plaintiff, when it never actually spoke to the former student and she never actually filed a Title IX claim at all.  In addition, during the process of

22

the Title IX investigation, DePaul violated Plaintiff's right to due process. Plaintiff was prohibited from future employment at DePaul, and prohibited from participating in any DePaul-sponsored, or co-sponsored, events. DePaul later imposed another punishment: under its direction and control, *The DePaulia* published an article discussing Plaintiff by name and disparaging his professional reputation. DePaul also undermined Plaintiff at his trial.

108.    Defendant's discriminatory conduct caused Plaintiff damages as more fully described above.

## COUNT VII
## 42 U.S.C. § 1981 – Race/Ethnicity Discrimination

109.    Plaintiff reasserts and realleges all previously pled paragraphs as if incorporated fully herein.

110.    Plaintiff is an Arab American. He was qualified and performed his job excellently, as observed in student and faculty teaching evaluations over the years. Plaintiff was the most popular teacher in the department, his courses were almost always full and students were waitlisted to attend his course. Plaintiff and the only other VAP in the Religious Studies department, a white male, were both offered adjunct positions after they were informed of the budget cuts, and both were invited to request Enhanced Pay. Plaintiff was treated disparately in that he was abruptly informed that he would not be brought back to adjunct, when the other similarly situated colleague was brought back as an adjunct.

111.    Defendant also discriminated against Plaintiff when, after the conclusion of the second Title IX investigation, he was prohibited from future employment at DePaul, and from participating in DePaul sponsored or co-sponsored events. The process and basis upon

which DePaul imposed this penalty was arbitrary and capricious, and not routinely imposed in all cases involving faculty accused of sexual harassment at DePaul.

112.    Defendant's discriminatory conduct caused Plaintiff damages as more fully described above.

## COUNT VIII
### Breach of Contractual Obligation to Defend and Indemnify

113.    Plaintiff reasserts and realleges all previously pled paragraphs as if incorporated fully herein.

114.    As described more fully above, DePaul owed a duty to defend and indemnify Plaintiff.  DePaul took up the duty to defend and began substantial performance, even continuing said performance after it was dismissed from the lawsuit.

115.    DePaul breached its duty to Plaintiff when, after agreeing to defend and indemnify Plaintiff and substantially performing on said agreement, it terminated his defense without cause.

116.    DePaul's breach caused Plaintiff damage, including, but not limited to, having to bear the costs of his defense while unemployed.

## COUNT IX
### Breach of Fiduciary Duties / Defense and Indemnification

117.    Plaintiff reasserts and realleges all previously pled paragraphs as if incorporated fully herein.

118.    Defendants DePaul and Morgen owed a fiduciary duty to defend and indemnify Plaintiff.

119.    As elaborated further above, Defendants violated their fiduciary duties to act in good faith and to deal fairly with Plaintiff.  Defendants placed DePaul's legal and public

relations interests above their fiduciary duties to Plaintiff, when, upon DePaul's dismissal from the case, it stopped indemnifying and defending him. Defendants acted with malice or with reckless disregard of their duties toward the Plaintiff.

120.    Defendants' breach of fiduciary duty to Plaintiff caused him damage including, but not limited to, having to bear the cost of defense while unemployed.

**COUNT X**
**Breach of Employment Contract**

121.    Plaintiff reasserts and realleges all previously pled paragraphs as if incorporated fully herein.

122.    Defendant DePaul offered Plaintiff employment to teach as an adjunct for the upcoming academic year, and Plaintiff accepted. The terms of this contract were specific with respect to duration and the duties to be performed. Plaintiff was to receive a minimum of $4,800 per course. The adjunct contract would have renewed each academic Quarter when new courses began. The classes he was to teach were already determined.

123.    Defendant DePaul breached this contract when it informed Plaintiff that he would not be brought back to adjunct.

124.    Defendant DePaul's breach caused Plaintiff damage, as more fully described above.

**COUNT XI**
**Breach of Fiduciary Duty in Employment Contract**

125.    Plaintiff reasserts and realleges all previously pled paragraphs as if incorporated fully herein.

126.    As elaborated further above, Defendant DePaul violated its fiduciary duty to act in good faith and to deal fairly with Plaintiff when Defendant agreed to have Plaintiff adjunct

in the upcoming year and also told him to request Enhanced Pay and then used the Enhanced

Pay request as a basis to deny Plaintiff employment as an adjunct. As described more fully

above, DePaul's real motivation for the breach was to protect its own legal and public

relations interests and to discriminate and retaliate against Plaintiff.

127.    Defendants' breach of fiduciary duty caused Plaintiff damage including, but not

limited to, that he was not employed the next academic year, as more fully described above.

## COUNT XII
## Promissory Estoppel

128.    Plaintiff reasserts and realleges all previously pled paragraphs as if incorporated

fully herein.

129.    Defendant DePaul made an unambiguous promise that Plaintiff could adjunct in

the next academic year and told Plaintiff he could request Enhanced Pay based on his years

of experience at DePaul.

130.    Plaintiff's reliance on DePaul's promises was expected and foreseeable.

131.    Plaintiff relied on the promises to his detriment when he proposed Enhanced Pay

he thought would be fair, and DePaul later used this as a basis to deny him employment as an

adjunct, causing him damage, as more fully described above.

## COUNT XIII
## False Light Invasion of Privacy

132.    Plaintiff reasserts and realleges all previously pled paragraphs as if incorporated

fully herein.

133.    As described more fully above, Defendants DePaul, Tamburro and Morgen, along

with other unnamed DePaul faculty and staff, colluded to place Plaintiff in a false light to the

public by way of the article published in *The DePaulia* newspaper. The false light imputed

upon Plaintiff the commission of a crime, as well as conduct that would impute upon his professional integrity, and thus would be highly offensive to a reasonable person. Defendants acted with knowledge that the statements were false or with reckless disregard for whether the statements were true or false.

134.    Defendants are responsible for the publication.  Defendants determined when to publish the article about Plaintiff, gave journalists access to otherwise private information, and ultimately approved all of the information that was included, and excluded, from the article.  Statements that placed Plaintiff in a false light include, but are not limited to: including the former student's false claim, unrebutted, that Plaintiff was the subject of "many complaints" of harassment, when Defendants knew or should have known the statement was false; quoting a student that was not even in the same class as the former student (while claiming she was) who then commented negatively on Plaintiff's professionalism; and omitted the fact that Plaintiff had filed a defamation claim and provided no legal updates on the case, even though DePaul actively promoted the article until September 2018.

135.    Defendants' conduct caused Plaintiff damage, including, but not limited to, loss of professional and economic opportunities and significant damage to his professional reputation.

## CONCLUSION

WHEREFORE, Plaintiff LAITH SAUD prays the Honorable Court enter judgment in his favor and against Defendant DEPAUL UNIVERSITY and grant him the following relief:

a.  Actual damages;

b.  Compensatory damages;

c.  Punitive damages;

27

d.  Costs;

e.  Attorney's fees;

f.  Injunctive relief ordering Defendant DePaul University to remove its ban on Plaintiff

from applying for future employment opportunities and participating in DePaul

sponsored and co-sponsored events;

g.  Injunctive relief ordering Defendant DePaul University to remove the article about

Plaintiff from any university affiliated websites and media platforms; and

h.  Such other relief as the Court deems just and equitable, or to which Plaintiff is entitled as

a matter of law.


Respectfully submitted,
LAITH SAUD
Plaintiff


_____/s/Christina Abraham_____
By:    Christina Abraham
       Attorney for Plaintiff


November 19, 2019


Attorney No. 6298946
Christina Abraham, Esq.
Attorney for Plaintiff
161 N. Clark Street, Suite 1600
312-588-7150

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

Laith Saud,

          Plaintiff,

    v.

DePaul University,

          Defendant.

Case No. 1:19-cv-03945

Judge Robert M. Dow

## DEFENDANT'S ANSWER TO PLAINTIFF'S SECOND AMENDED COMPLAINT

Defendant DePaul University, ("DePaul"), by and through the undersigned attorneys, hereby answers the Second Amended Complaint ("SAC") of Plaintiff Laith Saud ("Plaintiff") as follows:

## INTRODUCTION

1.    This case is about DePaul, Morgen and Tamburro throwing an unprotected employee under the bus to further the university's own legal and public relations interest. Defendants in this case, at every stage of the facts in question, misled the Plaintiff, deprived him of good faith fair dealing and cooperation, colluded with one another to ruin his reputation, discriminated against him on the basis of his gender, race, national origin and religion, retaliated against him for engaging in protected activity, and abused his due process rights.

**Answer:**    DePaul denies the allegations in Paragraph 1.

2.    Plaintiff was a popular lecturer at DePaul for approximately twelve (12) years. In 2017, Plaintiff was falsely accused of sexual assault. The accusations were proven false such that Plaintiff was exonerated in court and won a defamation claim against his accuser. The accuser's pleadings were contrived in such a way so as to make DePaul a party to the suit. DePaul's General Counsel exploited the Plaintiff's reliance on their legal counsel. In the process of litigating that suit, DePaul, through Morgen, promised to indemnify and defend Plaintiff, only to use the arrangement as a means to coerce the Plaintiff and to retaliate against him should he not comply with their wishes. DePaul, Morgen and Tamburro also contrived a false Title IX report in order to protect the legal and public relations interests of DePaul, in direct violation of federal guidelines on such investigations. In fact, in the process of contriving this report, Defendants did not once speak with Plaintiff's accuser, nor with anyone with direct knowledge of her allegations. Further, the accuser never filed a Title IX complaint at all, and Defendants suppressed a claim of sexual misconduct made by Plaintiff in this case. Finally, Defendants placed Plaintiff in false light by publishing an article in DePaul's newspaper that recklessly repeated the false accusations

Defendants knew or should have known were false from their own records and other information at their disposal. These and other actions described more fully below indicate Defendants acted with improper motivations, including discriminatory motives on the basis of Plaintiff's gender, race/ethnicity, national origin, religion and in retaliation for Plaintiff's making a complaint of sexual misconduct and maintaining his innocence throughout the accusations.

**Answer:**    DePaul admits in 2017 Plaintiff and DePaul were named in a lawsuit that accused

Plaintiff of sexual assault. The allegations concerning the court proceedings, outcome at trial and

the publication in DePaul's student newspaper relate to counts the Court already has dismissed

from the SAC and, thus, no response is required from DePaul pursuant to the Court's Order at Dkt

No. 65. DePaul denies the remaining allegations in Paragraph 2.

3.    While Plaintiff was ultimately exonerated by a trial court in the Circuit Court of Cook County, significant damage was done to him as a direct and proximate cause of Defendants' acts and omissions. Defendants, both individually and together in collusion, worked to undermine and deprive Plaintiff of his rights, at the expense of their duties to Plaintiff, and at expense of the truth. DePaul and Morgen first used Plaintiff's job status to mislead him, Plaintiff was informed in July of 2017 that he may be able to return to work at some future date. Within that context, the Plaintiff assumed DePaul's good faith. DePaul and Morgen used that leverage to have Plaintiff enter into a joint defense agreement. DePaul and Morgen used these circumstances to further mislead, leverage and control Plaintiff, communicating to him that if Plaintiff did not comply, he would face detrimental consequences (they also used the arrangement to communicate to him misleading assurances). When the Plaintiff refused to be coerced into a settlement arrangement that was against his interest, DePaul took its first step in retaliating against him by depriving him of attorneys. When the Plaintiff communicated to DePaul that he felt his rights were violated, DePaul punished him again by publishing an article they informed him should not be published. DePaul also used the joint defense agreement up to and through trial, only to attempt to subvert his defense at trial.

**Answer:**    The allegations concerning the court proceedings, outcome at trial and the

publication in DePaul's student newspaper relate to counts the Court already has dismissed from

the SAC and, thus, no response is required from DePaul pursuant to the Court's Order at Dkt No.

65. DePaul denies the remaining allegations in Paragraph 3.

## JURISDICTION & VENUE

4.    This court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367. This action is brought in part pursuant to 42 U.S.C. § 2000e et seq. for sex, race and national origin discrimination, harassment, and retaliation, 20 U.S.C. § 1681 for sex discrimination during the

course of a Title IX investigation, and 42 U.S.C. § 1981 for racial discrimination in employment, among other counts asserted.  Plaintiff filed a continuing action charge of discrimination with the Equal Employment Opportunity Commission on November 5, 2019 and was issued a Right to Sue on November 14, 2019.

**Answer:**     DePaul admits this action purports to be brought pursuant to 42 U.S.C. § 1981

("Section 1981") for alleged racial discrimination in employment.  The allegations concerning the

charge of discrimination Plaintiff allegedly filed with the Equal Employment Opportunity

Commission ("EEOC") and the EEOC's issuance of a Right to Sue relate to counts the Court

already has dismissed from the SAC and, thus, no response is required from DePaul pursuant to

the Court's Order at Dkt No. 65.  DePaul denies the remaining allegations in Paragraph 4.

5.     Venue is proper under 28 U.S.C. § 1391(b).  The parties reside and/or conduct business in this judicial district, and the events giving rise to the claims asserted herein occurred in this judicial district as well.

**Answer:**     DePaul admits venue is proper in this Court.  DePaul admits it conducts business

in this judicial district.  DePaul denies the remaining allegations in Paragraph 5.

## THE PARTIES

6.     Plaintiff LAITH SAUD ("Plaintiff") was employed in the Religious Studies department at Defendant DePaul University for twelve years.

**Answer:**     DePaul denies the allegations in Paragraph 6.

7.     Defendant DEPAUL UNIVERSITY ("DePaul") is a private university organized under the Illinois General Not for Profit Corporation Act, 805 ILCS 105/ et seq.  DePaul is being sued under all counts of this complaint.

**Answer:**     DePaul admits it is a private university organized under the Illinois General Not for

Profit Corporation Act, 805 ILCS 105/101.01 *et seq*.  DePaul denies the remaining allegations in

Paragraph 7.

8.     Defendant MARLA MORGEN ("Morgen"), at all times relevant hereto, was employed as Senior Associate General Counsel at DePaul.  In this capacity, Morgen advised DePaul on certain matters pertaining to Plaintiff, which, as elaborated upon below, breached

contractual and fiduciary duties owed to him. Morgen is being sued under Counts IX, XI and XIII of this complaint.

**Answer:**        The allegations contained in Paragraph 8 relate to counts the Court already has

dismissed from the SAC and, thus, no response is required from DePaul pursuant to the Court's

Order at Dkt No. 65.

9.        Defendant Karen Tamburro ("Tamburro"), at all times relevant hereto, Tamburro was employed as the Title IX Coordinator at DePaul. In this capacity, Tamburro was responsible for overseeing DePaul's Title IX compliance, which included conducting investigations of complaints of alleged violations of DePaul's Title IX enforcement policy. Tamburro is being sued under Count XIII of this complaint.

**Answer:**        The allegations contained in Paragraph 9 relate to counts the Court already has

dismissed from the SAC and, thus, no response is required from DePaul pursuant to the Court's

Order at Dkt No. 65.

## FACTUAL ALLEGATIONS

### *Background*

10.        Plaintiff is male of Arab heritage. He is Iraqi-American and Muslim.

**Answer:**        DePaul is without sufficient knowledge to form a belief as to the truth of the

allegations in Paragraph 10 and, therefore, denies the same.

11.        Plaintiff was hired as an adjunct lecturer at DePaul in or around 2005. Plaintiff taught primarily in the Religious Studies Department. Plaintiff's classes were extremely popular, and there were often a number of students on a waitlist to enroll into his courses.

**Answer:**        DePaul denies the allegations in Paragraph 11.

12.        In part because of his success in bringing up enrollment in the Religious Studies Department, in or around 2010, Plaintiff was promoted to Visiting Assistant Professor ("VAP"). The VAP contract was renewed each academic term after a review of Plaintiff's performance. Plaintiff routinely received exceptional student and faculty evaluations.

**Answer:**        DePaul denies the allegations in paragraph 12.

13.        In the Spring of 2017, Plaintiff and the only other VAP in the Religious Studies Department were informed that their positions were being shifted due to "budgetary constraints".

The other VAP was a white, non-Muslim, male.

**Answer:**     DePaul denies the allegations in Paragraph 13.

14.     Meanwhile, because he was so economically important to the Religious Studies department, teaching the most popular classes in the department, the chair of the department, Khaled Keshk, invited Plaintiff to adjunct in Religious Studies. Plaintiff accepted at the amount of $4,800 per course, and arrangements were being made for him to teach in the Fall.

**Answer:**     DePaul denies the allegations in Paragraph 14.

15.     Plaintiff accepted the offer to adjunct in Religious Studies. At minimum, Plaintiff would receive the base salary for adjuncts of his seniority at DePaul, $4,800 per course taught.

**Answer:**     DePaul denies the allegations in Paragraph 15.

16.     In June of 2017, in an email to Plaintiff and the other VAP in the department, Keshk invited them to propose bonus pay on the basis of "Enhanced Pay" – a program commonly used for senior adjunct faculty - and told them he would solicit those amounts from the dean of the college.

**Answer:**     DePaul denies the allegations in Paragraph 16.

17.     Plaintiff responded to Keshk, proposing Enhanced Pay and providing his justifications for the proposed amount. Plaintiff's proposal also did not reject the $4,800 base salary for adjuncts, nor did he ever make Enhanced Pay a condition of his employment.

**Answer:**     DePaul denies the allegations in Paragraph 17.

18.     Adjunct positions at DePaul (as with most universities) are limited-term contracts that expire at the end of the quarter or semester. They are renewed as an adjunct begins teaching in a new quarter or semester. Adjuncts at DePaul are paid per course.

**Answer:**     DePaul is without sufficient knowledge to form a belief as to the truth of Plaintiff's allegations regarding the terms or conditions under which other universities may employ adjunct professors. DePaul denies the remaining allegations in Paragraph 18.

19.     Upon information and belief, the other VAP in the department returned to work the next academic year as an adjunct.

**Answer:**     DePaul denies the allegations in Paragraph 19.

*former student Falsely Accuses Plaintiff, Sparking Title IX Investigation*

20.     During the Spring of 2017, Plaintiff received a lien letter from an attorney representing a former student. The former student is a white woman. The letter advised there was a claim against Plaintiff "with regards to repeated acts of sexual misconduct and reckless behavior involving a student taking one of [Plaintiff's] classes." The letter did not provide any detail regarding the alleged acts of the Plaintiff. A letter was also sent to DePaul.

**Answer:**     DePaul is without sufficient knowledge to form a belief as to the truth of Plaintiff's

allegations that he received a lien letter from an attorney representing a former student or the

contents of the letter. DePaul admits it was sent a letter. Answering further, DePaul states it

received a letter from attorneys representing a former student asserting Plaintiff engaged in

"repeated acts of sexual misconduct and reckless behavior involved a student taking one of

[Plaintiff's] courses."

21.     Sometime in or around May of 2017, Plaintiff was informed that DePaul was investigating him for the alleged sexual misconduct. The investigation was conducted by DePaul's Title IX Coordinator, Defendant Karen Tamburro.

**Answer:**     DePaul admits its investigation into the former student's allegations against

Plaintiff was conducted by DePaul's Title IX Coordinator, Karen Tamburro. DePaul denies the

remaining allegations in Paragraph 21.

22.     Plaintiff immediately informed his department chair, Keshk, that he was being investigated. Keshk warned Plaintiff that he did not think Plaintiff would be treated fairly because he is a male of Arab heritage, considering DePaul's history.

**Answer:**     DePaul denies the allegations in paragraph 22.

23.     In early May of 2017, Plaintiff met with Tamburro. Plaintiff was not informed of any specific allegations against him. During this meeting, Plaintiff informed Tamburro that he had a social relationship with the former student that later evolved into a romantic relationship, and that the former student had gotten upset with him in February of 2017 (nearly a year after she had taken his course) when he didn't respond to her text messages within a day. He further informed Tamburro that he never used his position for sexual favors, and that he gave out A's to all students who attended and participated in his course.

**Answer:**     DePaul admits Tamburro met with Plaintiff in early May of 2017. DePaul denies

the remaining allegations in Paragraph 23.

24.    Tamburro attempted to contact the former student, both directly and through her attorneys.  Neither the former student, nor her attorneys, cooperated with the investigation nor provided further detail regarding the alleged sexual misconduct.

**Answer:**    DePaul admits Tamburro attempted to contact the former student, both directly and

through her attorneys. DePaul denies the allegations in Paragraph 24.

25.    Sometime in May 2017, Tamburro completed her investigation and issued a report finding Plaintiff did not violate any of DePaul's policies.

**Answer:**    DePaul denies the allegations in Paragraph 25.

26.    At all times relevant, DePaul did not have a policy prohibiting romantic relationships between students and faculty; DePaul's policy prohibited the abuse of power in the event of such relationships.

**Answer:**    DePaul denies the allegations in Paragraph 26.

27.    Plaintiff informed Keshk regarding the findings.  Keshk congratulated Plaintiff in a text message.  Keshk again congratulated Plaintiff the next time they saw one another in person.

**Answer:**    DePaul denies the allegations in Paragraph 27.

28.    Plaintiff also emailed Tamburro sometime in or around June of 2017, saying he believed he was the victim of sexual misconduct by the former student.  Tamburro never responded to the email, nor did she open an investigation into Plaintiff's claim.  Plaintiff also later emailed Morgen, also stating he believed he was the victim of sexual misconduct by the former student. Morgen also did not acknowledge the complaint.

**Answer:**    DePaul denies the allegations in Paragraph 28.

### *Former student files lawsuit against Plaintiff and DePaul, DePaul withdraws adjunct offer, DePaul begins to defend and indemnify Plaintiff*

29.    On June 29, 2017, the former student filed a lawsuit naming DePaul and Plaintiff as defendants.  Against Plaintiff, she alleged common law battery and violation of the Illinois Gender Violence Act ("GVA").  Against DePaul, she alleged negligent hiring and supervision.

**Answer:**    DePaul admits that, on June 29, 2017, the former student filed a lawsuit naming

DePaul and Plaintiff as defendants.  DePaul admits the former student's lawsuit asserted battery

and violation of the Illinois Gender Violence Act against Plaintiff.  DePaul denies the remaining

allegations in Paragraph 29.

30. The Chicago Sun-Times published an article about the lawsuit, not naming Plaintiff by name, but noting the case involved DePaul University. This sparked a petition from students, widely circulated on social media, in which comments were made regarding Plaintiff's gender. Upon information and belief, DePaul was aware and was motivated by the petition and these comments. Tamburro, along with several other DePaul administrators, were sent the petition and had access to the comments made in it.

**Answer:** The allegations contained in Paragraph 30 relate to counts the Court already has dismissed from the SAC and, thus, no response is required from DePaul pursuant to the Court's Order at Dkt No. 65.

31. The former student's lawsuit alleged that Plaintiff had been the subject of "many complaints of harassment" at DePaul, and that DePaul knew or should have known that Plaintiff was engaging in sexual misconduct. In fact, this claim was completely false, DePaul knew it was false, and it was her failure to provide specifics for this claim that later led to DePaul's dismissal from the case.

**Answer:** The allegations contained in Paragraph 31 relate to counts the Court already has dismissed from the SAC and, thus, no response is required from DePaul pursuant to the Court's Order at Dkt No. 65..

32. Against Plaintiff, the former student alleged that on a certain night, Plaintiff picked her up from the DePaul campus, took her out for dinner and drinks, "plied her with alcohol", and then took her back to his apartment where he "forcibly" pursued sex with her, twice. She also alleged a separate incident in Plaintiff's office at DePaul, where she claimed Plaintiff coerced her into touching herself. The only fact alleged in support of her coercion claim was that Plaintiff was her instructor.

**Answer:** DePaul denies the allegations in Paragraph 32.

33. Approximately a week or so later, DePaul's Senior Associate General Counsel, Defendant Marla Morgen, contacted Plaintiff and informed him that, pursuant to the terms of DePaul's Bylaws, DePaul would indemnify and defend Plaintiff. Morgen told Plaintiff that DePaul would select his attorneys for him.

**Answer:** The allegations contained in Paragraph 33 relate to counts the Court already has dismissed from the SAC and, thus, no response is required from DePaul pursuant to the Court's Order at Dkt No. 65.

34. DePaul selected Plaintiff's attorneys for him and began paying for his defense.

**Answer:**    The allegations contained in Paragraph 34 relate to counts the Court already has dismissed from the SAC and, thus, no response is required from DePaul pursuant to the Court's Order at Dkt No. 65.

35.    DePaul and Plaintiff's attorneys entered into a Joint Defense Agreement ("JDA"). Among the terms was a requirement of written notice to the other party when one party intended to terminate the JDA.

**Answer:**    The allegations contained in Paragraph 35 relate to counts the Court already has dismissed from the SAC and, thus, no response is required from DePaul pursuant to the Court's Order at Dkt No. 65.

36.    DePaul pressured Plaintiff to agree to the JDA.  The JDA gave DePaul access to influence his defense and gain privy to otherwise privileged information, and to manage and control Plaintiff.  Defendant took advantage of the JDA, all the way up until trial.

**Answer:**    The allegations contained in Paragraph 36 relate to counts the Court already has dismissed from the SAC and, thus, no response is required from DePaul pursuant to the Court's Order at Dkt No. 65.

37.    Throughout the course of the lawsuit, DePaul, through its attorneys at Michael Best, warned or implied to Plaintiff that if he did not go along with its wishes, he could face detrimental consequences.  DePaul would later make good on these threats.  This sent a clear signal to Plaintiff that, against the most serious accusations a person could face in life, DePaul would interfere with or refuse to provide information vital to his defense.

**Answer:**    The allegations contained in Paragraph 37 relate to counts the Court already has dismissed from the SAC and, thus, no response is required from DePaul pursuant to the Court's Order at Dkt No. 65.

### *DePaul re-opens investigation*

38.    After the former student filed her lawsuit, Tamburro reopened her investigation regarding the former student's claims.  Once again, neither the former student nor her attorneys cooperated with the investigation.  Upon information and belief, Tamburro was given access to information and documents from the case through Morgen, in violation of the JDA.

**Answer:**      DePaul admits Tamburro reopened DePaul's investigation regarding a former

student's claims sometime after the former student filed her lawsuit.  DePaul denies the remaining

allegations in Paragraph 38.

      39.    Upon information and belief, during her investigation Tamburro contacted Arab
and Muslim students that were not enrolled in Plaintiff's classes to discuss the investigation of
Plaintiff.

**Answer:**      DePaul denies the allegations in Paragraph 39.

      40.    Tamburro issued a second report in October of 2017.  Without any change in the
evidence, Tamburro changed her findings in the second report.  While she still maintained that a
preponderance of the evidence did not support a finding that Plaintiff committed battery or abused
his position, she changed her findings regarding sexual harassment.  Specifically, Tamburro found
that Plaintiff had sexually harassed the former student.  Tamburro's methods and findings failed
to adhere to federal guidelines on conducting Title IX investigations or DePaul procedures.

**Answer:**      DePaul admits Tamburro issued a second report in October of 2017.  DePaul also

admits Tamburro found Plaintiff violated DePaul's Anti-Discrimination and Anti-Harassment

policy.  DePaul denies the remaining allegations in Paragraph 40.

      41.    Following Tamburro's report, DePaul sent Plaintiff a letter stating that he was not
eligible for future employment at DePaul, and no longer allowed to participate in any DePaul
sponsored events, nor in any events co-sponsored by DePaul.

**Answer:**      DePaul denies the allegations in Paragraph 41.

      42.    Plaintiff was told that the investigation was closed and would not be reopened in
spite of the fact evidence was incoming and overwhelmingly in support of the Plaintiff.
Additionally, universities often do not conclude Title IX investigations as litigation is ongoing, but
DePaul actively discarded that practice precisely because they had a predetermined conclusion in
mind.

**Answer:**      DePaul denies the allegations in Paragraph 42.

      43.    Upon information and belief, other similarly situated non-Arab, non-Iraqi, non-
Muslim and non-male faculty are treated more favorably during Title IX investigations, and are
not subjected to the same punishment for alleged violations of DePaul's sexual harassment policy.

**Answer:**      DePaul denies the allegations in Paragraph 43.

***DePaul is dismissed from the lawsuit***

44.    Plaintiff filed his verified Answer to the former student's complaint.  Specifically, he denied ever using his position or grades for sexual favors, and denied that the encounters alleged by the former student ever took place.  Plaintiff also countersued the former student for defamation.

**Answer:**    DePaul admits Plaintiff filed a verified Answer to the former student's complaint.

DePaul admits Plaintiff also countersued the former student for defamation.  DePaul denies the

remaining allegations in Paragraph 44.

45.    DePaul was first dismissed without prejudice from the lawsuit on the basis that, without more, an employer could not be held vicariously liable for sexual assault by an employee. The former student was given leave to file an Amended Complaint to plead more sufficient facts regarding the negligence claim against DePaul, and did.  In February of 2018, DePaul was again dismissed on the same basis, this time with prejudice, because the former student could not plead sufficient facts that Plaintiff had been the subject of any complaints of harassment at all.

**Answer:**    The allegations contained in Paragraph 45 relate to counts the Court already has

dismissed from the SAC and, thus, no response is required from DePaul pursuant to the Court's

Order at Dkt No. 65.

### *DePaul stops defending/indemnifying Plaintiff, and the case proceeds to trial*

46.    Following DePaul's dismissal in February of 2018, the former student filed a Notice of Appeal.

**Answer:**    The allegations contained in Paragraph 46 relate to counts the Court already has

dismissed from the SAC and, thus, no response is required from DePaul pursuant to the Court's

Order at Dkt No. 65.

47.    Following the former student's notice of appeal, DePaul entered into settlement negotiations with the former student.  DePaul also pressured Plaintiff to pay money to his false accuser to settle the case.  Plaintiff did not want to pay his accuser, maintaining that the lawsuit was baseless and had been filed in bad faith.

**Answer:**    The allegations contained in Paragraph 47 relate to counts the Court already has

dismissed from the SAC and, thus, no response is required from DePaul.

48.    DePaul then informed Plaintiff, via Morgen, that it would no longer defend or indemnify him.  DePaul provided no explanation to Plaintiff for its action.

**Answer:**    The allegations contained in Paragraph 48 relate to parties the Court already has dismissed from the SAC and, thus, no response is required from DePaul pursuant to the Court's Order at Dkt No. 65.

49.    Plaintiff communicated to DePaul, through Morgen, that he believed his rights were being violated. Morgen responded, stating she disagreed with Plaintiff's characterizations but that Plaintiff should communicate with her regarding any issues he had. These communications occurred prior to the publication of the article about Plaintiff.

**Answer:**    The allegations contained in Paragraph 49 relate to counts the Court already has dismissed from the SAC and, thus, no response is required from DePaul pursuant to the Court's Order at Dkt No. 65.

50.    DePaul entered into an agreement in principle with the former student. After this agreement in principle was reached, after it stopped indemnifying and defending Plaintiff, and after Plaintiff complained to Morgen about his treatment, DePaul published an article about Plaintiff in The DePaulia, as further elaborated upon below. Within 24 hours of the publication, the former student voluntarily dismissed her appeal against DePaul pursuant to a settlement agreement with them.

**Answer:**    The allegations contained in Paragraph 50 relate to counts the Court already has dismissed from the SAC and, thus, no response is required from DePaul pursuant to the Court's Order at Dkt No. 65.

51.    DePaul never notified Plaintiff that it was terminating the JDA.

**Answer:**    The allegations contained in Paragraph 51 relate to counts the Court already has dismissed from the SAC and, thus, no response is required from DePaul pursuant to the Court's Order at Dkt No. 65.

52.    The case proceeded to trial. Because he could not afford to pay the attorneys DePaul had obtained for him, Plaintiff was forced to proceed pro se until he found counsel to represent him pro bono.

**Answer:**    The allegations contained in Paragraph 52 relate to counts the Court already has dismissed from the SAC and, thus, no response is required from DePaul pursuant to the Court's

Order at Dkt No. 65.

53.    DePaul's attorneys later contacted Plaintiff's attorney to obtain updates and information on the case, including when it was preparing to represent two of DePaul's faculty (Tamburro and Keshk) in depositions.  Upon information and belief, DePaul maintained the JDA in order to keep leverage over the Plaintiff and to mislead him into providing them with information on the case.

**Answer:**    The allegations contained in Paragraph 53 relate to counts the Court already has

dismissed from the SAC and, thus, no response is required from DePaul pursuant to the Court's

Order at Dkt No. 65.

54.    Throughout the course of the litigation, Plaintiff maintained that the former student's complaint was baseless, the events alleged never occurred, he never abused his position, and the pair had a consensual relationship.

**Answer:**    The allegations contained in Paragraph 54 relate to counts the Court already has

dismissed from the SAC and, thus, no response is required from DePaul pursuant to the Court's

Order at Dkt No. 65.

55.    Plaintiff obtained evidence that negated the former student's version of events entirely, showing through phone records, receipts and bank records that the events she had alleged could not have occurred.  A bench trial was held on the matter on April 15-16, 2019.  An attorney from Michael Best and someone from DePaul's Office of General Counsel were present on behalf of DePaul on the first day of trial.  The trial judge denied the former student's claims and granted Plaintiff's defamation claim.

**Answer:**    The allegations contained in Paragraph 55 relate to counts the Court already has

dismissed from the SAC and, thus, no response is required from DePaul pursuant to the Court's

Order at Dkt No. 65.

56.    Despite the former student's denial there had been a consensual relationship, the trial court found there to have been one due to numerous phone and text messages (most occurring after the course was over), and the former student's own admissions at trial.

**Answer:**    The allegations contained in Paragraph 56 relate to counts the Court already has

dismissed from the SAC and, thus, no response is required from DePaul pursuant to the Court's

Order at Dkt No. 65.

57.     More importantly, the trial court found that the former student's allegations could not have happened and the Plaintiff never plied her with alcohol.

**Answer:**     The allegations contained in Paragraph 57 relate to counts the Court already has

dismissed from the SAC and, thus, no response is required from DePaul pursuant to the Court's

Order at Dkt No. 65.

58.     The former student also admitted Plaintiff never offered her anything, nor threatened her, nor that there was ever a quid pro quo arrangement between them.  Text messages between them showed the former student had gotten angry with the Plaintiff a few months before filing her lawsuit (and nearly a year after the course was over) when he did not respond to her text messages quickly enough.  This, among other testimony and evidence, allowed the trial court to enter its finding against the former student and for Plaintiff.

**Answer:**     The allegations contained in Paragraph 58 relate to counts the Court already has

dismissed from the SAC and, thus, no response is required from DePaul pursuant to the Court's

Order at Dkt No. 65.

59.     Not only did the trial court find the alleged assault never occurred, the trial court found that the Plaintiff never abused his position in pursuit of any relationship.  Tamburro's Title IX investigation report was never reopened or updated to reflect the trial court's findings.

**Answer:**     The allegations contained in Paragraph 59 relate to counts the Court already has

dismissed from the SAC and, thus, no response is required from DePaul pursuant to the Court's

Order at Dkt No. 65.

60.     On day one of the bench trial, Tamburro and Keshk testified.  Their testimonies deviated from their depositions.  Keshk and Tumburro contradicted one another regarding sources of information used in Tamburro's October 2017 report, in which she changed her finding with respect to whether Plaintiff violated DePaul's policy on sexual harassment.  Among other inconsistencies, Keshk testified he learned of Plaintiff's alleged misconduct through Tamburro's report, whereas Tamburro testified she obtained information from Keshk to substantiate her findings.

**Answer:**     The allegations concerning the former student's trial against Plaintiff relate to

counts the Court already has dismissed from the SAC and, thus, no response is required from

DePaul.  DePaul denies the remaining allegations in Paragraph 60 pursuant to the Court's Order

at Dkt No. 65.

61.    During discovery in the case, Plaintiff issued a subpoena to DePaul requesting, among other things, the former student's sign-in records at the dormitory where her friend lived. The former student testified that, following the alleged assault, she went to her friend's dorm and was signed in at approximately 1am. DePaul produced the requested sign- in records in response to the subpoena, which confirmed her sign in at that time. At trial, the former student's attorneys objected to the admission of the sign-in records as evidence, arguing they were not self-authenticating. The trial judge agreed and noting DePaul's attorney and someone from DePaul's Office of General Counsel were present in the courtroom, the judge requested Plaintiff to ask DePaul if they would authenticate the sign-in records. Plaintiff's attorney made the request to DePaul's attorney and DePaul refused to cooperate. The trial judge ultimately allowed the evidence in with Plaintiff's own testimony authenticating the document.

**Answer:**    The allegations contained in Paragraph 61 relate to counts the Court already has

dismissed from the SAC and, thus, no response is required from DePaul pursuant to the Court's

Order at Dkt No. 65.

62.    At trial the Plaintiff realized that any belief in good faith he had in DePaul was completely misplaced and that DePaul had deliberately misled him in order to avoid a lawsuit against themselves.

**Answer:**    The allegations contained in Paragraph 62 relate to counts the Court already has

dismissed from the SAC and, thus, no response is required from DePaul pursuant to the Court's

Order at Dkt No. 65.

63.    The trial judge denied all of the former student's claims against Plaintiff, finding the sexual encounter she had alleged never took place and Plaintiff did not abuse his position. The trial judge also granted Plaintiff's defamation claim against the former student.

**Answer:**    The allegations contained in Paragraph 63 relate to counts the Court already has

dismissed from the SAC and, thus, no response is required from DePaul pursuant to the Court's

Order at Dkt No. 65.

### *The DePaulia article*

64.    The DePaulia is DePaul's school newspaper, published through DePaul's College of Communication. While the articles are written by student journalists, they are advised by faculty at DePaul's College of Communication. DePaul's College of Communication also offers a course, Writing for The DePaulia (JOUR390), in which students enroll in a course for credit and

write stories for publication in the paper.

**Answer:**    The allegations contained in Paragraph 64 relate to counts the Court already has

dismissed from the SAC and, thus, no response is required from DePaul pursuant to the Court's

Order at Dkt No. 65.

65.    The journalists contacted Plaintiff in January of 2018 for a comment on the case. Plaintiff's attorneys advised him that DePaul did not want him to provide a comment to The DePaulia. DePaul conveyed to Plaintiff that the article would likely not be published if he did not provide a comment because the journalists would have had no new information to publish. Plaintiff, relying on Depaul, provided no statement to The DePaulia. Nor did his attorneys.

**Answer:**    The allegations contained in Paragraph 65 relate to counts the Court already has

dismissed from the SAC and, thus, no response is required from DePaul pursuant to the Court's

Order at Dkt No. 65.

66.    On April 2, 2018, as DePaul was executing its agreement with the former student, The DePaulia, published an article about the former student's allegations. The article was entitled, "Power Player: Former DePaul student sues ex-professor for sexual coercion."

**Answer:**    The allegations contained in Paragraph 66 relate to counts the Court already has

dismissed from the SAC and, thus, no response is required from DePaul pursuant to the Court's

Order at Dkt No. 65.

67.    Upon information and belief, DePaulia journalists or advising faculty were in communication with DePaul administration regarding what content to include in the article, whom to speak with, and when to publish it.

**Answer:**    The allegations contained in Paragraph 67 relate to counts the Court already has

dismissed from the SAC and, thus, no response is required from DePaul pursuant to the Court's

Order at Dkt No. 65.

68.    DePaul was responsible for the article's publication and exercised control over its contents and when it would be published. DePaulia journalists wanted to publish the story as early as January but were delayed by DePaul.

**Answer:**    The allegations contained in Paragraph 68 relate to counts the Court already has

dismissed from the SAC and, thus, no response is required from DePaul pursuant to the Court's

Order at Dkt No. 65.

69.    DePaul communicated to the Plaintiff they had no influence over the article, however, journalists were given access to Plaintiff's student lists and student contact information by DePaul.

**Answer:**    The allegations contained in Paragraph 69 relate to counts the Court already has

dismissed from the SAC and, thus, no response is required from DePaul pursuant to the Court's

Order at Dkt No. 65.

70.    The article repeated the completely baseless allegations contained in the former student's lawsuit, including that Plaintiff had been the subject of "many complaints of harassment" at DePaul, that he had "plied" the former student with alcohol, and that he used his position to coerce the former student into having sex with him.

**Answer:**    The allegations contained in Paragraph 70 relate to counts the Court already has

dismissed from the SAC and, thus, no response is required from DePaul pursuant to the Court's

Order at Dkt No. 65.

71.    The article misrepresented Plaintiff's denials and statements in his filed pleadings.

**Answer:**    The allegations contained in Paragraph 71 relate to counts the Court already has

dismissed from the SAC and, thus, no response is required from DePaul pursuant to the Court's

Order at Dkt No. 65.

72.    Upon information and belief, one of the journalists working on the piece told one of the students interviewed that she believed DePaul was discriminating against Plaintiff because he was Arab and male.

**Answer:**    The allegations contained in Paragraph 72 relate to counts the Court already has

dismissed from the SAC and, thus, no response is required from DePaul pursuant to the Court's

Order at Dkt No. 65.

73.    The article was posted on The DePaulia website. The article was also "pinned" on The DePaulia's Twitter account for several months, which meant that it appeared at the top of the Twitter page regardless of more recent articles published and "tweeted" by the paper. DePaul

actively promoted the article until September of 2018.

**Answer:**      The allegations contained in Paragraph 73 relate to counts the Court already has

dismissed from the SAC and, thus, no response is required from DePaul pursuant to the Court's

Order at Dkt No. 65.

73.    The article claimed to have interviewed classmates of the former student, but in fact
never did so.  It is a blatant misrepresentation.

**Answer:**      The allegations contained in Paragraph 74 relate to counts the Court already has

dismissed from the SAC and, thus, no response is required from DePaul pursuant to the Court's

Order at Dkt No. 65.

75.    The article also inexplicably discusses Plaintiff's personal background, including
his religion and his religiosity.

**Answer:**      The allegations contained in Paragraph 75 relate to counts the Court already has

dismissed from the SAC and, thus, no response is required from DePaul pursuant to the Court's

Order at Dkt No. 65.

76.    Upon information and belief, the journalists were directed to change the subject of
the article to faculty student dating.  In spite of the presence of such relationships at DePaul, the
article never discussed a single other faculty members' personal dating life.

**Answer:**      The allegations contained in Paragraph 76 relate to counts the Court already has

dismissed from the SAC and, thus, no response is required from DePaul pursuant to the Court's

Order at Dkt No. 65.

77.    The students' investigation into the litigation was stopped in February and
inexplicably no updates were provided in the intervening months before the article's publication
on April 2.

**Answer:**      The allegations contained in Paragraph 77 relate to counts the Court already has

dismissed from the SAC and, thus, no response is required from DePaul pursuant to the Court's

Order at Dkt No. 65.

78.    The article quoted Tamburro and Carol Hughes, Executive Director of Strategic Content and Media at DePaul, who told The DePaulia that Plaintiff was "not currently employed at DePaul" and would not comment on the reason he had left.  DePaul administrators also made no comment in the article regarding the fact that Plaintiff was never the subject of "many complaints" of harassment at the university, as had been alleged by the former student.  This and several of the former student's other false allegations were merely repeated throughout the article without rebuttal, even though DePaul knew or had reason to know of their falsity.

**Answer:**    The allegations contained in Paragraph 78 relate to counts the Court already has

dismissed from the SAC and, thus, no response is required from DePaul pursuant to the Court's

Order at Dkt No. 65.

79.    The article made no mention of Plaintiff's countersuit for defamation.  The article about the Plaintiff was pinned on The DePaulia twitter account for several months after it was published.  Upon information and belief, no other article posted on the DePaulia's Twitter page was pinned for that length of time.  The article remains on The DePaulia website today.

**Answer:**    The allegations contained in Paragraph 79 relate to counts the Court already has

dismissed from the SAC and, thus, no response is required from DePaul pursuant to the Court's

Order at Dkt No. 65.

### *Plaintiff's damages*

80.    Plaintiff has not been permitted to return to teach at DePaul.  He has also not been permitted to participate in any activities sponsored or co-sponsored by the university.  This ban has not been lifted by the university.

**Answer:**    DePaul admits Plaintiff is not eligible for employment at DePaul.  DePaul denies

the remaining allegations in Paragraph 80.

81.    The DePaulia article remains on the first page of search results when conducting a Google search of Plaintiff's name.  The result of this has been devastating upon the Plaintiff, as it has rendered him unemployable to any employer with an internet search engine.

**Answer:**    The allegations contained in Paragraph 81 relate to counts the Court already has

dismissed from the SAC and, thus, no response is required from DePaul pursuant to the Court's

Order at Dkt No. 65.

82.    Plaintiff had been invited to lecture at classes at DePaul, but could not, due to the

restrictions imposed on him by DePaul.

**Answer:**     DePaul is without sufficient knowledge to form a belief as to the truth of the

allegations in Paragraph 82 and, therefore, denies the same.

83.     Plaintiff has applied for other academic positions but has not received requests for interviews or any offers of employment.  In some cases, Plaintiff has been directly told that news of the former student's lawsuit is the reason that he has not been considered for employment.

**Answer:**     DePaul is without sufficient knowledge to form a belief as to the truth of the

allegations in Paragraph 83 and, therefore, denies the same.

84.     Sometime in 2017, Plaintiff had a one-man show in production with a Chicago theater company.  Following the publication of The DePaulia article, the theater company informed Plaintiff that it learned of the lawsuit through The DePaulia article and could not work with Plaintiff as a result.

**Answer:**     The allegations contained in Paragraph 84 relate to counts the Court already has

dismissed from the SAC and, thus, no response is required from DePaul pursuant to the Court's

Order at Dkt No. 65.

85.     Throughout his career at DePaul, Plaintiff was also a frequent guest on local news and radio.  Following The DePaulia article, the Plaintiff's relationships with local news contacts were damaged, and he was no longer sought out for his commentary.

**Answer:**     The allegations contained in Paragraph 85 relate to counts the Court already has

dismissed from the SAC and, thus, no response is required from DePaul pursuant to the Court's

Order at Dkt No. 65.

86.     In 2016, Plaintiff performed a TedX talk at DePaul.  Following publication of The DePaulia article, DePaul removed Plaintiff's TedX talk from its YouTube channel and other media platforms.

**Answer:**     The allegations contained in Paragraph 86 relate to counts the Court already has

dismissed from the SAC and, thus, no response is required from DePaul pursuant to the Court's

Order at Dkt No. 65.

87.     The aforementioned caused Plaintiff to be without employment for over two (2)

years and counting, severely impacting his ability to provide for his daughter as a single father. Despite the fact that Plaintiff, after spending ten (10) years pursuing his PhD at the University of Chicago, the aforementioned also negatively impacted Plaintiff's professional standing and reputation, destroying his academic career.

**Answer:**      The allegations contained in Paragraph 87 relate to counts the Court already has

dismissed from the SAC and, thus, no response is required from DePaul pursuant to the Court's

Order at Dkt No. 65.

## COUNT I
### Title VII – Race

88.     Plaintiff reasserts and realleges all previously pled paragraphs as if incorporated fully herein.

**Answer:**      This Count was dismissed by the Court and, thus, no response is required from

DePaul.

89.     Plaintiff is an Arab American. He was qualified and performed his job excellently, as observed in student and faculty teaching evaluations over the years. Plaintiff was the most popular teacher in the department, his courses were almost always full and students were waitlisted to attend his course. Plaintiff and the only other VAP in the Religious Studies department, a white male, were both offered adjunct positions after they were informed of the budget cuts, and both were invited to request Enhanced Pay. Plaintiff was treated disparately in that he was abruptly informed that he would not be brought back to adjunct, when the other similarly situated colleague was brought back as an adjunct.

**Answer:**      This Count was dismissed by the Court and, thus, no response is required from

DePaul.

90.     Among other acts and omissions, DePaul also discriminated against Plaintiff when, after the conclusion of the second Title IX investigation, he was prohibited from future employment at DePaul, and from participating in DePaul sponsored or co-sponsored events. The process and basis upon which DePaul imposed this penalty was arbitrary and capricious, and not routinely imposed in all cases involving faculty accused of sexual harassment at DePaul. DePaul also published an article about Plaintiff that remains on The DePaulia website today, which, among other things, disparages Plaintiff's professional reputation. Plaintiff was treated disparately from his white female accuser and also disparately from other similarly situated non-Arab faculty.

**Answer:**      This Count was dismissed by the Court and, thus, no response is required from

DePaul.

91.    Defendant's discriminatory conduct caused Plaintiff damages as more fully described above.

**Answer:**    This Count was dismissed by the Court and, thus, no response is required from DePaul.

## COUNT II
## Title VII - National Origin Discrimination

92.    Plaintiff reasserts and realleges all previously pled paragraphs as if incorporated fully herein.

**Answer:**    This Count was dismissed by the Court and, thus, no response is required from DePaul.

93.    Plaintiff's nation of origin is Iraq. He was qualified and performed his job excellently, as observed in student and faculty teaching evaluations over the years. Plaintiff was one of the most popular teachers in the department, his courses were always full and students were waitlisted to attend his course.  Plaintiff and the only other VAP in the Religious Studies department, a white non-Iraqi male, were both offered adjunct positions after they were informed of the budget cuts, and both were invited to request Enhanced Pay. Plaintiff was treated disparately in that he was abruptly informed that he would not be brought back to adjunct, when the other similarly situated colleague was brought back as an adjunct.

**Answer:**    This Count was dismissed by the Court and, thus, no response is required from DePaul.

94.    Among other acts and omissions, Defendant also discriminated against Plaintiff when, after the conclusion of the second Title IX investigation, he was prohibited from future employment at DePaul and from participating in DePaul sponsored or co-sponsored events. The process and basis upon which DePaul imposed this penalty was arbitrary and capricious, and not routinely imposed in all cases involving faculty accused of sexual harassment at DePaul. DePaul also published an article about Plaintiff that remains on The DePaulia website today, which, among other things, disparages Plaintiff's professional reputation. Plaintiff was treated disparately from his white female accuser, and also disparately from other similarly situated non-Iraqi faculty.

**Answer:**    This Count was dismissed by the Court and, thus, no response is required from DePaul.

95.    Defendant's discriminatory conduct caused Plaintiff damages as more fully described above.

**Answer:**        This Count was dismissed by the Court and, thus, no response is required from

DePaul.

# COUNT III
## Title VII - Gender Discrimination

96.    Plaintiff reasserts and realleges all previously pled paragraphs as if incorporated fully herein.

**Answer:**        This Count was dismissed by the Court and, thus, no response is required from

DePaul.

97.    DePaul discriminated against Plaintiff on the basis of his gender, male. This includes, but is not limited to: DePaul did not investigate, nor even respond to Plaintiff's report that he felt he had been the victim of sexual misconduct by the former student. Plaintiff was also treated disparately in that DePaul issued a credibility determination in favor of the former student, and against Plaintiff, when it never actually spoke to the former student and she never actually filed a Title IX claim at all. In addition, during the process of the Title IX investigation, DePaul violated Plaintiff's right to due process. Plaintiff was prohibited from future employment at DePaul, and prohibited from participating in any DePaul-sponsored, or co-sponsored, events. DePaul later imposed another punishment: under its direction and control, The DePaulia published an article discussing Plaintiff by name and disparaging his professional reputation. DePaul also undermined Plaintiff at his trial. Plaintiff was treated disparately from his white female accuser, and also disparately from other similarly situated non-male faculty.

**Answer:**        This Count was dismissed by the Court and, thus, no response is required from

DePaul.

98.    DePaul's termination and refusal to rehire Plaintiff was also motivated by gender bias. DePaul's stated reason for terminating and refusing to hire Plaintiff were pretext for the unlawful discrimination.

**Answer:**        This Count was dismissed by the Court and, thus, no response is required from

DePaul.

99.    Defendant's discriminatory conduct caused Plaintiff damages as more fully described above.

**Answer:**        This Count was dismissed by the Court and, thus, no response is required from

DePaul.

## COUNT IV
### Title VII – Retaliation

100.    Plaintiff reasserts and realleges all previously pled paragraphs as if incorporated fully herein.

**Answer:**    This Count was dismissed by the Court and, thus, no response is required from DePaul.

101.    Plaintiff engaged in protected activity when he made complaints to Tamburro and Morgen, and when he exercised his right to maintain his innocence. Among other acts and omissions, DePaul retaliated against Plaintiff when it refused to bring him back to teach, banned him from future employment and from participating in events, stopped defending him, caused the article to be published in The DePaulia regarding him and acted to undermine Plaintiff's trial.

**Answer:**    This Count was dismissed by the Court and, thus, no response is required from DePaul.

102.    DePaul's retaliatory conduct caused Plaintiff damages as more fully described above.

**Answer:**    This Count was dismissed by the Court and, thus, no response is required from DePaul.

## COUNT V
### Title VII – Harassment

103.    Plaintiff reasserts and realleges all previously pled paragraphs as if incorporated fully herein.

**Answer:**    This Count was dismissed by the Court and, thus, no response is required from DePaul.

104.    Among other acts or omissions, DePaul's (continued) publication/posting of the article in The DePaulia and on Twitter, DePaul faculty's conduct at trial (including providing false testimony and refusing to authenticate documents as requested by the trial court) and DePaul's (continued) ban prohibiting Plaintiff from seeking employment or from participating in DePaul sponsored or co-sponsored events constitute harassment. Said harassment is motivated by discriminatory bias and in retaliation, as more fully described above.

**Answer:**    This Count was dismissed by the Court and, thus, no response is required from

DePaul.

105.    Said harassment caused Plaintiff damages as more fully described above.

**Answer:**    This Count was dismissed by the Court and, thus, no response is required from

DePaul.

## COUNT VI
## Title IX – Gender Discrimination

106.    Plaintiff reasserts and realleges all previously pled paragraphs as if incorporated fully herein.

**Answer:**    This Count was dismissed with prejudice by the Court and, thus, no response is

required from DePaul.

107.    DePaul discriminated against Plaintiff on the basis of his gender, male. This includes, but is not limited to: DePaul did not investigate, nor even respond to, Plaintiff's report that he felt he had been the victim of sexual misconduct by the former student. Plaintiff was also treated disparately in that DePaul issued a credibility determination in favor of the former student, and against Plaintiff, when it never actually spoke to the former student and she never actually filed a Title IX claim at all.  In addition, during the process of the Title IX investigation, DePaul violated Plaintiff's right to due process. Plaintiff was prohibited from future employment at DePaul, and prohibited from participating in any DePaul-sponsored, or co-sponsored, events. DePaul later imposed another punishment: under its direction and control, The DePaulia published an article discussing Plaintiff by name and disparaging his professional reputation. DePaul also undermined Plaintiff at his trial.

**Answer:**    This Count was dismissed with prejudice by the Court and, thus, no response is

required from DePaul.

108.    Defendant's discriminatory conduct caused Plaintiff damages as more fully described above.

**Answer:**    This Count was dismissed with prejudice by the Court and, thus, no response is

required from DePaul.

## COUNT VII
## 42 U.S.C. § 1981 – Race/Ethnicity Discrimination

109.    Plaintiff reasserts and realleges all previously pled paragraphs as if incorporated fully herein.

25

**Answer:**        DePaul incorporates by reference its answers to Paragraphs 1-108 of Plaintiff's

SAC as if set forth fully herein.

110.    Plaintiff is an Arab American. He was qualified and performed his job excellently, as observed in student and faculty teaching evaluations over the years. Plaintiff was the most popular teacher in the department, his courses were almost always full and students were waitlisted to attend his course. Plaintiff and the only other VAP in the Religious Studies department, a white male, were both offered adjunct positions after they were informed of the budget cuts, and both were invited to request Enhanced Pay. Plaintiff was treated disparately in that he was abruptly informed that he would not be brought back to adjunct, when the other similarly situated colleague was brought back as an adjunct.

**Answer:**        DePaul is without sufficient knowledge to form a belief as to the truth of Plaintiff's

allegations that he is Arab American and, therefore, denies the same. DePaul denies the remaining

allegations in Paragraph 110.

111.    Defendant also discriminated against Plaintiff when, after the conclusion of the second Title IX investigation, he was prohibited from future employment at DePaul, and from participating in DePaul sponsored or co-sponsored events. The process and basis upon which DePaul imposed this penalty was arbitrary and capricious, and not routinely imposed in all cases involving faculty accused of sexual harassment at DePaul.

**Answer:**        DePaul denies the allegations in Paragraph 111.

112.    Defendant's discriminatory conduct caused Plaintiff damages as more fully described above.

**Answer:**        DePaul denies the allegations in Paragraph 112.

## COUNT VIII
## Breach of Contractual Obligation to Defend and Indemnify

113.    Plaintiff reasserts and realleges all previously pled paragraphs as if incorporated fully herein.

**Answer:**        This Count was dismissed by the Court for lack of subject matter jurisdiction and,

thus, no response is required from DePaul.

114.    As described more fully above, DePaul owed a duty to defend and indemnify Plaintiff. DePaul took up the duty to defend and began substantial performance, even continuing said performance after it was dismissed from the lawsuit.

**Answer:**        This Count was dismissed by the Court for lack of subject matter jurisdiction and,

thus, no response is required from DePaul.

115.    DePaul breached its duty to Plaintiff when, after agreeing to defend and indemnify
Plaintiff and substantially performing on said agreement, it terminated his defense without cause.

**Answer:**        This Count was dismissed by the Court for lack of subject matter jurisdiction and,

thus, no response is required from DePaul.

116.    DePaul's breach caused Plaintiff damage, including, but not limited to, having to
bear the costs of his defense while unemployed.

**Answer:**        This Count was dismissed by the Court for lack of subject matter jurisdiction and,

thus, no response is required from DePaul.

**COUNT IX**
**Breach of Fiduciary Duties / Defense and Indemnification**

117.    Plaintiff reasserts and realleges all previously pled paragraphs as if incorporated
fully herein.

**Answer:**        This Count was dismissed by the Court for lack of subject matter jurisdiction and,

thus, no response is required from DePaul.

118.    Defendants DePaul and Morgen owed a fiduciary duty to defend and indemnify
Plaintiff.

**Answer:**        This Count was dismissed by the Court for lack of subject matter jurisdiction and,

thus, no response is required from DePaul.

119.    As elaborated further above, Defendants violated their fiduciary duties to act in
good faith and to deal fairly with Plaintiff.  Defendants placed DePaul's legal and public relations
interests above their fiduciary duties to Plaintiff, when, upon DePaul's dismissal from the case, it
stopped indemnifying and defending him. Defendants acted with malice or with reckless disregard
of their duties toward the Plaintiff.

**Answer:**        This Count was dismissed by the Court for lack of subject matter jurisdiction and,

thus, no response is required from DePaul.

120.     Defendants' breach of fiduciary duty to Plaintiff caused him damage including, but not limited to, having to bear the cost of defense while unemployed.

**Answer:**     This Count was dismissed by the Court for lack of subject matter jurisdiction and, thus, no response is required from DePaul.

## COUNT X
## Breach of Employment Contract

121.     Plaintiff reasserts and realleges all previously pled paragraphs as if incorporated fully herein.

**Answer:**     This Count was dismissed by the Court for lack of subject matter jurisdiction and, thus, no response is required from DePaul.

122.     Defendant DePaul offered Plaintiff employment to teach as an adjunct for the upcoming academic year, and Plaintiff accepted. The terms of this contract were specific with respect to duration and the duties to be performed. Plaintiff was to receive a minimum of $4,800 per course. The adjunct contract would have renewed each academic Quarter when new courses began.  The classes he was to teach were already determined.

**Answer:**     This Count was dismissed by the Court for lack of subject matter jurisdiction and, thus, no response is required from DePaul.

123.     Defendant DePaul breached this contract when it informed Plaintiff that he would not be brought back to adjunct.

**Answer:**     This Count was dismissed by the Court for lack of subject matter jurisdiction and, thus, no response is required from DePaul.

124.     Defendant DePaul's breach caused Plaintiff damage, as more fully described above.

**Answer:**     This Count was dismissed by the Court for lack of subject matter jurisdiction and, thus, no response is required from DePaul.

## COUNT XI
## Breach of Fiduciary Duty in Employment Contract

125.     Plaintiff reasserts and realleges all previously pled paragraphs as if incorporated fully herein.

**Answer:**        This Count was dismissed by the Court for lack of subject matter jurisdiction and,

thus, no response is required from DePaul.

126.    As elaborated further above, Defendant DePaul violated its fiduciary duty to act in good faith and to deal fairly with Plaintiff when Defendant agreed to have Plaintiff adjunct in the upcoming year and also told him to request Enhanced Pay and then used the Enhanced Pay request as a basis to deny Plaintiff employment as an adjunct. As described more fully above, DePaul's real motivation for the breach was to protect its own legal and public relations interests and to discriminate and retaliate against Plaintiff.

**Answer:**        This Count was dismissed by the Court for lack of subject matter jurisdiction and,

thus, no response is required from DePaul.

127.    Defendants' breach of fiduciary duty caused Plaintiff damage including, but not limited to, that he was not employed the next academic year, as more fully described above.

**Answer:**        This Count was dismissed by the Court for lack of subject matter jurisdiction and,

thus, no response is required from DePaul.

## COUNT XII
## Promissory Estoppel

128.    Plaintiff reasserts and realleges all previously pled paragraphs as if incorporated fully herein.

**Answer:**        This Count was dismissed by the Court for lack of subject matter jurisdiction and,

thus, no response is required from DePaul.

129.    Defendant DePaul made an unambiguous promise that Plaintiff could adjunct in the next academic year and told Plaintiff he could request Enhanced Pay based on his years of experience at DePaul.

**Answer:**        This Count was dismissed by the Court for lack of subject matter jurisdiction and,

thus, no response is required from DePaul.

130.    Plaintiff's reliance on DePaul's promises was expected and foreseeable.

**Answer:**        This Count was dismissed by the Court for lack of subject matter jurisdiction and,

thus, no response is required from DePaul.

131.    Plaintiff relied on the promises to his detriment when he proposed Enhanced Pay he thought would be fair, and DePaul later used this as a basis to deny him employment as an adjunct, causing him damage, as more fully described above.

**Answer:**    This Count was dismissed by the Court for lack of subject matter jurisdiction and,

thus, no response is required from DePaul.

## COUNT XIII
## False Light Invasion of Privacy

132.    Plaintiff reasserts and realleges all previously pled paragraphs as if incorporated fully herein.

**Answer:**    This Count was dismissed by the Court for lack of subject matter jurisdiction and,

thus, no response is required from DePaul.

133.    As described more fully above, Defendants DePaul, Tamburro and Morgen, along with other unnamed DePaul faculty and staff, colluded to place Plaintiff in a false light to the public by way of the article published in The DePaulia newspaper.  The false light imputed upon Plaintiff the commission of a crime, as well as conduct that would impute upon his professional integrity, and thus would be highly offensive to a reasonable person.  Defendants acted with knowledge that the statements were false or with reckless disregard for whether the statements were true or false.

**Answer:**    This Count was dismissed by the Court for lack of subject matter jurisdiction and,

thus, no response is required from DePaul.

134.    Defendants are responsible for the publication. Defendants determined when to publish the article about Plaintiff, gave journalists access to otherwise private information, and ultimately approved all of the information that was included, and excluded, from the article. Statements that placed Plaintiff in a false light include, but are not limited to: including the former student's false claim, unrebutted, that Plaintiff was the subject of "many complaints" of harassment, when Defendants knew or should have known the statement was false; quoting a student that was not even in the same class as the former student (while claiming she was) who then commented negatively on Plaintiff's professionalism; and omitted the fact that Plaintiff had filed a defamation claim and provided no legal updates on the case, even though DePaul actively promoted the article until September 2018.

**Answer:**    This Count was dismissed by the Court for lack of subject matter jurisdiction and,

thus, no response is required from DePaul.

135.    Defendants' conduct caused Plaintiff damage, including, but not limited to, loss of

professional and economic opportunities and significant damage to his professional reputation.

**Answer:**    This Count was dismissed by the Court for lack of subject matter jurisdiction and, thus, no response is required from DePaul.

DePaul denies that Plaintiff is entitled to any of the relief requested following Paragraph 135 of the SAC.

## AFFIRMATIVE DEFENSES

As and for its Affirmative Defenses to Plaintiff's Second Amended Complaint, Defendant DePaul University states as follows:

1.    To the extent Plaintiff has failed to exercise diligence to mitigate his alleged damages, such damages are barred.

2.    DePaul acted reasonably and in good faith at all times to comply with applicable laws; therefore, Plaintiff's claims for punitive damages are barred.

3.    Plaintiff's claims are barred, in whole or in part, by Plaintiff's unclean hands.

DePaul reserves the right to amend its answer and affirmative defenses for purposes of raising any additional affirmative defenses presently existing or that may be learned through discovery and/or further proceedings in this matter.

Dated: January 15, 2021                           Respectfully submitted,

                                                  Defendant DePaul University

                                        By:    /s/ Brian P. Paul
                                               One of Its Attorneys


Brian P. Paul
Kerryann M. Haase
Michael K. Chropowicz
Michael Best & Friedrich LLP
444 W. Lake Street, Suite 3200
Chicago, IL  60606
Telephone: 312.222.0800

## CERTIFICATE OF SERVICE

I hereby certify that on January 15, 2021, I electronically filed the foregoing ***Defendant's Answer to Plaintiff's Second Amended Complaint*** with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

**Christina W. Abraham**
Abraham Law & Consulting, LLC
161 N. Clark St., Suite 1600
Chicago, Illinois 60601
Email: christina.w.abraham@gmail.com


/s/ Brian P. Paul
*Attorney for Defendant DePaul University*
Michael Best & Friedrich LLP
444 West Lake Street, Suite 3200
Chicago, Illinois 60606
E-mail: bppaul@michaelbest.com

## IN THE FEDERAL DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

LAITH SAUD,

Plaintiff,

v.

DEPAUL UNIVERSITY,

Defendant.

Case No.: 19-cv-3945

Hon. Judge Joan B. Gottschall

Hon. Magistrate Judge Susan E. Cox

### PLAINTIFF'S RESPONSE TO DEFENDANT'S STATEMENT OF MATERIAL FACTS

Plaintiff LAITH SAUD ("Saud"), by and through undersigned Counsel, submits in accordance with Local Rule 56.1(b)(3) of the United States District Court for the Northern District of Illinois, the following response to the movant's statement of undisputed material facts:

### BACKGROUND[1]

1. DePaul University ("DePaul") is a private Catholic, Vincentian university located in Chicago, Illinois. (Declaration of Guillermo Vásquez de Velasco ("Velasco Decl.") at ¶ 3, attached as Exhibit 1 to Appendix of Exhibits to DePaul's Motion for Summary Judgment ("Appendix")).

**RESPONSE:**

**Plaintiff objects to Defendant Exhibit 1, Velasco Declaration, to the extent that it repeats or is inconsistent with prior deposition testimony and to the extent that it deals with matters raised in the deposition. Subject to and without waiving his objections, Plaintiff does not dispute the statements in DSOF ¶ 1.**

---

[1] Plaintiff objects to Defendants use of subject headings to the extent that they intend to establish facts. Plaintiff neither incorporates nor responds to the Defendant's SMF subject headings in his response.

1

2.   DePaul has ten different colleges and schools, each of which have their own dean who generally is responsible for overseeing the operations of the college or school, providing input on the college's or school's curriculum, managing the budget within the college or school, and other administrative duties. (Exhibit 1, Velasco Decl. ¶ 4; Deposition Transcript of Guillermo Vásquez de Velasco ("Velasco Dep.") at 19:1-10, attached as Exhibit 2 to Appendix).

**RESPONSE:**

**Plaintiff objects to Defendant Exhibit 1, Velasco Declaration, to the extent that it repeats or is inconsistent with prior deposition testimony and to the extent that it deals with matters raised in the deposition. Subject to and without waiving his objections, Plaintiff does not dispute the statements in DSOF ¶ 2**

3.   DePaul's Anti-Discrimination and Anti-Harassment Policy and Procedures ("ADAH Policy") stated, in part:

**II. Scope Detail**

This policy affects all members of the DePaul community as well as those who interact with the DePaul community and its members.

* * *

**VI. Policy**
It is the policy of DePaul University that no person shall be the object of discrimi- nation or harassment on the basis of race, color, ethnicity, . . . national origin . . . or other status protected by local, state, or federal law in its employment or its educa- tional settings.

* * *

**Prohibited Harassment**

* * *

Special Considerations – Consensual Relationships
Amorous relationships that might be appropriate in other circumstances present serious difficulties within the University Community. Relationships between individuals in inherently unequal positions (such as teacher and student, supervisor and employee) may

2

undermine the real or perceived integrity of the supervision and evaluation process, as well as affect the trust inherent in the educational environment. Consensual romantic relationships in which one party is in a position to re- view the work or influence the career of the other may provide grounds for com- plaint when that relationship gives undue access or advantage to, restricts opportunities of, or creates a hostile and unacceptable environment for one of the parties to the relationship, or for others.

In such circumstances, consent may not be considered a defense against a charge of sexual harassment in violation of this Policy. The determination of what consti- tutes sexual harassment depends upon the specific facts and the context in which the conduct occurs.

### D. Reporting

\* \* \*

The Office of Institutional Diversity and Equity ('OIDE') is responsible for receiv- ing, processing, and investigating complaints of discrimination, harassment, and/or retaliation[.]

\* \* \*

[A]ll DePaul faculty, staff, and student employees are required to promptly report incidents of sex discrimination and sexual harassment, including sexual and relationship violence that comes to their attention to the Title IX Coordinator.

Title IX Coordinator: The DePaul University Title IX Coordinator is located in the Office of Institutional Diversity and Equity.

(Deposition of Laith Saud ("Pl. Dep.") at 338:18-339:22, attached as Exhibit 3 to Appendix; Pl. Dep. Ex. 20 at DEF00048-DEF00053, attached as Exhibit 4 to Appendix; Deposition Transcript of Karen Tamburro ("Tamburro Dep.") 112:13-23, attached as Exhibit 5 to Appendix).

**RESPONSE:**

**Plaintiff disputes DSOF ¶ 3 to the extent that it is incomplete and therefore misleading. Plaintiff does not dispute that the quoted portions in DSOF ¶ 3 are excerpted from DePaul's ADAH policy. Under this section of the ADAH policy, "Prohibited Harassment", which is not included in Defendant's excerpts, is defined as:**

3

**Harassment is unwelcome conduct that is based on any of the above described protected categories. Such harassment is prohibited where: 1) enduring the offensive conduct becomes a term or condition of ones academic, working, or living environment, or 2) the conduct is severe or pervasive enough to create an academic, working, or living environment that a reasonable person would consider intimidating, hostile, or abusive.**

**Minor and isolated incidents (unless extremely serious) generally will not rise to the level of prohibited conduct. To be prohibited, the conduct must create an academic, working, or living environment that would be intimidating, hostile, or abusive to reasonable people.**

**Depending on the specific circumstances and impact on the workplace or academic environment, examples of harassment and violation of this policy include, but are not limited to, verbal abuse, offensive innuendo, derogatory comments, or the open display of offensive objects or pictures concerning a person's race, color, ethnicity, religion, sex, gender, gender identity, sexual orientation, national origin, age, marital status, pregnancy, parental status, family relationship status, physical or mental disability, military status, genetic information or other protected status.**

**In addition to the examples of prohibited harassment above, sexual harassment warrants further explanation. Sexual harassment also includes, but is not limited to, any unwelcome sexual advances, direct or indirect, requests for sexual favors and other verbal or physical conduct of a sexual nature when: submission to such conduct is made or is threatened to be made, either explicitly or implicitly, a term or condition of instruction, employment or participation in other university activity; or**

- **submission to such conduct is made or is threatened to be made, either explicitly or implicitly, a term or condition of instruction, employment or participation in other university activity; or**
- **submission to or rejection of such conduct by an individual is used or is threatened to be used as a basis for evaluation and making academic or employment decisions affecting that individual.**

**Def. MSJ Ex. 4. Plaintiff further adds that the policy is not interpreted to expressly prohibit relationships between faculty and students, even where the student is enrolled in the faculty member's class. Def. MSJ Ex. 4; Pl. MSJ Exhibit 8, Ortiz Dep. p. 43; Pl. MSJ Exhibit 15, Tamburro Dep. p. 19; Pl. MSJ Exhibit 18, Email from Tamburro to Chris Bury; Pl. MSJ Exhibit 19, DePaulia Power Player Article.**

4.   Plaintiff was aware of DePaul's ADAH Policy language during his employment at DePaul. (Exhibit 3, Pl. Dep. 341:9-17).

**RESPONSE:**

      **Plaintiff does not dispute the statements in DSOF ¶ 4.**

    5. In 2017, Karen Tamburro was DePaul's Title IX Coordinator. (Tamburro Dep.13:16-24, 14:5-16; Declaration of Karen Tamburro ("Tamburro Decl.") at ¶ 3, attached as Exhibit 6 to Appendix).

**RESPONSE:**

      **Plaintiff objects to Defendant Exhibit 6, Tamburro Declaration, to the extent that it repeats or is inconsistent with prior deposition testimony and to the extent that it deals with matters raised in the deposition. Subject to and without waiving his objections, Plaintiff does not dispute the statements in DSOF ¶ 5.**

    6.   Tamburro was responsible for investigating complaints and concerns of sex discrimination, sexual harassment, and sexual and relationship violence, impacting DePaul students and faculty under DePaul's ADAH and Sexual Relationship Violence Prevention and Response Policies. (Exhibit 5, Tamburro Dep. 14:17-21, 23:17-24, 29:18-31:3, 57:17-20; Exhibit 6, Tamburro Decl. ¶ 3).

**RESPONSE:**

    **Plaintiff objects to Defendant Exhibit 6, Tamburro Declaration, to the extent that it repeats or is inconsistent with prior deposition testimony and to the extent that it deals with matters raised in the deposition. Subject to and without waiving his objections, Plaintiff does not dispute the statements in DSOF ¶ 5.**

7. Plaintiff began working in DePaul's Department of Religious Studies ("Religious Studies") as an adjunct instructor in 2005 or 2006. (Exhibit 3, Pl. Dep. 20:4-12, 20:21-24).

**RESPONSE:**

    **Plaintiff does not dispute the statements in DSOF ¶ 7.**

8. Dr. Khaled Keshk, also Arab American, currently is and was the Chair of Religious Studies in 2017. (Exhibit 3, Pl. Dep. 187:15-18; Deposition Transcript of Khaled Keshk ("Keshk Dep.") 12:4-10, attached as Exhibit 7 to Appendix; Declaration of Dr. Khaled Keshk ("Keshk Decl.") at ¶ 3, attached as Exhibit 8 to Appendix).

**RESPONSE:**

    **Plaintiff objects to Defendant Exhibit 7, Keshk Declaration, to the extent that it repeats or is inconsistent with prior deposition testimony and to the extent that it deals with matters raised in the deposition. Subject to and without waiving his objections, Plaintiff does not dispute the statements in DSOF ¶ 8.**

9. Religious Studies is part of DePaul's College of Liberal Arts and Social Sciences ("LAS"). (Exhibit 1, Velasco Decl. ¶ 6).

**RESPONSE:**

    **Plaintiff objects to Defendant Exhibit 1, Velasco Declaration, to the extent that it repeats or is inconsistent with prior deposition testimony and to the extent that it deals with matters raised in the deposition. Subject to and without waiving his objections, Plaintiff does not dispute the statements in DSOF ¶ 9.**

10. Guillermo Vásquez de Velasco started as the Dean of LAS on or about July 1, 2016, and held that position in 2017. (Exhibit 1, Velasco Decl. ¶ 5; Exhibit 2, Velasco Dep. 11:17-25). The Dean

has never met Plaintiff and he is not aware of Plaintiff's race. (Exhibit 3, Pl. Dep. 315:18-19; Exhibit 2, Velasco Dep. 32:22-33:1; Exhibit 1, Velasco Decl. ¶ 10).

**RESPONSE:**

**Plaintiff objects to Defendant Exhibit 1, Velasco Declaration, to the extent that it repeats or is inconsistent with prior deposition testimony and to the extent that it deals with matters raised in the deposition. Subject to and without waiving his objections, Plaintiff disputes DSOF ¶ 10 in part. Plaintiff does not dispute Velasco was LAS Dean in 2017. Plaintiff disputes Dean Velasco never met Plaintiff and did not know his race. In July of 2016 Velasco was included in an email that discussed a TedX talk given by Plaintiff that discussed his Arab and Muslim background. He also recalled something about a talk Plaintiff gave and was copied on an email that discussed a TedX talk Plaintiff gave about his Arab upbringing. Pl. MSJ Ex. 12, Velasco Dep. p. 33-34; see also Velasco Dep. Ex. 2., attached as Pl. Resp. MSJ Ex. 1.**

11. Plaintiff later became a term faculty member in Religious Studies. (Exhibit 3, Pl.Dep. 31:3-10, 34:19-21; Exhibit 7, Keshk Dep. 75:9-25, 76:16-18).

**RESPONSE:**

**Plaintiff does not dispute the statements in DSOF ¶ 11.**

12. The term faculty position is a non-tenure track position hired through annual teach- ing contracts, which expire at the end of each academic year. (Exhibit 3, Pl. Dep. 34:22-35:6; Exhibit 1, Velasco Decl. ¶ 7).

**RESPONSE:**

**Plaintiff objects to Defendant Exhibit 1, Velasco Declaration, to the extent that it repeats or is inconsistent with prior deposition testimony and to the extent that it deals with matters**

**raised in the deposition. Subject to and without waiving his objections, Plaintiff does not dispute the statements in DSOF ¶ 11.**

13. Plaintiff's last term faculty appointment at DePaul was for the 2016-2017 academic year. (Exhibit 3, Pl. Dep. 36:17-19, 75:9-76:16; Pl. Dep. Ex. 5, attached as Exhibit 9 to Appen- dix). Plaintiff's offer letter stated, "This is a one year term faculty appointment that runs through June 30, 2017 with possibility of renewal depending on annual performance review and/or budget availability." (Exhibit 3, Pl. Dep. 75:9-20; Exhibit 9, Pl. Dep. Ex. 5).

**RESPONSE:**

**Plaintiff does not dispute the statements in DSOF ¶ 13.**

14. On April 10, 2017, the Dean sent a letter to Plaintiff stating, in part, "I am writing to inform you that I will not be reappointing you for academic year 2017-2018 due to the budgetary constraints within the college. As you are aware, your current appointment is for academic year 2016-2017 and will end June 30, 2017." (Exhibit 3, Pl. Dep. 79:20-24, 171:9-23; Pl. Dep. Ex. 8, attached as Exhibit 10 to Appendix).

**RESPONSE:**

**Plaintiff disputes the statements in DSOF ¶ 14 they are incomplete and therefore misleading. The letter also states, "I want, however, to take this occasion to note that your department's review reflects favorably on your instructional and collegial performance and to thank you for your dedication to our students' education." Pl. MSJ Ex. 13 at DEF 9558.**

15. On April 11, 2017, in conjunction with learning Plaintiff's contract would not be renewed, Keshk discussed with Plaintiff the possibility of teaching as an adjunct instructor in the fall. (Exhibit 3, Pl. Dep. 78:12-79:17, 172:4-173:20; Exhibit 7, Keshk Dep. 102:10-103:19).

**RESPONSE:**

**Plaintiff does not dispute the statements in DSOF ¶ 15.**

16. For DePaul's Autumn Quarter in 2017, the highest pay Keshk was authorized to offer an adjunct was $4,800 per course. (Exhibit 3, Pl. Dep. 263:2-19; Pl. Dep. Ex. 13, attached as Exhibit 11 to Appendix; Exhibit 2, Velasco Dep. 122:1-10). Adjuncts cannot receive more than $4,800 per course without approval from the Dean. (Exhibit 3, Pl. Dep. 263:2-19; Exhibit 11, Pl. Dep. Ex. 13; Exhibit 2, Velasco Dep. 122:1-11).

**RESPONSE:**

**Plaintiff does not dispute the statements in DSOF ¶ 16.**

17. Even though the Dean's approval is required to pay an adjunct more than $4,800 per course, the decision of whether to hire an adjunct faculty member belongs to the Chair of the department. (Exhibit 2, Velasco Dep. 115:2-3, 122:1-10; Exhibit 7, Keshk Dep. 12:6-21).

**RESPONSE:**

**Plaintiff disputes the statements in DSOF ¶ 17. The Dean's office was involved in determining whether to bring Saud back to adjunct because they are "always involved" in those decisions. Pl. MSJ Ex. 2, Keshk Dep., 17:3-16.**

18. The Chair of the department is responsible for deciding what courses will be taught, reviewing enrollment in courses, determining whether the course should move forward and, if so, confirming with the adjunct assigned to teach the course. (Exhibit 3, Pl. Dep. 26:9-27:21, 28:14-18; Exhibit 8, Keshk Decl. ¶ 4).

**RESPONSE:**

**Plaintiff objects to Defendant Exhibit 8, Keshk Declaration, to the extent that it repeats or is inconsistent with prior deposition testimony and to the extent that it deals with matters raised in the deposition. Plaintiff disputes the statements in DSOF ¶ 18 as they are incomplete**

**and therefore misleading. The Chair reports to the Dean, is limited to the budget set by the Dean and the Dean is "always involved" in the hire of adjuncts. Pl. MSJ Ex. 2, Keshk Dep., 17:3-16; Pl. MSJ Ex. 12, Velasco Dep. 19:9-12.**

19. In April 2017, DePaul received a letter from an attorney representing a former DePaul student (hereinafter referred to as, "C.M.") (the "Attorney Letter"). (Exhibit 3, Pl. Dep. 175:7-23, 176:9-177:4; Pl. Dep. Ex. 9, attached as Exhibit 12 to Appendix).

**RESPONSE:**

   **Plaintiff does not dispute the statements in DSOF ¶ 19.**

20. The Attorney Letter was dated April 10, 2017, though Plaintiff did not receive a copy until after his April 11, 2017 discussion with Keshk. (Exhibit 3, Pl. Dep. 79:11-17, 176:9-177:13; Exhibit 12, Pl. Dep. Ex. 9).

**RESPONSE:**

   **Plaintiff does not dispute the statements in DSOF ¶ 20.**

21. The Attorney Letter was addressed to Plaintiff and stated the attorney represented "DePaul student [C.M.] in connection with a claim against you with regards to repeated acts of sexual misconduct and reckless behavior involving a student taking one your classes." (Exhibit 3, Pl. Dep. 176:9-18; Exhibit 12, Pl. Dep. Ex. 9).

**RESPONSE:**

   **Plaintiff does not dispute the statements in DSOF ¶ 21.**

22. The Attorney Letter was the first time anyone had complained to DePaul about a relationship between Plaintiff and C.M. (Exhibit 3, Pl. Dep. 176:2-6).

**RESPONSE:**

   **Plaintiff does not dispute the statements in DSOF ¶ 22.**

23. Plaintiff does not believe DePaul was behind C.M. sending the Attorney Letter to Plaintiff and DePaul. (Exhibit 3, Pl. Dep. 234:5-10).

**RESPONSE:**

**Plaintiff objects to DSOF ¶ 23 as speculative. Plaintiff disputes the statements in DSOF ¶ 23 as they are incomplete and therefore misleading. Plaintiff stated, "not necessarily, nor does it have to be my belief... My belief is DePaul took it as an opportunity to get rid of me." Pl. MSJ Ex. 1, p. 234:9-13. Plaintiff believes DePaul also created an environment where third parties were "enthusiastic" about reporting him to OIDE (*Id.* 234:21-22), after the CampusWatch article came out (*Id.* 236:1-2).**

24. Tamburro received a copy of the Attorney Letter and opened an investigation into the claim. (Exhibit 5, Tamburro Dep. 35:10-12, 36:2-6, 50:14-51:9, 57:6-8). Tamburro's investigation also encompassed a report related to a second DePaul student that was brought to Tamburro's attention on April 12, 2017. (Exhibit 5, Tamburro Dep. 36:2-6, 50:6-17).

**RESPONSE:**

**Plaintiff disputes DSOF ¶ 24 in part. Plaintiff does not dispute that Tamburro received a copy of the Attorney Lien letter and opened an investigation into the claim. Plaintiff disputes the remaining statements in DSOF ¶ 24 as they are incomplete and therefore misleading. Regarding the second report, Tamburro was investigating a report made to her on or about April 12, 2017, made by a student who overheard about another student, ▮▮▮▮▮▮ ("AR"), going out for drinks with Plaintiff and that AR "did not think anything was wrong with it." Pl. MSJ Ex. 20, Pl. MSJ Ex. 27, pp. 34-35. Tamburro emailed AR regarding the alleged overheard conversation and met with AR. AR denied anything improper occurred and denied feeling uncomfortable. Pl. MSJ Ex. 22, Pl. MSJ Ex. 34; Pl.**

11

**MSJ Ex. 15, pp. 47-48.  AR felt uncomfortable that someone was eavesdropping on her conversation and reporting about it.  Pl. MSJ Ex. 22. AR asked Tamburro to tell her who had listened in and reported on her conversation.  Tamburro never responded. *Id.* "Based on [her] conversation with Tamburro, and her pointed tone, [AR] had the distinct impression they were trying to build a case against [Saud]." Pl.  MSJ Ex. 34, AR Affidavit.  For example, AR was "repeatedly asked the same questions over and over". *Id.***

25. Plaintiff informed Keshk of the OIDE investigation. (Exhibit 3, Pl. Dep. 180:3-182:3).

**RESPONSE:**

**Plaintiff does not dispute the statements in DSOF ¶ 25.**

26. Plaintiff told Keshk that he was very happy he was dismissed for financial reasons because the investigation would be a disaster on Plaintiff's record, and told Keshk he did not want to come back to DePaul. (Exhibit 3, Pl. Dep. 189:9-19; Exhibit 7, Keshk Dep. 112:14-114 119:23-120:2).

**RESPONSE:**

**Plaintiff disputes the statements in DSOF ¶ 26. Plaintiff testified to a conversation with Keshk, but at his deposition he was not asked if he resigned, rather was asked only if he told Keshk he was "fortunate" the budget cuts came before the OIDE investigation.  Pl. MSJ Ex. 1, pp. 188-189.  Keshk told Plaintiff DePaul would discriminate against him in the OIDE investigation, and this conversation occurred within that context.  Pl. MSJ Ex. 1, p: 183:1-3, 183:9-12, 183:15-17, 189:14-24; 190:1-9, 190:13-18. Plaintiff denies he resigned or that he told Keshk he did not want to come back to DePaul.  Pl. MSJ Resp. Exhibit 3, Affidavit 2 of Plaintiff.**

27. On May 2, 2017, Tamburro interviewed Plaintiff. (Exhibit 3, Pl. Dep. 199:20- 200:1, 200:12-201:14; Pl. Dep. Ex. 10, attached as Exhibit 13 to Appendix). Tamburro took notes during the interview and prepared a typed version of her notes after the interview, which stated, in part:

> Prof al Saud stated that a sexual relationship developed in mid-June 2016, after the course ended and she was no longer a student      Prof. al Saud stated that they had sex on two separate occasions in his home in June 2016. He stated that the sex was consensual.

* * *

Prof al Saud stated that [C.M.] did not return to DePaul in fall 2016. (Exhibit 3, Pl. Dep. 200:12-201:14; Exhibit 13, Pl. Dep. Ex. 10; Exhibit 5, Tamburro Dep. 86:2- 9, 87:4-19).

**RESPONSE:**

**Plaintiff objects to Def. MSJ Ex. 13 as double hearsay to the extent that it is offered for proof of the matters asserted therein. Tamburro testified she destroyed her handwritten notes. Pl. MSJ Ex. 15, Tamburro Dep., 86:6-9. Plaintiff also disputes the characterization of ¶ 27 as incomplete and therefore misleading. Plaintiff testified to the discrepancies in Tamburro's notes, including as to when he told Tamburro the sexual relationship began. Pl. MSJ Ex. 1, pp. 205, 209-211. Plaintiff on numerous occasions stated the course was over when the sex occurred. Pl. MSJ Ex. 1, p. 84:19-24, 85:17, 117, 127:4-5.**

28. Tamburro's typed notes accurately reflect what Plaintiff told Tamburro in the interview with respect to the above statements, except according to Plaintiff he "told Karen Tam- burro that the relationship happened after the class ended, which could have been any time between May and June." (Exhibit 3, Pl. Dep. 204:6-214:11). Tamburro disputes this. (Exhibit 5, Tamburro Dep. 87:8-19).

**RESPONSE:**

13

**Plaintiff disputes the statements in DSOF ¶ 28. Saud testified to discrepancies between what he told Tamburro and what was contained in the typed document. Pl. MSJ Ex. 1, pp. 205, 209-211.**

29. C.M.'s attorney informed Tamburro to not contact his client. (Exhibit 5, Tamburro Dep. 56:19-57:5). Thus, C.M. did not participate in the investigation. (Exhibit 5, Tamburro Dep. 75:6-76:3).

**RESPONSE:**

**Plaintiff does not dispute the statements in DSOF ¶ 29.**

30. In May 2017, Tamburro concluded her investigation and prepared a written report and findings, dated May 9, 2017. (Exhibit 5, Tamburro Dep. 72:7-17; Tamburro Dep. Ex. 13, attached as Exhibit 14 to Appendix).

**RESPONSE:**

**Plaintiff objects to Def. MSJ Ex 14 as hearsay to the extent that it is offered for proof of the matters asserted therein. Plaintiff does not dispute Tamburro concluded her investigation in May 2017 and prepared a written report and findings dated May 9, 2017.**

31. In her May 9, 2017 report, Tamburro relied upon her notes from Plaintiff's May 2, 2017 interview, and found insufficient evidence to support a finding that Plaintiff engaged in a sexual offense, sexual misconduct, or sexual harassment, as those terms are defined in DePaul's ADAH and Sexual Relationship Violence Prevention and Response ("SRVPR") Policies. (Exhibit 5, Tamburro Dep. 72:7-17, 96:20-24; Exhibit 14, Tamburro Dep. Ex. 13; Exhibit 6, Tamburro Decl. ¶ 6).

**RESPONSE:**

**Plaintiff objects to Def. MSJ Ex 14 as hearsay to the extent that it is offered for proof of the matters asserted therein.  Plaintiff objects to Defendant Exhibit 6, Tamburro Declaration, to the extent that it repeats or is inconsistent with prior deposition testimony and to the extent that it deals with matters raised in the deposition. Subject to and without waiving his objections, Plaintiff disputes DSOF ¶ 31 in part. It is undisputed that Tamburro found insufficient evidence to support a finding that Plaintiff violated the ADAH policy. Plaintiff disputes that she "relied upon her notes from Plaintiff's May 2, 2017" interview if they intend it to mean that she relied exclusively upon her notes from Plaintiff's interview.**

32. Tamburro's May 9, 2017 report stated, in part, "The information presented supports that Prof. al Saud did not request or solicit, directly or indirectly that Student B engage in a sexual relationship with him while she was a student in his class. No information suggests that a sexual relationship was connected to Student B's participation in the class or the grade she received in the class." (Exhibit 5, Tamburro Dep. 72:7-17; Exhibit 14, Tamburro Dep. Ex. 13 at DEF00234).

**RESPONSE:**

**Plaintiff objects to Def. MSJ Ex 14 as hearsay to the extent that it is offered for proof of the matters asserted therein.  Plaintiff does not dispute that Tamburro wrote this in her May 2017 report.**

33. Plaintiff had no reason to believe Tamburro was singling out or targeting Plaintiff in the investigation. (Exhibit 3, Pl. Dep. 309:4-9).

**RESPONSE:**

**Plaintiff objects to this statement as speculative. Plaintiff disputes DSOF ¶ 33 as it is incomplete and therefore misleading. Plaintiff was testifying about his impression at the time**

15

he first spoke with Tamburro and Plaintiff later came to believe she was targeting him and provided detailed reasons for this belief. **Pl. MSJ Ex. 1, Pl. Dep., 309:3-312-:13.**

34. On May 10, 2017, Tamburro notified Plaintiff and C.M. of her findings. (Exhibit 3, Pl. Dep. 241:14-242:13; Pl. Dep. Ex. 12, attached as Exhibit 15 to Appendix; Exhibit 6, Tam- burro Decl. ¶ 7).

**RESPONSE:**

**Plaintiff objects to Def. Ex. 15 as hearsay to the extent that it is offered for proof of the matters asserted therein. It is undisputed that on May 10, 2017 Tamburro notified Plaintiff of her findings.**

35. After Plaintiff received Tamburro's May 10, 2017 closing letter, Plaintiff informed Keshk he was cleared. (Exhibit 3, Pl. Dep. 191:20-192:9, 243:6-22, Exhibit 7, Keshk Dep. 124:15-25; Keshk Dep. Ex. 17, attached as Exhibit 16 to Appendix). Plaintiff never disclosed to Keshk in April or May 2017 he had sex with C.M. while she was a student in Plaintiff's class. (Exhibit 3, Pl. Dep. 180:9-199:4).

**RESPONSE:**

**Plaintiff disputes DSOF ¶ 35 in part. Plaintiff does not dispute the first sentence in DSOF 35. Plaintiff disputes the remaining statements. Plaintiff did not have sex with CM while she was a student in his class and DePaul has not proffered evidence that he did. Plaintiff on numerous occasions stated the course was over when the sex occurred. Pl. MSJ Ex. 1, p. 84:19-24, 85:17, 117, 127:4-5.**

36. Plaintiff later told Keshk he wanted to teach at DePaul as an adjunct. (Exhibit 7, Keshk Dep. 114:25-116:15).

**RESPONSE:**

**Plaintiff disputes DSOF ¶ 36 in part. Plaintiff disputes that he "later" told Keshk he wanted to adjunct. Plaintiff informed Keshk and the Dean of his desire to continue teaching at DePaul immediately after he was informed his term faculty contract would be canceled due to budget cuts. Pl. MSJ Ex. 13, Nonrenewal letter; Pl. MSJ Ex. 12, Velasco, 49:10-16, 86:25-87:1; Ex. 2, 96:7-25; Pl. MSJ Ex. 1, Saud, 249:3-18; Pl. MSJ Ex. 2, Keshk, 113:16-22; Pl. MSJ Ex. 39; Pl. MSJ Ex. 56, Keshk-Saud Email re cancellation of contract; Pl. MSJ Ex. 75, Saud-Velasco email.**

37. Keshk began looking into plans for Plaintiff to teach in the fall and was "going to bring him back as an adjunct." (Exhibit 7, Keshk Dep. 115:9-14, 116:12-15, 160:6-12).

**RESPONSE:**

**Plaintiff disputes DSOF ¶ 35 as incomplete and misleading. On April 11, 2017, Keshk began inquiring about whether Plaintiff and Comparator A could return to adjunct. Pl. MSJ Ex. 2, Keshk Dep., pp. 113-114; Pl. MSJ Ex. 39. Keshk then scheduled Comparator A's classes for the Fall quarter, but not Plaintiff's. Pl. MSJ Exhibit 41; Pl. MSJ Ex. 2, Keshk Dep., 163-165. He told Plaintiff that his courses were "taken off" and that they were "rescheduling" them in May of 2017. Pl. MSJ Ex. 42-43; Pl. MSJ Ex. 2, Keshk Dep., 161-170. In June of 2017, Keshk told Plaintiff that his "courses were on the books", but they were not. Pl. MSJ Ex. 2, Keshk Dep., 170; Pl. MSJ Ex. 44. During this time, the LAS Dean's office had created an "adjunct position" for Comparator A and authorized Keshk to terminate his term faculty position from the system, and at the same time "terminated" Plaintiff's "adjunct position", then reinstated it so that Keshk could "terminate him in the system". Pl. MSJ Ex. 2, Keshk, 173-176; Pl. MSJ Ex. 47.**

17

38. On June 8, 2017, Plaintiff emailed Keshk stating, in part, "After doing some investigating and speaking with folks on campus, 'enhanced pay' has come to my attention for adjuncts" and asked Dr. Keshk, "Is this something we could look into?" (Exhibit 7, Keshk Dep. 135:12-23; Keshk Dep. Ex. 21, attached as Exhibit 17 to Appendix).

**RESPONSE:**

**Plaintiff does not dispute the statements in DSOF ¶ 38.**

39. On June 28, 2017, Plaintiff emailed Keshk stating, in part, "Last week I had a very helpful meeting with Katie Kutina of the Dean's office regarding adjunct pay. I am aware that the Dean's office does approve pay above the $4,800 mark, Katie instructed me that the process for me to request such pay should begin with my department chair " (Exhibit 3, Pl. Dep. 264:3-265:11; Pl. Dep. Ex. 14, attached as Exhibit 18 to Appendix).

**RESPONSE:**

**Plaintiff does not dispute the statements in DSOF ¶ 39.**

40. On June 28, 2017, Keshk emailed Plaintiff and ████████ asking them to let him know "what would be a 'fair' amount for your salary and I will send a letter soliciting that amount from the Dean." (Exhibit 3, Pl. Dep. 269:23-270:15; Pl. Dep. Ex. 15, attached as Exhibit 19 to Appendix).

**RESPONSE:**

**Plaintiff does not dispute the statements in DSOF ¶ 40.**

41. On June 29, 2017, C.M. filed a lawsuit in the Circuit Court of Cook County, Illinois against Plaintiff and DePaul, asserting claims for battery, negligence, and violations of the Illinois Gender Violence Act (the "Circuit Court lawsuit"). (Exhibit 5, Tamburro Dep. 65:21-66:3; Tam- burro Dep. Ex. 11, attached as Exhibit 20 to Appendix).

**RESPONSE:**

**Plaintiff objects to the statements in DSOF ¶ 41 and to Defendant Exhibit 20 to the extent they intend to establish CM's complaint allegations as fact.  Subject to and without waiving his objections, Plaintiff does not dispute that on June 29, 2017, CM filed a lawsuit against DePaul and Plaintiff alleging negligent hiring, battery and violations of the Illinois Gender Violence Act.**

42. C.M.'s complaint alleged, in part, that on April 15, 2016, Plaintiff had dinner with C.M. where he "plied the plaintiff with alcohol in an attempt to get her intoxicated"; after dinner Plaintiff took C.M. to his home and "began to aggressively seek sexual relations with the plaintiff" and Plaintiff "had sexual intercourse with his student at that time." (Exhibit 5, Tamburro Dep. 65:21-66:3; Exhibit 20, Tamburro Dep. Ex. 11 at ¶ 7).

**RESPONSE:**

**Plaintiff objects to the statements in DSOF ¶ 42 and to Defendant Exhibit 20 to the extent they intend to establish CM's complaint allegations as fact.  Subject to and without waiving his objections, Plaintiff does not dispute CM made the allegations stated in DSOF ¶ 42.**

43. C.M.'s complaint alleged, in part, Plaintiff told C.M., "he would give her an A in his class and that she did not have to take the final exam." (Exhibit 5, Tamburro Dep. 65:21-66:3; Exhibit 20, Tamburro Dep. Ex. 11 at ¶ 9).

**RESPONSE:**

**Plaintiff objects to the statements in DSOF ¶ 43 and to Defendant Exhibit 20 to the extent they intend to establish CM's complaint allegations as fact.  Subject to and without**

**waiving his objections, Plaintiff does not dispute C.M. made the allegations stated in DSOF ¶ 43.**

44. On June 29, 2017, the Chicago Sun Times published an article about the lawsuit against Plaintiff and DePaul. (Exhibit 3, Pl. Dep. 282:5-8; Exhibit 8, Keshk Decl. ¶ 5).

**RESPONSE:**

**Plaintiff objects to Defendant Exhibit 8, Keshk Declaration, to the extent that it repeats or is inconsistent with prior deposition testimony and to the extent that it deals with matters raised in the deposition. Subject to and without waiving his objections, Plaintiff does not dispute that on June 29, 2017, the *Chicago Sun Times* published an article about the lawsuit against Plaintiff and DePaul.**

45. On June 30, 2017, Plaintiff's employment at DePaul ended pursuant to the conclu- sion of his term faculty appointment. (Exhibit 3, Pl. Dep. 36:17-19, 75:9-20; Exhibit 9, Pl. Dep. Ex. 5). Plaintiff did not hold any other employment at DePaul after the end of his term faculty position. (Exhibit 3, Pl. Dep. 37:8-12).

**RESPONSE:**

**Plaintiff disputes DSOF ¶ 45 as it is incomplete and therefore misleading. Plaintiff was told he would return to teach under an adjunct contract and he was told that plans were underway to schedule his courses. Pl. MSJ Ex. 44-47; Pl MSJ Ex. 2, Keshk Dep., pp. 163-176. Plaintiff does not dispute the last day of his term faculty contract was June 30, 2017.**

46. On June 30, 2017, Keshk became aware of the Circuit Court lawsuit from a student who texted him after seeing the Chicago Sun Times article. (Exhibit 7, Keshk Dep. 183:6-185:16, 258:10-14; Keshk Dep. Ex. 35, attached as Exhibit 21 to Appendix).

**RESPONSE:**

**Plaintiff disputes DSOF ¶ 46 as it mischaracterizes the facts through omission. The text exchange provided as Def. MSJ Ex. 21 is clearly incomplete. Keshk was asked about this at his deposition and stated he could not recall if there were more texts with this student. Pl. MSJ Ex. 2, Keshk Dep., p. 183-186. Plaintiff does not dispute that on June 30, 2017, ███ ███, a student of Keshk but not a student of Plaintiff, texted Keshk stating "I heard about the lawsuit. Don't tell me it's true…" The record does not establish Keshk "became aware" of the lawsuit from ███ or that either knew who it was about. Def. Ex. 21.**

47. On July 1, 2017, Plaintiff responded to Keshk's June 28, 2017 email concerning enhanced pay and requested $6,000 per course. (Exhibit 3, Pl. Dep. 269:23-270:15, 278:21-279:5; Exhibit 19, Pl. Dep. Ex. 15).

**RESPONSE:**

**Plaintiff does not dispute the statements in DSOF ¶ 47.**

48. On July 5, 2017, Keshk contacted Tamburro to advise her that he received two reports regarding Plaintiff since the publication of the Chicago Sun Times article. (Exhibit 3, Pl. Dep. 283:14-19; Exhibit 7, Keshk Dep. 258:15-17; Exhibit 5, Tamburro Dep. 87:8; Tamburro Dep. Ex. 17 at DEF00214, attached as Exhibit 22 to Appendix).

**RESPONSE:**

**Plaintiff objects to Defendant Exhibit 22 as hearsay to the extent that it is offered to prove the matters asserted therein. Plaintiff disputes DSOF ¶ 48. The so-called "reports" were never investigated as "reports" by Tamburro or DePaul's OIDE, and Plaintiff was never made aware of them. Pl. MSJ Exhibit 57, August 21, 2017 OIDE letter to Saud re investigation. Keshk was instructed by DePaul to gather information about Plaintiff. Pl. MSJ Exhibit 25, Tamburro OIDE investigation notes, pp. 1-2, 4; Pl. MSJ Exhibit 15,**

Tamburro, 124:12-20; Pl. MSJ Exhibit 2, Keshk, 186:11-14, 268:4-18; 226:19-24.  Keshk

denied participating in the OIDE investigation of Plaintiff at the C.M. trial. Pl. MSJ Ex. 2,

Keshk Dep., 208-212; Pl. MSJ Ex. 81, Trial Transcript, 70:14-23.

        During his deposition in this litigation, and for the first time ever, Keshk claimed he

decided not to bring Plaintiff back to adjunct because, after receiving the so-called "reports",

he was "fearful that those allegations were actually correct."  Pl. MSJ Ex. 2, Keshk Dep.,

264.  Keshk did not ask Plaintiff about the information he "gathered" because "it was clear

to [him] that Laith would be lying to [him] whatever he said."  Pl. MSJ Ex. 2, 265:3-23.

Keshk could not explain what "information" he was claiming the additional women brought

forward and denied "gather[ing] any information" about Plaintiff.  Pl. MSJ Ex. 2, 190:20-

196:8, 261:21-264:22.

    At C.M.'s trial Keshk testified that he only learned Plaintiff had allegedly lied about when

the sexual relationship with C.M. began when OIDE made its determination in October 2017.

Pl. MSJ Ex. 2, Keshk Dep., 236-37, Pl. MSJ Ex. 81, p. 70:14-23.  Keshk doubled down on this

testimony during his deposition.  Pl. MSJ. Ex. 2, Keshk Dep., 236-237.

        Only during this litigation did Keshk claim he received additional "reports" about

Plaintiff. Keshk provided Tamburro with the contact information of the additional

Arab/Muslim female students, including ███████  who apparently only brought up the

*Chicago Sun Times* article about the lawsuit. *See* DSOF ¶ 46 and Plaintiff's response; Pl.

MSJ Ex. 2, Keshk Dep., 193-196. Between June 30 and July 5, Keshk reported information

about Saud from four women; none of them were current students, three were never students

of Saud, and all were Middle-Eastern and/or Muslim. Pl. MSJ Ex. 15, p. 115-116, Pl. MSJ

Ex. 2, p. 193-200; Pl. Resp. MSJ Ex 2, Affidavit 1 of Plaintiff.

None of the women that Keshk claimed made "reports" brought those reports to OIDE and none filed a complaint with OIDE after Keshk had Tamburro contact them. Pl. MSJ Ex. 15, 119-122; Pl MSJ Ex. 2, 194, 206-207. Keshk was told to bring them any information he came across regarding Plaintiff. Pl. MSJ Ex. 2, Keshk, 186:11-190:19. Tamburro has two versions of the same memo attributing a statement to two different female students who Keshk claimed to have obtained information regarding Saud. Pl. MSJ Ex. 2, 199-200; Pl. Rsp. MSJ Exhibit 4 (Memo version 1); Pl. Rsp. MSJ Exhibit 5 (Memo version 2). Keshk was involved in DePaul's investigation of Saud, but did not know whether he was helping with the C.M. litigation or the OIDE investigation. Pl. MSJ Ex. 2, Keshk, 267:23-269:16. Keshk was told that "if there's any communication or any indication about the lawsuit, I should turn over all material to [Tamburro]". Pl. MSJ Ex. 2, Keshk, 186:6-188:22. Keshk did not see a distinction between the lawsuit and the OIDE investigation. Pl. MSJ Ex. 2, Keshk, 260:5-14.

49. Tamburro's notes from her conversation with Keshk state, in part:

> [T]he Chair of the Religious Studies Department contacted the Title IX Coordinator to advise that he had received two reports regarding Prof. Laith Al Saud subsequent to the publication of the Sun Times article. One report indicated that a former stu- dent had heard that Prof. Al Saud had been in a relationship with former student [redacted]. A second report indicated that former student [redacted] had an uncom- fortable exchange with Prof. Al Saud on an occasion where she baby sat for him.

(Exhibit 5, Tamburro Dep. 87:8; Exhibit 22, Tamburro Dep. Ex. 17 at DEF00214).

**RESPONSE:**

Plaintiff objects to Defendant Exhibit 22 as hearsay to the extent that it is offered to prove the matters asserted therein. Plaintiff disputes statements in DSOF ¶ 46 as they mischaracterize through omission.

23

  **Plaintiff does not dispute that Tamburro's notes reflect she had a conversation with Keshk. Tamburro and Keshk discussed the investigation on more than one occasion: and at least on or about July 5 and July 26, 2017.**

  **Plaintiff disputes the characterization that Plaintiff had a "relationship with another student" and that he had an "uncomfortable exchange" with another student. Tamburro's notes regarding the alleged "relationship with another student" state in full:**

> **With regard to [redacted], Roya and Keshk initially thought that the complaint referenced in the Sun Times article was filed by [redacted]. Roya had shared with Keshk that she had heard from a friend of a friend that [redacted] was very much interested in Laith and thought it was moving to another level but then learned that Laith was still with [redacted]."**

**Def. Ex. 22, p. 2 (DEF 215). Tamburro's notes reflect that Keshk gossiped with Roya about Plaintiff and discovered no direct information from Roya.  There is no record of Tamburro spoke directly with the former student that Roya and Keshk were discussing. Another set of Tamburro's notes reflect Keshk told Tamburro this discussion reportedly occurred with another student, ▮▮▮▮▮, and not Roya. *See* Pl. Rsp. MSJ Exhibit 4 (Memo version 1); Pl. Rsp. MSJ Exhibit 5 (Memo version 2).**

  **Plaintiff disputes that he had an "uncomfortable" exchange with another former student, he disputes the individual ever was a student of his, and disputes that she reported the exchange was "uncomfortable." Tamburro's notes reflect she reached out to that student following the discussion Tamburro had with Keshk. *See* Def. Ex. 22, page 1.  Tamburro's notes state in full:**

> **[Redacted] responded and spoke with Title IX Coordinator on July 6, 2017. [Redacted] reported that she did not have Prof. Al Saud as an instructor. However, she knew him because she worked in the Religious Studies department and through her work at CAIR (Council on American Islamic Relations). [Redacted] reported that on one occasion she baby sat for Prof. Al Saud. When he returned home, rather than immediately call for an Uber or a**

> cab, he started talking to her and offered her a drink. She declined. He did not
> pressure her for physical activity of a sexual nature, or make any advances, or
> otherwise engage in overtures. She just thought it was an unusual exchange.
> She estimated that this may have occurred in 2013. She thought the exchange
> odd at the time.  She did not report this incident to DePaul nor did she report
> the incident to CAIR.

**Def. Ex. 22, p. 1, (Def. 214).**

50. On July 6, 2017, Keshk sent the following email to Plaintiff:

> Dear Laith,
> Thank you for your note. I must inform you that I cannot offer you a course assign-
> ment for the Fall Quarter. In addition to low projected course enrollments, and
> thus uncertainties about final course offerings, your compensation requirements
> far ex- ceed what I am able to pay adjunct instructors.
>
> Should an assignment that would be suitable for you become available, I will
> con- tact you to discuss your availability. In the meantime, I suggest that you
> pursue other opportunities, as I do not know if any suitable assignments will be
> available at DePaul in the immediate future.

(Exhibit 3, Pl. Dep. 269:23-270:15, 282:12-24; Exhibit 19, Pl. Dep. Ex. 15; Exhibit 7, Keshk

Dep. 144:1-4).

**RESPONSE:**

    **Plaintiff objects to Defendant Exhibit 19 to the extent it is offered to assert the truth of**

**the matters therein. Plaintiff does not dispute that on July 6, 2017, Keshk sent Plaintiff an email**

**claiming he would not be offered a course assignment for the Fall Quarter because of (1) low**

**projected course enrollments and (2) Plaintiff's "compensation requirements".**

51. The Circuit Court lawsuit and the reports Keshk received from two former students were a

black cloud over Plaintiff's head and was the "biggest issue" at the time Keshk decided not to hire

Plaintiff to adjunct in the 2017 Fall Quarter. (Exhibit 7, Keshk Dep. 146:12-147:19, 151:7- 152:6,

258:10-259:2, 261:20-262:13). Keshk did not include this reason in his July 6, 2017 email because

he was not sure if he had "the right" to discuss the lawsuit and complaints with Plaintiff. (Exhibit 7, Keshk Dep. 147:11-19).

**RESPONSE:**

**Plaintiff disputes DSOF ¶ 51. Plaintiff disputes that Keshk received two "reports" from "two former students" as stated in PRDSOF ¶¶ 48-49. Keshk was directed to gather information for DePaul and sent DePaul whatever information he could regarding Plaintiff. Pl. MSJ Ex. 2, Keshk, 186:11-190:19. Keshk denied this at C.M.'s trial. Pl. MSJ Ex. 81, C.M. Trial Transcript, 58:10-15, 70:22-23.**

52. Keshk did not feel comfortable to have Plaintiff teach in the classroom, and "whether we believe this to be true or not", Keshk believed it was the right decision because he would "always have been very fearful that those allegations were actually correct and I'm endan-gering our students." (Exhibit 7, Keshk Dep. 249:20-250:3, 264:13-18).

**RESPONSE:**

**Plaintiff disputes DSOF ¶ 52. As stated in PRDSOF ¶¶ 48-49, Plaintiff disputes that Keshk received two "reports" from "two former students". Keshk did not ask Saud about the information he "gathered" because "it was clear to [him] that Laith would be lying to [him] whatever he said." Pl. MSJ Ex. 2, Keshk Dep., 265:3-266:24. Keshk could not explain what "information" he had learned from other women, while denying "gather[ing] any information" about Plaintiff. Pl. MSJ Ex. 2, 265. At the C.M trial in April of 2019, Keshk was asked directly why Plaintiff was not brought back to teach, and he said it was because of the budget cuts. Pl. MSJ Ex. 81, C.M. Trial Transcript, 60:17-61:7. Keshk was directly asked whether the lawsuit had anything to do with Plaintiff's departure and Keshk denied it did. *Id.* at 61:3-7.**

53 ██████ returned to teaching as an adjunct at DePaul for the Autumn Quarter and received

$4,800 per course. (Exhibit 7, Keshk Dep. 148:4-14, 255:18-257:7; Keshk Dep. Ex. 43, attached

as Exhibit 23 to Appendix).

**RESPONSE:**

   **Plaintiff does not dispute DSOF ¶ 53.**

54. On July 26, 2017, Dr. Keshk contacted Tamburro to share additional information regarding

Plaintiff. (Exhibit 5, Tamburro Dep. 87:8; Exhibit 22, Tamburro Dep. Ex. 17 at DEF00215).

**RESPONSE:**

   **Plaintiff disputes the characterization of ¶ 54 as incomplete and therefore misleading.**

**Keshk was instructed to aid in the investigation.  Pl. MSJ Ex. 2, Keshk, 186:11-190:19.**

55. Tamburro's notes from her conversation with Keshk state, in part:

> In April 2017, Laith reported to Keshk that he did not understand why [C.M.]
> was complaining about him. * * * Laith told Keshk that they had a sexual
> relationship when [C.M.] was no longer at DePaul. Keshk said that after Laith
> met with TIXC, his description changed somewhat. He stated that Laith said
> [C.M.] pursued him, all through class, during and after, and "so I had sex with
> her." Keshk took this to mean that Laith was implying a sexual relationship
> began while [C.M.] was in Laith's class.

(Exhibit 5, Tamburro Dep. 87:8; Exhibit 22, Tamburro Dep. Ex. 17 at DEF00215; Exhibit 7,

Keshk Dep. 221:14-223:1, 232:17-233:8, 234:15-22; Exhibit 21, Keshk Dep. Ex. 33 at

DEF00215).

**RESPONSE:**

   **Plaintiff objects to Def. MSJ Ex. 22 as hearsay to the extent that it is offered for proof**

**of the matters asserted therein. Plaintiff disputes DSOF ¶ 55 as incomplete and therefore**

**misleading.  The portion not quoted by Defendant from Tamburro's note on this subject**

**states:**

27

> **Laith referred to [C.M.] as a divorced, older, former student. Laith did not understand where this was all coming from because she had been 'pursuing him and pursuing him' and stated 'I have all these texts from her' while scrolling through his phone. Keskh said he did not see any texts.**

**Plaintiff also disputes the statements in DSOF ¶ 55 because Keshk testified at C.M.'s trial that he learned the information from Tamburro's Title IX report in October of 2017. Pl. MSJ Ex. 81, C.M. Trial Transcript, 70:14-18.**

56. Tamburro's notes from the conversation with Keshk accurately reflect what Keshk told her in the conversation with him. (Exhibit 6, Tamburro Decl. ¶ 8; Exhibit 7, Keshk Dep. 221:14-223:14).

**RESPONSE:**

**Plaintiff objects to Def. Exhibit 6, Tamburro Declaration, to the extent that it repeats or is inconsistent with prior deposition testimony and to the extent that it deals with matters raised in the deposition. Plaintiff objects to Tamburro's notes, Def. Exhibit 22, to the extent it is offered for the truth of the matters asserted therein. Subject to and without waiving his objections, the statements in DSOF ¶ 56 are disputed. Tamburro admitted to destroying her handwritten notes. Pl. MSJ Ex. 15, Tamburro Dep. 86:6-9. Keshk has obvious credibility issues. Pl. MSJ Ex. 81, C.M. Trial Trancript, 58:14, 59-60, 61:3-7, 64, 67:1-8, 74:21-24; Pl. MSJ Ex. 2, Keshk Dep., 220, 31, 55-60; *compare* Pl. MSJ Ex. 68, McCloud Affidavit. Tamburro also has credibility issues. Pl. MSJ Ex. 15, Tamburro Dep., 94, 147, 163-164.**

57. On August 21, 2017, Tamburro sent Plaintiff a letter stating, in part, "OIDE obtained additional information concerning the allegations made by Student B concerning you. Based on the information, OIDE is initiating further investigation." (Exhibit 3, Pl. Dep. 329:3-20; Pl. Dep. Ex. 17, attached as Exhibit 24 to Appendix; Exhibit 5, Tamburro Dep. 64:13-15).

**RESPONSE:**

28

**Plaintiff objects to Def. Exhibit 24 to the extent that it is offered for proof of the matters asserted therein. Plaintiff does not dispute that on August 21, 2017, Tamburro sent Plaintiff a letter stating OIDE was "initiating further investigation" and stated it was based on "additional information concerning the allegations made by Student B concerning" Plaintiff.**

58. Tamburro's August 21, 2017 letter stated, in part, "Specifically, OIDE is investi- gating an allegation that you engaged in sexual harassment of Student B by initiating a dating relationship while she was a student enrolled in your class, initiating sexual acts with her both on and off campus while she was a student enrolled in your class, and promising her a grade of an A, in absence of taking the final in our [sic] class due to your relationship with her." (Exhibit 3, Pl. Dep. 329:3-20; Exhibit 24, Pl. Dep. Ex. 17; Exhibit 5, Tamburro Dep. 64:13-15).

**RESPONSE:**

**Plaintiff objects to Def. Exhibit 24 to the extent that it is offered for proof of the matters asserted therein.  It is undisputed that Tamburro's letter stated this in part.**

59. Tamburro's August 21, 2017 letter requested an interview with Plaintiff by Sep- tember 1, 2017. (Exhibit 3, Pl. Dep. 329:3-20; Exhibit 24, Pl. Dep. Ex. 17).

**RESPONSE:**

**Plaintiff objects to Def. Exhibit 24 to the extent that it is offered for proof of the matters asserted therein.  It is undisputed that Tamburro's letter stated this in part.**

60. On August 30, 2017, Plaintiff filed a Verified Answer to C.M.'s complaint, in which Plaintiff admitted: he sent C.M. an email while she was a student in Plaintiff's class and that C.M. accepted the invitation to get a drink; and that he "engaged in sexual intercourse" with C.M..

(Exhibit 3, Pl. Dep. 343:1-14; Pl. Dep. Ex. 24 at ¶ 6 and Affirmative Defense ¶ 7, attached as Exhibit 25 to Appendix).

**RESPONSE:**

**Plaintiff disputes DSOF ¶ 60 as incomplete and therefore misleading. Plaintiff's filed Verified Answer to C.M.'s complaint does not admit to the statements in DSOF ¶ 60. Plaintiff's Answer denies the encounter alleged by C.M. and states they had sex on a different occasion on a later date.  Pl. MSJ Ex. 76 (pp. 3-4, 6-8).**

61. On September 1, 2017, Plaintiff emailed Tamburro a copy of the Verified Answer he filed with the Circuit Court and stated in his email to Tamburro, "On the advice of counsel, I respectfully decline to be further interviewed at this time given that the current investigation relates to pending civil litigation" and "My Answer is a matter of public record and should give you an opportunity to review my position with respect to the most recent allegations." (Exhibit 3, Pl. Dep. 331:3-332:5, 343:1-14; Exhibit 25, Pl. Dep. Ex. 24).

**RESPONSE:**

**Plaintiff disputes DSOF ¶ 61 as incomplete and therefore misleading. Plaintiff does not dispute that on September 1, 2017, Plaintiff emailed Tamburro a copy of his Verified Answer to C.M.'s lawsuit.  Plaintiff's email to Tamburro states in full:**

> **On the advice of counsel, I respectfully decline to be further interviewed at this time given that the current investigation relates to pending civil litigation. However, I deny that I have engaged in conduct in violation of the University's Anti-Discrimination and Anti-Harassment Policy and Procedures.**
>
> **In the spirit of cooperation, I am attaching a redacted copy of my Answer and Affirmative Defense to Student B's Complaint, which we filed with the Court yesterday. My Answer is a matter of public record and should give you an opportunity to review my position with respect to the most recent allegations.**

30

> **To the extent your investigation relates to any other allegations or should you feel you need additional information, please contact me and we will reconsider our position.**

**Def. MSJ Ex. 25.**

62. Plaintiff did not have any other communications with Tamburro regarding the allegations in the lawsuit or Tamburro's investigation after Plaintiff's September 1, 2017 email. (Exhibit 3, Pl. Dep. 343:1-14, 352:17-353:16).

**RESPONSE:**

**Plaintiff disputes DSOF ¶ 62. Following Plaintiff's email on September 1, 2017, Tamburro responded to Plaintiff stating "Thank you…I will be in contact with you if any additional information is needed." Pl. Resp. MSJ Exhibit 6, Tamburro-Saud Email; Pl. MSJ Ex. 15, Tamburro Dep., 147-148.  Tamburro never contacted Saud after this. Pl. MSJ Ex. 15, Tamburro Dep., 147.**

63. C.M.'s attorney informed DePaul that C.M. did not wish to participate in an inter- view, and did not participate in Tamburro's investigation. (Exhibit 5, Tamburro Dep. 64:13-15, 73:20-22, 109:19-21; Tamburro Dep. Ex. 14 at DEF00237, attached as Exhibit 26 to Appendix).

**RESPONSE:**

**Plaintiff objects to Defendant Exhibit 26 to the extent that it is offered for proof of the matters asserted therein. Subject to and without waiving his objections, Plaintiff does not dispute the statements in DSOF ¶ 63.**

64. In addition to Tamburro's July 26, 2017 discussion with Keshk, Tamburro inter- viewed a staff member and student, and reviewed documents, including Plaintiff's Verified An- swer to the C.M. complaint. (Exhibit 5, Tamburro Dep. 73:20-22, 123:12-14; Exhibit 26, Tam- burro Dep. Ex. 14 at DEF00237).

31

**RESPONSE:**

**Plaintiff objects to Def. Exhibit 26 to the extent that it is offered for proof of the matters asserted therein. Plaintiff disputes DSOF ¶ 64. The individuals interviewed by Tamburro were not interviewed pursuant to C.M.'s allegations, as they had no direct knowledge regarding C.M.'s complaint and were interviewed pursuant to unrelated information provided by Keshk. Def. Exhibit 22, at DEF 215-216; Pl. MSJ Ex. 15, Tamburro, 116.**

65. On October 5, 2017, Tamburro issued a second report which stated, in part:

> OIDE determined that Prof. al Saud lacked credibility with respect to his statements as to when the sexual relationship with [C.M.] began. In his statements to the Title IX Coordinator in May 2017, Prof. al Saud was definitive in stating that the sexual relationship began after [C.M.] was no longer a student enrolled in one of his course [sic]. He stated that the sexual relationship began in mid-June 2016. In his August 30, 2017, sworn pleading, Prof. al Saud denies that he engaged in sexual acts with [C.M.] on April 15, 2016 and several weeks later in his office. However, unlike his unsworn statement to the Title IX Coordinator, Prof. al Saud does not represent that the sexual relationship began in mid-June, and further, does not make a definitive statement that the relationship began when [C.M.] was no longer a student. Addi- tionally, Faculty member A reported that in April 2016, Prof. al Saud initially de- nied to Faculty member A that he engaged in a sexual relationship with [C.M.] while she was enrolled in his course. Faculty member A felt that later, in May 2017, Prof. al Saud implied that he had engaged in a sexual relationship while [C.M.] was his student.

> \* \* \*

> Prof. al Saud maintains the relationship was consensual. [C.M.'s] civil complaint indicates she viewed the sexual relationship as creating a hostile and unacceptable environment. The Policy indicates that because relationships between individuals in inherently unequal positions (such as teacher and student) may undermine the real or perceived integrity of the evaluation process, as well as affect the trust in- herent in the educational environment, depending on the circumstances, consent may not be considered a defense under the Policy to an allegation of sexual harass- ment in situations in which one party is in a position to review the work or influence the career of the other. Based on the information gathered at this time, using a pre- ponderance of the evidence standard (more likely than not) OIDE determined the information is sufficient to support a

conclusion that [C.M.] was subjected to sexual harassment by Prof. al Saud. (Exhibit 5, Tamburro Dep. 73:20-22, 127:12-24, 132:17-25; Exhibit 26, Tamburro Dep. Ex. 14 at DEF00241 and DEF00244).

**RESPONSE:**

**Plaintiff objects to Defendant Exhibit 26 to the extent that it is offered for proof of the matters asserted therein. Subject to and without waiving his objections, Plaintiff does not dispute that DSOF ¶ 65 contains excerpted quotes from Tamburro's October 2017 findings.**

66. According to Plaintiff, he had sex with C.M. "sometime in mid to late May to early June, whenever the period was that the course ended, my course ended, and then it was that interim with the finals week which I did not hold classes  " (Exhibit 3, Pl. Dep. 126:11-17).

**RESPONSE:**

**Plaintiff disputes DSOF ¶ 66 as incomplete and therefore misleading. Plaintiff on numerous occasions stated the course was over when the sex occurred. Pl. MSJ Ex. 1, p. 84:19-24, 85:17, 117, 127:4-5.**

67. According to Plaintiff, DePaul's spring quarter in 2016 ran from March through sometime between June 1 and June 10, 2016, and his class ended sometime between May 21 and May 28, 2016. (Exhibit 3, Pl. Dep. 82:9-83:11, 85:15-86:1). Students would not learn of their grades from DePaul until after the end of the quarter. (Exhibit 3, Pl. Dep. 147:7-11).

**RESPONSE:**

**Plaintiff disputes DSOF ¶ 67. Plaintiff's testimony regarding when the class ended was a range based on the fact that there was no final exam administered for his class, and finals take place from late May to mid-June. Pl. MSJ Ex. 1, Pl. Dep., p. 84.**

68. According to Plaintiff, the only time he had sexual intercourse with C.M. was be- fore C.M. went on a road trip the week of June 6, 2016. (Exhibit 3, Pl. Dep. 129:8-23, 154:12-21).

**RESPONSE:**

      **Plaintiff disputes DSOF ¶ 68 as incomplete and therefore misleading. 38. Plaintiff repeatedly testified his recollection about when the sexual intercourse occurred.  Pl. MSJ Ex. 1, p. 84:19-24, 85:17, 117, 127:4-5. Plaintiff testified his course was over Pl. MSJ Ex. 1, pp. 82-83.**

69. On October 6, 2017, Tamburro notified Plaintiff of the outcome of her investiga- tion, and informed Plaintiff the Dean and Keshk would contact Plaintiff to discuss consequences. (Exhibit 3, Pl. Dep. 332:6-15; Pl. Dep. Ex. 18, attached as Exhibit 27 to Appendix).

**RESPONSE:**

      **Plaintiff objects to Defendant Exhibit 27 to the extent that it is offered for proof of the matters asserted therein. Plaintiff does not dispute that on October 6, 2017, Tamburro notified Plaintiff of the outcome of her second investigation.**

70. On October 23, 2017, the Dean sent a letter to Plaintiff which stated, in part:

> You received a letter from DePaul's Title IX Coordinator informing you that the Office of Institutional Diversity and Equity had concluded that your conduct was in violation of DePaul University's Anti-Discrimination and Anti-Harassment pol- icy ("Special Considerations—Consensual Relationships"). Pursuant to that policy, reports that a faculty member has violated the policy are to be addressed by the appropriate Dean.

> As you know, your prior appointment has ended and you are not currently em- ployed by DePaul University. Based on the information received, you are not eli- gible for future employment at DePaul University. Additionally, you may not pro- vide formal or informal instruction in any classroom-based or co-curricular activi- ties sponsored by DePaul.

(Exhibit 3, Pl. Dep. 335:17-336:1; 342:6-23; Pl. Dep. Ex. 22, attached as Exhibit 28 to Appendix). The Dean based his decision on OIDE's finding that Plaintiff had sex with a

student who was enrolled in Plaintiff's class. (Exhibit 2, Velasco Dep. 209:13-15, 213:18-214:1).

**RESPONSE:**

      **Plaintiff objects to Defendant Exhibit 28 to the extent that it is offered for proof of the matters asserted therein. Subject to and without waiving his objections, Plaintiff does not dispute that Velasco sent Plaintiff this communication.**

      71. Neither Tamburro's investigation nor her findings were influenced by Plaintiff's race, and the Dean had no reason to believe Tamburro's investigation or findings were influenced by Plaintiff's race. (Exhibit 1, Velasco Decl. ¶ 11; Exhibit 6, Tamburro Decl. ¶ 9).

**RESPONSE:**

      **Plaintiff objects to Defendant Exhibit 1 (Velasco Declaration) and Exhibit 6 (Tamburro Declaration), to the extent that they repeats or is inconsistent with prior deposition testimony and to the extent that they deal with matters raised in depositions. Plaintiff also objects to DSOF ¶ 71 to the extent that it forms legal conclusion and would require legal argument in response. Subject to and without waiving his objection, Plaintiff disputes DSOF ¶ 71 for the reasons elaborated throughout his Memorandum of Law in Opposition to Summary Judgment.**

      72. On May 31, 2018, Plaintiff was deposed in the Circuit Court case brought against him and explained the timing of when he had sex with C.M. as follows:

| | |
|---|---|
| Q: | Was it in April? |
| A: | It was sometime after, but I can't recall. |
| Q: | She was still a student of yours? |
| A: | Possibly, yes. |
| Q: | Yes? |
| A: | Yes, potentially. Maybe. It depends on technically when the class ends. It depends if you're talking about the class ending technically. |

(Exhibit 3, Pl. Dep. 138:14-22, 139:10-20, 140:16-142:2, 143:2-10; Pl. Dep. Ex. 7, cited excerpts attached as Exhibit 29 to Appendix).

**RESPONSE:**

**Plaintiff does not dispute that this was his testimony at his deposition during the C.M. litigation.**

73. According to Plaintiff, "Philosophically I'm of the position that two people should be able to sleep with each other whenever they want " (Exhibit 3, Pl. Dep. 117:18-20, 118:5-15).

**RESPONSE:**

**Plaintiff disputes DSOF ¶ 73 to the extent it mischaracterizes his testimony. Plaintiff stated he would not have a sexual relationship with a student in his class. Pl. MSJ Ex. 1, Plaintiff Dep, 117:4-118:2.   Plaintiff offered lengthy explanation about relations during a class.  Pl. MSJ Ex. 1, pp. 115-127, 150.**

74. In early 2014, DePaul's Office of Public Safety ("Public Safety") received infor- mation about a comment posted to a public Facebook page stating, "PROFESSOR LISACK a DePaul Catholick [sic] studies Teacher RAPED ME[.]" (Declaration of Barbara Schaffer ("Schaf- fer Decl.") at ¶ 4, Ex. A, attached as Exhibit 30 to Appendix (emphasis in original)).

**RESPONSE:**

**Plaintiff objects to Defendant Exhibit 30, Schaffer Declaration, to the extent that it repeats or is inconsistent with prior deposition testimony and to the extent that it deals with matters raised in the deposition. Subject to and without waiving his objection, Plaintiff disputes DSOF ¶ 74 as incomplete and therefore misleading. Plaintiff does not dispute that on or about April 24, 2014, DePaul's Office of Public Safety received information alleging**

36

**Comparator A raped a student. The information was posted to a Facebook page entitled "DePaul Confessions."**

75. Public Safety created a case report that included, in part, the following narrative, "THE ACCUSED NAME IS NOT FOUND IN DEPAUL UNIVERSITY DIRECTORY. THE ONLY NAME FOUND IN DEPAUL UNIVERSITY DIRECTORY THAT IS SIMILAR IS ███████ ██████ OF REGILIOUS STUDIES." (Exhibit 30, Schaffer Decl. ¶ 4, Ex. A (emphasis in original)). When DePaul received this information, it conducted a search for students registered at DePaul under the name "Donny Juan" but was unable to locate any such student. (Exhibit 30, Schaffer Decl. ¶ 5).

**RESPONSE:**

**Plaintiff objects to Defendant Exhibit 30, Schaffer Declaration, to the extent that it repeats or is inconsistent with prior deposition testimony and to the extent that it deals with matters raised in the deposition. Plaintiff objects to Def. Ex. 30-A to the extent that it is offered for proof of the matters asserted therein. Subject to and without waiving his objections, Plaintiff does not dispute DSOF ¶ 75.**

76. Barbara Schaffer, then-Associate Vice President for OIDE, was assigned to inves- tigate the matter. (Deposition Transcript of Barbara Schaffer ("Schaffer Dep.") 14:13-14, 94:15- 95:25, attached as Exhibit 31 to Appendix; Schaffer Dep. Ex. 5, attached as Exhibit 32 to Appen- dix; Schaffer Decl. ¶ 3).

**RESPONSE:**

**Plaintiff objects to Def. Exhibits 31 and 32 to the extent that they are offered for proof of the matters asserted therein. Subject to and without waiving his objections, Plaintiff does**

not dispute Schaffer was assigned to investigate the allegation Comparator A raped a student.

77. On May 2, 2014, █████ provided Schaffer the following information: "I looked up 'David Lisak' on Google (that was the last name you gave me, and I just added my first name) and learned that Dr. David Lisak, PhD, is a professor (at UMass?) whose specialty is rape, undetected rapists, non-stranger rape. (You can Google him and see)." (Exhibit 31, Schaffer Dep. 94:15- 95:25; Exhibit 32, Schaffer Dep. Ex. 5 at DEF010511).

**RESPONSE:**

**Plaintiff objects to Def. Exhibits 31 and 32 to the extent that they are offered for proof of the matters asserted therein. Subject to and without waiving his objections, Plaintiff does not dispute Comparator A sent this communication to Schaffer on May 2, 2014.**

78. On June 2, 2014, Schaffer emailed █████ stating, in part, "We were unable to turn up any other information, so I just wanted you to know that we have closed this issue." (Exhibit 31, Schaffer Dep. 94:15-95:25; Exhibit 32, Schaffer Dep. Ex. 5 at DEF010511).

**RESPONSE:**

**Plaintiff objects to Def. Exhibits 31 and 32 to the extent that they are offered for proof of the matters asserted therein. Subject to and without waiving his objections, Plaintiff disputes DSOF ¶ 78 as incomplete and therefore misleading. Schaffer's email states in full:**

> **First, I want to thank you for your help in allowing us to close this issue. We appreciate your 'sleuthing' for us. We were unable to turn up any other information, so I just want to know that we have closed this issue. If you would like to discuss this any further, feel free to contact me.**

**Def. Exhibit 32.**

79. Neither Keshk nor the Dean made any decisions related to █████ employment at DePaul in 2014. (Exhibit 1, Velasco Decl. ¶ 9; Exhibit 8, Keshk Decl. ¶ 8). Keshk was not aware of any

OIDE complaint against ▮▮▮ at any time prior to this lawsuit being filed. (Exhibit 7, Keshk Dep. 97:1-15; Exhibit 8, Keshk Decl. ¶ 8).

**RESPONSE:**

**Plaintiff objects to Defendant Exhibits 1 and 8, Velasco and Keshk Declarations, to the extent that they repeat or are inconsistent with prior deposition testimony and to the extent that they deal with matters raised in the deposition. Subject to and without waiving his objections, Plaintiff disputes DSOF ¶ 79. Keshk was Chair of the Religious Studies department and was making decisions regarding ▮▮▮ performance evaluations, assignment of classes, renewal of contracts and other matters that he testified he administers to as Chair of the department.  Pl. MSJ Ex. 2, Keshk Dep., 12-15. The Dean is "always involved" in the hire of adjuncts, and the Dean was involved in Comparator A's rehire under an adjunct contract in 2017. Pl. MSJ Ex. 2, Keshk Dep., 17:3-16.**

80. In 2015, OIDE investigated a complaint alleging ▮▮▮ engaged in "verbal exchanges" of a sexual nature with a student who "no longer enrolled" in his course. (Exhibit 5, Tamburro Dep. 151:11-153:18; Tamburro Dep. Ex. 24, attached as Exhibit 33 to Appendix). OIDE determined ▮▮▮ violated the "Consensual Relationship" portion of DePaul's ADAH Pol- icy and issued several sanctions against ▮▮▮ including a determination he was not eligible for rehire at DePaul. (Exhibit 5, Tamburro Dep. 151:11-153:18; Exhibit 33, Tamburro Dep. Ex. 24 at DEF010501-DEF010502). The Dean did not make any decisions related to ▮▮▮ employment at DePaul. (Exhibit 1, Velasco Decl. ¶ 14).

**RESPONSE:**

**Plaintiff objects to Def. Exhibit 1, Velasco Declaration, to the extent that it repeats or is inconsistent with prior deposition testimony and to the extent that it deals with matters**

raised in the deposition. Plaintiff disputes DSOF ¶ 80 in part. Plaintiff does not dispute that

the Dean was not involved in decisions related to Comparator B's employment at DePaul.

Plaintiff disputes DSOF ¶ 80 as incomplete and therefore misleading. The partially quoted

excerpts are Tamburro's findings, not the complainant's allegations. See Def. Exhibit 33 at

Def 10501. The complete section quoted by DePaul of Tamburro's report states:

> The information provided during the investigation confirms that you have
> engaged in verbal exchanges with the Complainant of an explicit sexual
> nature, to-wit, the Whitney Houston parodied Saving All My Semen email; the
> discussion of sexual fantasies involving the Complainant and another woman;
> the Tove Lo video clip in which the artist simulates masturbation and partially
> exposes her breasts and your comparison of the Complainant to the artist.

*Id.* Tamburro's further stated in her findings:

> While these exchanges occurred while the Complainant was no longer enrolled
> in a current course of yours and you contend that the Complainant consented
> to the exchanges, the Policy provides that, in situations in which one party is
> in a position to review the work or influence the career of the other the
> relationship may create a hostile or unacceptable environment. As an
> instructor at the University, you remain in a position to review the work or
> influence the career of the Complainant. This is especially the case when you
> are requesting the Complainant to enroll in one of your courses (New German
> Cinema and WRD 104) in the upcoming quarter. Further, the Policy
> specifically states the consent may not be considered a defense against a charge
> of sexual harassment in such circumstances.

*Id.* Def 10501-10502.

## PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS

1. Plaintiff Laith Saud ("Plaintiff") is Iraqi Arab American. Pl. MSJ Exhibit 1, Plaintiff

Dep., 12:8, 17:23-18:, 187:17-18.

2. Term faculty at DePaul teach three courses per quarter. Pl. MSJ Exhibit 1, Pl. Dep.,

171:3-6. Adjunct faculty teach a maximum of two courses per quarter. Pl. MSJ Exhibit 2, Keshk,

105:5-6.

3.   Enhanced Pay for adjunct faculty was available with approval from the Dean.  Pl. MSJ Ex. 2, p. 135; Pl. MSJ Ex. 40.

4.   Plaintiff was considered an "easy grader". Pl. MSJ Exhibit 81, C.M. Trial Transcript, (C.M. testimony) at p. 226:4-227:17. All students who attended his class received an A grade, and it was common knowledge that Plaintiff gave all his participating students A's. Pl. Ex. 1, Plaintiff Dep., 145:20-24, 145:1-6, 147:13-16, 147:17-24.

5.   Plaintiff consistently received "good" or higher performance evaluations for his teaching, his classes were always in high demand and students were on waitlists to enroll.  This includes on April 10, 2017, Saud received a department performance rating of "Good" and was unanimously recommended for renewal of his term faculty contract. He was frequently recommended by his peers for speaking engagements.  Pl. MSJ Ex. 2, Keshk Dep., p. 91:14-17.

6.   ████████ Comparator A (White) also received a "Good" department performance rating. Comparator A also requested enhanced pay and requested more money per course than Plaintiff.  Pl. MSJ Ex. 2, Keshk Dep., 26, 140, 173; Pl. MSJ Ex. 39; Pl. MSJ Ex. 51.

7.   On January 18, 2017, Saud's event was flagged by DePaul's Marketing and Communications department. The event was flagged because the event would discuss "Muslim civil liberties" during the presidency of Donald J. Trump and because Saud was "vocal about his dislike for Trump." Pl. MSJ Ex. 1, Saud, 230:1-22; Pl. MSJ Ex.4, Blakley, 50:13-51:7; Pl. MSJ Ex.7, Email re Muslim Civil Rights Event.

8.   On April 6, 2017, the Middle East Forum, published an article on its website "Campus Watch" about Saud teaching at DePaul, his midwestern upbringing as an Arab American, and his political views. The purpose of "Campus Watch" is to "make life miserable" for academics that

are Arab or pro-Arab. Pl. MSJ Ex. 11, Campus Watch Article; Pl. MSJ Ex.2, Keshk Dep., 83:20-84:1.

9.    DePaul contracts with a third-party vendor to search the internet for media reports about DePaul and provide daily reports to Blakley's department. DePaul may have received a link to the "Campus Watch" article regarding Plaintiff from this third-party vendor. Pl. MSJ Ex.4, Blakley Dep., 46:24-47:2, 48:11-15.

10.   After the article about Plaintiff was published, his relationship with Keshk began to sour. Pl. MSJ Ex. 1, Pl. Dep., p. 244:23-24.

11.   Prior to April 10, 2017, Plaintiff had never been the subject of a complaint of misconduct. Pl. MSJ Exhibit 1, Saud, 187:1-6; Pl. MSJ Exhibit 2, Keshk, 91:14-17, 176:2-5; Pl. MSJ Exhibit 6, p. 1; Pl. MSJ Ex. 15, Tamburro, 42:14-23; Pl. MSJ Exhibit 81, CM Trial Transcript, 62:6-7; Pl. MSJ Exhibit 3, 2016 Saud renewal letter; Pl. MSJ Exhibit 65, Emails re Evaluation Scores.

12.   The "Attorney Letter" referenced in DSOF ¶ 21 and included as Def. Exhibit 12 is an attorney lien letter and also copied DePaul's President and Chief General Counsel.

13.   C.M.'s attorney also threatened Tamburro with "interference with prospective business" if she contacted his client. Pl. MSJ Ex. 26, Tamburro OIDE Memo May 2017, page 2.

14.   Prior to this, no one had ever alleged Plaintiff had engaged in misconduct at DePaul. Pl. MSJ Ex. 1, Saud, 187:1-6; Pl. MSJ Ex.2, Keshk, 91:14-17, 176:2-5; Pl. MSJ Ex. 6, p. 1; Pl. MSJ Ex. 15, Tamburro, 42:14-23; Pl. MSJ Ex. 81, CM Trial Transcript, 62:6-7; Pl. MSJ Ex.3, 2016 Saud renewal letter; Pl. MSJ Ex. 65, Emails re Evaluation Scores.

15.  Tamburro's notes from her May 2017 interview with Plaintiff state in part:

> [Plaintiff] explained his understanding of the ADAH policy stating that 'you are not to pursue a  student  unsolicited; or if a student asks you to leave her alone, you do.' He stated it would be a breach of the consensual relationship policy if a student engages in a relationship with out of fear or intimidation.

> [Plaintiff] stated that [C.M.] was a student in his class in the spring of 2016. He did not know her before that quarter, it was the first time he had her in a class. He described her as 'older, divorced' student who was 25 years old. He stated, "we had a friendship develop" over the course of the quarter; however, 'no special privileges or advantages were extended to her,' she remained a student. [Plaintiff] stated that during the course of the quarter he saw [C.M.] Outside of the classroom on campus. He stated that he grabbed a coffee with her, and grabbed drinks with her in the Gold Coast. He stated that 85-90% was friendly/friendship, explaining 'it was clear that there was a mutual attraction but it was also clear that they would not be taking it that way while she remained a student.' [C.M] received an A in the class. Her grade was based on his coursework and no special favors were extended to her. [Plaintiff] noted that he is an easy grader. He also noted that he socializes with his students stating 'it is not unusual [for him] to grab drinks with a student', whether male or female. [Plaintiff] described himself as very social.
>
> [Plaintiff] stated that a sexual relationship developed in mid June 2016, after the course ended and she was no longer a student. [Plaintiff] described the sexual relationship starting due to mutual chemistry; he did not proposition [C.M.]. He stated it was difficult how to explain how the sex was initiated, but said that they were both sober, they returned to his home, and had sex. [Plaintiff] stated that they had sex on two separate occasions in his home in June 2016. He stated that the sex was consensual.

Pl. MSJ Exhibit 25, at DEF 218-219.

16. Saud was asked about the date of when he had sex with C.M. a year after the fact. Pl. MSJ Ex. 1, p. 148:12-18. Plaintiff provided Tamburro a date range. Pl. MSJ Ex. 1, p. 209:6-12. Saud informed Tamburro that his class ended early that quarter because there was no final, so his class ended before finals weeks (finals weeks are usually sometime from latter May into first half of June). Pl. MSJ Ex. 1, pp. 84:19-22, 126:13-18; Pl. Resp. MSJ Ex 7, C.M. Trial Transcript (Nermina Aly testimony) 5:15-6:1.

17. Tamburro was aware that C.M. had returned to DePaul that fall and did not see that as a reason to find Saud in violation of the ADAH policy (again, C.M's complaint came a year after the relationship). Pl. MSJ Ex. 15, Tamburro Dep. p. 154-157.

18. Plaintiff was never told he misunderstood DePaul's ADAH policy. Pl. MSJ Exs. 26, 28, and Def. MSJ Ex. 22. While Tamburro's notes reflect she discussed the policy with Saud (Def. MSJ Ex. 22 p. 6) Tamburro does not anywhere note Saud misunderstood the ADAH policy in her notes or memo or findings. *Id.* At no point was Saud told the policy prohibits relationships between students who had taken a faculty member's class, let alone a student at DePaul generally. Saud was cleared of any wrongdoing and sent back to teach. Pl. MSJ Ex. 1, Pl. Dep., p. 208:1-8, Pl. MSJ Ex. 28, May 2017 Letter to Saud; Pl. MSJ Ex. 15, Tamburro, 63.

19. In May of 2017, Keshk failed to schedule Plaintiff's courses while students were enrolling for Fall 2017 courses and later cancelled Plaintiff's courses. Pl. MSJ Ex. 41, Jorgenson-Keshk emails; Pl. MSJ Ex. 42, Keshk-Saud emails; Pl. MSJ Ex. 43, Keshk-Jorgenson emails re Saud courses; Pl. MSJ Ex. 44, Saud-Jorgenson-Keshk emails; Pl. MSJ Ex. 45, Keshk-Jorgenson emails re Saud courses; Pl. MSJ Ex. 46, Keshk email; Pl. MSJ Ex. 47; Pl. MSJ Ex. 2, Keshk, 62:6-7; 161:18-165:24; 163:20-165:22; 166:23-164:4; 170:5-23; 173:18-175:3. Comparator A's courses were not cancelled. *Id.*

20. Comparator A (who had also been accused of sexual misconduct) asked for more money, was denied his compensation request, and was brought back to adjunct under the standard $4800 per course. Pl. MSJ Ex. 48, Saud-Keshk-Kutina Emails re Enhanced Pay; Pl. MSJ Ex.49, Saud Enhanced Pay request; Pl. MSJ Ex.51, Keshk-Kutina emails re Comparator A Enhanced Pay request; Pl. MSJ Ex.74, Saud's Enhanced Pay request to Keshk; Pl. MSJ Ex.2, Keshk, 139:15-17, 141:1-144:11, 148:6-149:20.

21. The Chicago Sun Times article did not identify Plaintiff or C.M. Pl. MSJ Ex. 30, Krause Dep. p. 19.

22. When Tamburro reopened her OIDE investigation, she never informed or asked Plaintiff about the so-called "additional reports" Keshk brought to her or that she conducted any investigation into them. Exhibit 57, August 21, 2017 OIDE letter to Saud re investigation; Exhibit 76, Saud email to Tamburro with Responsive Pleading; Pl. Rsp. MSJ Ex. 6.  Counsel for Defendant likewise never asked Plaintiff about them during his deposition. *See* Pl. MSJ Ex. 1, Plaintiff Dep.

23. For the second time, Tamburro proceeded with the OIDE investigation against Plaintiff absent an interview with the accuser.  Pl. MSJ Ex. 15 p. 109.

24. When Plaintiff emailed her on September 1, 2017 conveying the advice of his counsel and asking Tamburro to contact him if she had any other questions (DSOF ¶ 61), Tamburro had still by this point had not told him he was being investigated for anything other than CM's allegations.  Pl. MSJ Ex. 57, Pl. MSJ Ex. 15, Tamburro, 134, 146-147.

25. Tamburro never determined what conduct Saud engaged in that constituted a violation of the ADAH policy. Pl. MSJ Ex. 15, Tamburro Dep. p. 154-157; Pl MSJ Ex. 59, Oct 2017 OIDE Determination Letter.

26. Tamburro almost exclusively used "information provided by Keshk," to make only a credibility determination about Saud, not a determination about his conduct. Pl. MSJ Ex. 15, Tamburro, 116-126, 193-207.

27. Tamburro made a favorable credibility determination in favor of C.M. based solely on her unverified filed complaint. Pl. MSJ Ex. 15, Tamburro, 32:16-32:4, 36:13-24, 137:5-143:12; Pl. MSJ Ex. 54, October 5, 2017 Tamburo memo of investigation; Pl. MSJ Ex. 59, OIDE October 6, 2017 determination letter; Pl. MSJ Ex. 81, CM Trial Transcript, 83:8-19.

28. Tamburro, Velasco and Keshk met with each other to discuss her findings and the discipline.  Pl MSJ Ex. 61, Tamburro-Velasco-Keshk emails re meeting; Pl MSJ Ex. 62, Tamburro-Velsaco-Keshk Emails; Pl MSJ Ex. 15, Tamburro, 148:21-149:2.

29. Velasco also conferred with DePaul's Provost on the issue of discipline.  Pl MSJ Ex. 60, September 21, 2017 Agenda for Velasco-DenBoer meeting; Pl MSJ Ex.10, denBoer, 45:1-20. Velasco is not always involved in imposing discipline in OIDE matters.  Pl. MSJ Ex. 12, pp. 70-72. Velasco could not explain why he imposed the discipline on Plaintiff. Pl. MSJ Ex. 12, p. 187-188, 194-195. Plaintiff was not permitted to appeal. Pl. MSJ Ex. 63, Velasco email re Saud's intent to appeal; Pl. MSJ Ex. 12, Velasco, 196:11-197:3.

30. While Tamburro determined C.M.'s claims were credible, at a bench trial in the Circuit Court of Cook County on April 16-17, 2019, Judge Casandra Lewis determined C.M.'s account was not possible. The trial court found C.M.'s alleged incident did not occur because the evidence established Plaintiff and C.M. went for dinner and drinks in the Gold Coast, there was a record of C.M. returning to DePaul that evening, and there was "insufficient time to travel from the Gold Coast to Hyde Park and then from Hyde Park to Lincoln Park in the time allotted."  Pl. MSJ Ex. 35, ¶ 5.  The trial court also concluded that, given the timeline and evidence, C.M.'s claims of assault could not have happened, the relationship she had with Saud was consensual as C.M. continued to see him well after the class, and that no *quid pro quo* occurred. Pl. MSJ Ex. 35 ¶¶ 1-14.  The judge also determined C.M. lied about Saud and awarded him his defamation claim. *Id*. C.M. did not appeal.

31. While C.M. alleged Plaintiff offered to waive the final for her if she had sex with him, the trial court found there was actually no final administered to the class (another student testified to that fact at trial). Pl. MSJ Ex. 1, pp. 84:19-22, 126:13-18; Pl. Resp. MSJ Exhibit 7, Excerpt of

C.M. Trial Transcript, (N.A. testimony) p. 5:15. Because there was no final, and because all of

Plaintiff's students who attended the class received an A grade, the trial court concluded there

was no evidence Plaintiff coerced C.M. into sex. Pl. MSJ Ex. 35.

32. At the C.M trial in April of 2019, Keshk was asked directly why Saud was not brought

back to teach, and he said it was because of the budget cuts. Pl. MSJ Ex. 81, pp. 60-61.  Keshk

was directly asked whether the lawsuit had anything to do with Saud's departure and Keshk

denied it did. *Id*. at 61.

33. Keshk acknowledged issues of discrimination at DePaul and that he commented about it

to others.  Pl. MSJ Ex. 2, Keshk Dep.,  21-26; Pl. MSJ Ex. 12, Velasco Dep., 104, 110-111.

Keshk was also up for reappointment as Chair of the Religious Studies Department and his

appointment was renewed by Velasco in late June 2017. ; Pl. MSJ Ex. 53; Pl. MSJ Ex. 2, Keshk

Dep., p. 128-129. Velasco also acknowledged a race discrimination problem at DePaul and

testified DePaul had received grant money to work on an "anti-racist action plan" that includes a

self-assessment on diversity, equity and inclusion.  Pl. MSJ Ex. 12, Velasco Dep. pp. 29-30.

34. Plaintiff once complained to Keshk that a colleague (German, white) made comments

claiming Plaintiff had an "allegiance" to Saudi Arabia. Keshk thought it was a "stupid

misunderstanding", and he did not escalate the complaint because he thought the colleague

meant it as "a joke – or not a joke meaning kind of – like a funny, oh, no, it's not. He has – he's

not Saudi. It's like, just because his name is Saud, he's not Saudi. And I don't think it had any

bearing on – on – on the whole logical issue and stuff like that." Pl. MSJ Ex. 2, 84:13-88:11.

35. Keshk believed Saud would "throw [him] under the bus." Pl. MSJ Ex. 2, 266.

36. Saud is not the first faculty member in his department to be subject to OIDE investigation

after being targeted by the website. ███████ a white colleague, faced a similar events in

47

Spring 2016. Pl. MSJ Ex. 78-79. Keshk denied ▮▮▮▮ was ever subject to an OIDE investigation. Pl. MSJ Ex. 2, Keshk Dep., pp. 41-42. ▮▮▮▮ provided an affidavit for Saud testifying to the events. Pl. MSJ Ex. 79. ▮▮▮ was cleared of wrongdoing. *Id.*

37. Keshk has failed to respond to discrimination issues raised by faculty members in his department, including when a faculty member received death threats. Pl. MSJ Ex. 68, McCloud Affidavit.

38. A Title IX investigator cannot complete a Title IX investigation without speaking to both sides, because it would adversely affect a credibility determination. Pl. MSJ Ex. 27, Wayne Dep. p. 32:2-10.

39. Schaffer, who also contributed to Plaintiff's OIDE investigations, concluded the student who reported that Comparator A raped them may have mistakenly accused him because of the similarity in his name with another professor, one who does not teach at DePaul - even though the complaint says the alleged rapist was DePaul Catholic Studies Professor (which is Comparator A's role). Schaffer let Comparator A do his own "sleuthing". They did not involve or inform his chair, but with Plaintiff they did. Pl. MSJ Ex. 37; Pl. MSJ Ex. 38, Pl. MSJ Ex. 36, Schaffer Dep., 29.

August 16, 2023

Respectfully Submitted,

/s/Christina Abraham

Christina Abraham
Attorney for the Plaintiff

48

Attorney No. 6298946
Christina Abraham, Esq.
Abraham Law & Consulting, LLC
161 N. Clark Street, Suite 1600
312-588-7150

**<u>Certificate of Service</u>**

The undersigned attorney hereby certifies that she caused a copy of Plaintiff's

Response to Defendant's Statement of Facts to be served upon the following parties listed below,

via the Northern District of Illinois Electronic Case Management System to all parties registered

for electronic service on August 16, 2023.



<u>/s/Christina Abraham</u>

Christina Abraham
Attorney for the Plaintiff

Attorney No. 6298946
Christina Abraham, Esq.
Abraham Law & Consulting, LLC
161 N. Clark Street, Suite 1600
312-588-7150

50

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| Laith Saud, | |
| Plaintiff, | No. 1:19-cv-03945 |
| v. | Judge Joan B. Gottschall |
| DePaul University, | Magistrate Judge Susan E. Cox |
| Defendant. | |

**DEPAUL UNIVERSITY'S RESPONSE TO
PLAINTIFF'S AMENDED RULE 56 STATEMENT OF MATERIAL FACTS**

Defendant DePaul University ("DePaul"), by and through the undersigned attorneys, and pursuant to Local Rule 56.1(b)(2), hereby submits the following Response to Plaintiff Laith Saud ("Plaintiff")'s Amended Rule 56 Statement of Material Facts (Dkt. Entry ("DE") 241).[1]

| | Plaintiff's Fact | DePaul's Response |
|---|---|---|
| 1 | **Fact:** DePaul University ("DePaul") is a private Catholic university in Chicago, Illinois and is organized under the Illinois Not for Profit Act, 805 ILCS 105 *et seq.* **Dkt 66, ¶ 7 (Def Answer).** | **Response:** Admitted. |

| | Plaintiff's Fact | DePaul's Response |
|---|---|---|
| 2 | **Fact:** DePaul's Anti-Harassment Policy and Procedures ("ADAH Policy"), under Special Considerations – Consensual Relationships, states:<br><br>Amorous relationships that might be appropriate in other circumstances present serious difficulties within the University Community. Relationships between individuals in inherently unequal positions (such as teacher and student, supervisor and employee) may undermine the real or perceived integrity of the | **Response:** Admitted. |

---

[1] DePaul admits certain facts for purposes of Plaintiff's motion for summary judgment (DE 220) only.

| | supervision and evaluation process, as well as affect the trust inherent in the educational environment. Consensual romantic or sexual relationships in which one party is in a position to review the work or influence the career of the other may provide grounds for complaint when that relationship gives undue access or advantage to, restricts opportunities of, or creates a hostile and unacceptable environment for one of the parties to the relationship, or for others. In such circumstances, consent may not be considered a defense against a charge of sexual harassment in violation of this Policy. The determination of what constitutes sexual harassment depends upon the specific facts and the context in which the conduct occurs. **Exhibit 17, ADAH Policy, p. 3.** | |
|---|---|---|

| | **Plaintiff's Fact** | **DePaul's Response** |
|---|---|---|
| 3 | **Fact:** DePaul's ADAH Policy does not prohibit consensual relationships between faculty and students, even where the student is currently enrolled in a course instructed by the faculty member. **Exhibit 17, DePaul's ADAH Policy, p. 3; Exhibit 15, Tamburro, 175:22-176:2, 177:8-21; Exhibit 18, Email from Tamburro to Chris Bury; Exhibit 19, *The DePaulia* "Power Player" Article, p. 1; Ex 8, 43:5-15, 46:14-17.** | **Response:** Disputed. Plaintiff's ("Pl.") Exhibit 17 at DEF10439. |

| | **Plaintiff's Fact** | **DePaul's Response** |
|---|---|---|
| 4 | **Fact:** Plaintiff Laith Saud ("Saud") is Iraqi Arab American. Saud was hired at Defendant DePaul University ("DePaul") in 2005 or 2006. **Exhibit 1, Saud, 12:8, 17:23-18: [*sic*], 187:17-18.** | **Response:** Admitted. |

2

| | | |
|---|---|---|
| | | |

| | Plaintiff's Fact | DePaul's Response |
|---|---|---|
| 5 | **Fact:** Saud consistently received "good" or higher performance evaluations for his teaching, his classes were always in high demand and students were on waitlists to enroll. This includes on April 10, 2017, Saud received a department performance rating of "Good" and was unanimously recommended for renewal of his term faculty contract. ▓▓▓ ▓▓▓▓▓ Comparator A (White) also received a "Good" department performance rating. Prior to April 10, 2017, Plaintiff had never been the subject of a complaint of misconduct. **Exhibit 1, Saud, 187:1-6; Exhibit 2, Keshk, 91:14-17, 176:2-5; Exhibit 6, p. 1; Ex. 15, Tamburro, 42:14-23; Exhibit 81, CM Trial Transcript, 62:6-7; Exhibit 3, 2016 Saud renewal letter; Exhibit 65, Emails re Evaluation Scores.** | **Response:** Disputed that Saud consistently received "good" or higher performance evaluations for this teaching, his classes were always in high demand and students were on waitlists to enroll. Pl. Exhibit 65, Email (4-5-2016 at 5:36 PM); Pl. Exhibit 81, CM Trial Transcript at 62:3-7. Disputed that on April 10, 2017, Saud received a department performance rating of "Good." Pl. Exhibit 6 at DEF08984. Admitted as to the remainder. |

| | Plaintiff's Fact | DePaul's Response |
|---|---|---|
| 6 | **Fact:** In January of 2017, Saud facilitated and moderated a panel entitled "Muslim Civil Liberties in the Age of Trump". Linda Blakley, DePaul's VP of Marketing and Communications, learned of the event from a subordinate in her department. **Exhibit 4, Blakely, 49:2-50:8; Exhibit 7, Email re Muslim Civil Rights Event.** | **Response:** Disputed that in January of 2017, Saud facilitated and moderated a panel entitled "Muslim Civil Liberties in the Age of Trump." Pl. Exhibit 7, Email (1-18-2017 at 2:51 PM). Admitted as to the remainder. |

| | Plaintiff's Fact | DePaul's Response |
|---|---|---|
| 7 | **Fact:** On January 18, 2017, Saud's event was flagged by DePaul's Marketing and Communications department. The event was flagged because the event would discuss "Muslim civil liberties" during the presidency of Donald J. | **Response:** Disputed. Pl. Exhibit 4, Blakley Tr. 48:18-52:19; Pl. Exhibit 7, Email (1-18-2017 at 3:12 PM). |

| | | |
|---|---|---|
| | Trump and because Saud was "vocal about his dislike for Trump." **Exhibit 1, Saud, 230:1-22; Exhibit 4, Blakley, 50:13-51:7; Exhibit 7, Email re Muslim Civil Rights Event.** | |

| | Plaintiff's Fact | DePaul's Response |
|---|---|---|
| 8 | **Fact:** Blakley forward the email flagging the Muslim civil liberties event to senior DePaul administrators, including DePaul's president, the provost, as well as the Vice President of the Office of Institutional Diversity and Equity (OIDE), Elizabeth Ortiz. Blakely does not usually inform senior administrators about events on campus. **Exhibit 7, Email re Muslim Civil Rights Event; Exhibit 8, Ortiz, 94:2-6; Exhibit 4, Blakley, 49:12-53:21; Exhibit 9, Holtschneider, 68:1-69:5.** | **Response:** Disputed. Pl. Exhibit 4, Blakley Tr. 49:12-53:21; Pl. Exhibit 7, Email (1-18-2017 at 3:21 PM); Pl. Exhibit 8, Ortiz Tr. 94:2-6. |

| | Plaintiff's Fact | DePaul's Response |
|---|---|---|
| 9 | **Fact:** On April 6, 2017, the Middle East Forum, published an article on its website "Campus Watch" about Saud teaching at DePaul, his midwestern upbringing as an Arab American, and his political views. The purpose of "Campus Watch" is to "make life miserable" for academics that are Arab or pro-Arab. **Exhibit 11, Campus Watch Article; Exhibit 2, Keshk, 83:20-84:1.** | **Objections:** Hearsay.<br><br>**Response:** Disputed. Pl. Exhibit 11; Pl. Exhibit 2, Keshk Tr. 83:20-84:1. |

| | Plaintiff's Fact | DePaul's Response |
|---|---|---|
| 10 | DePaul contracts with a third-party vendor to search the internet for media reports about DePaul and provide daily reports to Blakley's department. DePaul may have received a link to the "Campus Watch" article regarding Plaintiff from this third-party vendor. **Exhibit 4, Blakley, 46:24-47:2, 48:11-15.** | **Response:** Disputed. Pl. Exhibit 4, Blakley Tr. at 13:21-14:7; 47:22-48:15. |

| | Plaintiff's Fact | DePaul's Response |
|---|---|---|
| 11 | **Fact:** After notification that their term contracts would not be renewed due to budgetary cuts, Keshk told Saud and Comparator A that they would continue to teach in the Religious Studies department under adjunct contracts. Keshk told Saud he could teach two classes in the Autumn 2017 academic quarter. **Exhibit 13, Nonrenewal letter; Exhibit 12, Velasco, 49:10-16; Ex. 2, 96:7-25; Exhibit 1, Saud, 249:3-18; Exhibit 2, Keshk, 113:16-22; Exhibit 39; Exhibit 56, Keshk-Saud Email re cancellation of contract.** | **Response:** Disputed. Pl. Exhibit 1, Saud Tr. at 249:3-23; Pl. Exhibit 2, Keshk Tr. at 102:10-103:19; Pl. Exhibit 56, Email (4-10-2017 at 8:13 PM). |

| | Plaintiff's Fact | DePaul's Response |
|---|---|---|
| 12 | **Fact:** Adjuncts are limited to two classes per quarter and are paid a base rate of $4,800 per course. **Exhibit 2, Keshk, 105:5-6; Exhibit 40, Memo re Adjunct Pay.** | **Response:** Disputed. Pl. Exhibit 40. |

| | Plaintiff's Fact | DePaul's Response |
|---|---|---|
| 13 | **Fact:** OIDE does not formally investigate every report it receives, particularly when a complainant does not cooperate. The Title IX Coordinator decides whether to investigate a complaint. The Title IX investigator is supposed to interview both the accuser and the accused during an investigation. **Exhibit 8, Ortiz, 21:5-6, 22:15-19; Exhibit 27, Wayne Dep. 28:22-29:5, 30:5-12, 31:20-32:10.** | **Response:** Disputed. Pl. Exhibit 8, Ortiz Tr. at 22:21-23:15; Pl. Exhibit 15, Tamburro Tr. at 30:8-9, 30:22-31:3, 31:21-32:10; Pl. Exhibit 27, Wayne Tr. at 30:5-12. |

| | Plaintiff's Fact | DePaul's Response |
|---|---|---|
| 14 | **Fact:** On April 10 and 12, 2017, days after the Campus Watch article was published, two reports about Saud were made to OIDE. The first report involved ▓▓▓▓▓▓▓ "CM" (White). CM was older than the average student. CM did not cooperate in the investigation. The second report involved AR, who did cooperate with the investigation, and | **Response:** Disputed that on April 10, 2017, a report involving C.M. was made to OIDE. Pl. Exhibit 14; Pl. Exhibit 16. Disputed that CM was older than the average student. Pl. Exhibit 1, Saud Tr. 87:14-18. Disputed AR insisted nothing inappropriate occurred between her and Plaintiff, and that AR felt pressured to implicate Plaintiff in wrongdoing. Pl. Exhibit 34, Aff. of AR at ¶¶ 1-2. Admitted as to the |

| | | |
|---|---|---|
| | insisted nothing inappropriate occurred between her and Saud. AR felt she was being pressured to implicate Saud in wrongdoing and that they were trying to build a case against him. **Exhibit 14, Lien Letter; Exhibit 16, Maxient Report; Exhibit 20, Wayne-Tamburro Emails; Exhibit 27, Wayne Dep., 35:19-36:20; Exhibit 1, Saud, 87:14-18.** | remainder. |

| | Plaintiff's Fact | DePaul's Response |
|---|---|---|
| 15 | **Fact:** On or about April 13, 2017, Title IX Investigator Karen Tamburro (White) initiated an investigation into the reports involving CM and AR. Tamburro was assisted in her investigation by Barbara Schaffer, who was copied on several privileged emails pertaining to the OIDE investigation. **Exhibit 21, Deutschman emails; Exhibit 32, DePaul Third Amended Privilege Log, lines 72-74, 80-85, 164-165, 314, 319-327.** | **Response:** Disputed that on or about April 13, 2017, Title IX Investigator Karen Tamburro initiated an investigation into the reports involving CM and AR. Pl. Exhibit 15, Tamburro Tr. 14:5-7; Pl. Exhibit 21 at DEF00070-DEF00071 (Email – 4-13-2017 at 3:46 PM); Pl. Exhibit 24. Disputed that Tamburro was assisted in her investigation by Barbara Schaffer, who was copied on several emails pertaining to the OIDE investigation. Pl. Exhibit 32, DePaul's Third Amended Privilege Log, lines 72-74, 80-85, 164-165, 314, 319-327; Pl. Exhibit 36, Schaffer Tr. 111:17-19. Admitted as to the remainder. |

| | Plaintiff's Fact | DePaul's Response |
|---|---|---|
| 16 | **Fact:** CM obtained an attorney who informed DePaul that CM would not cooperate in DePaul's "internal investigation." **Exhibit 21, Deutschman Emails, p. 3; Exhibit 15, Tamburro, 75:15-20; Exhibit 26, OIDE May 9, 2017 Memo, p. 2.** | **Response:** Admitted. |

| | Plaintiff's Fact | DePaul's Response |
|---|---|---|
| 17 | **Fact:** Saud informed the Chair of the Religious Studies department, Khaled Keshk, of the investigation. Keshk warned Saud that DePaul would discriminate against him. **Exhibit 1, Saud, 180:9-182:12.** | **Response:** Disputed that Keshk warned Saud that DePaul would discriminate against him. Pl. Exhibit 2, Keshk Tr. 118:15-22. Admitted as to the remainder. |

| | Plaintiff's Fact | DePaul's Response |
|---|---|---|
| 18 | **Fact:** Tamburro met with AR on or about April 18, 2017. Tamburro took notes during the meeting. During the meeting, AR "denied anything physical occurred between her and [Saud]" and she was not made to feel uncomfortable by Saud. **Exhibit 22, AR-Tamburro Emails; Exhibit 23, Tamburro notes re AR meeting; Exhibit 34, AR Affidavit.** | **Response:** Admitted. |

| | Plaintiff's Fact | DePaul's Response |
|---|---|---|
| 19 | **Fact:** Tamburro was "insistent on seeing [AR] even though [she] never expressed any concern and was adamant there was no concern, after a third party mischaracterized interactions between [Saud] and reported those mischaracterizations to Title IX." AR had the impression they "were trying to build a case against Laith Saud. [AR] was repeatedly asked the same questions over and over again, specifically whether [she] 'felt comfortable' around Laith Saud, even though [she] made it clear that [she] did and there was no issue." AR emailed Tamburro to find out who had reported her because was [*sic*] "bothering [her] ever since the report was made", but Tamburro did not respond. **Exhibit 34, AR Affidavit, ¶¶ 1-2, Exhibit 22, Tamburro-AR emails, p.1.** | **Objections:** Hearsay.<br><br>**Response:** Disputed that a third party mischaracterized interactions between Saud and reported those mischaracterizations to Title IX. Pl. Exhibit 20, Email (4-12-2017 at 12:16 PM); Pl. Exhibit 23, Email (4-18-2017 at 4:56 PM); Pl. Exhibit 26 at DEF000230). Admitted as to the remainder. |

| | Plaintiff's Fact | DePaul's Response |
|---|---|---|
| 20 | **Fact:** On April 20, 2017, Tamburro notified Saud by letter that was the subject of "reports [he] engaged in sexual harassment of students" and requested a meeting with him. **Exhibit 24, April 2017 Letter from OIDE.** | **Response:** Admitted. |

| | Plaintiff's Fact | DePaul's Response |
|---|---|---|
| 21 | **Fact:** Saud was interviewed by Tamburro on or about May 2, 2017. Saud stated that during the course of the | **Response:** Disputed that Saud stated his relationship with CM was a "consensual relationship." Pl. Exhibit 25 at DEF00218. Admitted |

| | | |
|---|---|---|
| | quarter, he saw CM outside of the class-room on campus, grabbed coffee with her and had drinks with her on the Gold Coast. Saud admitted to having a consensual relationship with CM and said the relationship occurred "after the class had ended, which could have been anytime between May and June." During the meeting, Tamburro also asked Saud about AR, even though at this time AR had already told Tamburro that she was not made to feel uncomfortable by Saud. **Exhibit 1, Saud, 209:6-12; Exhibit 25, Tamburro Notes, p. 5.** | as to the remainder. |

| | **Plaintiff's Fact** | **DePaul's Response** |
|---|---|---|
| 22 | **Fact:** Tamburro issued a memo reporting on her findings on May 9, 2017. Tamburro concluded that Saud did not violate DePaul's ADAH policy with respect to either AR and CM. **Exhibit 26, May 9, 2017 OIDE Memo, pp. 4, 6.** | **Response:** Admitted. |

| | **Plaintiff's Fact** | **DePaul's Response** |
|---|---|---|
| 23 | **Fact:** On May 10, 2017, Tamburro sent Saud a letter informing her of her conclusion that he did not violate DePaul's ADAH policy. Saud informed Keshk by text and Keshk responded "Mabrook", which is Arabic for "congratulations." **Exhibit 28, May 10, 2017 Letter to Saud; Exhibit 15, Tamburro, 63:7-10; Exhibit 55, Saud-Keshk texts; Exhibit 2, Keshk, 124:24- 125:3.** | **Response:** Admitted. |

| | **Plaintiff's Fact** | **DePaul's Response** |
|---|---|---|
| 24 | **Fact:** On June 28, 2017, Saud emailed Tamburro stating he felt he was the target of misconduct by CM. Tamburro never responded to Saud's email. Tamburro did not inform Saud he could file a claim against his accuser. **Exhibit 29, Plaintiff's complaint to Tamburro; Exhibit 15, Tamburro, 92:12-93:1, 145:25-146:10.** | **Response:** Admitted. |

|    | Plaintiff's Fact | DePaul's Response |
|----|------------------|-------------------|
| 25 | **Fact:** Tamburro herself [*sic*] the subject of a discrimination complaint by a subordinate. Title IX investigator Cheryl Wayne, African American, complained Tamburro credited a white employee's statements, Title IX investigator Barbara Schaffer, over hers. DePaul conducted an investigation and determined it could not substantiate Wayne's complaint. Wayne observed that Tamburro treated white faculty more favorably during OIDE investigations. **Exhibit 67, Wayne Affidavit, ¶¶ 10-22, ¶¶ 8-9.** | **Objection:** Contradicts prior deposition testimony. Pl. Exhibit 27, Wayne Tr. 33:10-17, 59:23-60:4, 60:18-61:6.

**Response:** Disputed that Title IX investigator Cheryl Wayne complained Tamburro credited a white employee's statements, Title IX investigator Barbara Schaffer, over hers. Pl. Exhibit 67, Aff. of C. Wayne at ¶ 22. Disputed that DePaul conducted an investigation. Pl. Exhibit 67, Aff. of C. Wayne at ¶ 22; Def. Exhibit 1, Third-Party Investigator's Closing Letter. Disputed that Wayne observed that Tamburro treated white faculty more favorably during OIDE investigations. Pl. Exhibit 27, Wayne Tr. 33:10-17, 59:23-60:4, 60:18-61:6; Pl. Exhibit 67, Aff. of C. Wayne at ¶¶ 8-9; Admitted as to the remainder. |

|    | Plaintiff's Fact | DePaul's Response |
|----|------------------|-------------------|
| 26 | **Fact:** On May 2, 2017, Keshk's assistant, Sean Jorgenson, notified the administration that the Religious Studies department wanted to cancel all three of Saud's upcoming courses; these courses were Religious Studies courses 116.101, 116.102 and 263.101. Two of these courses were relisted and reassigned to "STAFF". Comparator A's courses were not canceled, rather his courses were reduced from three courses to two courses and the courses were assigned to Comparator A on the course listings. Keshk could not explain why Saud and Comparator A received different treatment in the handling of the upcoming Autumn 2017 courses. **Exhibit 41, Jorgenson-Keshk emails; Exhibit 2, Keshk, 163:20-165:22.** | **Response:** Disputed that Comparator A's courses were not cancelled, rather his courses were reduced from three courses to two courses and the courses were assigned to Comparator A on the course listings. Pl. Exhibit 41, Email (5-2-2017 at 2:47 PM). Disputed that Keshk could not explain why Saud and Comparator A received different treatment in the handling of the upcoming Autumn 2017 courses. Pl. Exhibit 41, Email (5-2-2017 at 2:47 PM); Pl. Exhibit 42, Email (5-3-2017 at 12:55 PM). Admitted as to the remainder. |

|    | Plaintiff's Fact | DePaul's Response |
|----|------------------|-------------------|
| 27 | **Fact:** On May 3, 2017, Saud reached out to Keshk about the canceled courses because students that were trying to enroll in his courses contacted Saud letting | **Response:** Disputed that Saud reached out to Keshk about the canceled courses because students that were trying to enroll in his courses contacted Saud letting him know his |

9

| | | |
|---|---|---|
| | him know his courses had not been posted. Keshk told Saud, "We canceled the term faculty classes now so that we don't have to do it at the last minute". This was not done for Comparator A. **Exhibit 42, Keshk-Saud emails; Exhibit 2, Keshk, 166:23-164:4; Exhibit 41, Jorgenson-Keshk emails.** | courses had not been posted. Pl. Exhibit 42, Email (5-3-2017 at 11:48 AM). Disputed this was not done for Comparator A. Pl. Exhibit 41, Email (5-2-2017 at 2:47 AM). Admitted as to the remainder. |

| | Plaintiff's Fact | DePaul's Response |
|---|---|---|
| 28 | **Fact:** On May 17, 2017, Saud asked Jorgenson about his courses. Keshk told Saud, "Your courses were taken off and now we are trying to reschedule you." Keshk offered Saud two different courses to teach in the Autumn 2017 quarter: Religion 265 and Religion 224 and Saud accepted. **Exhibit 44, Saud-Jorgenson-Keshk emails; Exhibit 2, Keshk, 170:5-23.** | **Response:** Disputed that Keshk offered Saud two different courses to teach in the Autumn 2017 quarter: Religion 265 and Religion 224 and Saud accepted. DE 164-33, Email (5-22-2017 at 9:56 AM).[2]; Pl. Exhibit 2, Keshk Tr. 115:9-116:15. Admitted as to the remainder. |

| | Plaintiff's Fact | DePaul's Response |
|---|---|---|
| 29 | **Fact:** On May 17, 2017, Saud emailed Dean Velasco and copied Keshk. Saud's email reiterated his positive contributions to the university and asking to discuss his appointment at DePaul. Velasco did not respond to the email. **Exhibit 75, Saud-Velasco email; Exhibit 12, Velasco, 86:25-87:1.** | **Response:** Admitted. |

| | Plaintiff's Fact | DePaul's Response |
|---|---|---|
| 30 | **Fact:** On May 24, 2017, Saud reached out to Jorgenson again regarding his courses not being listed. Jorgenson forwarded the email to Keshk. Keshk responded to Jorgenson stating, "Your courses are on the books." The courses were not assigned to Saud, but rather assigned to "STAFF". **Exhibit 45, Keshk-Jorgenson emails re Saud courses; Exhibit 43, Keshk- Jorgenson emails** | **Response:** Disputed. Pl. Exhibit 43, Email (5-22-2017 at 9:23 AM); Pl. Exhibit 45, Email (5-24-2017 at 11:35 AM); Pl. Exhibit 46, Email (6-6-2017 at 9:50 AM). |

---

[2] Plaintiff's re-filed Exhibit List (DE 224) does not contain an Exhibit 44. DePaul presumes Exhibit 44 is intended to be the same email thread Plaintiff filed in support of his first summary judgment motion as DE 164-33.

| | | |
|---|---|---|
| | re Saud courses; Exhibit 46, Keshk email; Exhibit 2, Keshk, 161:18-165:24. | |

| | Plaintiff's Fact | DePaul's Response |
|---|---|---|
| 31 | **Fact:** On June 26, 2017, Katie Kutina-Grublesky, Personnel Coordinator for the LAS Dean's Office, emailed Keshk about Comparator A and Saud's contracts. Her email states:<br><br>An adjunct position was created for [Comparator A], so he may be terminated in the system from his full-time role [if you have not already done so]. The effective date for his termination is 7/1/17. Laith Saud's adjunct position was terminated and I'm reinstating it today. I'll confirm when that is done and then you can terminate him in the system with an effective date of 7/1/17.<br><br>**Exhibit 47; Exhibit 2, Keshk, 173:18-175:3.** | **Response:** Admitted. |

| | Plaintiff's Fact | DePaul's Response |
|---|---|---|
| 32 | **Fact:** On June 28, 2017, after a meeting with Kutina-Grublesky, Saud emailed Keshk and Kutina-Grublesky inquiring about Enhanced Pay. The same day, Keshk emailed Saud and Comparator A they could request Enhanced Pay and he would "solicit" the amounts they requested from Dean Velasco. Both Saud and Comparator A submitted Enhanced Pay requests. Comparator A asked for $37,529 per year, which is $6,254.83 per course. Saud requested $6000 per course. Keshk requested Enhanced Pay for Comparator A by forwarding his request to Dean Velasco. There is no record Keshk forwarded or otherwise relayed Saud's Enhanced Pay request to | **Response:** Disputed that Keshk requested Enhanced Pay for Comparator A by forwarding his request to Dean Velasco. Pl. Exhibit 51, Email (7-12-2017 at 10:11 AM). Disputed there is no record Keshk forwarded or otherwise relayed Saud's Enhanced Pay request to the Dean. Pl. Exhibit 2, Keshk Tr. 141:8-9. Admitted as to the remainder. |

| | | |
|---|---|---|
| | the Dean. **Exhibit 48, Saud-Keshk-Kutina Emails re Enhanced Pay; Exhibit 49, Saud Enhanced Pay request; Exhibit 51, Keshk-Kutina emails re Comparator A Enhanced Pay request; Exhibit 74, Saud's Enhanced Pay request to Keshk; Exhibit 2, Keshk, 139:15-17, 141:1-144:11, 148:6-149:20.** | |

| | Plaintiff's Fact | DePaul's Response |
|---|---|---|
| 33 | **Fact:** DePaul offers "Enhanced Pay" to adjunct faculty on a discretionary basis. **Exhibit 40, Memo re Adjunct Pay.** | **Response:** Disputed. Pl. Exhibit 1, Saud Tr. 264:3-265:11; Pl. Exhibit 40; Pl. Exhibit 48, Email (6-28-2017 at 9:14 AM). |

| | Plaintiff's Fact | DePaul's Response |
|---|---|---|
| 34 | **Fact:** On June 30, 2017 Dean Velasco reappointed Keshk as Chair of the Religious Studies department. **Exhibit 53, Memo re Keshk reappointment; Exhibit 2, Keshk, 21:15-17; Exhibit 12, Velasco, 111:9-11.** | **Response:** Disputed. Pl. Exhibit 12, Velasco Tr. 110:14-23; Pl. Exhibit 53. |

| | Plaintiff's Fact | DePaul's Response |
|---|---|---|
| 35 | **Fact:** On July 6, 2017, Keshk emailed Saud stating he "cannot offer" him a course assignment for the Autumn quarter. Keshk's email stated: "In addition to low projected course enrollments, and thus uncertainties about final course offerings, your compensation requirements far exceed what I am able to pay adjunct instructors." Keshk communicated with the Office of General Counsel the same day this email was sent. Keshk later admitted that the Deans [*sic*] office is always involved in employment decisions, and admitted the reasons stated in his email were not true. **Exhibit 50, Keshk-Saud email re Enhanced Pay; Exhibit 32, DePaul Third Amended Privilege Log, lines 96-100; Exhibit 2, Keshk, 17:3-16, 146:12-20.** | **Response:** Disputed that Keshk later admitted the Dean's office is always involved in employment decisions, and admitted the reasons stated in his email were not true. Pl. Exhibit 2, Keshk Tr. 17:8-16, 146:12-147:19, 151:1-152:6, 249:20-250:3, 258:11-259:8, 261:21-262:16, 264:14-22; Pl. Exhibit 12, Velasco Tr. 115:3-13. Admitted as to the remainder. |

|    | Plaintiff's Fact | DePaul's Response |
|----|------------------|-------------------|
| 36 | **Fact:** On July 21, 2017, Keshk informed Comparator A that the "Dean's office is unable to pay more than the base adjunct amount ($4,800/course) due to budgetary reasons. I am very sorry for this disappointing news." Comparator A taught under an adjunct contract in the Autumn 2017 Quarter at a salary of $4,800 per course. **Exhibit 52, Keshk-Comparator A emails re Enhanced Pay; Exhibit 64, ▮▮▮▮ adjunct letter; Exhibit 2, Keshk, 157:7-15, 174:4-6.** | **Response:** Disputed that on July 21, 2017, Keshk informed Comparator A that the "Dean's office is unable to pay more than the base adjunct amount ($4,800/course) due to budgetary reasons. I am very sorry for this disappointing news." Pl. Exhibit 52, Email (7-21-2017 at 12:54 PM). Admitted as to the remainder. |

|    | Plaintiff's Fact | DePaul's Response |
|----|------------------|-------------------|
| 37 | **Fact:** On June 29, 2017, CM, through her attorney, filed an unverified complaint in the Circuit Court of Cook County, Illinois. CM sued DePaul and Saud. CM's complaint alleged common law battery and violation of the Illinois Gender Violence Act against Saud, and negligent hiring and supervision against DePaul. CM alleged Saud took her out for dinner and drinks, "plied her with alcohol" and took her back to his apartment where he "aggressively" pursued sex with her. **Exhibit 5, CM Unverified Complaint, ¶¶ 4, 7.** | **Response:** Admitted. |

|    | Plaintiff's Fact | DePaul's Response |
|----|------------------|-------------------|
| 38 | **Fact:** DePaul became aware of the lawsuit as early as June 30, 2017. **Exhibit 32, DePaul Third Amended Privilege Log, lines 101-106.** | **Response:** DePaul admits only that the individuals identified on lines 101-106 received emails communications regarding the lawsuit on June 30, 2017. Disputed as to the remainder. Pl. Exhibit 32, lines 101-106.[3] |

|    | Plaintiff's Fact | DePaul's Response |
|----|------------------|-------------------|
| 39 | **Fact:** Upon learning of the complaint, Tamburro reopened the OIDE investigation of Saud and did not initially inform Saud. **Exhibit 15, Tamburro, 36:2-24.** | **Response:** Disputed. Pl. Exhibit 15, Tamburro Tr. 110:22-111:11. |

---

[3] DePaul does not identify the content of the emails in order to preserve attorney-client privilege.

|    | **Plaintiff's Fact** | **DePaul's Response** |
|----|----------------------|------------------------|
| 40 | **Fact:** CM again did not cooperate in the OIDE investigation. **Exhibit 54, OIDE October 5, 2017 Memo, p. 6.** | **Response:** Admitted. |

|    | **Plaintiff's Fact** | **DePaul's Response** |
|----|----------------------|------------------------|
| 41 | **Fact:** At the request of DePaul, Keshk gathered information for Tamburro's OIDE investigation of Saud. Keshk communicated with Tamburro regarding the investigation on at least three occasions. Keshk was told that "if there's any communication or any indication about the lawsuit, I should turn over all material to [Tamburro]". Keshk believed Saud would "throw him under the bus." Keshk did not understand the distinction between the OIDE investigation and the lawsuit. **Exhibit 25, Tamburro OIDE investigation notes, pp. 1-2, 4; Exhibit 15, Tamburro, 124:12-20; Exhibit 2, Keshk, 186:11-14, 268:4-18; 226:19-24.** | **Response:** Disputed that Keshk gathered information for Tamburro's OIDE investigation of Saud at the request of DePaul. Pl. Exhibit 2, Keshk Tr. 186:9-187:8, 187:20-188:11; 265:3-6; 267:23-268:24; Pl. Exhibit 15, Tamburro Tr. 112:24-113:6, 113:22-114:1. Disputed that Keshk communicated with Tamburro regarding the investigation on at least three occasions. Pl. Exhibit 25 at DEF000214-DEF000215 and DEF00217. Disputed that Keshk did not understand the distinction between the OIDE investigation and the lawsuit. Pl. Exhibit 2, Keshk Tr. 260:5-14. Admitted as to the remainder. |

|    | **Plaintiff's Fact** | **DePaul's Response** |
|----|----------------------|------------------------|
| 42 | **Fact:** Keshk reported to Tamburro conversations he had with others about Saud, all of whom were Arab or Muslim. This included: a rumor that a student was romantically interested in Saud; and Saud's babysitter, who was never a student of Saud and was not a student at DePaul at the time, recollecting a time where he offered her a drink on one occasion, she declined, and nothing further occurred. Tamburro's conversations with the individuals Keshk reported to her did not result in any OIDE investigations. **Exhibit 25, Tamburro Notes, p. 2, 4; Exhibit 15, Tamburro, 117:21-121-25 [*sic*]; Exhibit 69, Saud Affidavit I, ¶¶ 12-21.** | **Response:** Disputed. Pl. Exhibit 25 at DEF00214-00215; Pl. Exhibit 69, Aff. of L. Saud at ¶¶ 12-21. |

| | Plaintiff's Fact | DePaul's Response |
|---|---|---|
| 43 | **Fact:** Tamburro investigated Keshk's reports. Tamburro contacted at least three Arab and/or Muslim female De-Paul students or former students, but did not "open an investigation" as to them. None of the students reported being made uncomfortable by Saud. Tamburro did not recall speaking to any student "who had specific knowledge about [Saud]'s relationship with [CM]. **Exhibit 15, 117:21-121:15, 122:2-17, 116:20-22.** | **Response:** Disputed that Tamburro contacted at least three Arab and/or Muslim female De-Paul students or former students. Pl. Exhibit 15, Tamburro Tr. 115:8-15, 117:21-118:15, 120:11-121:3; Pl. Exhibit 25 at DEF00214. Disputed that none of the students reported being made uncomfortable by Saud. Pl. Exhibit 15, Tamburro Tr. 120:11-19; Pl. Exhibit 25 at DEF00214. Admitted to the remainder. |

| | Plaintiff's Fact | DePaul's Response |
|---|---|---|
| 44 | **Fact:** Keshk denied involvement in the OIDE investigation of Saud. Keshk denied "gather[ing] any information" about Saud. Keshk recalled Saud telling him that CM pursued him and the relationship began after she was a student. Keshk testified at the Martalogu trial that he learned Saud had allegedly lied about when the sexual relationship began when OIDE made its determination in October 2017. During his second deposition, and for the first time ever, Keshk claimed he decided not to bring Saud back to adjunct because, after having received new information from additional women, he was "fearful that those allegations were actually correct". Keshk stated, "It was clear to me that [Saud] would be lying to me whatever he said." **Exhibit 2, Keshk, 207:19-208:23, 216:10-17, 236:7-237:19, 260:5-14, 264:14-265:23; Exhibit 81, 70:14- 18.** | **Response:** Disputed that Keshk recalled Saud telling him that CM pursued him and the relationship began after she was a student. Pl. Exhibit 2, Keshk Tr. 221:14-223:14, 232:17-233:8; Pl. Exhibit 25 at DEF00215. Disputed that Keshk testified at the Martalogu trial that he learned Saud had allegedly lied about when the sexual relationship began when OIDE made its determination in October 2017. Pl. Exhibit 2, Keshk Tr. 260:5-261:14; Pl. Exhibit 81, Trial Transcript at 70:14-18. Admitted as to the remainder. |

| | Plaintiff's Fact | DePaul's Response |
|---|---|---|
| 45 | **Fact:** On August 2, 2017, Tamburro notified Saud that she was reopening the OIDE investigation into CM's claims based on the allegations in her complaint. The letter did not inform Saud about any other reports OIDE had | **Response:** Disputed that Tamburro notified Saud she was reopening the OIDE investigation into CM's claims based on the allegations in her complaint on August 2, 2017. Pl. Exhibit 57 at DEF09045. Disputed that Saud declined to meet with Tamburro personally, but |

| | |
|---|---|
| received from Keshk. Tamburro requested a second meeting with Saud. On the advice of his DePaul-appointed counsel, Saud declined to meet with Tamburro personally, but cooperated by sending Tamburro a copy of his responsive pleading and asked her to contact him if she had any questions. Saud stated, "To the extent your investigation relates to any other allegations or should you feel you need additional information, please contact me and we will reconsider our position." **Exhibit 57, August 21, 2017 OIDE letter to Saud re investigation; Exhibit 76, Saud email to Tamburro with Responsive Pleading.** | cooperated by sending Tamburro a copy of his responsive pleading and asked her to contact him if she had any questions. Pl. Exhibit 57 at DEF09045. Admitted as to the remainder. |

| | Plaintiff's Fact | DePaul's Response |
|---|---|---|
| 46 | **Fact:** Tamburro told Saud she would contact him "if any additional information is needed" but she did not. This includes that Tamburro did not contact Saud regarding any supposed "discrepancy in his pleadings versus his statements" to her in May. **Exhibit 15, Tamburro, 146:11-20, 147:18-148:4.** | **Response:** Disputed. Pl. Exhibit 15, Tamburro Tr. 146:11-20, 147:18-148:4. |

| | Plaintiff's Fact | DePaul's Response |
|---|---|---|
| 47 | **Fact:** During her investigation, Tamburro did not speak to anyone with specific knowledge about CM's allegations. **Exhibit 15, Tamburro, 116:20-22.** | **Response:** Disputed. Pl. Exhibit 15, Tamburro Tr. 116:7-22. |

| | Plaintiff's Fact | DePaul's Response |
|---|---|---|
| 48 | **Fact:** During her investigation, Tamburro communicated regularly with DePaul's Office of General Counsel regarding Saud. **Exhibit 32, DePaul Third Amended Privilege Log; Exhibit 58, Tamburro-Morgen meeting confirmations regarding Saud, pp. 11-14, 15.** | **Response:** Disputed. Pl. Exhibit 58 at DEF00910 (Email – 7-10-2017 at 10:38 AM), DEF00912 (Email – 7-28-2017 at 12:53 PM), DEF00913 (Email – 8-11-2017 at 1:23 PM), DEF00914 (Email – 8-28-2017 at 9:39 AM), DEF00915 (Email – 8-29-2017 at 11:08 AM). |

| | Plaintiff's Fact | DePaul's Response |
|---|---|---|

| 49 | **Fact:** On October 5, 2017, Tamburro wrote a memo of her findings of investigation. Tamburro concluded Saud had violated DePaul's ADAH policy by creating a "hostile and unacceptable environment" for CM. Tamburro determined the relationship with CM began while she was a student in his class. Although she never spoke with CM, Tamburro determined CM's complaint allegations were "credible". Tamburro concluded that Saud provided "inconsistent information as to when the sexual relationship began." Tamburro determined this because "in his sworn pleading, he omitted the date of when the relationship began." Tamburro determined Saud was "credible with regard to his statements that the sexual relationship with [CM] was consensual" and "credible with regard to his statement that [CM]'s grade was not depending [*sic*] on a sexual relationship with him." Tamburro claimed she relied upon information provided by Keshk to make her finding against Saud. Tamburro did not find the discrepancies between CM's complaint and her findings to affect CM's credibility. For Saud, the omission in his responsive pleading of the date his relationship with CM began was sufficient for Tamburro to make an adverse credibility finding as to Saud. **Exhibit 15, 32:16-32:4 [*sic*], 36:13-24, 137:5-143:12; Exhibit 54, October 5, 2017 Tamburro memo of investigation; Exhibit 59, OIDE October 6, 2017 determination letter; Exhibit 81, CM Trial Transcript, 83:8-19.** | **Response:** Disputed that Tamburro wrote a memo of her findings on October 5, 2017. Pl. Exhibit 54 at DEF00236. Disputed that Tamburro concluded Saud had violated DePaul's ADAH policy by creating a "hostile and unacceptable environment" for CM. Pl. Exhibit 54 at DEF000236-DEF00244. Disputed that Tamburro determined CM's complaint allegations were "credible." Pl. Exhibit 54 at DEF000241. Disputed that Tamburro claimed she relied upon information provided by Keshk to make her finding against Saud. Pl. Exhibit 54 at DEF000236-DEF00244. Disputed that Tamburro did not find the discrepancies between CM's complaint and her findings to affect CM's credibility. Pl. Exhibit 54 at DEF000241. Disputed that the omission in Saud's responsive pleading of the date his relationship with CM began was sufficient for Tamburro to make an adverse credibility finding as to Saud. Pl. Exhibit 54 at DEF00244. Admitted as to the remainder. |
|---|---|---|

|  | **Plaintiff's Fact** | **DePaul's Response** |
|---|---|---|
| 50 | **Fact:** On October 5, 2017, Tamburro notified Saud of her findings. Tamburro's letter did not articulate to Saud what he did to violate the ADAH policy. Tamburro did not provide her memo of | **Response:** Disputed that Tamburro notified Saud of her findings on October 5, 2017. Pl. Exhibit 59 at LS843. Disputed that Tamburro's letter did not articulate to Saud what he did to violate the ADAH policy. Pl. Exhibit |

| | | |
|---|---|---|
| | investigation to Saud. Tamburro's letter reiterated the allegations against Saud and informed him of the adverse finding but did not explain what conduct he was found to have engaged in. Tamburro's letter to Saud listed her sources, stated the issues investigated, and stated she would share her findings with Keshk and Dean Velasco. **Exhibit 59, p. 2; Exhibit 15, Tamburro, 154:5-157-19 .** | 59 at LS843. Disputed that Tamburro's letter reiterated the allegations against Saud and did not explain what conduct he was found to have engaged in. Pl. Exhibit 59 at LS843. Disputed that Tamburro's letter to Saud listed her sources, stated the issues investigated, and stated she would share her findings with Keshk and Dean Velasco. Pl. Exhibit 59 at LS843. Admitted as to the remainder. |

| | **Plaintiff's Fact** | **DePaul's Response** |
|---|---|---|
| 51 | **Fact:** Prior to the close of Tamburro's investigation Dean Velasco discussed disciplining Saud with university provost Martin denBoer. **Exhibit 60, September 21, 2017 Agenda for Velasco-DenBoer meeting; Exhibit 10, denBoer, 45:1-20.** | **Response:** Disputed. Pl. Exhibit 10, denBoer Tr. 45:1-20; Pl. Exhibit 60 at DEF10283. |

| | **Plaintiff's Fact** | **DePaul's Response** |
|---|---|---|
| 52 | **Fact:** On October 6, 2017, during an in-person meeting, Tamburro shared her findings with Keshk and Dean Velasco. The Dean "normally" determines discipline when the policy has been found to be violated. **Exhibit 61, Tamburro-Velasco-Keshk emails re meeting; Exhibit 62, Tamburro-Velsaco-Keshk Emails; Exhibit 15, Tamburro, 148:21-149:2.** | **Response:** Disputed that Tamburro shared her findings with Keshk and Dean Velasco. Pl. Exhibit 12, Velasco Tr. 189:2-4; Pl. Exhibit 61, Email (10-6-2017 at 1:22 PM). Admitted as to the remainder. |

| | **Plaintiff's Fact** | **DePaul's Response** |
|---|---|---|
| 53 | **Fact:** Although Tamburro's findings did not conclude such, Tamburro led Velasco to believe that Saud had engaged in a dating relationship with CM while she was a student in his class, and that he promised her an A in the absence of taking the final. He did not ask Tamburro questions or request details regarding her findings beyond what was contained in her letter to Saud. **Exhibit 12, Velasco, 184:10-186:13, 186:21-187:7.** | **Response:** Disputed. Pl. Exhibit 12, Velasco Tr. 188:11-15, 190:10-13, 213:4-11, 213:18-214:1. |

Case: 1:19-cv-03945 Document #: 248 Filed: 08/16/23 Page 19 of 28 PageID #:15383
Case: 25-1034    Document: 14    Filed: 04/30/2025    Pages: 230    S.A. 130 (183 of 230)

| | Plaintiff's Fact | DePaul's Response |
|---|---|---|
| 54 | **Fact:** Dean Velasco showed Keshk a letter he intended to send Saud, but Keshk did not recall what the letter stated. On October 23, 2017, Dean Velasco sent the letter to Saud, which states the following in part:<br><br>On October 23, 2017, Dean Velasco emailed Saud a letter informing him that, as a result of Tamburro's findings: [Y]ou are not eligible for future employment at DePaul University. Additionally, you may not provide formal or informal instruction in any classroom-based or co-curricular activities sponsored by DePaul. This includes, for example, serving as a guest speaker for a course or a departmental co-curricular activity.<br><br>**Exhibit 77; Exhibit 12, Velasco, 193-94; Exhibit 2, Keshk, 240:3-13.** | **Response:** Disputed as to the accuracy of the block quote from the October 23, 2017 letter. Pl. Exhibit 77. Admitted as to the remainder. |

| | Plaintiff's Fact | DePaul's Response |
|---|---|---|
| 55 | **Fact:** On October 24, 2017, Saud emailed Dean Velasco's assistant indicating his intent to appeal the discipline. **Exhibit 63, Velasco email re Saud's intent to appeal; Exhibit 12, Velasco, 196:11-197:3.** | **Response:** Disputed. Pl. Exhibit 63, Email (10-25-2017 at 5:09 PM). |

| | Plaintiff's Fact | DePaul's Response |
|---|---|---|
| 56 | **Fact:** Velasco conferred with Office of General Counsel and told Saud he did not have a right to appeal. On October 25, 2017, Velasco emailed Saud stating there were "no appeal procedures available" to him. **Exhibit 63, Velasco email** | **Response:** Admitted. |

| | re Saud's intent to appeal; Exhibit 12, Velasco, 196:11-197:3. | |

| | **Plaintiff's Fact** | **DePaul's Response** |
|---|---|---|
| 57 | **Fact:** ▓▓▓▓▓▓ (Comparator A), white male. Comparator A worked in the same department as Saud, had the same term faculty contract as Saud, and like Saud, in April of 2017 was informed he could return in the Fall to adjunct two courses. Like Saud, he was told he could request enhanced pay and Keshk would "solicit" the amount requested from the Dean. Comparator A requested more money for his adjunct contract than Saud. Comparator A's enhanced pay request was denied. Unlike Saud, Comparator A was brought back to adjunct. Comparator A was accused of rape in 2014. His accuser did not cooperate in an OIDE investigation (OIDE was not able to contact the accuser). Keshk was not informed of the OIDE investigation into Comparator A and Keshk did not participate in the investigation of Comparator A. Comparator A was able to conduct his own OIDE investigation regarding himself. Comparator A was not disciplined. OIDE accepted Comparator A's investigation findings and closed the investigation without making a memo or any record of it. The only record of Comparator A's OIDE investigation is contained in emails. **Exhibit 2, Keshk, 98:12- 16, 90:6-21, 96:15-25; Exhibit 37, Schaffer-Comparator A emails re rape accusation; Exhibit 38, Emails re Comparator A rape investigation; Exhibit 36, Schaffer, 104:20-105:7; Exhibit 52, ▓▓▓-Keshk emails re Enhanced Pay request; Exhibit 64, ▓▓▓ adjunct letter.** | **Response:** Disputed that ▓▓▓ had the same term faculty contract as Saud. Def. Exhibit 2, Declaration of Guillermo Vásquez de Velasco ("Velasco Decl.") at ¶ 7. Disputed that, like Saud, in April of 2017 was informed he could return in the Fall to adjunct two courses. Pl. Exhibit 2, Keshk Tr. 115:9-18, 116:12-15. Disputed that ▓▓▓ was accused of rape in 2014. Pl. Exhibit 38 at DEF11610-DEF11611 (Email – 4-29-2014 at 1:52 PM), DEF11609-DEF11610 (Email – 4-29-2014 at 3:51 PM), DEF11609 (Email – 4-29-2014 at 5:46 PM), DEF11617 (Email – 5-2-2014 at 5:15 PM). Disputed that his accuser did not cooperate in an OIDE investigation (OIDE was not able to contact the accuser). Pl. Exhibit 38 at DEF11609 (Email – 4-29-2014 at 5:46 PM). Disputed that ▓▓▓ was able to conduct his own OIDE investigation regarding himself. Pl. Exhibit 38 at DEF11612 (Email – 5-1-2014 at 2:38 PM). Disputed that OIDE accepted ▓▓▓ investigation findings and closed the investigation without making a memo or any record of it. Pl. Exhibit 36, Schaffer Tr. 98:1-99:15; Pl. Exhibit 38 at DEF11638 (Email – 6-2-2014 at 12:59 PM) and DEF11640 (Email – 8-4-2015 at 3:18 PM). Disputed the only record of ▓▓▓s investigation is contained in emails. DE 133 at 2. Admitted as to the remainder. |

|    | Plaintiff's Fact | DePaul's Response |
|----|------------------|-------------------|
| 58 | **Fact:** ▓▓▓▓ (Comparator B), white male. Comparator B was an adjunct faculty member in the English Department. Like Saud, he was accused of violating DePaul's ADAH policy. Like Saud, he was investigated by Tamburro. Unlike Saud, Tamburro's investigation included conducting interviews of witnesses, including his accuser, who had cooperated with the investigation. Ex 80. Unlike Saud, Tamburro proactively told Comparator B that he could file a cross-complaint against his accuser, and Comparator B declined to do so. Tamburro found Comparator B violated the ADAH policy. Unlike Saud, Tamburro only notified the Chair of Comparator B's department, and not the Dean of LAS. The Chair of Comparator B's department determined the discipline against him. Unlike Saud, Comparator B was not banned from participating in DePaul activities. Unlike Saud, Comparator B was provided the reasons for the adverse finding. **Exhibit 80, Comparator B OIDE report; Exhibit 15, Tamburro, 152:7-4 , 164:6-11, 164:15-18, 164:19-21, 165:3-11.** | **Response:** Disputed that, unlike Saud, Tamburro's investigation included conducting interviews of witnesses. Pl. Exhibit 54 at DEF00237. Disputed that, unlike Saud, Tamburro proactively told ▓▓▓▓ that he could file a cross-complaint against his accuser. Pl. Exhibit 80 at DEF10505. Disputed that, unlike Saud, ▓▓▓▓ was provided the reasons for the adverse finding. Pl. Exhibit 59. Admitted as to the remainder. |

|    | Plaintiff's Fact | DePaul's Response |
|----|------------------|-------------------|
| 59 | **Fact:** *The DePaulia* is the university's newspaper. *The DePaulia* is financed by DePaul. This includes the salary of the faculty advisor, the wages of the student journalists, and the office space. In 2017, the faculty advisor for *The DePaulia* was Marla Krause (white). Krause was selected for the position by the Dean of the School of Communications. Krause acknowledged that, even though required by the Society of Professional Journalists Code of Ethics, *The DePaulia* does not notify readers of this conflict of interest when it reports on lawsuits involving DePaul. **Exhibit 30,** | **Response:** Disputed that *The DePaulia* is financed by DePaul and that this includes the salary of the faculty advisor, the wages of student journalists, and the office space. Pl. Exhibit 30, Krause Tr. 13:25-14:20. Disputed that Krause acknowledged that, even though required by the Society of Professional Journalists Code of Ethics, *The DePaulia* does not notify readers of this conflict of interest when it reports on lawsuits involving DePaul. Pl. Exhibit 30, Krause Tr. 14:24-17:19, 74:6-76:9. Admitted as to the remainder. |

|  | **Krause, 9:18-19, 10:18-19, 13:25-14:23, 74:6-75:14.** |  |
|---|---|---|

|  | **Plaintiff's Fact** | **DePaul's Response** |
|---|---|---|
| 60 | **Fact:** On July 6, 2017, Krause told student journalists to pursue a story about CM's allegations. Krause told the student journalists it could be the "biggest story" they would work on at the school. Krause's email to the student journalists stated: "Someone needs to get over to the Daley Building and track down the lawsuit so we can get the names. We might not want to print them…". **Exhibit 30, Krause, 24:13-25:7; Exhibit 31, Krause emails, p. 2.** | **Response:** Disputed that on July 6, 2017, Krause told student journalists to pursue a story about CM's allegations. Pl. Exhibit 31, Email (7-6-2017 at 3:43 PM). Disputed Krause told student journalists it could be the "biggest story" they would work on at the school. Pl. Exhibit 31, Email (7-6-2017 at 3:43 PM). Admitted as to the remainder. |

|  | **Plaintiff's Fact** | **DePaul's Response** |
|---|---|---|
| 61 | **Fact:** When Krause learned the accused faculty member in CM's lawsuit had an Arabic name and that he taught Islamic studies, she commented "the irony is priceless" and noted he was "likely easy to fire". Krause could not explain this comment at her deposition. Krause obtained a copy of Saud's curriculum vitae from the Dean of the School of Communications. **Exhibit 31, p. 1, Exhibit 30, Krause, 28:24-30:16, 59:1-3; Exhibit 66, Krause-Ghanem emails re Saud CV.** | **Response:** Disputed that Krause learned the accused faculty member in CM's lawsuit had an Arabic name and that he taught Islamic studies. Pl. Exhibit 31, Email (7-8-2017 at 11:47 AM). Disputed that Krause could not explain this comment at her deposition. Pl. Exhibit 30, Krause Tr. 34:1-9. Admitted as to the remainder. |

|  | **Plaintiff's Fact** | **DePaul's Response** |
|---|---|---|
| 62 | **Fact:** *The DePaulia* also communicated with Tamburro and Caryn Chaden, a DePaul administrator, about the OIDE investigation regarding Saud. **Exhibit 18, Tamburro-Bury emails.** | **Response:** Disputed. Pl. Exhibit 18, Email (2-12-2018 – 1:22 and 7:27 PM). |

|  | **Plaintiff's Fact** | **DePaul's Response** |
|---|---|---|
| 63 | **Fact:** Plaintiff filed a defamation counterclaim against CM. **Exhibit 35, p. 2[.]** | **Response:** Admitted. |

|  | **Plaintiff's Fact** | **DePaul's Response** |
|---|---|---|
| 64 | **Fact:** In February of 2018, DePaul was dismissed from the CM lawsuit. CM | **Response:** Disputed that in February of 2018, DePaul was dismissed from the CM lawsuit. |

| | | |
|---|---|---|
| | appealed. **Exhibit 19, The DePaulia "Power Player" article; Exhibit 30, Krause, 64:15-65:12.** | Defendant's ("Def.") Exhibit 3, Circuit Court Order dated January 16, 2018. Admitted as to the remainder. |

| | **Plaintiff's Fact** | **DePaul's Response** |
|---|---|---|
| 65 | **Fact:** After Saud refused to pay a settlement to his accuser, on April 2, 2018, *The DePaulia* published an article about the lawsuit, naming Saud. The article was entitled "Power Player Former DePaul student sues ex-professor for sexual coercion[.]" **Exhibit 19, *The DePaulia* "Power Player" article; Exhibit 30, Krause, 64:15-65:12.** | **Response:** Admitted. |

| | **Plaintiff's Fact** | **DePaul's Response** |
|---|---|---|
| 66 | **Fact:** DePaul administrators were provided an advance copy of The DePaulia's article about Saud before it was published. The article falsely claimed another student was in the same course as CM and published disparaging comments made about Saud by the other student, including that she was not "surprised" about CM's allegations. **Exhibit 19, *The DePaulia* "Power Player" article; Exhibit 30, Krause, 64:15-65:12.** | **Response:** Disputed. Pl. Exhibit 19. |

| | **Plaintiff's Fact** | **DePaul's Response** |
|---|---|---|
| 67 | **Fact:** According to AR, the editor-in-chief of *The DePaulia* Amber Colon expressed to her concern that DePaul administrators and staff were discriminating against Saud "by insisting a white woman's accusations against him must be true because they (DePaul) assumed him to be the stereotypically 'violent' Arab/Muslim man." When Plaintiff reached out to Colon for her testimony about what she observed as discriminatory, Colon responded "where do I begin?" Shortly after this email, DePaul's attorneys entered appearances for all of *The DePaulia* journalists and prevented Plaintiff from contacting or | **Objections:** Hearsay.<br><br>**Response:** Disputed that Plaintiff reached out to Colon for her testimony about what she observed as discriminatory and Colon responded "where do I begin?" Pl. Exhibit 82, Email (7-16-2021 at 12:07 and 2:52 PM). Disputed that DePaul's attorneys entered appearances for all of *The DePaulia* journalists and prevented Plaintiff from contacting or deposing them. DE 102, Court Order dated 9-23-2021. Admitted as to the remainder. |

|  | | |
|---|---|---|
|  | deposing them. **Exhibit 34, AR Affidavit, ¶¶ 3-4; Exhibit 81; Dkts 80-83.** | |

|  | **Plaintiff's Fact** | **DePaul's Response** |
|---|---|---|
| 68 | **Fact:** A bench trial in the CM lawsuit was conducted on April 16-17, 2019. On April 23, 2019, Judge Casandra Lewis found the "evidence does not support a finding in favor of [CM] on either count." Specifically, the trial court found that on the night alleged, the parties could not have had time to return to Saud's apartment to have sexual intercourse at all, given credit card statements and sign-in records. CM's account of events never happened. The trial court also found in favor of Saud on his defamation claim. **Exhibit 35, CM Trial Order, p. 3.** | **Response:** Disputed the bench trial in the CM lawsuit was conducted on April 16-17, 2019. Def. Exhibit 4, Circuit Court Docket, *C.M. v. Laith Saud, et al.* at 4. Disputed the trial court found CM's account of events never happened. Pl. Exhibit 35 at LS003047-LS003049. Admitted as to the remainder. |

|  | **Plaintiff's Fact** | **DePaul's Response** |
|---|---|---|
| 69 | **Fact:** DePaul University has a history of targeting faculty of color and their supporters by weaponizing the Office of Institutional Diversity and Equity ("OIDE") against them. This includes in the Spring of 2016, after backlash from an event involving a conservative pro-Trump "social commentator", faculty of color were flagged to OIDE for vocalizing discontent with the administration's treatment of students opposing the event. The speaker was controversial for extreme comments such as referring to Muslims as "rapefugees" and for describing an African American female comedian as a "gorilla". After students protested the event and called on DePaul to cancel the event, Holtschneider criticized the students that demonstrated against the speaker. Holtschneider acknowledged "terrible treatment" and "online ugliness" that resulted from the incident, which included faculty of color being targeted with threats and hate messages. **Exhibit 9, Holtschneider,** | **Objections:** Hearsay.<br><br>**Response:** Disputed. Pl. Exhibit 9, Holtschneider Tr. 49:9, 53:3-9, 55:10-18, 60:9-61:24; Pl. Exhibit 36, Schaffer Tr. 60:14-25, 61:14-17, 63:6-20, 66:6-68:5, 74:22-77:14, 80:18-22, 86:5-15; Pl. Exhibit 70, Email (6-1-2016 at 10:46 PM); Pl. Exhibit 71, Email (5-31-2016 at 3:23 PM); Pl. Exhibit 72, Email (6-2-2016 at 9:33 PM); Pl. Exhibit 78, Email (4-6-2022 at 2:27 PM). |

| | |
|---|---|
| **49:9, 53:7-9, 53:14-54:13, 55:10-18, 59:10-14, 59:19-24, 61:5-62:13; Exhibit 68, McCloud Affidavit, ¶ 2; Exhibit 36, Schaffer, 61:14-17, 63:18-24, 63:25-2 [*sic*], 64:3-8, 66:6-68:8, 74:22-77:14, 77:17-79:16, 79:17-78:9 [*sic*], 80:18-22, 81:14-17, 85:5-12; Exhibit 70, Terry Smith Email; Exhibit 71, Cheng Email; Exhibit 72, Cho Email; Exhibit 78, Additional faculty emails re university response.** | |

| | **Plaintiff's Fact** | **DePaul's Response** |
|---|---|---|
| 70 | **Fact:** OIDE investigated at least two faculty of color after they criticized the university's handling of the event. These were law school faculty members Terri Smith and Sumi Cho, who later sued DePaul for discrimination. **Exhibit 8, Ortiz, 55:21-56:1, 58:20-59:4, 79:2-11, 85:2-5.** | **Response:** Disputed that OIDE investigated at least two faculty of color after they criticized the university's handling of the event. Pl. Exhibit 8, Ortiz Tr. 55:21-56:5, 58:20-59:4; Pl. Exhibit 36, Schaffer Tr. 55:12-56:24, 64:3-12, 79:17-80:6. Admitted as to the remainder. |

| | **Plaintiff's Fact** | **DePaul's Response** |
|---|---|---|
| 71 | **Fact:** Despite reports of threats received by faculty members of color to OIDE following the controversial event, OIDE did not investigate those reports or threats. **Exhibit 36, Schaffer, 84:21-85:3, Exhibit 68, McCloud Affidavit, ¶ 2.** | **Objections:** Hearsay.<br><br>**Response:** Disputed. Pl. Exhibit 36, Schaffer Tr. 84:21-85:3; Pl. Exhibit 68, Aff. of A. McCloud at ¶ 2. |

| | **Plaintiff's Fact** | **DePaul's Response** |
|---|---|---|
| 72 | **Fact:** Religious Studies Department Chair Khaled Keshk (Arab) received reports from members of his department after the backlash from the controversial event which included "numerous threats and racially charged messages", including "messages using the n-word and making death threats." Keshk did not report the threats to OIDE or to public safety. This includes threats received by Professor Amina McCloud, who reported threats she received in the Spring of 2016, but nobody from DePaul's administration or public safety contacted | **Objections:** Hearsay.<br><br>**Response:** Disputed. Pl. Exhibit 2, Keshk Tr. 57:21-58:17; Pl. Exhibit 68, Aff. of A. McCloud at ¶¶ 2-3; Pl. Exhibit 73 at DEF04965 (Email – 5-27-2016 at 12:28 PM), DEF04964 (Email – 5-27-2016 at 12:32 PM). |

| | her. According to McCloud, Keshk was unsupportive when faculty brought up discrimination issues. **Exhibit 2, Keshk, 57:21-58:17; Exhibit 68, McCloud Affidavit, ¶¶ 2-3; Exhibit 73, Religious Studies Faculty emails raising concerns.** | |

| | **Plaintiff's Fact** | **DePaul's Response** |
|---|---|---|
| 73 | **Fact:** In 2016, Scott Paeth, a white tenured faculty member of the Religious Studies department was the target of two OIDE investigations after he was targeted by the Middle East Forum, the organization that publishes the website Campus Watch. The website targets Arab academics and academics perceived to be sympathetic to Arabs. Paeth told the department he was under OIDE investigation following the Campus Watch article publication. The OIDE investigation did not result in discipline. Keshk did not involve himself, nor did DePaul involve him, in the Paeth investigation. **Exhibit 79, Paeth Affidavit; Exhibit 2, Keshk, 41:21-42:2, 83:20-84:11; Exhibit 78, Paeth emails.** | **Response:** Disputed that in 2016, Scott Paeth, a white tenured faculty member of the Religious Studies department was the target of two OIDE investigations after he was targeted by the Middle East Forum, the organization that publishes the website Campus Watch. Pl. Exhibit 2, Keshk Tr. 41:21-42:2; Pl. Exhibit 78, Email (4-6-2022 at 2:27 PM); Pl. Exhibit 79, Aff. of S. Paeth at ¶¶ 1-5. Disputed that Keshk testified the website targets Arab academics and academics perceived to be sympathetic to Arabs. Pl. Exhibit 2, Keshk Tr. 83:20-84:11. Admitted as to the remainder. |

| | **Plaintiff's Fact** | **DePaul's Response** |
|---|---|---|
| 74 | **Fact:** In 2007, OIDE investigated a Jewish academic after he challenged his denial of tenure over his positions on the Israel-Palestine conflict, which were criticized for being pro-Arab. **Exhibit 9, Holtschneider, 23:20-24:12; Exhibit 8, Ortiz, 53:10-54:7.** | **Response:** Disputed. Pl. Exhibit 8, Ortiz Tr. 53:10-55:17; Pl. Exhibit 9, Holtschneider Tr. 23:20-24:15. |

| | **Plaintiff's Fact** | **DePaul's Response** |
|---|---|---|
| 75 | **Fact:** Faculty of color have complained the OIDE process has been weaponized against them. On one occasion, an African American faculty member brought a noose to investigator Barbara Schaffer's (white) office to protest her investigation. **Exhibit 36, Schaffer, 92:12-93:1.** | **Response:** Disputed. Pl. Exhibit 36, Schaffer Tr. 79:3-16, 86:17-87:10, 92:12-93:4. |

|    | Plaintiff's Fact | DePaul's Response |
|----|------------------|-------------------|
| 76 | **Fact:** According to Wayne, Tamburro treated white faculty more favorably during OIDE investigations by offering "more protection and benefit of the doubt than faculty of color" and that Tamburro would provide "more supervision" of Wayne's cases when the case involved a "white faculty or staff member". **Exhibit 67, Wayne Affidavit, ¶¶ 8-9.** | **Objection:** Contradicts prior deposition testimony. Pl. Exhibit 27, Wayne Tr. 33:10-17, 59:23-60:4, 60:18-61:6.<br><br>**Response:** Disputed. Pl. Exhibit 27, Wayne Tr. 33:10-17, 59:23-60:4, 60:18-61:6; Pl. Exhibit 67, Aff. of C. Wayne at ¶ 8. |

Dated: August 16, 2023

Respectfully submitted,

DePaul University

By:    /s/ Brian P. Paul
       One of Its Attorneys

Brian P. Paul
Kerryann M. Haase
Michael K. Chropowicz
Michael Best & Friedrich LLP
444 West Lake Street, Suite 3200
Chicago, Illinois  60606
Telephone: 312.222.0800

## CERTIFICATE OF SERVICE

I, hereby certify that on August 16 2023, I electronically filed the foregoing ***DePaul University's Response to Plaintiff's Amended Rule 56 Statement of Material Facts*** with the Clerk of the Court using the CM/ECF NextGen system, which will send notification of such filing to the following counsel of record:

**Christina W. Abraham**
Abraham Law & Consulting, LLC
161 N. Clark St., Suite 4700
Chicago, Illinois 60601
Email: christina.w.abraham@gmail.com

/s/ Brian P. Paul
*Attorney for Defendant*
Michael Best & Friedrich LLP
444 West Lake Street, Suite 3200
Chicago, Illinois 60606
Telephone: 312.222.0800
Email: bppaul@michaelbest.com

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

Laith Saud,

　　　*Plaintiff,*

v.

DePaul University,

　　　*Defendant.*

No. 19 CV 3945

Judge Lindsay C. Jenkins

MEMORANDUM OPINION AND ORDER

Plaintiff Laith Saud brings this employment discrimination action against his former employer, Defendant DePaul University. He alleges that DePaul failed to rehire him as an adjunct instructor and then barred him from future employment in violation of 42 U.S.C. § 1981. Before the Court are the parties' cross-motions for summary judgment, [Dkt. 205 (Defendant); Dkt. 220 (Plaintiff).][1] For the reasons that follow, the Court grants Defendant's motion for summary judgment and denies Plaintiff's motion for summary judgment.

I.　　**Threshold Issues**

　　A.　　**Local Rule 56.1 Statements & Statements of Additional Facts**

"On summary judgment, the Court limits its analysis of the facts to the evidence that is presented in the parties' Local Rule 56.1 statements." *Kirsch v. Brightstar Corp.*, 78 F. Supp. 3d 676, 697 (N.D. Ill. 2015). The statements serve a valuable purpose: they help the Court in "organizing the evidence and identifying

---

[1]　　Citations to docket filings generally refer to the electronic pagination provided by CM/ECF, which may not be consistent with page numbers in the underlying documents.

disputed facts." *Fed. Trade Comm'n v. Bay Area Bus. Council, Inc.*, 423 F.3d 627, 633 (7th Cir. 2005). "To dispute an asserted fact, a party must cite specific evidentiary material that controverts the fact and must concisely explain how the cited material controverts the asserted fact. Asserted facts may be deemed admitted if not controverted with specific citations to evidentiary material." L.R. 56.1(e)(3).

DePaul asks the Court to disregard much of Saud's Local Rule 56.1 Statement [Dkt. 241] and Statement of Additional Facts [Dkt. 258 at 40] for failing to comply with Rule 56.1. [Dkt. 249 at 8; Dkt. 263 at 6.] As a remedy, DePaul encourages the Court to treat all DePaul's facts as admitted. [Dkt. 263 at 6.]

Saud's Local Rule 56.1 Statement and Statement of Additional Facts suffer from a variety of Local Rule 56.1 violations. Many paragraphs are improperly padded with multiple facts in violation of L.R. 56.1(d)(1) ("statement of material facts … must consist of *concise* numbered paragraphs.") (emphasis added) [See, *e.g.* Dkt. 241, ¶¶ 44, 49, 57, 69.] Saud often fails to cite evidence to support the factual statements included in his Rule 56.1 Statement, and many of Saud's factual assertions misstate the record.[2] L.R. 56.1(d)(2), (e)(3). In his own Local Rule 56.1 Statement and in response to DePaul's Rule 56.1 Statement, Saud cites large sections of deposition testimony and other evidence without including pin citations. L.R. 56.1(d)(2). He also disputes as misleading and incomplete many of the facts DePaul cites in its Local Rule 56.1 Statement, but Saud's cited evidence falls far short of actually disputing

---

[2] The Court notes below where Saud's factual assertions misstate the record only slightly and the correct assertion is obvious from admissible evidence cited. In that event, the Court considers the factual assertion as true.

2

the asserted fact. L.R. 56.1(e)(3). In this way, Saud contravenes another aspect of Local Rule 56.1, which prohibits parties from setting out in their response to an asserted fact a new fact not fairly responsive to the asserted fact. L.R. 56.1(e)(2).

The Seventh Circuit "has repeatedly recognized that district courts may require exact compliance with their local rules," including the "local rules governing summary judgment." *Allen-Noll v. Madison Area Tech. Coll.*, 969 F.3d 343, 349 (7th Cir. 2020) (collecting cases). Consistent with the purpose of Local Rule 56.1, however, the Court has "broad discretion" to relax or enforce strictly local rules governing summary judgment practice. *Edgewood Manor Apt. Homes, LLC v. RSUI Indem. Co.*, 733 F.3d 761, 770 (7th Cir. 2013) (citing *Modrowski v. Pigatto*, 712 F.3d 1168, 1169 (7th Cir. 2013)); *see also Cracco*, 559 F.3d at 632.

Despite these issues, and because the Court prefers to decide cases on the merits, not on technicalities, the Court will not disregard Saud's Statement of Facts or Statement of Additional Facts entirely. Nor will it accept wholesale DePaul's factual assertions. However, where plagued by the issues discussed, the Court disregards Saud's factual assertion, and where appropriate, treats DePaul's assertion as undisputed.

## B.    Admissibility

Several of the documents the parties rely on in their summary judgment motions present hearsay concerns, which the Court addresses at the outset.

First, are Karen Tamburro's notes from her interview with Saud on May 2, 2017. [Dkt. 208-13.] During her deposition Tamburro testified that when she met with Saud she took handwritten notes. [Dkt. 226-7 (Tamburro Deposition 85:15-

86:15; 119:4-11).] As was her practice, she prepared a typed version of the notes, expanding upon the shorthand she used but not otherwise changing the note's substance. [*Id.*] Saud objects on hearsay grounds. The objection is overruled. The notes themselves are business records under the hearsay exception provided in Rule 803(6) of the Federal Rules of Evidence. *See Igasaki v. Illinois Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 956 (7th Cir. 2021) (explaining "performance evaluations, corrective action plans, and disciplinary documents are all business records"). Tamburro testified to taking handwritten notes during the interview with Saud and then memorializing them in typewritten fashion. [*Id.* at 85:15-86:15.] From Tamburro's deposition testimony, it is clear this was her regular practice when conducting Title IX investigations for DePaul. [*Id.* at 119:4-11.]

Saud protests that the substance of Tamburro's notes differs from his own memory of their meeting and suggests that Tamburro's practice of transcribing notes is further evidence of untrustworthiness. *See* F.R.E. 803(6)(e). But Saud's differing memory of the event does nothing to contradict *Tamburro's* memory of their meeting. Tamburro's testimony about her notetaking processes confirms their trustworthiness for summary judgment purposes—at least as to Tamburro's memory of her meeting with Saud.[3] The portions of the notes that summarize what Saud said are not hearsay because they are the admission of a party opponent under Rule 801(2). Consequently, Tamburro's notes are admissible evidence, and the Court will consider them.

---

[3]    Saud's related argument, that the entire Title IX investigation, including Tamburro's reports and notes, was pretextual, will be considered as part of his pretext argument.

Second are Tamburro's notes from her meetings with other DePaul administrators and students such as A.R. [Dkt. 223-12]; Khaled Keshk, Religious Studies Chair, [Dkt. 215 at DEF00214-15, DEF00217]; and Michael Van Dorp, formerly the assistant to the Religious Studies Chair [*Id.* at DEF00216]. Like the notes from Tamburro's meeting with Saud, they are business records under Rule 803(6). However, where Tamburro's notes summarize what A.R., Keshk, Van Dorp and others told her, those statements are hearsay to which no applicable exception applies.[4] *United States v. Christ*, 513 F.3d 762, 769 (7th Cir. 2008) ("[S]tatements made by third parties in an otherwise admissible business record cannot properly be admitted for their truth unless they can be shown independently to fall within a recognized hearsay exception." (citation and internal quotation marks omitted) (cleaned up)); *United States v. Borrasi*, 639 F.3d 774, 780 (7th Cir. 2011) ("[C]ourts may not permit the introduction of hearsay contained within hearsay unless *each* layer is properly admitted under an exception to Rule 802."). Therefore, the Court disregards those portions of Tamburro's notes.

Third are the Title IX Investigation Reports—one from May 2017 and the other from October 2017. [Dkt. 223-14; Dkt. 208-26.] Like the notes, the reports are business records under Rule 803(6). The portions of the reports that rely on statements made by Saud are admissions of a party opponent under Rule 801(2). However, sections of the reports that rely on conversations with others and information learned from those conversations are hearsay and inadmissible. *See*

---

[4]     Since A.R.'s affidavit was filed in support of Saud's motion, it is appropriate for consideration on summary judgment. *James v. Hale*, 959 F.3d 307, 315 (7th Cir. 2020).

*Christ*, 513 F.3d at 769; *Borrasi*, 639 F.3d at 780. That includes information shared by other students or about other students as well as information Keshk shared with Tamburro. Saud argues in passing that the reports are not admissible because they were "prepared with an eye toward litigation." [Dkt. 257 at 6.] He provides no factual support for that assertion, and the evidence presented in this case suggests otherwise. Consequently, the Court will consider the portions of those reports that are not hearsay.

Fourth are declarations DePaul attached in support of its motion for summary judgment. [Dkt. 208-1; Dkt. 208-6; Dkt. 216.] Saud asks the Court to disregard those declarations claiming they contradict the witness's testimony in a prior deposition— specifically, depositions taken in C.M.'s civil case. *See James*, 959 F.3d at 316 (discussing sham-affidavit rule).

Saud offers one example, arguing that the declarants, Valesco, Keshk, and Tamburro, attested that they did not consider Saud's race in their decision-making but made contradictory representations in deposition testimony. But Saud does not direct the Court to any contradiction, and the Court found none relevant to these motions. *See U.S. ex rel. Salazar v. Liebach*, 2002 WL 31253890, at *10 (N.D. Ill. Oct. 4, 2002) ("An undeveloped argument speaks to its paucity and the court may refuse to consider it" (citing *United States v. Jones*, 224 F.3d 621, 626 (7th Cir. 2000))).

## II.    Background

Unless noted, all facts recounted below are undisputed either because the parties agree or because of the failure to properly cite evidence refuting the fact asserted as required by Rule 56.1. Because both parties have moved for summary

judgment, when evaluating each motion, the Court must view the record in the light most favorable to the nonmovant. *See Frazier-Hill v. Chi. Transit Auth.*, 75 F.4th 797, 802 (7th Cir. 2023). As explained below, if the Court views the record in Saud's favor, DePaul is entitled to summary judgment, so it is apparent that if the Court views the record in DePaul's favor, Saud's motion must be denied. Rather than present two versions of the record, and because the Court ultimately grants DePaul's motion for summary judgment, the Court presents disputed facts in the light most favorable to Saud. *Emad v. Dodge Cty.*, 71 F.4th 649, 650 (7th Cir. 2023). The Court only relays facts that are material. That is, "facts that might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

DePaul is a private Catholic, Vincentian university in Chicago. [Dkt. 208-1 at ¶3; Dkt. 66, ¶7.] Saud, an Iraqi Arab American, began working in DePaul's Department of Religious Studies as an adjunct instructor in 2005 or 2006. [Dkt. 226-2 (Saud Deposition 12:4-8; 20:4-12, 20:21-24; 187:15-18).] Adjunct faculty teach a maximum of two courses per quarter. [Dkt. 226-3 (Keshk Deposition 104:23-105:8).]

At some point Saud became a term faculty member in the Religious Studies Department. [Dkt. 226-2 (Saud Deposition 31:3-10).] The term faculty position is a non-tenure track position hired through annual teaching contracts which expire at the end of each academic year. [Dkt. 208-1 at ¶7.] Unlike adjuncts, term faculty teach three courses per quarter. [Dkt. 226-2 (Saud Deposition 171:3-6).] Saud's last term faculty appointment at DePaul was for the 2016–2017 academic year, running

through June 30, 2017, with possibility of renewal depending on annual performance review and/or budget availability. [Dkt. 208-9 at 2.]

Dr. Khaled Keshk was the Chair of the Religious Studies Department within DePaul's College of Liberal Arts and Social Sciences (LAS), and Guillermo Vásquez de Velasco was Dean of LAS. [Dkt. 208-8 at ¶3; Dkt. 208-1 at ¶5.] As Chair, Keshk was responsible for deciding' what courses would be taught, reviewing enrollment in courses, determining whether the course should move forward and, if so, confirming with the adjunct assigned to teach the course. [Dkt. 208-8 at ¶4.][5] The Dean is responsible for overseeing the operations of the college or school. [Dkt. 208-1 ¶4.] That includes providing input on curriculum, managing the budget, and other administrative duties. [*Id.*]

## A.    DePaul's Policy

DePaul's Anti-Discrimination and Anti-Harassment Policy and Procedures (ADAH Policy) includes a section titled "Special Considerations – Consensual Relationships." [Dkt. 208-4 at 4.] It states:

> Amorous relationships that might be appropriate in other circumstances present serious difficulties within the University Community. Relationships between individuals in inherently unequal positions (such as teacher and student, supervisor and employee) may undermine the real or perceived integrity of the supervision and evaluation process, as well as affect the trust inherent in the educational environment. Consensual romantic or sexual relationships in which one party is in a position to review the work or influence the career of the other may

---

[5]    Saud disputes this assertion as incomplete and misleading, (*see* dkt. 258, ¶ 18), claiming that the Chair reports to the Dean, is limited to the budget set by the Dean, and the Dean is "always involved" in the hire of adjuncts. In support Saud cites Keshk's deposition where Keshk testified that the Dean's Office was "always involved" in disciplining or terminating an adjunct. [Dkt. 226-3 (Keshk Deposition 17:3-16).] Because Saud's citations do not contradict DePaul's, the Court deems DePaul's fact admitted.

provide grounds for complaint when that relationship gives undue access or advantage to, restricts opportunities of, or creates a hostile and unacceptable environment for one of the parties to the relationship, or for others.

In such circumstances, consent may not be considered a defense against a charge of sexual harassment in violation of this Policy. The determination of what constitutes sexual harassment depends upon the specific facts and the context in which the conduct occurs. [*Id.*]

Subject to the above "Special Considerations," DePaul's ADAH Policy does not explicitly prohibit relationships between faculty and students when the student is currently enrolled in the faculty member's course.[6] [*Id.*]

## B.    January 2017 On-Campus Event

In January 2017 Saud planned an on-campus discussion entitled "Muslim American Civil Liberties in the age of Trump." [Dkt. 224-7.] On January 18, 2017, Linda Blakley, DePaul's VP of Marketing and Communications learned of the planned event from a subordinate who forwarded her a flier explaining that while "[t]he language in the flier does not suggest it is specifically in protest of Trump's inauguration … it is the same day and Saud has been vocal about his dislike for Trump." [Dkt. 224-4 (Blakley Deposition 49:17-50:10); Dkt. 224-7.] The same day, Blakley forwarded the email and the event flyer to other administrators at DePaul

---

[6]    At SOF No. 3, Saud asserts that "DePaul's ADAH Policy does not prohibit consensual relationships between faculty and students, even where the student is currently enrolled in a course instructed by the faculty member." [Dkt. 250 at 2.] DePaul disputes this fact, citing to the policy language. [*Id.*] Saud's SOF is not fully supported by the ADAH Policy language. In the "Consensual Relationships" section, the Policy states that "consent may not be considered a defense against a charge of sexual harassment in violation of this Policy." [Dkt. 208-4 at DEF00050.] Therefore, while consent is not always relevant when evaluating the permissibility of the amorous relationship, Saud is correct that the policy does not include a blanket prohibition on relationships between faculty and students. Therefore, the Court views Saud's factual assertion to align with the undisputed evidence and to permit it to consider this evidence in the light most favorable to him.

9

including the Office of Institutional Diversity and Equity (OIDE). [Dkt. 224-7; Dkt. 224-4 (Blakley Deposition 51:9-22).]

### C.    Campus Watch Article

On April 6, 2017, a website, *Campus Watch*, published an article about Saud teaching at DePaul, as well as his midwestern upbringing as an Arab American, and political views.[7] [Dkt. 224-11.] DePaul contracts with a third-party vendor to monitor news and reports about DePaul and forward any to Blakley's department. [Dkt. 224-4 (Blakley deposition 46:20-47:2).] DePaul may have received a link to the *Campus Watch* article about Saud through the third-party vendor, but Blakley did not recall seeing it. [*Id.* at 48:9-15.]

### D.    The Non-Renewal of Saud's Term Faculty Contract

On April 10, 2017, the Religious Studies Department completed Saud's annual review, which indicated that the Personnel Committee and the Chair of the Religious Studies Department voted to renew him for a one-year term faculty position. [Dkt. 224-6.] On the same day, however, Dean Velasco sent Saud a letter informing him that he would not be reappointed for academic year 2017–2018 due to budgetary constraints within the college. [Dkt. 208-10 at 2.] As a result, Saud's then-current appointment would end on June 30, 2017, in accordance with his contract. [*Id.*] The Dean nonetheless thanked Saud for his dedication to students' education and noted that his department's review reflected favorably on his instructional and collegial

---

[7]    DePaul objects to this evidence on hearsay grounds, but that objection is overruled. Saud is not relying on the article for its truth, but rather for its alleged impact or effect on DePaul administrators. *See United States v. Cruse*, 805 F.3d 795, 810 (7th Cir. 2015).

performance. [*Id.*] Another term faculty member in the Religious Studies Department, David Lysik, was also informed that his contract would not be renewed for budgetary reasons. [Dkt. 226-3 (Keshk Deposition 96:5-25).]

The following day, April 11, 2017, Keshk contacted DePaul administrators about retaining Saud and Lysik as adjuncts for the fall quarter. [Dkt. 224-28.] The highest pay Keshk was authorized to offer an adjunct was $4,800 per course. [Dkt. 208-11 at 2.] Dean Velasco's approval was needed for adjuncts to be paid more. [*Id.*]

### E.     First Title IX Investigation

On April 10, 2017, an attorney sent a letter to Saud and DePaul claiming that Saud had committed "repeated acts of sexual misconduct and reckless behavior" against C.M., "a student taking one of [his] classes." [Dkt. 208-12 at 2.]

A copy of the letter made its way to Karen Tamburro, DePaul's Title IX coordinator who sits within DePaul's OIDE. [Dkt. 208-6 at ¶3.] She was responsible for investigating complaints and concerns of sexual discrimination, sexual harassment, and sexual and relationship violence impacting DePaul students and faculty under DePaul's ADAH Policy. [*Id.*] Tamburro opened an investigation into C.M.'s claim. [Dkt. 226-7 at 35-36, 50-51, 57 (35:10-12, 36:2-6, 50:14-51:9, 57:6-8).]

Tamburro interviewed Saud about C.M.'s allegations on May 2, 2017. [Dkt. 226-7 (Tamburro Deposition 199:20-200:1, 204:6-10).] She took handwritten notes using shorthand during the interview and prepared a typed version of her notes after the interview, which stated, in part:

> Prof al Saud stated that a sexual relationship developed [with C.M.] in mid-June 2016, after the course ended and she was no longer a student ... Prof. al Saud stated that they had sex on two separate

11

occasions in his home in June 2016. He stated that the sex was consensual … Prof al Saud stated that [C.M.] did not return to DePaul in fall 2016.

[Dkt. 208-13 at 2–3; Dkt. 226-7 (Tamburro Deposition 85:25-86:15).]

C.M.'s attorney informed Tamburro that his client would not participate in DePaul's investigation and directed Tamburro not to contact C.M., so C.M. did not participate in DePaul's investigation. [Dkt. 226-7 (Tamburro Deposition 56:19-57:5); Dkt. 224-19 at DEF00069-70.]

Tamburro's investigation encompassed a second report concerning Saud and DePaul student, A.R., which was brought to her attention on April 12, 2017. [Dkt 226-7 (Tamburro Deposition 36:2-6, 50:6-17); Dkt. 223-9.] Tamburro met with A.R. on April 18, 2017. [Dkt. 226-10.] A.R. denied anything physical occurred between her and Saud and explained no conduct occurred that made her feel uncomfortable. [Dkt. 223-12.] From the meeting with Tamburro, A.R. got the impression that "[DePaul was] trying to build a case against Laith Saud." [Dkt. 223-18.]

On May 9, 2017, Tamburro finalized a written report summarizing her investigation. [Dkt. 226-7 (Tamburro Deposition 72:5-17).] In it she explained there was insufficient evidence to support a finding that Saud engaged in a sexual offense, sexual misconduct, or sexual harassment with respect to C.M. as those terms are defined in DePaul's ADAH Policy. [Dkt. 214 at 6-8.] The report stated, in part,

> The information presented supports that Prof. al Saud did not request or solicit, directly or indirectly that [C.M.] engage in a sexual relationship with him while she was a student in his class. No information suggests that a sexual relationship was connected to [C.M.'s] participation in the class or the grade she received in the class.

[*Id*. at 6.] The report reached the same conclusion about A.R. [Dkt. 223-14 at 5.]

Tamburro notified Saud of her findings on May 10, 2017. [Dkt. 208-15 at 2.] Saud, in turn, notified Keshk that he was cleared. [Dkt. 226-2 (Saud Deposition 191:20-192:9).]

## F.    Adjunct Contract Negotiations

On May 2, 2017, before Tamburro's report was finalized, Keshk's assistant notified the administration that the Religious Studies Department wanted to cancel all three of Saud's upcoming courses but only one of Lysik's courses—the other Religious Studies Department term faculty member whose contract had not been renewed. [Dkt. 224-30 at 1-2.] Two of Saud's courses were relisted and assigned to "STAFF." [*Id.*] When Saud inquired about it, Keshk told him "[w]e cancelled the term faculty classes now so that we don't have to do it at the last minute." [Dkt. 224-13.]

On May 17, 2017, after Tamburro's report was finalized, Saud emailed Keshk's assistant about scheduling his courses for the Fall 2017 quarter. [Dkt. 164-33.][8] Keshk replied informing him that his courses had been "taken off and now we are trying to reschedule you." [*Id.*] He asked if Saud could teach REL 265 and REL 224 on Tuesdays and Thursdays. [*Id.*] Saud replied, "Sounds great." [*Id.*] A few weeks later, the Dean's office contacted Keshk, explaining:

> An adjunct position was created for David Lysik, so he may be terminated in the system from his full-time role [if you have not already done so]. … Laith Saud's adjunct position was terminated and I'm reinstating it today. I'll confirm when that is done and then you can terminate him in the system… [Dkt. 224-35.]

---

[8]    Saud did not attach Exhibit 44 to his present motion but did for his earlier summary judgment filing. The Court relies upon this filing.

On June 8, 2017, Saud emailed Keshk about the possibility of receiving more than $4,800 per course as an adjunct. He wrote, "After doing some investigating and speaking with folks on campus, 'enhanced pay' has come to my attention for adjuncts. Is this something we could look into?" [Dkt. 208-17 at 2.] A few weeks later, on June 28, 2017, Saud emailed Keshk again, explaining, "I am aware the Dean's office does approve pay above the $4,800 mark. Katie [Kutina from the Dean's office] instructed me that the process for me to request such pay should begin with my department chair." [Dkt. 208-18 at 2.]

On June 28, 2017, Keshk asked Saud and Lysik what a "fair" amount would be for their adjunct salary and informed them that he would "send a letter soliciting that amount from the Dean." [Dkt. 208-19 at 3.]

### G.     C.M.'s Lawsuit

The next day, on June 29, 2017, C.M. filed a lawsuit against Saud and DePaul, asserting claims for battery, negligence, and violation of the Illinois Gender Violence Act. [Dkt. 208-20.] Her lawsuit alleged, in part, that on April 15, 2016, while she was a student in Saud's class, she and Saud had dinner where he "plied [her] with alcohol in an attempt to get her intoxicated"; after dinner Saud took her to his home and "began to aggressively seek sexual relations with [her]," and Saud "had sexual intercourse with [her] at that time." [*Id.* at ¶7.] C.M.'s complaint also alleged that Saud told her he would give her an A in his class and that she did not have to take the final exam. [*Id.* at ¶9.]

14

The same day C.M. filed her suit, the Chicago Sun Times published an article about it. [Dkt. 208-8 at ¶5.] Keshk learned of the lawsuit on June 30, 2017. [Dkt. 226-3 (Keshk Deposition 185:1-4).]

## H.    Continued Adjunct Pay Negotiations

On July 1, 2017, Saud replied to Keshk's June 28, 2017, email and requested $6,000 per course. [Dkt. 208-19 at 3.] Lysik requested $37,529 per year which equates to $6,254.83 per course. [Dkt. 226-20.] Keshk forwarded Lysik's request to someone at the Dean's office. [*Id.*] Keshk testified that he forwarded Saud's request to the Dean's office, too, but aside from this testimony, there is no written record of Keshk doing so.[9] [Dkt. 226-3 (Keshk Deposition 141:8-19).]

On July 5, 2017, Keshk contacted Tamburro to advise her that he received two reports regarding Saud after the publication of the Chicago Sun Times article.[10] [Dkt. 226-12 at 1.]  The following day, Keshk sent Saud this email:

> Dear Laith,
>
> Thank you for your note. I must inform you that I cannot offer you a course assignment for the Fall Quarter. In addition to low projected course enrollments, and thus uncertainties about final course offerings, your compensation requirements far exceeds what I am able to pay adjunct instructors.
>
> Should an assignment that would be suitable for you become available, I will contact you to discuss your availability. In the meantime, I suggest that you pursue other opportunities, as I do not know if any suitable

---

[9]    Saud's SOF No. 32 asserts "there is no record Keshk forwarded or otherwise relayed Saud's enhanced pay request to the Dean." [Dkt. 250 at 12–13.] The Court views Saud's assertion to align with the evidence.

[10]    Saud objects to the statement on hearsay grounds. He is correct that the substance of the reports is inadmissible hearsay. However, the fact that reports were made to Keshk is not offered for the truth of any matter asserted in the reports but instead for its impact on both the Title IX investigation and Keshk's decision with respect to Saud's employment.

assignments will be available a DePaul in the immediate future. [Dkt. 208-19 at 2]

At his deposition, Keshk testified that C.M.'s "case" was a "black cloud over [Saud's] head" at the time Keshk decided not to hire him as an adjunct for the 2017 Fall Quarter. [Dkt. 226-3 (Keshk Deposition 146:12-147:19).] Keshk testified that C.M.'s lawsuit was a factor in his decision not to hire Saud as an adjunct for the 2017 Fall Quarter, but that he did not include it in his email to Saud because he was not sure if he had "the right" to discuss the lawsuit with Saud. [*Id.* at 147:11-19.] He did not feel comfortable having Saud teach in the classroom, and "would always have been very fearful that those allegations were actually correct." [*Id.* at 264:1-22.]

## I.     Second Title IX Investigation

On August 21, 2017, Tamburro sent Saud a letter explaining, "OIDE obtained additional information concerning the allegations made by [C.M.] concerning you. Based on the information, OIDE is initiating further investigation." [Dkt. 208-24 at 2.] Tamburro's letter went on:

> Specifically OIDE is investigating an allegation that you engaged in sexual harassment of [C.M.] by initiating a dating relationship while she was a student enrolled in your class, initiating sexual acts with her both on and off campus while she was a student enrolled in your class, and promising her a grade of an A, in absence of taking the final in [your] class due to your relationship with her.

[*Id.*] The letter requested an interview with Saud by September 1, 2017. [*Id.* at 3.]

On September 1, 2017, Saud emailed Tamburro a copy of the verified Answer he filed in C.M.'s lawsuit. [Dkt. 208-25 at 2.] He declined the interview request on the advice of counsel given that the investigation related to C.M.'s civil suit but forwarded

16

his verified Answer so that Tamburro could "review [his] position with respect to the most recent allegations." [*Id.*]

Saud's Answer admitted that while C.M. was a student in his class during the spring 2016 quarter, he sent her an email asking to get a drink and she agreed. [*Id.* at 4.] Saud also admitted that at an unspecified time he and C.M. had sex. [*Id.* at 8.] Saud's Answer left open the question of whether C.M. was still a student in his class when they had sex. Tamburro did not contact Saud about any potential discrepancy between his pleadings and the statements he made during his May interview, namely that the relationship developed in mid-June 2016, after the course ended and C.M. was no longer a student. [Dkt. 226-7 (Tamburro Deposition 146:11-25).]

C.M.'s attorney informed DePaul that C.M. did not wish to participate in an interview related to the second Title IX investigation. [*Id.* at 109:19-21.]

On October 5, 2017, Tamburro issued her report which found by a preponderance of the evidence that Saud subjected C.M. to sexual harassment. [Dkt. 208-26 at 10.] That conclusion was based in part on Tamburro's finding that Saud was inconsistent about when the sexual relationship began: Saud initially reported to Tamburro that it began in mid-June 2016, but this date was omitted from his Answer to C.M.'s complaint. [Dkt. 226-22 at 9.] She notified Saud by email the following day about the outcome of the investigation and informed him that Keshk and Dean Velasco would contact him to discuss the consequences. [Dkt. 208-27 at 2–3.]

17

On October 23, 2017, Saud received a letter from Dean Velasco informing him that as a result of the Title IX investigation, he was no longer eligible for future employment at DePaul. [Dkt. 226-2 (Saud Deposition 335:17-336:1; 342:6-23).] In addition, Dean Velasco informed Saud that he could not provide formal or informal instruction in any classroom-based or co-curricular activities sponsored by DePaul. [Dkt 224-57.]

A trial was held in C.M.'s lawsuit in April 2019. A judge found against C.M. on her claims and in Saud's favor on his counterclaim for defamation. [Dkt. 250 at 24 (SOF #68).]

This lawsuit followed.

## II.      Legal Standard

Summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Wade v. Ramos*, 26 F.4th 440, 446 (7th Cir. 2022) (quoting *Schacht v. Wis. Dept' of Corr.*, 175 F.3d 497, 504 (7th Cir. 1999)). A party opposing summary judgment must "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250. A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. On the other hand, summary judgment is proper if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Ellis v.*

18

*CCA of Tennessee LLC*, 650 F.3d 640, 646 (7th Cir. 2011) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

The Court "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Johnson v. Rimmer*, 936 F.3d 695, 705 (7th Cir. 2019) (quoting *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003)).

### III.    Analysis

Saud brings a race discrimination claim against DePaul based on 42 U.S.C. § 1981. "Section 1981 … protects the right of all persons to make and enforce contracts regardless of race." *Oliver v. Joint Logistics Managers, Inc.*, 893 F.3d 408, 411 (7th Cir. 2018) (citation and internal quotation marks omitted). The statute "offers relief when racial discrimination blocks the creation of a contractual relationship, as well as when racial discrimination impairs an existing contractual relationship." *Circle City Broad. I, LLC v. AT&T Servs., Inc.*, 99 F.4th 378, 383 (7th Cir. 2024) (citation and internal quotation marks omitted).

At summary judgment, the pertinent question is whether a reasonable juror could conclude that Saud would have been hired as an adjunct professor for the fall of 2017 and not barred from future employment at DePaul "if he had a different ethnicity, and everything else had remained the same." *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 764 (7th Cir. 2016); *see also Reives v. Illinois State Police*, 29 F.4th 887, 892 (7th Cir. 2022). To defeat summary judgment, Saud "must either provide enough evidence to permit a reasonable factfinder to conclude that [his] race caused the … adverse employment action," under *Ortiz*, 834 F.3d at 765, or shoulder his

19

burden under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973)." *Oliver*, 893 F.3d at 411–12 (cleaned up).

Saud alleges there are two distinct adverse actions at issue in this case: first, DePaul's decision not to hire him as an adjunct in Fall 2017, and second, DePaul's decision to bar him from future employment.[11] The Court addresses each adverse action separately below.

## A. Race Discrimination in Fall 2017 Adjunct Hiring

Saud first alleges that in the summer of 2017 he was not hired to be an adjunct instructor for the Fall 2017 quarter on account of his race. Under *McDonnell Douglas*, Saud must establish a *prima facie* case of racial discrimination by showing: (1) he is a member of a protected group; (2) he was qualified for the position and (3) he suffered an adverse employment action; and (4) other similarly situated persons who were not members of Saud's protected class were treated more favorably. *Gamble v. Cnty. of Cook*, 106 F.4th 622, 626 (7th Cir. 2024); *Oliver*, 893 F.3d at 412. If plaintiff carries his initial burden it moves "to the employer to articulate some legitimate, nondiscriminatory reason" for its decision. *McDonnell Douglas Corp.*, 411 U.S. at 802. Then the burden shifts back to plaintiff "to demonstrate that [his employer's] reason was pretext to hide a discriminatory motive." *Oliver*, 893 F.3d at 41.

---

[11]     Saud argues Tamburro's allegedly discriminatory investigation constitutes an independent adverse employment action. [Dkt. 242 at 6.] *Muldrow v. City of St. Louis* requires that the at-issue action "brought about some 'disadvantageous' change in an employment term or condition." 601 U.S. 346, 354 (2024). The Court considers these arguments as part of its pretext analysis.

20

1.    ***Prima Facie* Case**

Both Saud and DePaul agree that Saud satisfies the first two elements of the *prima facie* case. He is a member of a protected class on account of his race, [Dkt. 250, ¶ 4], and he was subjected to an adverse action when he was not rehired to teach as an adjunct. *Oliver*, 893 F.3d at 413.

There is sufficient evidence in the record to suggest that Saud was qualified for the position. In 2016, Saud received an evaluation of "good" on his department review. [Dkt. 224-46.] His review from the spring of 2017 also indicates that his department was prepared to recommend to the Dean that his one-year term faculty position contract be renewed. [Dkt. 224-6.] It was common for his classes to have a waitlist. [Dkt. 224-58 (C.M. Trial Testimony 62:6-7).] He was also frequently recommended by his peers for speaking engagements. [Dkt. 224-2 (Keshk Deposition 91:14-170).] While there may be valid reasons for DePaul to categorically prohibit a person from teaching when facing a lawsuit like the one C.M. filed against Saud, as DePaul argues, *see C.S. v. Madison Metropolitan School District*, 34 F.4th 536, 542 (7th Cir. 2022), there is no evidence of such a DePaul policy here. [Dkt. 209 at 12-13.]

To complete his *prima facia* case, Saud must identify comparators—similarly situated persons not a member of Saud's protected class who were treated more favorably. *Bless v. Cook Cnty. Sheriff's Off.*, 9 F.4th 565, 575 (7th Cir. 2021). "Although similarly situated employees need not be identical in every conceivable way, they must be directly comparable to the plaintiff in all material respects." *McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 369 (7th Cir. 2019). In most cases "material respects" means that plaintiff and his comparator "(1) dealt with the

same supervisor, (2) were subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Id.* (cleaned up). "Whether a comparator is similarly situated is typically a question for the fact finder, unless, of course, the plaintiff has no evidence from which a reasonable fact finder could conclude that the plaintiff met his burden on this issue." *Id.* That is the case here.

Saud points to David Lysik as a comparator who was treated better, but Lysik did not engage in similar conduct and mitigating circumstances explain DePaul's different treatment of him.

Lysik was a white male professor in the Religious Studies Department. [Dkt. 226-3 (Keshk Deposition 98:11-16).] In early 2014, DePaul's Public Safety office received information about a comment posted on a public Facebook page entitled "DePaul Confessions." [Dkt 216, ¶4.] The comment by "Donny Juan" said "PROFESSOR LISACK a DePaul Catholick [sic] studies Teacher RAPED ME." [*Id.*, ¶¶4,5.] Then-Vice President of OIDE, Barbara Schaffer, was assigned to investigate. [*Id.*, ¶4.] The case report Schaffer received from the Public Safety office explained, "The accused name is not found in DePaul University Directory. The only name found in DePaul University Directory that is similar is David Lysik of Re[l]i[g]ious Studies." [*Id.*, ¶4.] DePaul also could not locate any student with the name "Donny Juan." [*Id.*, ¶5.]

22

On May 2, 2014, Lysik emailed Schaffer informing her that he located a professor at another university, Dr. David Lisak, whose research specialty is rape. [Dkt. 217 at 2.] On June 2, 4014, Schaffer told Lysik that OIDE closed the case because it was "unable to turn up any other information." [*Id.*] Neither Keshk nor the Dean made any decisions related to Lysik's employment at DePaul in 2014.[12] Lysik was permitted to continue teaching after the investigation closed.

There are material differences between the allegations against Lysik and Saud that, taken together, confirm Lysik is not a valid comparator. The allegation against Lysik was made on a Facebook page while the allegation against Saud was made by an attorney representing the complainant. DePaul could not identify the person making the complaint against Lysik but could identify C.M. Because of the misspelling, the subject of "Donny Juan's" allegation was unclear. In contrast, C.M.'s allegation was unequivocally against Saud, and Saud admitted to having sex with C.M. during his interview with Tamburro—substantiating part of C.M.'s claim. A more appropriate comparator would be an identifiable faculty member who was accused of misconduct by a known or identified student but who was nonetheless permitted to teach as an adjunct. As a result of these significant differences, the fact that Lysik was permitted to continue teaching at DePaul "does not suggest anything 'fishy' about" DePaul's decision to not rehire Saud as an adjunct instructor. *Bless*, 9 F.4th at 575. Because there is an absence of evidence from which a jury could find

---

[12]    Plaintiff's objection to this statement of fact is overruled because he fails to cite evidence refuting DePaul's factual assertion specifically as to Lysik in the year 2014.

Lysik to be a similarly situated comparator, Saud has failed to establish a *prima facie* case of race discrimination under § 1981.

### 2.    Pretext

*McDonnell Douglas* framework aside, DePaul has offered a non-discriminatory reason for the employment decision, so Saud must offer evidence from which the jury could find that the explanation is pretextual. *Vassileva v. City of Chicago*, 118 F.4th 869, 874 (7th Cir. 2024) (cleaned up); *Ortiz*, 834 F.3d at 765.

DePaul's "legitimate nondiscriminatory rationale" for not rehiring Saud was that he was being sued for coercing a student, C.M., into having sex with him, and admitted to having sex with her. It argues that the evidence shows Keshk proceeded with the idea of hiring both Saud and Lysik as adjuncts but abandoned the plan days after C.M. filed her lawsuit. [Dkt. 208-19 at 2–3.]

Saud has the burden to show that DePaul's non-discriminatory reason was dishonest and the true reason was based on a discriminatory intent. *Logan v. City of Chicago*, 4 F.4th 529, 537 (7th Cir. 2021) (citation and internal quotation marks omitted). Pretext is "a dishonest explanation, a lie rather than an oddity or an error." *Vassileva*, 118 F.4th at 874; *Burton v. Bd. of Regents of Univ. of Wisconsin Sys.*, 851 F.3d 690, 698 (7th Cir. 2017) ("[P]retext involves more than just faulty reasoning or mistaken judgment on the part of the employer; it is a lie, specifically a phony reason for some action." (cleaned up)). The question "is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reason it has offered for the adverse action," *Liu v. Cook County*, 817 F.3d 307, 316 (7th Cir. 2016) (cleaned up). "A plaintiff may show a genuine dispute of fact on pretext

by identifying such weaknesses, implausibilities, inconsistencies, or contradictions in a stated reason that a reasonable trier of fact could find it unworthy of credence." *Id.* (cleaned up).

First, Saud directs the Court's attention to Keshk's shifting explanations for why he was not rehired. A jury can "reasonably infer pretext from an employer's shifting or inconsistent explanations for the challenged employment decision." *Appelbaum v. Milwaukee Metro. Sewerage Dist.*, 340 F.3d 573, 579 (7th Cir. 2003). In his July 6, 2017 email to Saud, Keshk listed two reasons for his decision not to offer Saud course assignments for the upcoming quarter. First, that Saud asked for too much money, and second that "low projected course enrollments" resulted in "uncertainties about final course offerings." [Dkt. 208-19 at 2] At his deposition, Keshk stated that C.M.'s "case" was a "black cloud over [Saud's] head" and influenced his decision not to rehire Saud. [Dkt. 226-3 (Keshk Deposition 146:12-147:19).] According to Keshk, he did not reference the lawsuit in his email because he wasn't sure if he had the right to discuss it with Saud. [*Id.*]

To be evidence of pretext, the explanations must be inconsistent so as to "permit an inference of mendacity." *Davenport v. Northrop Grumman Sys. Corp.*, 281 F. App'x 585, 588 (7th Cir. 2008); *Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 881 (7th Cir. 2016). The shifting explanations Saud points to—pay requirements, low projected enrollment, and the recently filed lawsuit—would not permit the inference that DePaul's reasons were dishonest, or a "mask" for illegal discrimination.

25

Regarding "low projected course enrollments," there is no evidence that Keshk's assertion about low projected course enrollments was a lie. Saud argues that Keshk manufactured low enrollment by cancelling Saud's courses in May 2017, before Saud requested enhanced adjunct pay. [Dkt. 242 at 10.] But Keshk worked with the Dean's office to cancel Saud's term faculty courses and faculty member status in the system because his term faculty contract had not been renewed. This was done so that the courses could be relisted, and Saud could be added to the system as an adjunct professor and continue teaching.[13]

On the money front, Saud sees as pretextual DePaul hiring Lysik as an adjunct when he requested more money per course. It is true Lysik requested $37,529 per year or $6,254.83 per course, (*see* dkt. 226-20), but Lysik ultimately accepted just $4,800 per course, which is less than what he or Saud requested. [Dkt 208-23 at 2.]

No reasonable fact finder could conclude that these reasons were pretext (*i.e.*, dishonest), even in light of Keshk's subsequent deposition testimony. Keshk did not disown the reasons listed in his email. [Dkt. 226-3 (Keshk Deposition 146:6–147:19).] And even if Keshk's email wasn't the full story of why Keshk refused to rehire him, Saud offers no evidence of an impermissible motivation. *Vassileva*, 118 F.4th at 874. In other words, the "shift" Saud identifies does not mean a reasonable jury could find that "the real reason [for the adverse employment action] was discriminatory." *Stockwell v. City of Harvey*, 597 F.3d 895, 901–02 (7th Cir. 2010).

---

[13]    Similarly, Saud's factual assertion that it was common for his courses to have waiting lists does not disprove Keshk's claim that in the summer of 2017 his courses had low projected enrollment. [Dkt. 224-58 (C.M. Trial Testimony, 62:6-7).]

Next Saud points to irregularities in DePaul's processes. He argues that DePaul's cancellation of his courses in May 2017 proves that it decided not to rehire him before C.M. filed her lawsuit and therefore, its alleged nondiscriminatory reason for its decision was pretextual. He also points out that in May 2017, DePaul cancelled all three of Saud's fall 2017 courses and relisted two of them as assigned to "STAFF."[14] Lysik, whose term faculty contract was also not renewed due to budget constraints, only had one of his courses cancelled. In support, Saud highlights Keshk's inability to explain at his deposition why Saud and Lysik received different treatment. [Dkt. 226-3 (Keshk Deposition 165:17-22).]

An employer's "unusual deviation from standard procedures can serve as circumstantial evidence of discrimination." *Baines v. Walgreen Co.*, 863 F.3d 656, 664 (7th Cir. 2017). To show pretext, there must be evidence permitting a jury to infer that the true motive for DePaul's actions were illegal discrimination. *Chatman v. Bd. of Educ. of City of Chicago*, 5 F.4th 738, 747 (7th Cir. 2021). Keshk's statements would not permit a jury to infer such a motive. Assuming that the decision to cancel Saud's courses for the upcoming quarter deviated from ordinary procedures or resulted in unfair treatment, they have nothing to do with race. Nor is there evidence suggesting that the differences were intended to "cover up more nefarious motives." *Id.*

As explained above, DePaul's cancellation of Saud's term faculty courses does not support the inference that DePaul had decided to fire him in May 2017. From late May until late June 2017, Keshk and others at DePaul communicated about relisting

---

[14]    Recall that term faculty teach three course per quarter while adjunct instructors teach only two. [Dkt. 226-2 (Saud Deposition 171:3-6); Dkt. 226-3 (Keshk Deposition 104:23-105:8).]

Saud in the system as an adjunct professor with adjunct courses Saud could continue to teach. [Dkt. 224-13; Dkt. 224-35.] Salary negotiations concerning enhanced adjunct pay continued throughout this time period. [Dkt. 208-17 at 2; Dkt. 208-18 at 2.] While DePaul's practice of cancelling term faculty members and reinstating them as adjuncts may be cumbersome, inconsistent, or poorly executed, Saud is unable to tie any process issues to race, which is fatal to his argument. *Barnes v. Bd. of Trustees of Univ. of Illinois*, 946 F.3d 384, 390 (7th Cir. 2020) (explaining that even if the employer's "process was not accurate, wise, or well-considered" does not make it pretextual).

Saud offers other scattershot arguments aimed at establishing Keshk's motives were discriminatory. None hit the mark. He asserts—without citation—that (1) his January 2017 event on campus about Muslim civil rights was flagged to high-level administrators; (2) days before he was accused he was the subject of a *Campus Watch* article; (3) DePaul never informed Saud of additional complaints when it reopened his investigation in August 2017; (4) Keshk was up for reappointment in June 2017; (5) Keshk has a pattern of ignoring faculty discrimination concerns, but was aware of them; (6) Keshk believed Saud would "throw [him] under the bus" and (7) Saud was not afforded an appeal. [Dkt. 257 at 12.] But without any evidence of discrimination—specifically, evidence that Keshk's decision was based Saud's race—Saud's critiques of Keshk fall short. *See Ennin v. CNH Indus. Am., LLC*, 878 F.3d 590, 597 (7th Cir. 2017) (explaining that "mere conjecture and speculation" is insufficient to support race discrimination claim).

28

On this record, no jury could find that illegal discrimination was why DePaul decided not to permit Saud to teach as an adjunct. Even when the record is viewed in Saud's favor and the evidence is considered "in a single pile," a factfinder could not reasonably conclude that the adverse employment action was because of Saud's race. *Ortiz*, 834 F.3d at 766.

## B.     Race Discrimination Regarding Future Employment

Saud also argues that DePaul violated § 1981 when Dean Velasco, after the conclusion of the second Title IX investigation in October 2017, decided Saud was ineligible for future employment at DePaul. The Court considers this claim under both the *McDonnell Douglas* and *Ortiz* standards.

### 1.     *Prima Facie* Case

The same *prima facie* requirements discussed above apply. Saud is undisputedly a member of a protected class,[15] and the parties also do not dispute that being deemed ineligible for future employment is an adverse employment action. [Dkt. 209 at 16; Dkt. 266 at 5.]

There is evidence, as discussed above, that Saud was qualified for future employment with DePaul. Though DePaul argues that the Title IX investigation determined Saud had violated DePaul's Policy with respect to C.M., it fails to cite evidence that violating the policy renders an instructor ineligible for future employment. The ADAH Policy itself includes no such provision.

---

[15]     DePaul argues, relying on Dean Velasco's declaration, that the Dean was unaware of Saud's race and therefore could not have impermissibly considered it. [Dkt. 208-1 at ¶1.] Saud counters that his name reflects his race. Since Saud's § 1981 claim can be resolved in other ways, the Court assumes Dean Velasco was aware of Saud's race.

Saud must also identify comparators—that is, someone who DePaul found violated the policy but was not deemed ineligible for future employment. *See Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012) (explaining the purpose of identifying comparators "is to eliminate other possible explanatory variables" for the employer's decision "such as differing roles, performance histories, or decision-making personnel").

Saud points to Lysik as a comparator, but as already discussed there are too many distinctions between them. Comparators need not "be identical in every conceivable way," but the differences between Saud, who was found to have violated the policy, and Lysik, who was not, "render[s] the comparison effectively useless." *Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 405 (7th Cir. 2007), *aff'd*, 553 U.S. 442 (2008). Put another way, evidence of Lysik's treatment does not eliminate the possibly that DePaul made its decision with respect to Saud's future employment because of his policy violation rather than on account of his race.

Alternatively, Saud identifies Joseph Suglia, another white professor at DePaul. In 2015, Tamburro headed an OIDE investigation into a complaint that Suglia engaged in "verbal exchanges … of an explicit sexual nature" with a student no longer enrolled in his course. [Dkt. 218 at 2.] OIDE determined Suglia violated the "Consensual Relationship" portion of DePaul's ADAH Policy and issued several sanctions against Suglia, including a determination that he was not eligible for rehire at DePaul. [*Id.* at 3.]

30

Suglia's ineligibility for future employment with DePaul means that he is not a suitable comparator. Indeed, evidence of Suglia's treatment supports the conclusion that DePaul barred from future employment individuals who violated its ADAH Policy, regardless of their race. A comparison with Suglia also fails because a different decisionmaker meted out his punishment—his department Chair, not the Dean of LAS. [Dkt. 218 at 3.] *Little v. Illinois Dep't of Revenue*, 369 F.3d 1007, 1012 (7th Cir. 2004) ("A similarly-situated employee must have been disciplined, or not, by the same decisionmaker who imposed an adverse employment action on the plaintiff."); *Mourning v. Ternes Packaging, Indiana, Inc.*, 868 F.3d 568, 571 (7th Cir. 2017) (holding that "to be an adequate comparator" plaintiff would need to show the comparator "was treated more favorably … by the same decisionmaker"). So Saud cannot establish his *prima facia* case for this reason either.[16]

## 2. Pretext

The Court next considers Saud's argument that DePaul's reason for barring him from future employment was pretextual.[17] His pretext arguments generally fall into the following categories: how DePaul conducted its investigation; discrepancies with Tamburro's recordkeeping and investigation practices; his disparate treatment

---

[16]    Saud argues that he was subjected to a worse outcome than Suglia because he was also prohibited from participating in DePaul sponsored events. Assuming being barred from sponsored events is a separate adverse employment action, Suglia still is not a suitable comparator because a different decisionmaker decided on his punishment. Consistent with *Ortiz*, however, the Court discusses the different treatment in its pretext discussion below.

[17]    Saud's briefing leaves murky what pretext arguments relate to which adverse employment action. The Court has endeavored to sort them out, giving Saud the benefit of the doubt wherever possible. *See Patterson v. Howe*, 96 F.4th 992, 999 (7th Cir. 2024) ("It is not the courts' responsibility to develop an argument for a party.")

during the investigation; and general allegations concerning DePaul's ongoing history of discriminating against minorities. Ultimately, even in combination, this evidence does not permit an inference of race discrimination. *Ortiz*, 834 F.3d at 764.

### i. Investigation Discrepancies and Errors

In her October Title IX Report, Tamburro determined that Saud lacked credibility on when the sexual relationship with C.M. began. That determination underpinned the finding that Saud violated DePaul's policy and, in turn, the Dean's ultimate decision regarding future employment.

To demonstrate pretext, Saud takes aim at Tamburro's negative credibility determination, which was based primarily on the conflict Tamburro identified between what Saud told her during his May interview and the information contained in Saud's verified Answer filed in September. The Answer did "not provide a timeframe for when the sexual relationship [with C.M.] began," but Tamburro's interview notes indicate that Saud "reported that the sexual relationship began sometime in mid-June 2016 when [C.M.] was not a student enrolled in his course." [Dkt. 226-22 at 4.]

Saud says that Tamburro manufactured a conflict between the interview notes and Saud's Answer by purposefully taking inaccurate notes. Even assuming this were true, it does not reveal pretext. Setting aside that the notes formed the basis for the May Report that *cleared* Saud, any inaccuracies were, at worst, a mistake; there is no evidence they were a "phony excuse." *Mullin v. Temco Mach., Inc.*, 732 F.3d 772, 778 (7th Cir. 2013) (holding that a "mere mistake by an employer does not constitute

32

pretext; instead, pretext "is a phony excuse.") Nor does Saud identify anything about the notes that reveal a discriminatory motive. *Tyburski*, 964 F.3d at 599 ("Tyburski has pointed to no evidence of improper motivation, other than the interviewers' knowledge of his age relative to that of the other candidates. This is not enough.") Put differently, even a "false report ..., standing alone, is insufficient to establish discriminatory animus." *Bragg v. Munster Med. Rsch. Found. Inc.*, 58 F.4th 265, 273 (7th Cir. 2023).

Saud also notes there was no inconsistency between the statements he made to Tamburro during the May interview and his verified Answer, which did not specify a date when Saud had sex with C.M. [Dkt. 257 at 15.] This, Saud suggests, means that Tamburro's conclusion that he lacked credibility was inaccurate because there was no conflict. But again, "faulty reasoning or mistaken judgment on the part of the employer" is insufficient to show pretext. *Harden v. Marion Cnty. Sheriff's Dep't*, 799 F.3d 857, 864 (7th Cir. 2015). To survive summary judgment, Saud must point to evidence permitting an inference of discriminatory animus. *Chatman*, 5 F.4th at 747 (pretext argument failed because plaintiff could not "persuasively assert that the Board's decision to eliminate the position was driven by discriminatory animus.")[18] He has not done so on this record.

Saud's other arguments attacking the way in which Tamburro reached her conclusion about his lack of credibility fare no better. He argues that Tamburro and

---

[18]    Saud's argument that Tamburro should have contacted him to inquire about the perceived inconsistency (*see* dkt. 208-25 at 2) or should have viewed his Answer through the lens of an attorney-drafted document (*see* dkt. 266 at 12) are unpersuasive for the same reason.

Keshk's testimony at C.M.'s trial was inconsistent, with each claiming that they relied on information supplied by the other to determine that Saud lied. [*Compare* Dkt. 242 at 11 *with* Dkt. 257 at 15.] As discussed, shifting or inconsistent explanations can demonstrate pretext when they permit an inference of mendacity, but Saud fails to meaningfully develop any argument or point to any evidence from which a jury could infer dishonesty from the differing testimony. Undeveloped arguments like this one are waived. *Greenbank v. Great Am. Assurance Co.*, 47 F.4th 618, 629 (7th Cir. 2022) ("We have made clear that perfunctory and underdeveloped arguments, and arguments that are unsupported by pertinent authority are waived.")

Lastly, because Saud has not shown Tamburro was biased, his cat's paw theory of liability also fails. Under this theory, "when a biased subordinate lacks decision-making power to [take adverse action against] an employee, but uses a formal decision maker as a dupe in a deliberate scheme to trigger a discriminatory employment action, [the Court] will consider the biased subordinate's actions as direct evidence of discrimination." *Nichols v. Michigan City Plant Plan. Dep't*, 755 F.3d 594, 600 (7th Cir. 2014) (cleaned up). To prove the theory, the plaintiff must show: "(1) the biased subordinate actually harbored discriminatory animus against [him]; and (2) "the subordinate's input was a proximate cause of the adverse employment decision." *Bragg*, 58 F.4th at 273 (cleaned up).

Without evidence that Tamburro, the allegedly biased subordinate, expressed racial bias towards Saud or acted in some discriminatory manner, Saud does not "get past the first step in the cat's-paw theory." *Id.* at 274. The absence of evidence that

34

Tamburro was racially biased in her investigation is fatal to Saud's assertion that Dean Velasco was used as a dupe.[19]

## ii. Other Disparities

Saud points to at least one instance where a similarly situated person was treated better following an OIDE investigation. He argues that Suglia was notified that he could file a counter-complaint against his accuser and was given greater detail about the nature of his policy violation. [Dkt. 218 at 2]. Additionally, Saud was barred from participating in DePaul-sponsored events when Suglia was not. [Dkt. 257 at 14.] Better treatment of people similarly situated but for the protected characteristic is one way to establish pretext. *Joll v. Valparaiso Cmty. Schs.*, 953 F.3d 923, 929 (7th Cir. 2020). The Court agrees that Saud his identified some evidence of discrimination through different treatment of Suglia, a white professor, following his OIDE investigation. This is not enough to sustain an inference of racial discrimination on its own, but something to add to the pile for consideration as a whole.

---

[19]    Saud argues the Dean premised his decision to bar Saud from future employment on a misunderstanding of Tamburro's October Title IX Report. According to Saud, the Dean interpreted Tamburro's report to mean that OIDE found Saud had done all the things C.M. accused him of doing, including exchanging grades for sex. [Dkt. 266 at 9; Dkt. 224-12 (Velasco Deposition 184:10–187:8).] But the October Title IX Report found in Saud's favor on that allegation. [Dkt. 208-26 at 10.] Whether or not Dean Velasco misunderstood the Title IX report is irrelevant absent evidence that he acted purposefully, or someone else acted purposefully in encouraging that mistake. *See Mullin*, 732 F.3d at 778. Furthermore, mistakenly predicating Saud's discipline on the belief that he agreed to exchange grades for sex is not evidence of race discrimination, which Saud needs to avoid summary judgment. *Stockwell*, 597 F.3d at 901–02; *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 696 (7th Cir. 2006).

Saud next argues the outcome of his OIDE investigation was "predetermined" and thus indicative of pretext.[20] For example, he asserts that Tamburro and Keshk attempted to elicit information about other potential accusers, and that neither notified Saud about the other reports.[21] According to Saud, "white faculty are always informed and integrated into investigations." [Dkt. 257 at 10.] But Saud does not cite to any evidence in the record in support of this assertion, and "generalized argument[s] that supervisors treat white employees better than [minority] employees," without support from record, is not sufficient. *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 899 (7th Cir. 2018).

Nor is the Court persuaded by Saud's arguments that the outcome of the Title IX investigation was pretextual because he "was punished for something that was not prohibited at DePaul." [Dkt. 242 at 12.] It is true that DePaul's ADAH policy does not explicitly prohibit sexual relationships between professors and students, even while students are currently enrolled in a professor's class. But whether Saud's actions violated DePaul's policy is beside the point (as is the fact that Saud later prevailed in C.M.'s lawsuit). What matters for pretext purposes is whether the relevant decisionmakers honestly believed Saud violated the policy when they made the decision to bar him from future employment. *See Ptasznik*, 464 F.3d at 696 ("An

---

[20]    Saud admits his arguments about insufficient process received during the Title IX investigation relate to his pretext claim. [Dkt. 257 at 16.] Such allegations cannot support a procedural due process claim since that claim was dismissed. [Dkt. 36 at 7; Dkt. 61 at 19.]

[21]    Keshk's testimony about reports made by others is hearsay and inadmissible to show pretext. *See Fall v. New York State United Tchrs.*, 289 F. App'x 419, 421 (2d Cir. 2008) ("[A] plaintiff must offer specific, admissible evidence of pretext."); *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 812 n.3 (7th Cir. 2017) ("[A] court may consider only admissible evidence in assessing a motion for summary judgment.").

employer's mistaken belief that the plaintiff's conduct merited termination is not unlawful, so long as the belief was honestly held."); *Cung Hnin v. TOA (USA), LLC*, 751 F.3d 499, 506 (7th Cir. 2014) (dispensing with employee's argument that his conduct did not violate his employer's policy because the issue is whether the employer honestly believed it did). Saud has mustered no evidence that the relevant actors and decisionmakers believed his conduct did not violate the policy.

Finally, Saud makes a variety of arguments aimed at showing an "ongoing history of discrimination" at DePaul and within OIDE. *Ford v. Marion Cnty. Sheriff's Off.*, 942 F.3d 839, 858 (7th Cir. 2019). He identifies (sometimes by name) other DePaul employees who were treated poorly (or treated well, if they were white), had their claims of race discrimination ignored, and were targeted by OIDE, including after publication of *Campus Watch* articles. [Dkt. 257 at 16; Dkt. 242 at 13; Dkt. 266 at 2; Dkt 266 at 15; Dkt 224-48].

While "a plaintiff can demonstrate pretext … by presenting evidence of the employer's … practices with respect to minority employment," Saud presents insufficient evidence to impugn DePaul's employment decision with respect to him. *Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 739 (7th Cir. 2006). Much of Saud's evidence is hearsay, such as Schaffer's testimony that others complained to her that they believed she discriminated against them. [Dkt. 226-17 (Schaffer Deposition 92:6-15).] The remaining evidence—such Schaffer's testimony that an African American professor once brought a noose to her office during an investigation [*Id.*, 92:22-93:1]— is too scant, disjointed, and general "to impugn a particular employment decision."

*Ford*, 942 F.3d at 858; *Stinson v. Cnty. of Cook*, 2020 WL 6870816, at *15 (N.D. Ill. Nov. 23, 2020) (explaining, in retaliation context, that even assuming plaintiff mustered evidence that her employer had a "culture of retaliation" she failed to connect any "general culture of retaliation to" her adverse employment action).

Also insufficient are Saud's passing references to Keshk's belief that Saud would throw him under the bus [Dkt. 226-3 (Keshk Deposition 265:21-266:24)] and how Keshk dismissed as a joke an instance where a peer evaluator commented about Saud having allegiance to Saudi Arabia. [*Id.* at 84:13-88:11.] These assertions are undeveloped and therefore waived. Waiver aside, even taken together, they are too scant to permit an inference of race discrimination.

Considered as a whole per *Ortiz*, 834 F.3d at 764, including DePaul's better treatment of Suglia, the evidence does not "permit a reasonable jury to infer 'an overall likelihood of discrimination' that merits a trial." *Joll*, 953 F.3d at 929 (citing *Ortiz*, 834 F.3d at 763).

## IV.    Conclusion

DePaul's Motion for Summary judgment is granted. Saud's Motion for Summary Judgment is denied.

Enter: 19-cv-3945
Date:  December 6, 2024

_____
Lindsay C. Jenkins
United States District Judge

38