No. 25-1034

In the United States Court of Appeals
for the Seventh Circuit

LAITH SAUD,

*Plaintiff-Appellant,*

v.

DEPAUL UNIVERSITY,

*Defendant-Appellee.*

Appeal from the United States District
Court for the Northern District of Illinois,
Case No. 19 C 3945
The Honorable Lindsay C. Jenkins, Presiding

**RESPONSE BRIEF OF DEFENDANT-APPELLEE
DEPAUL UNIVERSITY**

MICHAEL BEST & FRIEDRICH LLP
Brian P. Paul
444 West Lake Street, Suite 3200
Chicago, IL 60606
Phone: (312) 527-6843
bbpaul@michaelbest.com

Michael K. Chropowicz
444 West Lake Street, Suite 3200
Chicago, IL 60606
Phone: (312) 596-5852
michael.sokolowski@michaelbest.com

*Attorneys for Defendant-Appellee
DePaul University*

May 30, 2025

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: **25-1034**

Short Caption: **Laith Saud v. DePaul University**

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐       **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
**DePaul University**

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
**Michael Best & Friedrich LLP**

(3)    If the party, amicus or intervenor is a corporation:

   i)      Identify all its parent corporations, if any; and
           **N/A**

   ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:
           **N/A**

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:
**N/A**

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:
**N/A**

Attorney's Signature: **/s/ Brian P. Paul**                      Date:  **5/30/2025**

Attorney's Printed Name:  **Brian P. Paul**

Please indicate if you are Counsel of Record for the above listed parties pursuant to Circuit Rule 3(d).   Yes ☑  No ☐

Address:  **444 West Lake Street, Suite 3200, Chicago, IL 60606**

Phone Number: **312.527.6843**                 Fax Number:    **312.222.0818**

E-Mail Address: **BPPaul@michaelbest.com**

Appellate Court No: **25-1034**

Short Caption: **Laith Saud v. DePaul University**

  To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

  The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

  [ ] **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
  **DePaul University**

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
  **Michael Best & Friedrich LLP**

(3) If the party, amicus or intervenor is a corporation:

  i) Identify all its parent corporations, if any; and
   **N/A**

  ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:
   **N/A**

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:
  **N/A**

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:
  **N/A**

Attorney's Signature: **/s/ Michael K. Chropowicz**   Date: **5/30/2025**

Attorney's Printed Name: **Michael K. Chropowicz**

Please indicate if you are Counsel of Record for the above listed parties pursuant to Circuit Rule 3(d). Yes [ ] No [✔]

Address: **444 West Lake Street, Suite 3200, Chicago, IL 60606**

Phone Number: **312.596.5852**     Fax Number: **312.222.0818**

E-Mail Address: michael.sokolowski@michaelbest.com

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ......................................................... 1

STATEMENT OF THE ISSUES ............................................................ 1

STATEMENT OF THE CASE .............................................................. 2

I.     Factual Background ................................................................... 2

     A.    DePaul Declined to Renew Saud's Term Contract. ....................... 2

     B.    DePaul Learned that Saud Had Been Accused of Sexual
              Misconduct. ................................................................... 2

     C.    Saud Pursued an Adjunct Faculty Appointment. ......................... 4

     D.    C.M. Filed Suit Against Saud. ............................................. 5

     E.    Keshk Informed Saud He Would Not Be Hired for the 2017
              Fall Quarter. ................................................................... 6

     F.    Tamburro Reopened the Investigation and Issued New
              Findings. ......................................................................... 7

     G.    Dean Velasco Determined that Saud Was Ineligible for
              Future Employment. .......................................................... 8

II.    Procedural Background ........................................................... 8

SUMMARY OF THE ARGUMENT .................................................... 11

ARGUMENT ................................................................................ 13

I.     The District Court Correctly Determined that Saud Failed to
     Present Sufficient Evidence His Race Was the "But For" Cause of
     Keshk's Decision to Not Offer Him an Adjunct Faculty
     Appointment. ...................................................................... 14

     A.    Saud Failed to Establish that Lysik Is Similarly Situated. ............. 14

     B.    The District Court Correctly Determined that Saud Failed to
              Adduce Sufficient Evidence of Pretext. ................................... 22

II.    The District Court Correctly Determined that Saud Failed to
       Present Sufficient Evidence that His Race Was the "But For" Cause
       of the Decision to Deem Him Ineligible for Future Employment........................... 29

       A.    Lysik Is Not Similarly Situated. ........................................................... 29

       B.    Suglia Is Not Similarly Situated............................................................. 30

       C.    Tamburro's Investigation Is Not an Adverse Employment
             Action....................................................................................................... 32

       D.    Saud Failed to Establish Pretext............................................................. 34

III.   Saud's Remaining Challenges Are Meritless. ................................................. 38

       A.    The District Court Properly Applied *Ortiz*. ........................................ 39

       B.    The District Court Did Not Improperly Weigh Evidence or
             Make Credibility Determinations............................................................ 44

       C.    The District Court Did Not Defer to DePaul's Proffered
             Reasons or Draw Improper Inferences in DePaul's Favor.......................... 47

CONCLUSION ................................................................................................................. 48

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abebe v. Health & Hosp. Corp. of Marion Cnty.,*
    35 F.4th 601 (7th Cir. 2022) ............................................................................21

*Agugliaro v. Brooks Bros.,*
    927 F. Supp. 741 (S.D.N.Y. 1996) ..................................................................37

*Barnes v. Bd. of Trs. of the Univ. of Ill.,*
    946 F.3d 384 (7th Cir. 2020) ............................................................14, 22, 34

*Baum v. Boeing (China) Co.,*
    2020 WL 5763586 (N.D. Ill. Sept. 28, 2020) .................................................30

*Burton v. Bd. of Regents,*
    851 F.3d 690 (7th Cir. 2017) ......................................................................39, 42

*C.S. v. Madison Metro. Sch. Dist.,*
    34 F.4th 536 (7th Cir. 2022) ......................................................................18, 37

*Chatman v. Bd. of Educ. of Chi.,*
    5 F.4th 738 (7th Cir. 2021) ........................................................................22, 23

*Circle City Broad. I LLC v. AT&T Servs.,*
    99 F.4th 378 (7th Cir. 2024) ......................................................................26, 41

*Comcast Corp. v. Nat'l Ass'n of African American-Owned Media,*
    589 U.S. 327 (2020) ..........................................................................................13

*Cunningham v. Austin,*
    125 F.4th 783 (7th Cir. 2025) ..........................................................................22

*Deacon v. Peninsula Chi., LLC,*
    2017 WL 3531518 (N.D. Ill. Aug. 17, 2017) ..................................................36

*Duncan Place Owners Ass'n v. Danze, Inc.,*
    927 F.3d 970 (7th Cir. 2019) ......................................................................39, 42

*Edwards v. Ind. Univ.,*
    2020 WL 2062338 (S.D. Ind. Apr. 29, 2020) ............................................34, 37

*Ezell v. Potter,*
    400 F.3d 1041 (7th Cir. 2005) ..........................................................................17

*FKFJ, Inc. v. Vill. of Worth*,
11 F.4th 574 (7th Cir. 2021) ................................................................. 13

*Fluckes v. Johnny Rockets Grp., Inc.*,
2008 WL 5170850 (N.D. Ill. Dec. 10, 2008) ........................................ 37

*Ford v. Marion Cnty. Sheriff's Office*,
942 F.3d 839 (7th Cir. 2019) ................................................................. 44

*Galvan v. State*,
117 F.4th 935 (7th Cir. 2024) ............................................................... 37

*Gamble v. FCA US LLC*,
993 F.3d 534 (7th Cir. 2021) ................................................................. 22

*Gilbank v. Wood Cnty. Dep't of Hum. Servs.*,
111 F.4th 754 (7th Cir. 2024) ...................................................... passim

*Hnin v. TOA (USA), LLC*,
751 F.3d 499 (7th Cir. 2014) ......................................................... 31, 37

*Hoffstead v. Ne. Ill. Reg'l Commuter R.R. Corp.*,
132 F.4th 503 (7th Cir. 2025) ...................................................... passim

*Jeffers v. Comm'r*,
992 F.3d 649 (7th Cir. 2021) ................................................................. 39

*Keeton v. Morning Star, Inc.*,
667 F.3d 877 (7th Cir. 2012) ................................................................. 33

*Kuhn v. Washtenaw Cty.*,
709 F.3d 612 (6th Cir. 2013) ................................................................. 33

*Kuttner v. Zaruba*,
819 F.3d 970 (7th Cir. 2016) ................................................................. 21

*Lane v. Riverview Hosp.*,
835 F.3d 691 (7th Cir. 2016) ................................................................. 17

*Little v. Ill. Dep't of Revenue*,
369 F.3d 1007 (7th Cir. 2004) ............................................................... 31

*Liu v. Cook Cnty.*,
817 F.3d 307 (7th Cir. 2016) ................................................................. 22

iv

*Logan v. City of Chi.*,
    4 F.4th 529 (7th Cir. 2021)................................................................22, 23

*Ludlow v. Northwestern Univ.*,
    79 F. Supp. 3d 824 (N.D. Ill. 2015).........................................................33

*McCann v. Badget Mining Corp.*,
    965 F.3d 578 (7th Cir. 2020)....................................................................27

*McDaniel v. Progress Rail Locomotive*,
    940 F.3d 360 (7th Cir. 2019)........................................................15, 16, 31

*McDonnell Douglass Corp. v. Green*,
    411 U.S. 792 (1973)............................................................................14, 22

*Monroe v. Ind. Dep't of Transp.*,
    871 F.3d 495 (7th Cir. 2017)....................................................................13

*Moore v. City Colleges of Chi.*,
    2018 WL 4222878 (N.D. Ill. Sept. 5, 2018).............................................18

*Morgan v. SVT, LLC*,
    724 F.3d 990 (7th Cir. 2013)..............................................................32, 35

*Muldrow v. City of St. Louis*,
    601 U.S. 346 (2024)..................................................................................33

*Naca v. Macalester Coll.*,
    2018 WL 4516950 (D. Minn. Sep. 20, 2018) .....................................29, 38

*Navratil v. City of Racine*,
    101 F.4th 511 (7th Cir. 2024)...................................................................13

*Ortiz v. Werner Enters., Inc.*,
    834 F.3d 760 (7th Cir. 2016) ............................................................passim

*Patterson v. Ind. Newspapers*,
    589 F.3d 357 (7th Cir. 2009)....................................................................15

*Phillips v. Spencer*,
    793 F. App'x 435 (7th Cir. 2019) ............................................................18

*Rabé v. United Airlines, Inc.*,
    971 F. Supp. 2d 807 (N.D. Ill. 2013)........................................................29

*Saud v. DePaul Univ.*,
2019 WL 5577239 (N.D. Ill. Oct. 29, 2019) ................................................15, 42

*Scalzitti v. Paddock Publications, Inc.*,
925 F.2d 1468 (7th Cir. 1991) ....................................................................19

*Singmuongthong v. Bowen*,
77 F.4th 503 (7th Cir. 2023) ........................................................................13

*Sublett v. John Wiley & Sons, Inc.*,
463 F.3d 731 (7th Cir. 2006) ......................................................................44

*Sweet v. Town of Bargersville*,
18 F.4th 273 (7th Cir. 2021) ........................................................................28

*Tackett v. Dauss*,
132 F.4th 1026 (7th Cir. 2025) ..................................................................13

*Tonkovich v. Kan. Bd. of Regents*,
159 F.3d 504 (10th Cir. 1998) ....................................................................15

*Vaughn v. Vilsack*,
715 F.3d 1001 (7th Cir. 2013) ....................................................................24

**STATUTES**

42 U.S.C. § 1981 ................................................................................... passim

42 U.S.C. § 1983 ........................................................................................8

**OTHER AUTHORITIES**

Fed. R. App. P. 28 ......................................................................................28

Fed. R. App. P. 28(a)(8) ............................................................................31

Fed. R. Evid. 602 ..................................................................................39, 40

Fed. R. Evid 803 ........................................................................................45

Fed. R. Civ. P. 56 ......................................................................................46

Appellant Laith Saud ("Saud") filed this race discrimination action alleging that Appellee DePaul University ("DePaul") failed to rehire him as an adjunct professor and deemed him ineligible for future employment because he is Arab American. But to prevail on his claim under 42 U.S.C. § 1981, Saud was required to present evidence that his race was the "but for" cause of DePaul's decisions. And here, the district court correctly concluded Saud failed to adduce sufficient evidence that his Arab American status (as opposed to the undisputed fact that, among other things, he had sex with a student in his class) is the reason he is no longer eligible to teach at DePaul. Accordingly, this Court should affirm the district court's entry of summary judgment in DePaul's favor.

## JURISDICTIONAL STATEMENT

The jurisdictional statement in Saud's opening brief is complete and correct.

## STATEMENT OF THE ISSUES

1.   Whether the district court correctly determined Saud failed to create a genuine issue of material fact sufficient to proceed to trial on his claim that DePaul did not re-hire him as an adjunct instructor because of his race in light of undisputed evidence that, at the time DePaul made its decision, Saud was the subject of a pending lawsuit accusing him of sexually assaulting a student in his class, was the subject of two additional reports of misconduct toward students, and had requested too much money to teach courses with low projected enrollment.

2.   Whether the district court correctly determined Saud failed to create a genuine issue of material fact sufficient to proceed to trial on his claim that DePaul made him

1

ineligible for future employment because of his race in light of undisputed evidence that DePaul determined Saud violated its anti-harassment and anti-discrimination policy by having sexual intercourse with a student enrolled in his class.

## STATEMENT OF THE CASE

### I.     Factual Background

DePaul is a private Catholic, Vincentian university in Chicago. (R.207 ¶ 1; R.208-1 at 2.) DePaul's Department of Religious Studies ("Religious Studies") is part of the College of Liberal Arts and Social Sciences ("LAS"). (R.207 ¶ 9; R.208-1 at 2.)

Saud began working in Religious Studies as an adjunct instructor in 2005 or 2006 and later became a term faculty member. (R.207 ¶¶ 7, 11; R.208-3 at 5, 9.) Saud's last term faculty appointment was for the 2016-2017 academic year, which ended on June 30, 2017. (R.207 ¶ 13; R.208-9 at 2.)

#### A.     DePaul Declined to Renew Saud's Term Contract.

On April 10, 2017, Guillermo Vásquez de Velasco (Dean of LAS), sent a letter to Saud stating "I am writing to inform you that I will not be reappointing you for academic year 2017-2018 due to the budgetary constraints within the college. As you are aware, your current appointment is for academic year 2016-2017 and will end June 30, 2017." (R.207 ¶ 14, R.208-10 at 2.)

#### B.     DePaul Learned that Saud Had Been Accused of Sexual Misconduct.

After learning Saud would not receive a teaching contract for the 2017-2018 academic year, the Chair of Religious Studies, Dr. Khaled Keshk (who is also Arab

2

American), discussed with Saud the possibility of teaching as an adjunct instructor in the fall of 2017. (R.207 ¶¶ 8, 15; 208-7 at 11-12, R.208-8 at 2.)

Shortly thereafter, DePaul was copied on an attorneys' lien letter accusing Saud of repeated acts of sexual misconduct and reckless behavior involving a former DePaul student (referred to as "C.M.") (R.207 ¶¶ 19-21; R.208-12 at 2.) This letter was the first time DePaul became aware of any complaint about the relationship between Saud and C.M. (R.207 ¶ 22; R.208-3 at 39.)

Karen Tamburro, DePaul's Title IX Coordinator in the Office of Institutional Diversity and Equity ("OIDE"), opened an investigation into the allegations to determine if Saud violated university policies, including its Anti-Discrimination and Anti-Harassment Policy and Procedures ("ADAH Policy"). (R.207 ¶¶ 3, 5, 24; R.208-4, R.208-6 at 2.) The ADAH Policy contains a section titled "Special Considerations – Consensual Relationships," which addresses the "serious difficulties" that arise when "inherently unequal positions," such as a teacher and student, engage in an amorous relationship. (R.207 ¶ 3; R.208-4 at 4.) In such circumstances, the teacher may not invoke student consent as justification for the relationship. (*Id.*)

On May 2, 2017, Saud told Tamburro he had a sexual relationship with C.M. after his course ended and after Saud claimed to believe C.M. was no longer enrolled at DePaul. (R.207 ¶ 27; R.208-13 at 3-4.) C.M. refused to participate in the OIDE investigation and provided no statement or information to Tamburro. (R.207 ¶ 29; R.208-5 at 15-16.)

In a report dated May 9, 2017, Tamburro found that Saud did not violate the ADAH

Policy because:

> The information presented supports that Prof. al Saud did not request or
> solicit, directly or indirectly that [C.M.] engage in a sexual relationship
> with him while she was a student in his class. No information suggests
> that a sexual relationship was connected to [C.M.'s] participation in the
> class or the grade she received in the class. The information presented
> supports that [C.M.] engaged in a consensual sexual relationship with
> Prof. al Saud after [C.M.] was no longer a student in Prof. al Saud's class,
> and while Prof. al Saud may have been under the impression that she did
> not intend to return to DePaul for further coursework.

(R.207 ¶¶ 30-32; R.208-14 at 7.)

Tamburro notified Saud and C.M. of her findings. (R.207 ¶ 34; R.208-15 at 2-4.) Saud

did not believe Tamburro was singling out or targeting him through the investigation.

(R.207 ¶ 33; R.208-3 at 87.)

## C.     Saud Pursued an Adjunct Faculty Appointment.

After receiving Tamburro's letter, Saud informed Keshk that he wanted to teach at

DePaul as an adjunct, which Keshk agreed to pursue. (R.207 ¶¶ 35-37; R.208-7 at 15-17.)

Saud never disclosed to Keshk in April or May 2017 that he had sex with C.M. while she

was a student in his class. (R.207 ¶ 35; R.208-3 at 47-49.) Keshk began looking into plans

for Saud to teach in the fall and was "going to bring him back as an adjunct." (R.207

¶ 37; R.208-7 at 29.)

On June 28, 2017, Saud emailed Keshk stating, in part, "Last week I had a very

helpful meeting with Katie Kutina of the Dean's office regarding adjunct pay. I am

aware that the Dean's office does approve pay above the $4,800 mark, Katie instructed

me that the process for me to request such pay should begin with my department chair . . . ." (R.207 ¶ 39; R.208-18.)

That same day, Keshk emailed Saud and David Lysik, the other adjunct applicant, asking them to let him know what "would be a 'fair' amount for your salary and I will send a letter soliciting that amount from the Dean." (R.207 ¶ 40; R.208-19 at 3.)

### D.     C.M. Filed Suit Against Saud.

On June 29, 2017, C.M. filed a lawsuit against Saud and DePaul. (R.207 ¶ 41; R.208-20.) C.M. alleged that on April 15, 2016 (while C.M. was, in fact, a student in Saud's class) Saud had dinner with C.M. and "plied [her] with alcohol in an attempt to get her intoxicated"; then took her to his home after dinner, where he "began to aggressively seek sexual relations with her"; and "had sexual intercourse with his student at that time." (R.207 ¶ 42; R.208-20 at 3-4.) C.M. alleged further that Saud told C.M. that "he would give her an A in his class and that she did not have to take the final exam." (R.207 ¶ 43; R.208-20 at 4.) C.M. alleged the sex was "unwanted and inappropriate" and constituted a "physical invasion of a sexual nature under coercive conditions." (R.207 ¶ 40; R.208-20 at 4-5, 8.) C.M. concluded by alleging that she was "sexually assaulted and battered by [Saud]." (*Id.*)

That same day, the *Chicago Sun Times* published an article about the lawsuit. (R.207 ¶ 44; R.208-8 at 2.)

On June 30, 2017, Saud's employment contract at DePaul ended pursuant to the conclusion of his term faculty appointment. (R.207 ¶ 45; R.208-9.) Keshk became aware of C.M.'s lawsuit that same day. (R.207 ¶ 46; R.208-7 at 30-32.)

### E.     Keshk Informed Saud He Would Not Be Hired for the 2017 Fall Quarter.

On July 1, 2017, Saud emailed Keshk to request that he be paid $6,000 for an adjunct appointment, more than the $4,800 amount DePaul typically pays for adjunct appointments. (R.207 ¶¶ 16, 47; R.208-11, R.208-19 at 3.)

Between June 30 and July 5, 2017, two former students reported additional concerns to Keshk following the *Chicago Sun Times* article, which Keshk in turn reported to Tamburro. (R.207 ¶ 48; R.208-22 at 2.) Specifically, on July 5, Keshk informed Tamburro that one former student reported hearing of another former student having a romantic relationship with Saud, and another former student reported having an uncomfortable exchange with Saud while babysitting for him. (R.207 ¶ 49; R.208-22 at 2.)

Given C.M.'s lawsuit, the two additional complaints, Saud's excessive pay request, and low projected enrollment in Saud's potential course, Keshk informed Saud on July 6 that DePaul would not hire him for an adjunct faculty position. (R.207 ¶¶ 50-52; R.208-7 at 22-24, R.208-19 at 2.) The "biggest issue" driving Keshk's decision was the lawsuit and two reports regarding Saud's conduct with other students. (R.207 ¶ 51; R.208-7 at 23-28.) Keshk did not include this reason in his July 6 email because he was not sure if he had "the right" to discuss the lawsuit and complaints with Saud. (*Id.*). Keshk did not feel comfortable with Saud teaching in the classroom, and "whether we believe [the sexual assault allegations] to be true or not," Keshk believed it was the right decision because he would "always have been very fearful that those allegations were actually correct and I'm endangering our students." (R.207 ¶ 52; R.208-7 at 40, 48.)

6

### F.  Tamburro Reopened the Investigation and Issued New Findings.

With the new allegations, Tamburro reopened her investigation. (R.207 ¶¶ 57-58; R.208-24 at 2-3.) Saud refused to participate in the second investigation, other than providing Tamburro with his Verified Answer to C.M.'s lawsuit. (R.207 ¶ 61; R.208-25 at 2.) In his Verified Answer, Saud admitted to soliciting C.M. to get drinks after class and admitted to the sexual relationship. (R.207 ¶ 60; R.208-25 at 4, 8.) And contrary to his May 2017 interview with Tamburro, Saud did not assert in his Verified Answer that the sexual relationship occurred after C.M. was no longer in his class. (R.207 ¶¶ 27, 60; R.208-13 at 3-4, *see* R.208-25.) When reading the Verified Answer, the clear implication was that Saud had sex with C.M. while she was enrolled in his class. (*Id.*) Tamburro therefore determined, based on a preponderance of the evidence, that "Prof. al Saud engaged in a sexual relationship with [C.M.] while she was a student enrolled in his course." (R.207 ¶ 65; R.208-26 at 3, 10.) As a result, Tamburro determined Saud violated the ADAH Policy. (*Id.*)

In 2018, in the C.M. lawsuit, Saud testified under oath that C.M. was a student in his class when he had sex with her, "if you are talking about the class ending technically." (R.207 ¶ 72; R.208-29 at 6.) Saud testified in this case that he had sex with C.M. sometime between mid-May and early June 2016, but before June 6. (R.207 ¶¶ 66-68; R.208-3 at 24.) Saud's class did not "technically" end until June 10. (R.207 ¶ 67; R.208-3 at 19-20) Thus, Saud had sex with C.M. perhaps as early as mid-May, while she was enrolled in his class and still was subject to his evaluation and grading. (R.207 ¶¶ 66-67; R.208-3 at 24.)

Case: 25-1034      Document: 17      Filed: 05/30/2025      Pages: 59

### G.    Dean Velasco Determined that Saud Was Ineligible for Future Employment.

After reviewing the OIDE's finding, the Dean determined that Saud was not eligible for future employment with DePaul and instructed Saud not to provide formal or informal instruction in any classroom-based or co-curricular activities sponsored by DePaul. (R.207 ¶ 70; R.208-2 at 13-15, R.208-28 at 2.)

### II.    Procedural Background

In June 2019, Saud filed a nine-count complaint against DePaul and two former DePaul employees. (R.1.)

On July 19, 2019, Saud filed a First Amended Complaint. (R.17.) On October 29, 2019, the district court dismissed all of Saud's state law claims for lack of subject matter jurisdiction, dismissed Saud's 42 U.S.C. § 1983 due process claim with prejudice, dismissed Saud's Title IX discrimination claim without prejudice, and allowed Saud to replead his Title VII claims. (R.36.)

On November 19, 2019, Saud filed a Second Amended Complaint ("SAC") containing thirteen counts. (R.40.) On September 24, 2020, the district court dismissed Saud's Title VII and Title IX claims and again dismissed Saud's state law claims for lack of subject matter jurisdiction. (R.61.)

Saud's sole-surviving claim was for race discrimination under 42 U.S.C. § 1981, alleging that DePaul unlawfully discriminated against him on account of his race by: (i) failing to hire him for a part-time adjunct position in the fall quarter of 2017; and (ii) deeming him ineligible for future employment. (R.40.)

DePaul and Saud each moved for summary judgment following the close of discovery. (R.205; R.220.) On December 6, 2024, the district court granted DePaul's motion for summary judgment and denied Saud's cross-motion. (R.275.) The district court's rulings relevant to this appeal are as follows:

**Fall 2017 Adjunct Hiring.** In his summary judgment briefing, Saud argued that Lysik was similarly situated because he was the subject of an OIDE investigation in 2014, reported to Keshk, and requested enhanced pay for a potential adjunct appointment. (R.242 at 7-8.) Saud argued that DePaul treated Lysik more favorably by offering Lysik an adjunct appointment to teach in the fall quarter of 2017. (*Id.* at 8; R.256 at 10.) DePaul asserted that Keshk had legitimate, non-discriminatory reasons for his decision to not hire Saud because, unlike Lysik, Saud was the subject of a pending lawsuit accusing him sexually assaulting a student, Keshk received two additional reports about Saud suggesting he engaged in misconduct with other former students, and given this "black cloud" over Saud's head, Saud requested more money than Keshk could pay for courses that had low projected enrollment. (R.206 at 9-10.) Saud argued Keshk's reasons were pretextual and a cover up for discrimination. (R.242 at 10-12; R.256 at 11.)

The district court concluded that Saud failed to show he was treated less favorably than a similarly situated individual. (R.275 at 21-24.) The district court held, "Lysik did not engage in similar conduct and mitigating circumstances explain DePaul's different treatment of him." (*Id.* at 22.) The court concluded that no rational jury could find that Keshk's reasons for not hiring Saud (which were driven by the undisputed fact that

9

Saud had a pending lawsuit against him for sexually assaulting a student in his class and two additional reports of misconduct) were false and a pretext for race discrimination.

**Future Employment.** In his summary judgment briefing, Saud argued that both Lysik and David Suglia (another LAS professor) were similarly situated because they also were the subject of OIDE investigations in 2014 and 2015, respectively. (R.242 at 7-9.) Saud argued that DePaul treated Suglia more favorably in the investigation. (*Id.* at 8-9.) DePaul asserted the Dean had a legitimate, non-discriminatory reason for barring Saud from future employment because he determined that Saud violated DePaul's ADAH Policy by having sex with a student in his class—the same sanction Suglia received for violating the ADAH Policy. (R.206 at 13-14; R.261 at 13.) Saud argued the Dean's reason for his decision was pretextual and a cover up for discrimination. (R.242 at 12-13; R.256 at 13-15.)

The district court concluded Saud failed to demonstrate a *prima facie* case by showing he was treated less favorably than a similarly situated individual when the Dean deemed him ineligible for future employment because Saud had sex with a student in his class. (R.275 at 29-31.) The court also found that no rational juror could find that the Dean based his decision on Saud's race, as opposed to the undisputed fact Saud had sex with a student in his class.

## SUMMARY OF THE ARGUMENT

This Court should affirm the district court's final judgment for three reasons.

First, the district court correctly determined that Saud failed to present sufficient evidence that his race was the "but for" cause of Keshk's decision to not hire him for an adjunct faculty appointment for the fall quarter of 2017. Saud challenges the district court's findings on two primary points: (A) Lysik is a valid comparator sufficient to defeat summary judgment; and (B) there is sufficient evidence of pretext. Each argument is fatally flawed. Lysik is not comparable to Saud because Lysik: (1) was not the subject of a pending lawsuit accusing him of sexually assaulting a student in his class; (2) did not have sex with a student in his class; (3) did not have two pending student reports concerning inappropriate conduct; and (4) did not have low projected course enrollment. Saud also has failed to establish pretext that hides a discriminatory animus because the evidence is undisputed that Keshk did not hire Saud to adjunct for the 2017 fall quarter because of the "black cloud" hanging over Saud caused by the pending lawsuit asserting Saud used his position as a professor to sexually assault a student in his class and the two additional reports of Saud's misconduct toward students.

Second, the district court correctly determined that Saud failed to present sufficient evidence that his race was the "but for" cause of the Dean's decision to deem Saud ineligible for future employment. Saud challenges the district court's findings on three primary points: (A) Lysik and Suglia are valid comparators; (B) Tamburro's

investigation was not fair; and (C) there is sufficient evidence of pretext. Saud's arguments fail.

(A) Lysik is not a valid comparator because, unlike Saud, Lysik did not have sex with a student in his class and did not violate DePaul's ADAH policy. In fact, Saud cannot identify *any* evidence that Lysik engaged in any misconduct. Suglia is not a valid comparator because: (1) he did not have sex with a student enrolled in his class; (2) he was not treated more favorably because DePaul also determined he was ineligible for rehire; and (3) he did not share the same supervisor or decision-maker as Saud.

(B) Saud's questioning of Tamburro's investigation process is irrelevant and cannot avoid one indisputable fact: that investigation accurately determined Saud had sex with a student while the student was enrolled in his class in violation of DePaul's ADAH policy. Saud's attempts to distract from this finding are red herrings that should be disregarded.

(C) Despite all of Saud's pretext protestations (most of which are unsupported in the record, have nothing to do with the decision deeming Saud ineligible for future employment, and are not related to Saud's race), he fails to cite any record evidence to suggest that "but for" Saud's race, the Dean – the actual decision-maker in this case – would have allowed Saud to be hired in the future knowing that Saud had sex with a student enrolled in his class.

Third, Saud's challenges to other rulings and analysis similarly fail. Indeed, the district court: (A) explicitly and properly applied this Court's decision in *Ortiz*; (B) appropriately examined whether evidence supported assertions without improperly

12

weighing evidence or making credibility determinations; and (C) at no point deferred to DePaul's proffered reasons for its actions. Rather, the district court reviewed the evidence submitted on cross-summary judgment motions and found, based on the undisputed evidence supported by the record, that Saud had failed to create a genuine issue of material fact sufficient to proceed to trial on his claims.

## ARGUMENT

This Court reviews the district court's entry of summary judgment *de novo. Tackett v. Dauss*, 132 F.4th 1026, 1030 (7th Cir. 2025). "Summary judgment is appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* (quoting *Trahanas v. Northwestern Univ.*, 64 F.4th 842, 852 (7th Cir. 2023)). "A material fact is one that affects the outcome of the suit." *Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 503 (7th Cir. 2017). While the Court considers reasonable inferences in favor of the non-moving party, it "need not draw 'every conceivable inference,' in its favor." *FKFJ, Inc. v. Vill. of Worth*, 11 F.4th 574, 585 (7th Cir. 2021) (internal citation omitted). To prevent summary judgment, the non-moving party must present more than mere speculation or conjecture. *Navratil v. City of Racine*, 101 F.4th 511, 522 (7th Cir. 2024).

At summary judgment, Saud had the burden to come forward with evidence showing that his Arab American race was the "but for" cause of DePaul's decisions: (A) to not offer him an adjunct faculty appointment for the fall quarter in 2017; and (B) to deem him ineligible for future employment. *See Comcast Corp. v. Nat'l Ass'n of African*

*American-Owned Media*, 589 U.S. 327, 329, 341 (2020); *Singmuongthong v. Bowen*, 77 F.4th 503, 507 (7th Cir. 2023).

This is a higher burden of proof than claims brought under Title VII. "The applicable standard at summary judgment is whether the evidence would permit a reasonable factfinder to conclude that racial discrimination caused the adverse employment action[.]" *Barnes v. Bd. of Trs. of the Univ. of Ill.*, 946 F.3d 384, 389 (7th Cir. 2020) (citing *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)). Where, as here, the parties use the *McDonnell Douglas* burden-shifting framework, this Court also applies the framework to evaluate the evidence. *Id.*

I.     **The District Court Correctly Determined that Saud Failed to Present Sufficient Evidence His Race Was the "But For" Cause of Keshk's Decision to Not Offer Him an Adjunct Faculty Appointment.**

To survive summary judgment, Saud was required to show: (i) he was a member of a protected class; (ii) he was qualified for the position; (iii) he suffered an adverse employment action; and (iv) DePaul treated a similarly situated individual outside the protected class more favorably. *See McDonnell Douglass Corp. v. Green*, 411 U.S. 792, 802 (1973). As demonstrated below, the district court correctly determined that Saud failed to establish a prima *facie case* of discrimination because no rational juror could find that Lysik (Saud's alleged comparator for this claim) was similarly situated.

A.     **Saud Failed to Establish that Lysik Is Similarly Situated.**

Saud argues the district court failed to correctly apply the Court's similarly situated standard and should have found Lysik is similarly situated to Saud. (Pl. Br. at 16-19.) The district court concluded that Lysik was not similarly situated because he "did not

14

engage in similar conduct and mitigating circumstances explain DePaul's different treatment of him." (R.275 at 22.) The district court was correct.

This Court has held repeatedly that a similarly situated individual must be "directly comparable in all material respects." *Hoffstead v. Ne. Ill. Reg'l Commuter R.R. Corp.*, 132 F.4th 503, 512 (7th Cir. 2025) (cleaned up). This means Saud "must at least show that the comparators (1) 'dealt with the same supervisor,' (2) 'were subject to the same standards,' and (3) 'engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct'" or DePaul's treatment of them. *See McDaniel v. Progress Rail Locomotive*, 940 F.3d 360, 368-69 (7th Cir. 2019) (internal citation omitted). This includes whether the alleged comparator "engaged in comparable rule or policy violations." *Patterson v. Ind. Newspapers*, 589 F.3d 357, 365–66 (7th Cir. 2009).

Unlike Saud, Lysik: (i) was not the subject of a pending lawsuit accusing him of sexually assaulting a student; (ii) did not have sex with a student in his class; (iii) did not have two pending student report concerning inappropriate conduct; and (iv) did not have low projected course enrollment. (R.207 ¶¶ 41-43, 48-50, 78; R.208-19 at 2, R.208-20, R.208-22 at 2, R.208-32 at 2.) Thus, the record plainly establishes that Lysik is not similarly situated to Saud. *See Saud v. DePaul Univ.*, 2019 WL 5577239, at *9 (N.D. Ill. Oct. 29, 2019) ("And the comparator that the amended complaint suggests, a white Visiting Assistant Professor who was offered an adjunct position, may not be very similarly situated; based on the limited evidence before the court, it does not appear that the white professor had any romantic relationships with students, while Plaintiff

did."); *Tonkovich v. Kan. Bd. of Regents*, 159 F.3d 504, 533 (10th Cir. 1998) (plaintiff "would have had to allege that other professors who had sex with a student, in a manner that exploited the student, were not treated the way he was treated by University officials.").

Put simply, the differentiating circumstances between Saud and Lysik do not suggest that had all else remained the same except Saud's race, Keshk would have hired Saud to teach students in the fall quarter of 2017. *See McDaniel*, 940 F.3d at 368 (purpose of the similarly situated test "is to eliminate other possible explanatory variables, . . . which helps isolate the critical independent variable—discriminatory animus" (cleaned up)); *Ortiz*, 834 F.3d at 764 (critical question is "[w]hether a reasonable juror could conclude that [Saud] would have [been hired to teach in the fall quarter] if he had a different ethnicity, and everything else had remained the same.").

Against this backdrop, Saud claims there are four reasons the district court should have found Lysik to be similarly situated. (Pl. Br. at 19.) None provide grounds for reversal.

<u>Reason No. 1</u>: **Lysik's OIDE Investigation**

Saud argues that Lysik also was the subject of an OIDE investigation. (*Id.* at 19-20.) But the OIDE investigation of Lysik three years earlier, which did not result in any finding and of which Keshk had no knowledge, is irrelevant to the similarly situated analysis.

The allegation that led OIDE to investigate Lysik was a public comment on a Facebook® post made under the pseudonym "Donny Juan," which asserted that a

Professor "Lisack" raped them. (R.207 ¶ 74; R.208-30.) There was no actual allegation against Lysik (the accusation appeared to be a case of mistaken identity) and no evidence that "Donny Juan" was a student or purported to be a student at DePaul (R.207 ¶¶ 74-75; R.208-30.) Indeed, Lysik emailed the investigator informing her he located a professor at another university, Dr. David Lisak, whose research specialty is rape. (R.207 ¶ 77; R.208-32.) Unable to substantiate the allegation,[1] OIDE (through a different investigator) closed its investigation in 2014—three years *before* Keshk's decision to hire Lysik for an adjunct faculty appointment. (R.207 ¶ 78; R.208-32.) Moreover, it is undisputed that Keshk was not aware of the allegation involving Lysik at the time of his decision. *(*R.207 ¶ 79; R.208-8 at 3.) There were no pending allegations against Lysik at the time of Keshk's decision and Keshk had no knowledge of the prior claims. Lysik is therefore not similarly situated to Saud.

Saud's claim that these distinctions are "immaterial" is nonsensical. Saud's reliance on *Ezell v. Potter*, 400 F.3d 1041 (7th Cir. 2005), for the proposition that "comparators need only have engaged in *similar*, not identical, conduct" is equally misplaced. In *Ezell*, this Court denied summary judgment because the plaintiff's offense of taking a late lunch was sufficiently similar to the comparator's offense of losing a piece of certified mail. *Id.* at 1050. Unlike in *Ezell*, here, there is no evidence Lysik engaged in misconduct,

---

[1] Saud argues the district court should have credited the testimony of Cheryl Wayne, a former DePaul employee who worked in OIDE from 2016 to 2018. (Pl. Br. at 22; R.231-18 at 1.) Saud claims Wayne testified OIDE does not investigate a complaint if the accuser does not cooperate. (Pl. Br. at 22.) But this claim is false and not supported by Wayne's deposition transcript. (*See* R.224-21.) Wayne also testified she proceeded with a Title IX investigation in a case where the complainant did not initially respond. (R.224-21 at 31.)

much less in misconduct similar to Saud's. *See Lane v. Riverview Hosp.*, 835 F.3d 691, 696-97 (7th Cir. 2016) (despite similar misconduct accusation, alleged comparator not similarly situated where investigator found no substantiated policy violation). Moreover, Keshk's lack of knowledge of the prior OIDE investigation of Lysik further undermines Saud's attempt to compare the two. *See, e.g., Phillips v. Spencer*, 793 F. App'x 435, 439 (7th Cir. 2019) (plaintiff could not prove an alleged comparator was similarly situated because there was no evidence plaintiff's supervisor was aware of the comparator's conduct); *Moore v. City Colleges of Chi.*, 2018 WL 4222878, at *6 (N.D. Ill. Sept. 5, 2018) (professors who plaintiff alleged engaged in the same conduct deemed not comparable where supervisor was not aware of the comparator's alleged conduct).

It also is immaterial that there was no open OIDE investigation or finding against Saud when Keshk made his decision. (*See* Pl. Br. at 22.) At the time of his decision, Keshk knew that C.M. filed a lawsuit against Saud alleging he sexually assaulted her in exchange for better grades and he had also received two additional reports of potential misconduct. "On the legal side, the litigation process (discovery and summary judgment, in particular) will allow everything to get sorted out after the fact. But as a practical matter—when school officials have to make decisions in real time—the best course will be to err on the side of taking reactive and preventative measures to ensure compliance with Title IX." *C.S. v. Madison Metro. Sch. Dist.*, 34 F.4th 536, 544-45 (7th Cir. 2022). Here, the evidence makes clear that Keshk acted as any reasonable university administrator would and decided he should not hire Saud to teach students in the 2017

fall quarter while the allegations were pending. Tamburro's finding three months later is irrelevant to Keshk's decision making.

**Reason No. 2: Lysik's Enhanced Pay Request**

Saud also contends that Lysik is similarly situated because he requested more money than Saud.[2] (Pl. Br. at 19.) But that does not render the two similarly situated, as Keshk did not consider Saud's enhanced pay request in a vacuum. *See Scalzitti v. Paddock Publications, Inc.*, 925 F.2d 1468 (7th Cir. 1991) (decision-maker's conduct "cannot be viewed in a vacuum"). At the time Keshk made his decision, C.M. had filed her lawsuit against Saud, and Keshk had received two additional reports about potential misconduct. (R.248 ¶ 37; R.207 ¶¶ 48-49; R.208-22 at 2.) Given these distinctions, which Keshk testified was a "black cloud" over Saud, Keshk was justified in continuing to negotiate pay with Lysik while telling Saud that his request was too high and he would not be brought back to adjunct for the fall quarter.

The fact that Keshk did not forward Saud's enhanced pay request to the Dean does not suggest discrimination. Rather, on June 28, 2017, Keshk told Lysik and Saud that he would forward their pay requests to the Dean. (R.207 ¶ 40; R.208-19 at 3.) From June 30 to July 5, 2017, Keshk learned of the allegations against Saud and, on July 6, 2017, Keshk informed Saud he would not be hired as an adjunct in the fall quarter. (R.207 ¶¶ 48-52; R.208-7 at 22-24, R.208-19 at 2.) Saud's race was the same on June 28 as it was on July 6.

---

[2] Lysik ultimately received $4,800 per course, which was the maximum amount Keshk could offer and less than the amount Lysik or Saud requested. (R.207 ¶¶ 16, 53; R.208-23 at 2; R.248 ¶ 32.)

The only information that changed between that time was the new allegations against Saud, including that Saud sexually assaulted a student in his class and used his role as a professor to do it. These allegations distinguish Lysik from Saud.

**<u>Reason No. 3</u>: Lysik's Term Faculty Contract Cancellation**

Saud argues that Lysik also had his "term faculty contract[] canceled in April of 2017[.]" (Pl. Br. at 16.) Saud fails to explain how this is relevant, therefore waiving any argument that he established the similarly situated element because of it. *See Gilbank v. Wood Cnty. Dep't of Hum. Servs.*, 111 F.4th 754, 788 (7th Cir. 2024) ("Plaintiff waived this argument by failing to develop it[.]"). In any event, this fact is immaterial and does not preclude entry of summary judgment. The record plainly reflects that due to budget constraints, DePaul did not renew the term faculty contracts for Saud or Lysik. (R.207 ¶ 14; R.208-7 at 9.) Between April and June 2017, Keshk had discussions with Saud about the possibility of teaching as an adjunct. (R.207 ¶¶ 15, 36-40.) Before becoming aware of C.M.'s lawsuit and receiving two additional reports about misconduct, Keshk testified he was hoping to hire Saud as an adjunct faculty member and "was going to bring him back[.]" (R.207 ¶ 37; R.208-7 at 29.) Thus, the cancellation of Lysik's term faculty contract in April 2017 does not establish he was similarly situated to Saud at the time Keshk made his hiring decision on July 6, 2017.

**<u>Reason No. 4</u>: Lysik Had the Same Prior Job Title and Supervisor**

Finally, Saud cites the facts that Lysik previously held the same job title (before both of their term faculty positions were eliminated through budget cuts) and also reported to Keshk. (Pl. Br. at 19.) But Saud fails to explain why these facts have any relevance to

the Court's "similarly situated" analysis. *See Gilbank*, 111 F.4th at 788. Plainly, it does not for all the reasons set forth above. Saud "focuses on the wrong features, precluding a **meaningful** comparison." *Abebe v. Health & Hosp. Corp. of Marion Cnty.*, 35 F.4th 601, 607 (7th Cir. 2022) (affirming summary judgment on race and national origin discrimination claims where plaintiff failed to identify a proper comparator) (emphasis in original). At the time Keshk made his decision, Saud was accused of sexually assaulting C.M., had two other reports of potential misconduct with students, and had low projected course enrollments. Lysik did not.

Even considering Saud's four reasons, when viewed against the backdrop of C.M.'s lawsuit, the two additional reports Keshk received after the lawsuit was filed, and Saud's low projected course enrollment, no reasonable juror could conclude that Lysik is "directly comparable in all material respects." *Hoffstead*, 132 F.4th at 512. While comparators need not be identical in every conceivable way, the differences between Saud and Lysik "render[s] the comparison effectively useless" for explaining the reasons Lysik was offered the opportunity to adjunct in the fall quarter and Saud was not. *Kuttner v. Zaruba*, 819 F.3d 970, 977 (7th Cir. 2016) (summary judgment is appropriate when distinctions between proposed comparators and plaintiff are significant). The district court correctly held Lysik is not similarly situated and, therefore, Saud failed to establish a *prima facie* case.

### B.     The District Court Correctly Determined that Saud Failed to Adduce Sufficient Evidence of Pretext.

If, and only if, Saud establishes that DePaul treated a similarly situated instructor more favorably, the Court must determine whether the reasons for DePaul's decisions are a pretext for race discrimination. *See Gamble v. FCA US LLC*, 993 F.3d 534, 537 (7th Cir. 2021); *McDonnell Douglas*, 411 U.S. at 803. At the pretext stage, "'[t]he question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reason it has offered' for the adverse action." *Liu v. Cook Cnty.*, 817 F.3d 307, 316 (7th Cir. 2016) (quoting *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 635 (7th Cir. 2011)). Therefore, "[p]retext requires more than a mistaken judgment; it requires a lie." *Hoffstead*, 132 F.4th at 512; *see also Barnes*, 946 F.3d at 389 (pretext is not "just faulty reasoning or mistaken judgment on the part of the employer; it is [a] 'lie, specifically a phony reason for some action.'"). In evaluating pretext, this Court repeatedly has held a court is "is not a 'super-personnel department that reexamines an entity's business decisions.'" *Cunningham v. Austin*, 125 F.4th 783, 790 (7th Cir. 2025) (quoting *Baron v. City of Highland Park*, 195 F.3d 333, 341 (7th Cir. 1999)).

Saud therefore must show that: (i) DePaul's reasons were dishonest; and (ii) DePaul's true reason was based on a discriminatory intent. *See Chatman v. Bd. of Educ. of Chi.*, 5 F.4th 738, 746 (7th Cir. 2021) ("a showing of pretext alone is not enough; the plaintiff must also show that the explanations are a pretext for the prohibited animus."); *Logan v. City of Chi.*, 4 F.4th 529, 537 (7th Cir. 2021) (plaintiff must show "(1) the

employer's non-discriminatory reason was dishonest and (2) the employer's true reason was based on a discriminatory intent.") (citation omitted)).

Here, the record plainly establishes that Keshk decided to not offer Saud an adjunct faculty appointment for the fall quarter because of the allegations in C.M.'s lawsuit, the two additional reports about Saud's potential misconduct with students after C.M. filed her lawsuit, the fact that Keshk did not feel comfortable having Saud in the classroom with students based on the allegations, that even with this "black cloud," Saud still requested more money than Keshk could pay an adjunct, and the fact that his courses had low projected enrollment. (R.207 ¶ 51; R.208-7 at 23-28.) Keshk did not identify the lawsuit allegations in his email to Saud because Keshk was not sure if he had "the right" to discuss the lawsuit with him. (*Id.*) Saud does not, and cannot, claim the district court erred by determining DePaul had non-discriminatory reasons for the decision.

Therefore, the only question is whether the district court correctly determined that no rational jury would find that DePaul's reasons were phony and intended to mask unlawful race discrimination. *See Logan*, 4 F.4th at 537; *Chatman*, 5 F.4th at 747. Saud puts forward four arguments that purportedly show pretext, but each fails because they are not supported by the record, do not establish DePaul's reasons were phony, and are not related to Saud's race. Saud makes no effort to assist the Court by identifying which pretext argument applies to one or both of the decisions at issue in this case. Therefore, DePaul addresses each pretext argument according to the decision to which it appears to relate. In all events, none of Saud's reasons show the district court erred in granting summary judgment to DePaul.

**Alleged Pretext No. 1: Disparate Treatment from Alleged Comparators**

Saud argues the district court failed to consider evidence of disparate treatment between Saud and his alleged comparators. (*Id.* at 29.) Saud devotes only two cursory sentences to his pretext argument in his brief and, therefore, waives the argument. *See Gilbank*, 111 F.4th at 788. Regardless, Lysik (Saud's comparator for this claim) is not similarly situated for all the reasons explained in Section II.A. above.

**Alleged Pretext No. 2: Keshk Fabricated Reports**

Saud argues that Keshk fabricated the two additional reports he communicated to Tamburro because Keshk testified at C.M.'s trial there were no other complaints against Saud. (Pl. Br. at 31.) This claim is demonstrably false, as: (i) Keshk never testified there were no other complaints after C.M. filed her lawsuit (*see* R.224-58); (ii) Saud admitted he was aware that Keshk had conversations with others about their concerns with Saud after the lawsuit was filed (R.208-3 at 283); and (iii) Tamburro interviewed one of the former students who was the subject of the report and the former student acknowledged the incident with Saud that led to the making of the report (R.215 at 2.) The other student did not respond to Tamburro's requests to be interviewed. (R.207 ¶ 65.) Thus, Saud's claim that Keshk fabricated the reports is unsupported and is entirely contradicted by the record.

Saud also argues the reports were not "corroborated" by other students and did not lead to a finding that Saud violated DePaul policy. (Pl. Br. at 31.) This argument is a red herring. Saud does not dispute that Keshk honestly was concerned about the reports and Tamburro's findings three months later are immaterial to what Keshk knew at the

time he had to make a hiring decision. *Vaughn v. Vilsack*, 715 F.3d 1001, 1007 (7th Cir. 2013) (relevant inquiry is what facts the decision-maker knew at the time of the decision rather than the truth of the misconduct allegations). Given the misconduct allegations against Saud, Keshk acted as any reasonable university administrator would and determined that Saud should not teach students in the fall quarter.[3]

Finally, Saud fails to connect Keshk's alleged, but unsupported, fabrication of the two student reports to Saud's race.

**Alleged Pretext No. 3: Saud's Course Cancellation**

Saud argues that Keshk's reasons are pretext because Keshk cancelled Saud's term faculty courses in May 2017, before C.M. filed her lawsuit. (Pl. Br. at 31.) This claim is false and not supported by the record. On April 10, DePaul notified Saud he would not be brought back as a term faculty member due to budgetary constraints and his employment would end on June 30. (R.207 ¶ 14, R.208-10 at 2.) There was no reason to keep Saud's term faculty courses on the schedule. As early as May 17, but no later than June 6, courses Saud could teach as an adjunct were scheduled. (R.248 ¶¶ 28, 30.) And throughout June, Saud attempted to negotiate for a higher salary. (*Id.* ¶ 32.)

On June 26, the Personnel Coordinator for the Dean's Office emailed Saud instating him as an adjunct in DePaul's system. (*Id.* ¶ 31.) On June 28, Keshk emailed Saud and Lysik asking them for their salary requests. (*Id.* ¶ 32) Keshk's testimony is undisputed

---

[3] Saud also asserts that Tamburro never made him aware she was investigating the reports. (Pl. Br. at 31.) To the extent Saud argues the two reports were a pretext for Tamburro's finding against Saud, his argument fails because Tamburro's finding was not based on the two additional reports from Keshk. (R.208-26.)

25

that before becoming aware of C.M.'s lawsuit (and before he received reports about Saud's potential misconduct with other students), he was hoping to hire Saud for an adjunct faculty appointment. (R.207 ¶ 37; R.208-7 at 29.) Saud's claim that Keshk decided to not hire him in May 2017 rather than in July 2017 is entirely unsupported by the record. No rational jury could find that Keshk—who worked with Saud for more than ten years and was the same race as Saud—used C.M.'s lawsuit as a mask for race discrimination. (R.207 ¶ 8; R.208-3 at 48, R.208-8 at 2.).

As further alleged evidence of pretext, Saud argues that Keshk only cancelled one of Lysik's term faculty courses, whereas all of Saud's term faculty courses were cancelled. (Pl. Br. at 31.) This fact does not create a genuine issue of material fact because: (i) it does not render false any of Keshk's reasons for his decision to not hire Saud for an adjunct faculty appointment; and (ii) as the district court held, there is no "evidence suggesting that the differences were intended to 'cover up more nefarious motives.'" (R.275 at 27 (citing *Chatman*, 5 F.4th at 748); *see also Circle City Broad. I LLC v. AT&T Servs.,* 99 F.4th 378, 384 (7th Cir. 2024).("Speculation does not suffice to create a genuine issue of fact that defeats summary judgment.").

In scattershot fashion, Saud also points to other circumstances surrounding his courses that allegedly show Keshk intended to discriminate against him: (1) Lysik requested higher adjunct pay than Saud; and (2) the Personnel Coordinator for the Dean's Office terminated Saud's *adjunct* position in DePaul's system, but only terminated Lysik's *term faculty* position in the system. (Br. at 32.) But these arguments fail to suggest intentional race discrimination by Keshk because (i) Saud was the

defendant in a pending lawsuit accusing him of sexual assault, had two additional reports against him, and Lysik ultimately received $4,800 per course, which was the maximum amount Keshk could offer and less than the amount Saud or Lysik requested (R.207 ¶¶ 16, 53); and (ii) Saud's adjunct position was reinstated on June 26, 2017. (R.248 ¶ 31.) Saud's third pretext argument therefore fails.

**<u>Alleged Pretext No. 4</u>: Shifting Explanations**

Finally, Saud claims that Keshk's reasons changed since his July 6, 2017 email informing Saud he could not offer him an adjunct faculty appointment. (Pl. Br. at 33-34.) "'Shifting and inconsistent explanations can provide a basis for a finding of pretext. But the explanations must actually be shifting and inconsistent to permit an inference of mendacity.'" *McCann v. Badget Mining Corp.*, 965 F.3d 578, 589-90 (7th Cir. 2020) (affirming summary judgment where employee failed to demonstrate employer gave shifting explanations).

First, Saud argues that Keshk testified at C.M.'s trial there were no additional reports about Saud and C.M.'s lawsuit was not part of his decision-making. (Pl. Br. at 34.) As demonstrated above, this claim is false and unsupported by the record. (*See* R.224-58.)

Second, Saud argues Keshk's reasons changed because he testified in this lawsuit that C.M.'s lawsuit was one the reasons he did not offer Saud an adjunct faculty appointment. (Pl. Br. at 34.) This is not a shift in Keshk's reasons. When asked why he did not include the lawsuit in his email to Saud, Keshk testified he was not sure he had "the right" to discuss the lawsuit and he did not feel comfortable having Saud in the

27

classroom because "whether we believe this to be true or not," Keshk would "always have been very fearful that those allegations were actually correct and I'm endangering our students." (R.207 ¶ 52; R.208-7 at 24, 40, 4.) And Keshk testified the lawsuit was part of his decision-making at the time. (R.207 ¶ 52; R.208-7 at 24.)

The district court correctly recognized that Keshk did not disown the reasons in his email. (R.275 at 26.) The court noted that "even if Keshk's email wasn't the full story of why Keshk refused to rehire him, Saud offers no evidence of an impermissible motive." (*Id.*) The district court was correct. *See Sweet v. Town of Bargersville*, 18 F.4th 273, 280 (7th Cir. 2021) ("But [the employee's] evidence, when read in context, does not suggest pretext. Rather, the evidence as a whole points in the same direction: [the employee] was fired for *multiple* reasons") (emphasis in original). Keshk's decision not to elaborate in his email on this reason does not negate the truth of the reason, nor does it indicate Saud's race played any role in Keshk's decision.

Saud also argues the district court failed to consider the following additional pieces of evidence that allegedly prove Keshk's reasons were dishonest and a cover up for race discrimination: (i) Keshk told Saud that DePaul would discriminate against him; (ii) Keshk ignored other faculty complaints of discrimination or racism; (iii) Keshk was up for reappointment and testified that Saud was going to "throw him under the bus;" and (iv) Keshk helped Tamburro by fabricating reports about Saud. (Pl. Br. at 34.) But none of Saud's "evidence" is supported by the record and, therefore, cannot be the basis for reversing the district court's grant of summary judgment. *See* Fed. R. App. P. 28.

28

Further, none of Saud's assertions undercut the reasons for Keshk's hiring decision and do not show Keshk's decision was based on Saud's race.

*    *    *

"Nothing about the circumstances of this case gives rise to an inference of discrimination . . . . What changed after [C.M. filed her lawsuit] was not [Saud's] race/ancestry, sex, sexual orientation, or religion: what changed is that a former student made a formal complaint of sexual misconduct." *Naca v. Macalester Coll.*, 2018 WL 4516950, at *11 (D. Minn. Sep. 20, 2018), *aff'd*, 947 F.3d 500 (8th Cir. 2020).

## II. The District Court Correctly Determined that Saud Failed to Present Sufficient Evidence that His Race Was the "But For" Cause of the Decision to Deem Him Ineligible for Future Employment.

Applying the same *prima facie* test, the district court concluded that Saud failed to demonstrate that DePaul treated a similarly situated individual more favorably on Saud's claim that the Dean's decision to deem ineligible for future employment was based on his Arab American race. (R.275 at 31.)

At the outset, Saud appears to argue that Lysik and Suglia were treated more favorably "on the issue of the Title IX investigation." (Pl. Br. at 24.) For the reasons explained in Section II.C. below, Tamburro's investigation is not a separately actionable claim in this case. As further demonstrated below, his additional arguments fail to undermine the district court's rulings on this claim.

### A. Lysik Is Not Similarly Situated.

Saud cannot establish a *prima facie* case because Lysik is not a proper comparator for this claim for several reasons: (i) the Dean did not make any decisions about Lysik's

29

employment in 2014; (ii) a different OIDE investigator handled the complaint (*see Rabé v. United Airlines, Inc.*, 971 F. Supp. 2d 807, 824 (N.D. Ill. 2013) (plaintiff and his alleged comparator were investigated by different individuals)); (iii) the investigation into Lysik appeared to be a case of mistaken identity; and (iv) the investigator determined that Lysik did not violate DePaul's ADAH Policy (*see Baum v. Boeing (China) Co.*, 2020 WL 5763586, at *9 (N.D. Ill. Sept. 28, 2020) (employee not comparable to plaintiff because "investigation did not substantiate [the] complaints against Bakshi, whereas the complaint against Plaintiff was substantiated. This means that Bakshi was not comparable to Baum because he was not found to have engaged in any misconduct.") (cleaned up). (R.207 ¶¶ 74-79; *see also* R.275 at 30 ("the differences between Saud, who was found to have violated the policy, and Lysik, who was not, 'render[s] the comparison effectively useless").)

## B.    Suglia Is Not Similarly Situated.

Saud claims that Suglia is similarly situated because he "faced similar allegations of misconduct." (Pl. Br. at 25.) In 2015, Tamburro investigated a complaint alleging that Suglia engaged in "verbal exchanges . . . of an explicit sexual nature" with a student who was no longer enrolled in his class. (R.207 ¶ 80; R.208-33.) Tamburro determined Suglia violated the "Consensual Relationship" portion of DePaul's ADAH Policy and DePaul issued several sanctions against him, including a determination that he was not eligible for rehire at DePaul. (*Id.*) The Dean did not make any decisions related to Suglia's employment at DePaul. (*Id.*)

Saud focuses on a handful of perceived differences between his OIDE investigation and the investigation into Suglia: (i) Tamburro did not involve Suglia's supervisor; (ii) Tamburro did not report her findings to the Dean; (iii) Tamburro informed Suglia he could make a countercomplaint; and (iv) Tamburro spoke with Suglia's accuser. (Pl. Br. at 25.) These handful of perceived differences either misstate or are not supported by the record (*see* Fed. R. App. P. 28(a)(8)) or are immaterial to isolating the "the critical independent variable" of race. *McDaniel*, 940 F.3d at 368.[4] Tamburro interviewed Keshk because he contacted Tamburro with concerns (R.208-22 at 2); provided her report to the Dean as the appropriate decision-maker at the time (R.208-28 at 2); did not discuss with Saud any desire to pursue a counterclaim because he elected not to speak with Tamburro (R.208-25 at 2); and did not speak with Saud's accuser because she was represented by counsel and did not wish to participate. (R.208-5 at 15-16.)

Here, it is undisputed that: (i) Suglia did not have sex with a student enrolled in his class (*see Hoffstead*, 132 F.4th at 512); (ii) Suglia was not treated more favorably because DePaul also determined he was ineligible for rehire (*Hnin v. TOA (USA), LLC*, 751 F.3d 499, 505 (7th Cir. 2014) (comparator not similarly situated when subject to the same adverse action)); and (iii) the Dean did not make any decisions related to Suglia's employment at DePaul. (R.207 ¶ 80; R.208-1 at 3; R.248 ¶ 58); *see also Little v. Ill. Dep't of Revenue*, 369 F.3d 1007, 1012 (7th Cir. 2004) ("A similarly-situated employee must have been disciplined, or not, by the same decisionmaker who imposed an adverse

---

[4] Many of Saud's reasons relate to pretext. (Pl. Br. at 25-26.) DePaul thus addresses those claims in its pretext analysis.

employment action on the plaintiff"). In light of these undisputed facts, the district court correctly determined that Suglia is not similarly situated. If anything, as the district court correctly recognized, evidence of Suglia's treatment supports the conclusion that DePaul bars from future employment faculty members who violated its ADAH Policy, regardless of race.[5] Saud has identified no employee who was found to have violated the ADAH Policy and was not subsequently ineligible for future employment.

Accordingly, Saud cannot establish a *prima facie* case on his claim that the Dean's decision to make him ineligible for future employment was based on his race. Accordingly, the Court need not evaluate the issue of pretext and should affirm entry of summary judgment on this basis alone.

### C.     Tamburro's Investigation Is Not an Adverse Employment Action.

Saud contends that Tamburro's Title IX investigation *itself* constituted an independent, adverse employment action, asserting the investigation "resulted in the determination that Saud was ineligible for rehire and banned from participating in DePaul events." (Pl. Br. at 27.) This argument fails for several reasons.

First, to the extent Saud attempts to revive the due process claim the district court dismissed in 2020 (R.36 at 7-8), he makes no argument or showing that the district court

---

[5] Saud states the district court failed to consider that Tamburro is the reason the Dean "meted out" punishment in his case. (Pl. Br. at 27.) To the extent Saud makes a "cat's paw" argument, DePaul addresses the argument in Section III.C. below.

erred by dismissing that claim at the pleading stage. And of course, Saud cannot proceed to trial on this properly dismissed claim.

Second, neither the process of conducting an internal investigation nor an investigation's finding is actionable under Section 1981, which prohibits discrimination "in the making and enforcing of contracts." *Morgan v. SVT, LLC*, 724 F.3d 990, 995 (7th Cir. 2013). This Court and others have held repeatedly that an employer's internal investigation is not an adverse employment action. *See Keeton v. Morning Star, Inc.*, 667 F.3d 877, 886 (7th Cir. 2012) ("the investigation itself was not an adverse action"); *Kuhn v. Washtenaw Cty.*, 709 F.3d 612, 625 (6th Cir. 2013) ("an internal investigation into suspected wrongdoing by an employee [does not] constitute[] an adverse employment action."); *Ludlow v. Northwestern Univ.*, 79 F. Supp. 3d 824, 835 n.5 (N.D. Ill. 2015) ("an investigation by an employer, without more, is not an adverse action"). As the district court correctly noted, even under *Muldrow v. City of St. Louis*, 601 U.S. 346, 354 (2024), the challenged action must bring about some disadvantageous change in an employment term or condition. (R.275 at 20, n.11.) Tamburro's investigation itself did not bring about any change in the terms and conditions of Saud's employment (Saud was not a DePaul employee when Tamburro re-opened her investigation) and Tamburro did not recommend any discipline or sanction in her final report. (*See* R.208-26.)

Third, Saud does not (and cannot) dispute Tamburro's findings. Saud *admits* he asked C.M. to have drinks when she was a student in his class and admits he had sex with C.M. while she was "technically" a student in his class. (R.207 ¶¶ 60, 72; R.208-25

at 4, 8, R.208-29 at 6.) Thus, Tamburro's preponderance of the evidence finding was correct. This admission precludes a rational jury from concluding that race caused Tamburro's finding. In addition, Tamburro's process is immaterial to the basis for *the Dean's* determination that Saud had sex with C.M. while she was a student in Saud's class. And the Dean testified he had no reason to believe that Tamburro's investigation or findings were influenced by Saud's race. (R.207 ¶ 71; R.208-1 at 3.) The Dean believed that Saud had sex with C.M. while she was a student in his class and that belief is dispositive. (R.207 ¶ 70; R.208-2 at 14-15.)

### D.    Saud Failed to Establish Pretext.

The Dean determined that Saud was not eligible for future employment at DePaul because Saud violated the ADAH Policy by having sex with a student in his class. (R.207 ¶ 70; R.208-2 at 14-15, R.208-28 at 2.) Saud does not, and cannot, claim the district court erred by determining that DePaul had a non-discriminatory reason for the Dean's decision. *See Edwards v. Ind. Univ.*, 2020 WL 2062338, at *14–15 (S.D. Ind. Apr. 29, 2020) (a university's decision to no longer employ a professor found to have violated the university's policy on sexual misconduct by proposing a sexual relationship with a student is a legitimate, non-race based explanation), *aff'd*, 823 F. App'x 441 (7th Cir. 2020), *cert. denied*, 141 S. Ct. 1388 (2021). Therefore, the only question is whether the district court correctly determined that no rational jury could find that the Dean's decision to bar Saud from future employment because Saud decided to have sex with a student in his class was a phony reason designed to disguise the Dean's true intent to discriminate against Saud due to his race.

34

Saud does not dispute he had sex with C.M. while she was enrolled in his class. (R.207 ¶ 72; R.208-29 at 6.) Thus, Saud cannot show that DePaul's reason was a "lie" or "phony." *See Hoffstead*, 132 F.4th at 512; *Barnes*, 946 F.3d at 389. The Court should therefore affirm summary judgment on this basis alone. Saud nonetheless argues other evidence demonstrates the Dean's decision was not based on Saud's decision to have sex with a student in his class. All of Saud's pretext arguments fail.

**Alleged Pretext No. 1: Disparate Treatment from Alleged Comparators**

Saud argues DePaul's treatment of comparators is evidence the Dean's reason for his determination that Saud was ineligible for future employment is a pretext for race discrimination. (Pl. Br. at 29.)

As shown in Section I above, Lysik is not a proper comparator for this claim because: (i) the Dean did not make any decisions about Lysik's employment in 2014; (ii) a different OIDE investigator handled the complaint; (iii) the investigation into Lysik appeared to be a case of mistaken identity; and (iv) the investigator determined Lysik did not violate DePaul's ADAH Policy. (*See* R.207 ¶¶ 74-79.) Likewise, it is undisputed that (i) Suglia did not have sex with a student enrolled in his class; (ii) Suglia also was ineligible for rehire as a result of violating DePaul's ADAH Policy (*i.e.*, the same sanction Saud received); and (iii) the Dean did not make any decision in Suglia's case. (*Id.* ¶ 80; R.208-1 at 3, R.208-33.)

In his brief, Saud points to variations in the OIDE investigation process between Saud and Suglia, and notes that Suglia (unlike Saud) was not banned from participating

in DePaul-sponsored events.[6] (Pl. Br. at 25.) Even under *Ortiz*'s holistic directive, these differences do not undercut the reason the Dean determined Saud was ineligible for future employment (the Dean believed—correctly—Saud had sex with a student in his class). As the district court noted, "[t]his is not enough to sustain an inference of racial discrimination on its own, but something to add to the pile for consideration as a whole" and "[c]onsidered as a whole per *Ortiz*, 834 F.3d at 764, including DePaul's better treatment of Suglia, the evidence does not 'permit a reasonable jury to infer 'an overall likelihood of discrimination' that merits a trial'" given it is undisputed Saud had sex with C.M. while she was a student in Saud's class. And the fact DePaul banned Suglia for a "verbal exchange" reinforces DePaul's decision to ban Saud for having sex with a student.

**<u>Alleged Pretext No. 2</u>: Saud's Conduct Did Not Violate the ADAH Policy**

Saud argues DePaul's ADAH Policy does not prohibit faculty-student relationships, even when the student is enrolled in the faculty member's course. (Pl. Br. at 30.)

First, "Plaintiff's dispute with [DePaul's] interpretation of its policy and with [DePaul's] decisions based on that policy, without more, does not lead to the inference that [the decision] was based on his [protected class]. And as long as [DePaul's] decision . . . was not impermissibly premised on his [protected class], the Court cannot question

---

[6] This claim is not actionable under Section 1981 (*see Morgan*, 724 F.3d at 995 (7th Cir. 2013)), is not a materially adverse action, has nothing to do with the claims in Saud's SAC, was still issued by a different decision-maker, and in all events, there is no record evidence Suglia was, in fact, permitted to participate in DePaul-sponsored events following his OIDE investigation.

the extent to which Plaintiff did or did not violate [DePaul's ADAH] policy." *Deacon v. Peninsula Chi.*, LLC, 2017 WL 3531518, at *12 (N.D. Ill. Aug. 17, 2017).

Second, putting aside Tamburro's preponderance of the evidence finding (*i.e.*, that Saud had sex with a student in his class) was accurate, "[w]hether [Saud], in fact, committed the violations is irrelevant at this point in the analysis so long as [DePaul] believed that he violated [DePaul] policies and [based its decision on] that reason." *Fluckes v. Johnny Rockets Grp., Inc.*, 2008 WL 5170850, at *6 (N.D. Ill. Dec. 10, 2008); *see also Hnin*, 751 F.3d at 506 (dispensing with employee's argument that his conduct did not violate his employer's policy because the issue is whether the employer honestly believed it did); *Edwards*, 2020 WL 2062338, at *14 ("whether [the student's] allegations were actually true is irrelevant. The correct focus is whether IU believed that the allegations were true, and whether that belief formed the basis for IU's decision to terminate [the professor]"); *Agugliaro v. Brooks Bros.*, 927 F. Supp. 741, 747 (S.D.N.Y. 1996) ("Even assuming defendants were wrong in their belief that plaintiff had engaged in sexual misconduct, what is significant is that they based their decision . . . on that belief, and not his [protected class]"). Tamburro's statement to *The DePaulia* does not contradict her belief Saud lied about the date he had sex with C.M. and, therefore, violated DePaul's ADAH Policy.

Ultimately, Saud concedes that Tamburro found he did not violate the ADAH Policy in May 2017 and, in Saud's words, it was only after Tamburro had "a detailed claim from the accuser" (R.256 at 15) that she determined Saud violated the ADAH Policy in October 2017. (*See* R.207 ¶ 65.) Saud's admission that Tamburro relied on these changed facts

37

defeats any argument that Saud's race—which was the same in May 2017 as it was in October 2017—was the "but-for" cause for Tamburro's finding. Put simply, "this not a case in which the circumstances themselves cast doubt on the genuineness of the employer's alleged motivations, or the employer enforces the policy in an objectively unreasonable manner, such as would allow a jury to infer pretext." *Galvan v. State*, 117 F.4th 935, 945 (7th Cir. 2024); *see also C.S.*, 34 F.4th at 543 ("a school that knowingly employs a serial harasser is asking for trouble."); *Naca*, 2018 WL 4516950, at *11 ("This was extremely serious misconduct—and there is nothing at all suspicious about a college terminating a professor for committing such misconduct.").

For all the foregoing reasons, Saud's pretext arguments fail to establish that DePaul's reasons were false and that "but for" Saud's race, DePaul would not have prohibited Saud from future employment after determining Saud had sex with C.M. when she was a student in his class. There is *no* evidence that DePaul allows any faculty member, regardless of their protected class, to have sex with a student enrolled in their class and continue to be eligible for employment at DePaul. The Court should affirm the district court's entry of summary judgment.

### III.     Saud's Remaining Challenges Are Meritless.

Finally, Saud asserts a number of alleged errors by the district court. According to Saud, the district court erred by: (A) failing to apply *Ortiz*; (B) improperly weighing the evidence and making credibility determinations at summary judgment; and (C) giving improper deference to DePaul's proffered reasons for the decisions in this case and

erroneously drawing inferences in DePaul's favor. (Pl. Br. at 36-43 (Argument Sections D-F).) None of these assertions have merit.

### A.     The District Court Properly Applied *Ortiz*.

Saud argues the district court failed to apply *Ortiz* and failed to consider five additional pieces of evidence that, viewed holistically, allegedly point to discrimination against Saud. (*Id.* at 36-38.) As a threshold matter, the district court explicitly and expressly applied the holistic evidence framework called for by *Ortiz* and concluded that Saud's evidence "does not 'permit a reasonable jury to infer 'an overall likelihood of discrimination' that merits a trial.'" (R.275 at 19, 29, 31, 38.) And as described below, the additional pieces of evidence Saud identifies would not allow a rational jury to conclude that Saud's race was the "but for" cause of DePaul's decisions.

#### Evidence Piece No. 1

Saud claims the district court failed to meaningfully consider Cheryl Wayne's affidavit, which allegedly showed institutional bias and investigative prejudice at DePaul. (Pl. Br. at 36.)[7] But Saud never raised this argument in any of his summary judgment briefs and he also fails to explain how Wayne's affidavit relates to the decisions in this case. Thus, the argument is waived. *See Duncan Place Owners Ass'n v. Danze, Inc.*, 927 F.3d 970, 974 (7th Cir. 2019); *Gilbank*, 111 F.4th at 788; *Burton v. Bd. of Regents*, 851 F.3d

---

[7] Saud also argues that "others" corroborated institutional bias and investigative prejudice at DePaul but fails to identify these "other" individuals. The argument is therefore unsupported by the record and waived. *See Gilbank*, 111 F.4th at 788; *Jeffers v. Comm'r*, 992 F.3d 649, 653 (7th Cir. 2021) (the Court does not "scour the record in an attempt to formulate a cogent argument when [the plaintiff] has presented none.").

690, 695 (7th Cir. 2017) (a plaintiff cannot raise specific factual arguments that were absent from his briefing even if the issue was generally before the district court).

Regardless, Wayne's affidavit does not create a genuine issue of material fact on DePaul's decisions in this case. Wayne's affidavit outlines generally her experiences at DePaul and her interactions with her manager, Tamburro. (*See* R.231-18.) Wayne had no role in the investigation of Saud. (R.248 ¶ 25 (DePaul's Response).) Wayne's affidavit contradicts her prior deposition testimony, is inadmissible under Fed. R. Evid. 602, and is entirely speculative. In contradiction to her affidavit, Wayne admitted in her deposition taken prior to her affidavit that she never observed any disparity in the way white faculty were treated compared to faculty of color in the OIDE process. (R.224-27 at 60-61.) Further, Wayne's subsequent affidavit testimony about "racial bias" in Tamburro's investigations violates Fed. R. Evid. 602 and should be disregarded, as it is not based on personal knowledge and is speculative because Wayne concedes she did not supervise any of Tamburro's investigations. (R.231-18 at 1.) Finally, Wayne's affidavit: (i) does not speak to Tamburro's investigation into C.M.'s allegations; (ii) does not aver Tamburro's preponderance of the evidence finding against Saud was based on Saud's race; (iii) does not aver that the Dean based his decision on Saud's race; (iv) does not aver that Keshk based his decision on Saud's race; and (v) does not aver that Wayne was even aware of or has any personal knowledge of the two decisions in this case.

**Evidence Piece No. 2**

Next, Saud claims that DePaul administrators "flagged" him for organizing a Muslim civil rights event in January 2017. (Pl. Br. at 38.) But Saud's involvement with this campus

event does not support a claim that his race was the reason for DePaul's decisions because: (i) none of the individuals copied on the email purportedly "flagging" Saud were decision-makers in this case; (ii) both Keshk and the Dean testified they were not aware of the event; (iii) Saud cannot link the event itself or the email describing the event to either of the decisions in this case; (iv) the email contains nothing to suggest bias against Saud's because he is Arab American; and (v) Saud admits the witnesses testified they had no recollection "what, if anything, was discussed or done regarding the event[.]" (R.242 at 14; R.248 ¶¶ 6-8.)

Although Saud claims he believed other faculty did not face similar scrutiny (Pl. Br. at 38), he does not, and cannot, point to any record evidence supporting his belief. *See Circle City Broad. I LLC*, 99 F.4th at 384 ("Speculation does not suffice to create a genuine issue of fact that defeats summary judgment.").

### Evidence Piece No. 3

Saud also cites the fact that a third-party news outlet, *Campus Watch*, published an article about Saud's Midwest upbringing and his political views. (Pl. Br. at 38.) Again, this article does not establish any evidence of discriminatory animus in this case because it is undisputed that DePaul neither drafted nor published the article, the article does not relate to either of the decisions in this case, and there is no evidence that either of the decision-makers (or anyone else at DePaul) knew about or read the article. (R.248 ¶¶ 9-10.)

**Evidence Piece No. 4**

Saud also claims that A.R. (one of the students Tamburro interviewed in her first investigation) believed DePaul was attempting to "build a case against" him. (Pl. Br. at 38.) This evidence does not suggest that DePaul's reasons are a pretext for discrimination. Indeed, initially in May 2017, Tamburro's investigation found that Saud did *not* violate DePaul's policies with respect to C.M. or A.R. (R.207 ¶¶ 30-32; *see* R.208-14.) No rational jury could find that Tamburro suddenly developed an animus towards Saud's race when she concluded four months later that Saud violated DePaul's ADAH Policy after Saud admitted in a verified pleading that he invited C.M. to have drinks while she was a student in his class and "engaged in sexual intercourse." (R.207 ¶ 60; R.208-25 at 4, 8.) A.R.'s belief, even if credited, does not in any way undermine Tamburro's belief in her preponderance of the evidence finding.

**Evidence Piece No. 5**

Saud next claims DePaul's student-run newspaper, *The DePaulia*, published Saud's name in an article reporting on C.M.'s publicly filed lawsuit after the faculty advisor for the newspaper commented on the irony of Saud's position as a Religious Studies instructor. (Pl. Br. at 38.) But Saud never raised this argument in any of his summary judgment briefs with the district court nor does he explain how the article relates to the decisions in this case. Thus, the argument is waived. *See Duncan Place Owners Ass'n, Inc.*, 927 F.3d at 974; *Gilbank*, 111 F.4th at 788; *Burton*, 851 F.3d at 695.

In any event, this article is not evidence DePaul based its decisions on Saud's race for several reasons: (i) it was published more than eight months *after* Keshk made his hiring

decision and more than five months *after* the Dean determined that Saud was not eligible for future employment; (ii) it does not address either decision; (iii) neither Keshk, the Dean, nor Tamburro had any involvement in drafting the article; and (iv) the article does not suggest that DePaul's decisions were because of Saud's race. (*See* R.224-18.) *See also Saud*, 2019 WL 5577239, at *7 ("the DePaulia newspaper article on the state court suit against Plaintiff . . . is entirely unrelated to whether DePaul declined to hire Plaintiff as an adjunct due to his race") and *9 ("the surviving § 1981 claim is not related to the DePaulia article").

### Evidence Piece No. 6

Finally, Saud alleges a general backdrop of "widespread faculty concerns over racial bias at DePaul." (Pl. Br. at 36.) But this evidence is either inadmissible hearsay (*see* R.248 ¶¶ 69-76) or immaterial. Indeed, this Court has made unequivocally clear that "[g]eneral allegations of an 'ongoing history of discrimination' are not enough to impugn a particular employment decision." *Ford v. Marion Cnty. Sheriff's Office*, 942 F.3d 839, 858 (7th Cir. 2019)*; see also Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 739 (7th Cir. 2006) (employer's "alleged ongoing history of discrimination against African-Americans" was insufficient to create genuine issues of fact at summary judgment). In fact, none of the purported examples (which Saud cites to by docket references only): (i) show that someone of the same race as Saud was discriminated against; (ii) identify a DePaul employee who discriminated against Arab Americans; (iii) address sexual relationships with students; or (iv) involve the same decision-makers in this case. (*See* R.248 ¶¶ 69-76.) Saud does not even attempt to draw a connection (because he cannot) between DePaul's

decisions in this case and his speculation about other faculty members' purported experiences across the university. The alleged experiences of seemingly random faculty members in other colleges who have no identified involvement with Keshk, Tamburro, or the Dean cannot possibly have any bearing on the questions in this case.

### B.     The District Court Did Not Improperly Weigh Evidence or Make Credibility Determinations.

Saud argues the district court improperly weighed evidence and made credibility determinations in DePaul's favor based on: (i) alleged differences between Keshk's testimony at C.M.'s trial and his deposition testimony in this lawsuit; (ii) the determination that Tamburro honestly believed Saud violated the ADAH Policy; (iii) the determination that the different treatment Suglia received following his OIDE investigation was insufficient to stave off summary judgment; (iv) the determination that Tamburro's typed notes were trustworthy for purposes of Fed. R. Evid 803; (v) the determination that Saud failed to present evidence that his projected low course enrollment was false; and (vi) the crediting of testimony that Keshk chose not to continue salary discussions with Saud after learning of C.M.'s lawsuit and the two additional reports. (Pl. Br. at 39-41.) As discussed below, the purported errors identified by Saud are not errors at all, let alone rulings that undermine the propriety of entering summary judgment in DePaul's favor.

*First*, as demonstrated in Section I.B above, Saud's claims about purported inconsistencies in Keshk's testimony are illusory and unsupported by the record. Indeed, Keshk was not inconsistent about the reasons he did not hire Saud to teach in the Fall

quarter of 2017. The district court correctly identified the fact Keshk did not disown the reasons in his email and, "even if Keshk's email wasn't the full story of why Keshk refused to rehire him, Saud offers no evidence of an impermissible motive." (R.275 at 26.) The district court therefore did not assess or resolve witness credibility as to this issue because Keshk never contradicted the reasons that he did not hire Saud to adjunct in the fall quarter.

*Second*, the district court did not improperly weigh evidence or make improper credibility determinations when it concluded that there was no evidence that Tamburro did not honestly believe Saud violated the ADAH Policy. (R.275 at 36-37.) That is not weighing evidence or assessing credibility; it is simply assessing the evidence (or lack thereof) supporting or negating Saud's claims, as required by Rule 56 of the Federal Rules of Civil Procedure. And here, Tamburro's finding that Saud had sex with C.M. while C.M. was enrolled in Saud's class was supported in the record, and Tamburro's testimony that she did not consider Saud's race is undisputed. (R.207 ¶ 71; R.208-6 at 3.)

*Third*, as demonstrated in Section II.B. above, the district court appropriately considered the evidence of DePaul's treatment of Suglia and correctly concluded that in light of "DePaul's better treatment of Suglia, the evidence does not 'permit a reasonable jury to infer 'an overall likelihood of discrimination that merits a trial." (R.275 at 38.) Again, this ruling simply addressed the evidence presented by the parties and did not entail improper weighing of evidence or making credibility findings.

*Fourth*, the district court correctly ruled that Tamburro's typed notes from her investigation were admissible business records, despite Saud's recollection of what he

45

told Tamburro. As the district court observed, "Saud's differing memory of the event does nothing to contradict *Tamburro's* memory of their meeting." (R.275 at 4 (emphasis in original).) Moreover, Saud testified that Tamburro's notes accurately reflect what he told Tamburro in the interview, except that he "told Karen Tamburro that the relationship happened after the class ended, which could have been any time between May and June." (R.207 ¶ 28.) Even assuming Saud's recollection is correct, the discrepancy does not prove Tamburro's preponderance of the evidence finding in October 2017 was false or in any way related to Saud's race.

*Fifth*, the district court did not weigh evidence or make credibility findings in concluding that Saud failed to present evidence that Keshk's cited reason of projected low course enrollment was somehow a lie. Saud asserts there is evidence Keshk manufactured the result (Pl. Br. at 41) but fails to identify that evidence. Regardless, it is undisputed that as early as May 17, but no later than June 6, courses Saud could teach as an adjunct were scheduled. (R.248 ¶¶ 28, 30.)

*Sixth*, the district court did not weigh evidence or make credibility findings with respect to Keshk's decision to not continue negotiating salary with Saud. Given the "black cloud" surrounding Saud as of July 6, 2017, there were obvious grounds and justification for Keshk to continue negotiating pay with Lysik while telling Saud his request was too high and that he would not be brought back to adjunct.

### C.    The District Court Did Not Defer to DePaul's Proffered Reasons or Draw Improper Inferences in DePaul's Favor.

Saud argues the district court improperly deferred to DePaul's legitimate, non-discriminatory reasons and improperly drew inferences in favor of DePaul. (Pl. Br. at 41.) In support of this claim, Saud rehashes the same arguments made in support of his *prima facie* case and pretext. (*See id.*) For all the reasons explained above, those arguments fail. (*See* Sections I.A-II.D., *supra.*)

In fact, the district court did not defer to DePaul's proffered reasons or improperly draw inferences. Even considering Saud's evidence and drawing reasonable inferences in his favor, no rational jury could conclude that Saud's race—rather than the undisputed fact that he had sex with a student in his class—was the but-for cause of DePaul's decisions. *See Ortiz*, 834 F.3d at 764 (the question "is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race . . . caused the . . . adverse employment action.").

Finally, Saud claims that a jury might not believe that Tamburro honestly believed her preponderance of the evidence finding. (Pl. Br. at 43.) As shown above, however, there is no evidence that Tamburro did not honestly believe that Saud violated the ADAH Policy. (*See* R.207 ¶ 65.) To the extent Saud asserts a "cat's paw" theory, the argument is undeveloped and thus waived. *Gilbank*, 111 F.4th at 788. Waiver aside, Saud failed to come forward with evidence that Tamburro or the Dean held a discriminatory animus. Indeed, the Dean based his decision on his belief that Saud had sex with a student in his class. (R.207 ¶ 70; R.208-2 at 14-15.) The Dean testified he had no reason to believe

Tamburro's investigation or finding were influenced by Saud's race. (R.207 ¶ 71; 208-1 at

3.) The Dean's belief is undisputed and dispositive.

## CONCLUSION

For the foregoing reasons, the Court should affirm the district court's final

judgment.

Dated this 30th day of May, 2025

Respectfully submitted,

**MICHAEL BEST & FRIEDRICH LLP**

/s/ *Brian P. Paul*
Brian P. Paul
444 West Lake Street, Suite 3200
Chicago, Illinois 60606
Phone: (312) 222-0800
bbpaul@michaelbest.com

Michael K. Chropowicz
444 West Lake Street, Suite 3200
Chicago, Illinois 60606
Phone: (312) 222-0800
michael.sokolowski@michaelbest.com

*Attorneys for Defendant-Appellee,*
*DePaul University*

## <u>CERTIFICATE OF COMPLANCE</u>

Pursuant to Federal Rule of Appellate Procedure 32(g), I certify the foregoing document complies with the word limit of Circuit Rule 32(c) because it contains 13,163 words, including footnotes and excluding the parts exempted by Federal Rule of Appellate Procedure 32(f). I further certify the foregoing document complies with the typeface and type style requirements of Circuit Rule 32(b) because it has been prepared in a proportionally spaced typeface with serifs using Microsoft Office Word 365 and is set in Book Antiqua, 12-point font.

/s/ *Brian P. Paul*
Brian P. Paul

*Attorney for Defendant-Appellee,*
*DePaul University*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 30, 2025, I caused the foregoing ***Response Brief of***

***Defendant-Appellee DePaul University***, to be electronically filed with the Clerk of the

Court for the United States Court of Appeals for the Seventh Circuit by using the

CM/ECF NextGen system. I also certify two copies of the foregoing were served by U.S.

Mail and a digital version by electronic mail to the following:

**Christina W. Abraham**
Abraham Law & Consulting, LLC
161 N. Clark St., Suite 4700
Chicago, Illinois 60601
Email: christina.w.abraham@gmail.com


*/s/ Brian P. Paul*
Brian P. Paul

*Attorney for Defendant-Appellee,*
*DePaul University*