No. 25-1034

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SEVENTH CIRCUIT

---

LAITH SAUD,

*Plaintiff-Appellant*

v.

DEPAUL UNIVERSITY,

*Defendant-Appellee.*

---

Appeal from the United States District Court
For the Northern District of Illinois, Eastern Division
Case No. 19-cv-3945
The Honorable Judge Lindsay C. Jenkins, Judge Presiding

---

## REPLY BRIEF OF THE APPELLANT LAITH SAUD

Christina Abraham
Attorney No. 6298946
Abraham Law & Consulting
161 N. Clark Street, Suite 1600
Chicago, Illinois 60601

*Attorney for Plaintiff-Appellant Laith Saud*

---

## ORAL ARGUMENT REQUESTED

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................ iii

INTRODUCTION ........................................................................... 1

I.     SAUD HAS ESTABLISHED "BUT FOR" CAUSATION UNDER § 1981 ................ 2

II.    DEPAUL'S COMPARATOR ANALYSIS IS LEGALLY AND FACTUALLY
DEFICIENT ................................................................................ 5

a.     Lysik and Saud Were Similarly Situated ................................... 5

b.     Suglia and Saud were Similarly Situated .................................. 6

III.   DEPAUL'S PRETEXT JUSTIFICATIONS ARE POST HOC, FABRICATED,
AND CONTRADICTED BY THE RECORD ............................................ 7

a.     DePaul Waived or Failed to Rebut Key Facts Establishing Pretext ........... 9

i.     DePaul Waives Its Defense of the "Black Cloud" Rationale ................ 9

ii.    DePaul Waives Any Rebuttal to Discriminatory Use of Title IX ............ 12

iii.   DePaul Fails to Address Cat's Paw Liability .............................. 12

iv.    DePaul Does Not Engage with the ADAH Policy Language ................... 13

b.     Keshk's Bias and Motive Further Support an Inference of Race Discrimination ...... 14

IV.    DEPAUL MISCHARACTERIZES THE TITLE IX PROCESS AND IGNORES
KEY IRREGULARITIES ................................................................ 15

a.     DePaul's Attempt to Segment the Adverse Actions is Legally and Factually Misleading
17

b.     The Campus Watch Article, Coordinated Scrutiny, and Unexplained Course
Cancellation Support Discriminatory Intent .................................. 17

V.     INSTITUTIONAL BIAS, A.R.'S AFFIDAVIT, AND CHERYL WAYNE'S
TESTIMONY ARE PROBATIVE AND PROPER ...................................... 18

VI.    THE DISTRICT COURT FAILED TO APPLY LEGAL AUTHORITY ............. 19

VII.   DEPAUL FAILS TO ADDRESS THE EVIDENCE HOLISTICALLY AND
MISCHARACTERIZES EACH PIECE UNDER ORTIZ ............................... 20

a.     Cheryl Wayne's Testimony and Affidavit Were Admissible and Ignored by the
District Court .......................................................... 21

b.     Flagging Saud for a Muslim Civil Liberties Event Supports Inference of Bias .......... 22

c.     The Campus Watch Article and Its Aftermath Are Part of the Discriminatory Context
22

d.     The A.R. Affidavit Undermines DePaul's "Honest Belief" Defense ................. 23

**e.     The DePaulia Article and Tamburro's Admission Undermine DePaul's Policy Justification** .................................................................................................................**23**

**f.     Evidence of Institutional Discrimination and Weaponization of OIDE Supports the Pattern** ..............................................................................................................................**24**

**CONCLUSION** .......................................................................................................... **25**

**CERTIFICATE OF COMPLIANCE WITH F.R.A.P. 32(A)(7)** .............................................**26**

**CERTIFICATE OF SERVICE** ..............................................................................................**27**

# TABLE OF AUTHORITIES

**Cases**

*Bostock v. Clayton County*, 140 S. Ct. 1731, 1739 (2020) ........................................................ 2

*Coleman v. Donahoe*, 667 F.3d 835, 841 (7th Cir. 2012) ........................................................ 5

*Goswami v. Depaul Univ.*, No. 12 C 7167, *2, 10-13 (N.D. Ill. Jan 20, 2015) ........................ 16

*Guzman v. City of Chicago*, 689 F.3d 740, 744 n. 3 (7th Cir.2012) .............................. 9, 13, 20

*Humphries v. Cbocs West*, 474 F.3d 387, 404-405 (7th Cir. 2007) ........................................... 5

*Muldrow v. City of St. Louis*, 601 U.S. 346, 354 (2024) ........................................................ 12

*Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016) ................................... 2, 17, 19

*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000) .................................. 2, 15

*Rizzo v. Sheahan*, 266 F.3d 705, 717 (7th Cir. 2001) ............................................................ 12

*Spath v. Hayes Wheels Int'l–Ind. Inc.*, 211 F.3d 392, 397 (7th Cir.2000) ............................ 9, 20

*Staub v. Proctor Hosp.*, 562 U.S. 411, 421 (2011) ............................................................... 12

*Zuppardi v. Wal-Mart Stores, Inc.*, 770 F.3d 644 (7th Cir. 2014) ........................................... 9

**Rules**

Fed. R. Evid. 701 ...................................................................................................................... 18

## INTRODUCTION

Plaintiff-Appellant Laith Saud ("Saud") filed this race discrimination action alleging Defendant-Appellee DePaul University ("DePaul") denied Saud the same protections and opportunities DePaul provides to white faculty because he is an Arab-American. Saud provided ample evidence, when viewed in total, that Saud's supervisor (Khaled Keshk) and the Title IX coordinator (Karen Tamburro), denied Saud his opportunity to teach, to appeal any adverse decisions against him and to have the procedural protections Title IX affords other faculty. These are opportunities Keshk and Tamburro provided to white faculty. The court erred when it ignored Keshk denied under oath the very claims he now puts forward as the reasons Saud was not rehired. The court underplayed witnesses Saud produced that testified Keshk and Tamburro discriminated against minorities and him specifically. Accordingly, this court should overturn the court's entry in favor of DePaul and allow a jury to decide why DePaul constantly changes stories.

DePaul's response brief fails to substantively rebut many of Saud's core arguments, and in doing so, concedes critical factual disputes and legal errors requiring reversal. Its defense rests largely on post hoc explanations, speculative reasoning, and mischaracterizations of both the record and applicable law. Even more telling, DePaul wholly ignores several issues raised in the opening brief—including the shifting nature of its justifications, the failure of its Title IX process to follow established norms, and the presence of comparator evidence that undermines any claim to neutral treatment.

Most notably, DePaul fails to address why Keshk, its central decisionmaker, denied the "black cloud" rationale, additional student complaints, or that the C.M. lawsuit was a factor when asked in 2019—nearly two years after the events—in sworn testimony at the C.M. trial.

DePaul also fails to address evidence presented showing Keshk acted with discriminatory intent and an improper motive to curry favor with DePaul - an institution he understood systematically discriminates against faculty of color. Under *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016) and *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000), the pattern of inconsistent explanations and the failure to engage with the evidence requires a jury—not a court—resolve this dispute.

## I.     SAUD HAS ESTABLISHED "BUT FOR" CAUSATION UNDER § 1981

DePaul's response misstates the applicable causation standard and ignores the substantial body of evidence demonstrating race was the determinative, but-for cause of the adverse actions against Saud. Under *Bostock v. Clayton County*, 140 S. Ct. 1731, 1739 (2020), a plaintiff need only show "but for" his race, the adverse action would not have occurred. It need not be the only reason. As the Supreme Court emphasized in *Bostock*, "often, events have multiple but-for causes." 140 S. Ct. at 1739. Moreover, this Court has recognized discrimination may be proven through indirect or circumstantial evidence and plaintiffs are not required to produce direct admissions of bias. See *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 764 (7th Cir. 2016); *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000).

Here, Saud has met that burden. The evidence shows DePaul treated him differently than similarly situated white faculty and offered shifting and unsubstantiated explanations for its decisions. Notably:

*Timing of the Adverse Actions*: Saud's courses were removed from the schedule in early May 2017, while he was in good standing and before C.M.'s lawsuit was filed. Pl. Br. at pp.7, 28, 31-33. This timeline shows DePaul's decision not to rehire him could not have been based on the lawsuit—a justification it did not raise until after this litigation began.

*Keshk's Trial Testimony*: At the C.M. trial nearly two years later, Keshk testified under oath that Saud was not rehired due to budgetary reasons. He did not mention the lawsuit, the alleged student reports, or any policy violation. Pl. Br. at pp.31, 34, 39. DePaul does not offer a credible explanation for the omission, further supporting a finding of pretext. He also denied there were no other allegations.

*Unsubstantiated Student Reports*: The two alleged student complaints DePaul now cites in its response brief were vague, uncorroborated, and in one case, misrepresented. Pl. Br. at pp.4-6, 26, 31. Tamburro never interviewed any student to confirm the first report, and her own notes contradict the characterization of the second. These "reports" were solicited by Keshk after he was instructed to provide negative information about Saud to Title IX—a practice not applied to white faculty. During Keshk's deposition in this case, when asked what exactly constituted the alleged "first additional complaint" Keshk could not provide an answer. Dkt 224-2, Ex 2, 193:14-16.

*Comparators Treated More Favorably*: DePaul accepted David Lysik's "mistaken identity" explanation without further investigation and continued to offer him teaching opportunities, despite his higher salary request. In contrast, Saud's request—lower than Lysik's—was never even forwarded to the Dean. Joseph Suglia, another white faculty member, received greater procedural protections, was permitted thorough opportunities to respond to allegations, and was not banned from events. In addition, even though Saud was a term faculty member when the accusation was made, Saud was not given the opportunity to appeal. These disparities reflect race-based differential treatment. *See* Pl. Br. pp.16-27.

*Keshk's Motive and Bias*: Keshk's comments to Saud, acknowledging DePaul "would discriminate against [him]," and his statement Saud would "throw [him] under the bus," coupled

with his own reappointment as chair during this time, suggest a motive to act in self-interest at Saud's expense. DePaul does not rebut this evidence. Pl. Br. pp.34-35.

*Selective Enforcement of Policy*: Tamburro found Saud in violation of a policy that does not prohibit consensual faculty-student relationships—something she herself admitted to *The DePaulia*. DePaul's insistence on the timing of the relationship is an arbitrary, post hoc reason to find him in violation of the policy. Pl. Br. pp.30-31. If the timing of Saud's relationship was in itself a violation of the policy, he would have been in violation of the policy during the first investigation based on what he had told Tamburro. Based on Tamburro's investigation Suglia, however, a violation occurs even after a student was in the class because the instructor continues to have influence over the student's career. This was an ad hoc attempt to find Saud in violation of the policy when their other attempts had failed, thereby giving them the pretext to speak to the Dean to have him banned.

*Cumulative and Coordinated Adverse Actions*: DePaul's attempt to separate the non-rehire decision from the later Title IX finding and employment ban is unfounded. These actions stemmed from the same unsubstantiated allegations, involved the same actors, and functioned as a unified course of conduct culminating in Saud's total exclusion from employment. Viewed holistically under *Ortiz*, the cumulative weight of the evidence easily supports a finding Saud's race was the but-for cause of these outcomes.

DePaul's invocation of "multiple reasons" for its actions does not defeat Saud's claim. The question is whether, absent the racial animus and differential treatment, Saud would have been treated the same as his white colleagues. The record amply supports that conclusion. As such, Saud has met his burden to show but-for causation, and summary judgment should not have been granted.

## II. DEPAUL'S COMPARATOR ANALYSIS IS LEGALLY AND FACTUALLY DEFICIENT

For the reasons below, DePaul's attempt to dismiss Lysik and Suglia as comparators fails both factually and legally. DePaul fails to adequately address the standards set forth in *Humphries v. Cbocs West*, 474 F.3d 387, 404-405 (7th Cir. 2007) and *Coleman v. Donahoe*, 667 F.3d 835, 841 (7th Cir. 2012).

### a. Lysik and Saud Were Similarly Situated

Lysik and Saud were similarly situated: (i) Both were male adjunct faculty previously reduced from term positions due to budget cuts; (ii) Both faced allegations of sexual misconduct from outside DePaul's Title IX process; (iii) Neither complaint was substantiated; neither accuser cooperated; and (iv) Both had clean records in May 2017. *See* Pl. Br. Sec.B.

Despite this, DePaul offered Lysik an adjunct contract—even after he requested more money—while denying Saud the same opportunity. DePaul argues Lysik's complaint was "mistaken identity," but does not dispute the accuser identified Lysik by department, academic role, and an approximate spelling of his name.

Critically, DePaul accepted Lysik's explanation without further inquiry. It closed the matter without investigating, without interviewing the complainant, and without reopening any proceedings. Pl. Br. at p.9. In stark contrast, when allegations emerged involving Saud— similarly unsubstantiated and based on a non-cooperative complainant—DePaul aggressively reopened an investigation, solicited new information from third parties, and escalated the case to the Dean for further disciplinary action.

This is textbook disparate treatment. DePaul extended deference and procedural leniency to a white faculty member, while denying the same to an Arab faculty member under similar circumstances. The difference in how DePaul handled nearly identical situations—accepting

Lysik's word, while interrogating and escalating Saud's—is compelling circumstantial evidence of race-based discrimination under *Ortiz* and *Reeves*.

Further, DePaul does not refute Keshk forwarded Lysik's enhanced pay request but did not do so for Saud—even though Saud requested less. Nor does DePaul refute Keshk did not cancel all of Lysik's courses, but did so for Saud. Nor does it explain why he assigned Lysik's courses to Lysik but assigned Saud's courses to "Staff". These omissions remain unexplained.

### b.  Suglia and Saud were Similarly Situated

Tamburro treated Suglia differently than Saud in the following ways: (i) She gave Sugia ample opportunities to refute any adverse information against him; (ii) She interviewed witnesses in Suglia's case, including his accuser; (iii) She proactively told Suglia he could file a countercomplaint, but ignored Saud's request to file a counterclaim; (iv) She referred the matter only to his department chair, not the Dean; (v) Suglia was not banned or blacklisted from participating in events and programs. Pl. Br. Sec.B.ii.

DePaul responds by asserting the Dean didn't make the decision in Suglia's case but ignores Tamburro's discriminatory escalation of Saud's matter to the Dean enabled the more severe sanction. That is textbook *Cat's Paw* liability. *See* Dkt 256, p.11, Dkt. 275, p.32.

DePaul claims Tamburro did not respond to Saud's request to file a counterclaim because, in August when he was informed Tamburro reopened the investigation, he declined to be interviewed. This claim is baseless. Saud requested the counterclaim on June 28; it was not until August that Tamburro reopened the investigation and September 1st that Saud communicated – "on the advice of [DePaul-appointed] counsel" – he would decline the second interview but offered to continue to cooperate. *See* Dkt. 223-17, Pl. MSJ Ex.29; Dkt. 224-56, Pl. MSJ Ex.76. This claim also fails to address that Saud invited Tamburro to reach out to him if she

had further questions and she never did. Dkt. 223-7, Pl. MSJ Ex.15, 16-23. DePaul fails to provide a good faith explanation for why Tamburro never responded to Saud's request to file a counterclaim or his invitation for further questioning.

### III. DEPAUL'S PRETEXT JUSTIFICATIONS ARE POST HOC, FABRICATED, AND CONTRADICTED BY THE RECORD

DePaul argues Saud's employment ended due to: (i) C.M.'s lawsuit (filed after the non-rehire decision); (ii) two vague, unsubstantiated complaints; (iii) high salary demands (which were lower than Lysik's); and (iv) low projected enrollment (caused by listing Saud's courses under "Staff"). Each rationale is demonstrably false or post hoc.

DePaul's reliance on the C.M. lawsuit is plainly pretextual. First, the timing alone refutes it: Saud's courses were removed on or around May 2, 2017—well before the lawsuit was filed in late June. Pl. Br. at 28. This strongly suggests the decision was made earlier. Second, Keshk testified under oath at the C.M. trial nearly two years later that Saud was not retained for budgetary reasons; he said nothing about the lawsuit. Pl. Br. p.39. Third, there is no contemporaneous documentation tying the decision to the lawsuit. The "black cloud" rationale appeared only after this litigation began. *Id.* DePaul's failure to mention the lawsuit at the time—or at trial—supports the inference this explanation was pretext.

DePaul's invocation of two additional student reports is similarly unsupported and pretextual. DePaul has shuffled around four different women in their presented papers as making two claims against Saud, in addition to the white woman found liable for defamation against him.  Yet there are no "additional two complaints," there is no report of complaints, no record, no affidavits; but all the women were of Middle-Eastern/Muslim background.  See Dkt 253 ¶48. Saud contends DePaul attempted to contrive complaints from minority women to off-set the glaring fact that DePaul sided with a white woman making false claims against a man of color.

Tamburro authored two versions of a memo relaying a conversation with Keshk, each attributing the same key statement to a different person—an inconsistency that undermines credibility. Dkts. 254-4, 254-5. Tamburro never interviewed the individual who Keshk claimed allegedly made the first report. As for the second, DePaul misrepresents it as a student feeling "uncomfortable." But Tamburro's own notes contradict that characterization and confirm Saud's conduct was not inappropriate. Dkt. 248, ¶42; Dkt. 223-13, Pl. MSJ Ex.25, p.1. Moreover, none of these individuals were Saud's students. Dkt. 254-2 ¶¶12-13, 21. Tamburro testified there was nothing to investigate. Dkt. 223-7, Ex.15, 121:12-25. When Tamburro informed Saud she was reopening, it only pertained to C.M. and no other alleged reports. Dkt. 223-25.

Unequal treatment is further shown by the fact that Keshk was directed to collect information on Saud for Title IX—something not done for white comparators like Lysik or Suglia. Keshk actively sought negative information, even initiating vague reports. No similar effort occurred in the cases of white faculty facing comparable allegations. These "two reports" were not disclosed during the non-rehire decision or Keshk's trial testimony. They surfaced only after litigation began and remain entirely uncorroborated. Their inconsistencies, timing, and the one-sided investigation all support a finding of pretext.

DePaul's salary and enrollment arguments are equally flawed. DePaul does not explain why Lysik's higher salary request was considered and Lysik was offered the base rate, while Saud's lower request was never forwarded to Velasco and his salary request was used as a basis to deny him a contract. Pl. Br. at p.7. Nor does it explain why Saud's courses were listed under "Staff"—depressing enrollment—while Lysik's were not. Saud was one of the department's most popular instructors; waitlists were common; Keshk knew this. Dkt. 224, Pl. MSJ Ex.81, 62:6-7. A jury could reasonably find listing Saud's courses under "Staff" was meant to suppress

enrollment and create a pretext to justify not retaining him. This supports the inference the non-rehire decision was made before the lawsuit.

Finally, DePaul ignored internal procedures, denied Saud procedural protections, and withheld the benefit of the doubt routinely given to white comparators.

### a. DePaul Waived or Failed to Rebut Key Facts Establishing Pretext

Numerous facts raised in the opening brief are either not addressed or are addressed only in cursory fashion. Under Seventh Circuit precedent, failure to respond to an argument amounts to waiver; perfunctory or undeveloped arguments are waived. *Zuppardi v. Wal-Mart Stores, Inc.*, 770 F.3d 644 (7th Cir. 2014) (party waived the argument because she failed to identify which facts were improperly deemed admitted or how the alleged error by the court affected its decision); See *Guzman v. City of Chicago*, 689 F.3d 740, 744 n. 3 (7th Cir.2012) (quoting *Spath v. Hayes Wheels Int'l–Ind. Inc.*, 211 F.3d 392, 397 (7th Cir.2000)) ("Perfunctory and undeveloped arguments are waived, especially when, as here, a party fails to develop the factual basis of a claim on appeal and, instead, merely draws and relies upon bare conclusion.")

### i. DePaul Waives Its Defense of the "Black Cloud" Rationale

In its response, DePaul claims Keshk denied Saud adjunct teaching due to a "black cloud" created by the C.M. lawsuit and "two student complaints." But DePaul fails to explain why Keshk did not mention this rationale at the 2019 C.M. trial when asked under oath why Saud was not rehired. Keshk testified it was solely due to budget concerns. On the reasons Saud was not brought back, Keshk testified:

Q: Does Mr. Al-Saud still teach at DePaul?

A: No.

9

Q: Why not?

A: It was decided by the dean for budgetary reasons for – to terminate his contract.

Q: And that decision was made by the dean –

A: Yes.

Q: -- before [C.M]'s allegations even came out, correct?

A: I'm not certain about the timeline.

Q: Okay. To your knowledge, did the decision for Mr. Al-Saud to not be retained by DePaul have anything to do with the allegations made by [C.M.]?

A: To my knowledge, no.

Dkt. 224-58 (Pl. MSJ Ex.81), 60:17-61:7. The testimony leaves no room for interpretation.

Keshk testified at C.M.'s trial – nearly two years after the decision –the decision to "terminate"

Saud's contract and not further "retain" him (i) came from the Dean, (ii) was due to budgetary

reasons, and importantly, (iii) was not related to C.M.'s allegations. DePaul does not address this

and has therefore conceded the point.

On other complaints about Saud, Keshk testified:

Q: Now you taught at DePaul during the entire twelve-year period that [Saud] taught

there; is that right?

A: That is correct.

Q: And in those twelve years to your knowledge had anyone ever claimed that [Saud]

harassed them?

A: No.

Q: Or that he abused his position for sexual favors?

A: No.

Q: Or that he made offers or threats in exchange for sex?

A: No.

Q: Or that he had sexually assaulted them?

A: No.

Dkt. 224, Pl. MSJ Ex.81, 64:2-20. Keshk was asked the entirety of Saud's career at DePaul, and Keshk admitted there were none. It was only after Saud brought this lawsuit that DePaul repurposed failed attempts to impugn Saud as reasons. DePaul cannot now claim Keshk discovered complaints only after Saud's career ended, while simultaneously insisting it was the reason Keshk ended Saud's career. Def. Br. 25.

DePaul offers no explanation for why Keshk would omit these reasons under oath at the C.M. trial almost two years later if they were genuinely motivating factors. Instead, DePaul resorts to vague assertions that his testimony has been misconstrued, without offering any supporting explanation or citation. This response is inadequate, especially given the clarity and significance of Keshk's sworn trial testimony, which contradicts the justifications now advanced in this lawsuit.

This unexplained silence undermines DePaul's credibility and bolsters Saud's claim that these shifting justifications are a lie. DePaul offers no explanation for this glaring omission and thus waives its defense of these pretextual justifications.

DePaul argues Keshk's trial testimony has been misconstrued, citing (i) Keshk did not testify no other complaints were made after C.M. filed her lawsuit, (ii) Saud admitted knowing Keshk spoke with others about concerns raised post-lawsuit, and (iii) Tamburro interviewed one student named in the report who confirmed the incident, while the other student declined to be interviewed. DePaul's first point (i) was addressed above. DePaul's (ii) point is not supported by the record cited; it establishes Saud never had a conversation with Keshk, it does not establish

when or how Saud became aware and it is irrelevant; and (iii), as discussed in Sec. III, *supra*, the student DePaul alleges "acknowledged an incident," was never a student of Saud (or even DePaul at the time), never corroborated any incident occurred, explicitly denied Saud made any advances, and declined to file any report. She simply spoke with Tamburro and Tamburro concluded there was nothing to investigate and never did. DePaul, in bad faith, now construes this as a complaint.

### ii.  DePaul Waives Any Rebuttal to Discriminatory Use of Title IX

Saud argued the Title IX process constituted a discriminatory adverse action. DePaul mischaracterizes this as a "revived due process" argument and does not address the point. Def. Br. p.33. DePaul is referencing the dismissal of a separate count, which was dismissed for different reason. *See* Dkt. 36, p.7 (dismissing § 1983 claim because no facts alleged show defendants acted under color of law). The court did not determine Saud could not raise discrimination during the investigation process as part of his § 1981 claim. The court did not foreclose a showing of discrimination in the Title IX process would not sustain the § 1981 claim.

Rather, courts have held biased or retaliatory investigations, especially those deviating from standard protocols, can independently violate anti-discrimination laws. *Rizzo v. Sheahan*, 266 F.3d 705, 717 (7th Cir. 2001); *Muldrow v. City of St. Louis*, 601 U.S. 346, 354 (2024). The issue is not due process—it is discriminatory disparate treatment. Pl. Br. p.27. For the reasons addressed in the Suglia comparator analysis, and as the court acknowledged, Saud was treated less favorably during Tamburro's Title IX investigation.

### iii.  DePaul Fails to Address Cat's Paw Liability

Saud argues even if Velasco made the final employment decision, liability attaches to DePaul under *Staub v. Proctor Hosp.*, 562 U.S. 411, 421 (2011) (Cat's Paw), because Velasco's

decision was based on biased input from Keshk and Tamburro. DePaul's response ignores this legal theory. DePaul argues "Tamburro's process is immaterial to the basis for the Dean's determination Saud had sex with C.M. while she was a student in his class." Def. Br. p.35. This was addressed on summary judgment, and the court acknowledged the domino effect that resulted from Tamburro's investigation (Dkt. 275, p.32, 35). While arguing Tamburro's process is "immaterial", DePaul contradicts itself, arguing "the Dean testified he had no reason to believe that Tamburro's investigation or findings were influenced by Saud's race." Def. Br. p.35. This is irrelevant and self-serving, and supports the conclusion Velasco relied on Tamburro's findings. These inconsistent and incomplete arguments are therefore waived, and the evidence— particularly the irregular escalation of Saud's case to Velasco—supports the inference of discrimination. See *Guzman v. City of Chicago*, 689 F.3d at 744 n.3.

### iv. DePaul Does Not Engage with the ADAH Policy Language

Tamburro's finding Saud "had sex with a student enrolled in his class" violated policy is both legally and factually indefensible, as DePaul's ADAH policy does not prohibit consensual faculty-student relationships. This is not merely Saud's view—the court acknowledged this, and Tamburro herself confirmed this publicly in *The DePaulia*. Pl. Br. Sec.C.ii. Yet she concluded Saud's conduct—absent any coercion, harassment, or defined misconduct—warranted institutional sanction. This selective application, contrary to the policy's plain language, strongly supports Saud's claim of discriminatory treatment and casts doubt on the neutrality of the Title IX process.

Saud's May 2, 2017 interview with Tamburro confirms he disclosed his relationship with C.M., including that it began during the course and became sexual after the class ended. Pl. Br. p.26. Tamburro's notes do not indicate any correction, policy violation, or referral to Keshk. Her

acceptance of Saud's explanation is consistent with her later public statement that such relationships were not prohibited. Elizabeth Ortiz, VP of OIDE, likewise testified the university does not prohibit such relationships—even when a student is currently enrolled. Dkt. 223-7, Ex.8 at p.43. Despite this, Tamburro later cited the relationship as a policy violation, contradicting herself.

### b. Keshk's Bias and Motive Further Support an Inference of Race Discrimination

Additional evidence in the record underscores Keshk's conduct was not only inconsistent but also motivated by bias and personal interest to please his employer, whom Keshk understood systematically discriminates against faculty of color. Saud testified during the first Title IX investigation, Keshk told him explicitly DePaul would discriminate against him. Dkt. 253 ¶26. At the time, Keshk was up for reappointment as department chair—a decision made by the Dean whose office ultimately issued the employment ban. Dkt. 224-2, Pl. MSJ Ex.2, 128:17-129:23; *see also* 21:15-19.

Keshk also admitted he believed Saud would "throw [him] under the bus," suggesting personal animus and concern for his own interests.[1] Dkt. 224-2, Pl. MSJ Ex.2, 266:9-24. Moreover, Keshk acknowledged he was aware of discrimination concerns at DePaul, yet failed to act on complaints made by other faculty. Dkt. 224-2, Pl. MSJ Ex.2, 32:14-17, 55:24-58:17; *See also* Dkt. 224-48 (Pl. MSJ Ex.68). This is not the conduct of a neutral actor; it is the conduct of someone aligning with institutional bias to preserve his own status.

DePaul offers no rebuttal to this evidence, which strongly supports Saud's theory Keshk's actions were not honest mistakes or good-faith judgments, but discriminatory decisions

---

[1] Saud also testified Keshk told him DePaul would discriminate against him (Dkt. 232-2, Pl. MSJ Ex.1, 183:7-10).

intended to ingratiate himself with leadership. Under *Reeves*, this evidence undercuts DePaul's claim to "honest belief" and supports the inference the stated reasons for Saud's exclusion were pretext for unlawful discrimination. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 151 (2000).

## IV.     DEPAUL MISCHARACTERIZES THE TITLE IX PROCESS AND IGNORES KEY IRREGULARITIES

DePaul asserts the Title IX investigations into Saud were procedurally sound and race-neutral. The record tells a different story. Saud's Title IX investigation deviated significantly from established procedures and included anomalies that strongly support an inference of discriminatory treatment.

DePaul reopened the investigation against Saud without new evidence, based solely on an unverified civil complaint filed by C.M.— who refused to participate and provided no testimony. Despite this, Tamburro never followed up with Saud on her supposed new findings, nor her conversation with Keshk, which led her to conclude he violated the policy. At the C.M. trial, Tamburro testified she relied on Keshk to reach her conclusion. Dkt. 248, ¶49. This contrasts with how white faculty—such as Suglia—were treated: they were given an opportunity to respond, to review allegations, and to submit rebuttals or countercomplaints. Moreover, lack of credibility abounds, at the CM trial, Tamburro testified she relied on Keshk for her report, while Keshk testified he relied on her report for his information on Saud. Dkt. 248, ¶49. DePaul also denied Saud a right to appeal. *Id.* ¶¶55-56.

Keshk simply lacks credibility and is emotionally invested. In his deposition for this case, Keshk rambles for 18 pages to evade answering the question about the information he provided Tamburro in a clear fashion. He simply cannot provide a direct answer about what he

explicitly knew in a string of incoherent contradictory statements. See Dkt. 224-2, Pl. MSJ Ex.2, 221:14-239:22.

Moreover, DePaul initiated surveillance without any student complaint in the case of A.R. and pressed A.R. to incriminate Saud (Dkt. 248 ¶19), and later fabricated and unsubstantiated student reports against him via Keshk. These procedural anomalies are not minor irregularities—they indicate selective enforcement. At no point has DePaul explained why Saud's chair was brought into the investigation, or why the investigation was escalated to Velasco for permanent employment exclusion, while white comparators received more measured responses.

This is similar to *Goswami v. Depaul Univ.* There, the court held the extensive record—spanning thousands of pages—revealed numerous factual disputes precluding summary judgment and required a jury to assess witness credibility. Conflicting evaluations, internal communications suggestive of bias, and procedural anomalies raised questions about the true motivations behind the tenure denial. Given the complexity and scope of the record, and the need to evaluate intent, motive, and truthfulness—especially where alleged discriminatory animus may have influenced the decision through the actions of non-decisionmakers—a jury needed to evaluate the witnesses' demeanor and determine where the truth lay. *Goswami v. Depaul Univ.*, No. 12 C 7167, *2, 10-13 (N.D. Ill. Jan 20, 2015).

The court wrongly accepted DePaul's characterizations of these deviations as neutral. It failed to consider that unequal enforcement of internal policy—especially along racial lines—raises a triable issue of discriminatory intent.

### a. DePaul's Attempt to Segment the Adverse Actions is Legally and Factually Misleading

DePaul attempts to compartmentalize the adverse actions taken against Saud by treating the decision not to rehire him as separate from the later finding that he violated university policy and the resulting employment ban. This framing is both legally incorrect and factually misleading. Courts evaluating discrimination claims must assess the entire course of adverse treatment—not isolate events in a vacuum—especially where, as here, both actions stem from a continuous series of decisions by the same institutional actors. *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d at 765. DePaul cannot immunize its conduct by parsing out the steps of its discriminatory response. The decision not to retain him, the investigation into Saud, the "policy violation" finding, and the decision to bar him from future employment, were part of a coordinated process that originated with the same unsubstantiated allegations and were executed by the same individuals. These actions were neither temporally nor substantively distinct; they were cumulative adverse actions that together destroyed Saud's ability to work at DePaul – and in academia altogether. Under *Ortiz*, all of this evidence must be considered together to determine whether race was the but-for cause of the university's actions. DePaul's effort to silo these decisions is a transparent attempt to diminish the strength of the circumstantial evidence and should be rejected.

### b. The Campus Watch Article, Coordinated Scrutiny, and Unexplained Course Cancellation Support Discriminatory Intent

The timeline and surrounding context of the adverse actions against Saud reveal a coordinated response that supports an inference of discriminatory motive. On April 6, 2017, Campus Watch—a website known for targeting Arab-American faculty—published a negative article about Saud. Keshk admitted that Campus Watch is devoted to making Arab faculty's life "miserable." Dkt. 248, ¶9. Shortly after this, without informing Saud, Keshk removed him from

his teaching assignments for the upcoming term. After the article's publication, two women were reported to Title IX by third parties—neither of whom alleged misconduct themselves. One of them, A.R., provided an affidavit stating that nothing inappropriate had occurred between her and Saud and affirmed that she believed Title IX investigator Tamburro was attempting to build a case against him. Dkt. 248, ¶19; Dkt. 223, ¶2.

This pattern matches the one described in an affidavit from Religious Studies faculty member Scott Paeth, who attested DePaul faculty targeted by Campus Watch often faced multiple misconduct allegations in rapid succession. Dkt. 231. DePaul offers no explanation for why Saud's courses were cancelled prior to the C.M. lawsuit or why Keshk failed to alert or consult Saud before removing him from the schedule. Taken together, this evidence supports Saud's claim that the adverse actions taken against him were part of a racially motivated pattern of heightened scrutiny and selective enforcement.

## V.     INSTITUTIONAL BIAS, A.R.'S AFFIDAVIT, AND CHERYL WAYNE'S TESTIMONY ARE PROBATIVE AND PROPER

DePaul argues that Cheryl Wayne's testimony should be disregarded because she was not personally involved in Saud's case. This is incorrect and legally unfounded. Her testimony is admissible under FRE 701. Fed. R. Evid. 701. As a DePaul administrator with direct experience with DePaul's OIDE—the office that investigated Saud—Wayne received the first report concerning Saud and A.R. days after the Campus Watch article was published. Her observations about how OIDE operated, its selective handling of complaints against white versus minority faculty are relevant to discriminatory intent.

Wayne's testimony about institutional practices and departures from standard procedures supports an inference of race-based bias under FRE 701.

Wayne's account aligns with the broader pattern Saud experienced: diminished procedural fairness, increased scrutiny, and escalated sanctions—all within the same office where Wayne observed racial disparities. Moreover, her affidavit did not contradict her prior testimony, and DePaul fails to explain how; this argument is waived. See *Guzman*, *infra*, p.21. The court erred in disregarding this evidence, and DePaul's failure to rebut it reinforces its probative value.

The convergence of external targeting, rapid administrative escalation, inconsistent policy enforcement, and disparate process all support the inference that race was the but-for cause of the adverse actions he faced.

## VI.    THE DISTRICT COURT FAILED TO APPLY LEGAL AUTHORITY

The court's summary judgment ruling reflects a misapplication of the *McDonnell Douglas* burden-shifting framework, particularly in its comparator analysis and pretext evaluation. DePaul fails to properly address this. The court failed to draw reasonable inferences in Saud's favor when assessing DePaul's proffered justifications. Instead of determining whether a jury could find those reasons dishonest or inconsistent, it improperly credited DePaul's explanations—low enrollment, a "black cloud," and vague student reports—even though the record shows these justifications shifted over time, lacked evidentiary support, or emerged only after litigation began. This contravenes *Reeves* at 147, which prohibits courts from resolving credibility disputes at summary judgment where pretext evidence exists.

The court also failed to apply the holistic approach required by *Ortiz v. Werner*, 834 F.3d at 764. Other than through circular logic, DePaul also fails to address this. Rather than considering whether the full record supported a finding of racial discrimination, it parsed comparator evidence, procedural irregularities, shifting explanations, and institutional bias in

isolation—precisely the fragmented approach *Ortiz* rejects. Saud offered extensive evidence that, viewed together, could lead a jury to conclude that DePaul's actions were racially motivated.

DePaul claims the court "properly applied" *Ortiz* but ignores the central error: the court dismissed each category of evidence individually rather than considering their cumulative weight. That approach violates *Ortiz*. The court also drew inferences in DePaul's favor and overlooked credibility disputes—such as whether Keshk and Tamburro acted in good faith or colluded to remove Saud—issues that under *Reeves* must be resolved by a jury.

## VII.     DEPAUL FAILS TO ADDRESS THE EVIDENCE HOLISTICALLY AND MISCHARACTERIZES EACH PIECE UNDER ORTIZ

In an effort to shield the court's failure to consider the full record under *Ortiz*, DePaul selectively isolates six pieces of Saud's evidence and attempts to dismiss each as waived, irrelevant, or speculative. Each category was presented in the summary judgment record, cited in briefing, and directly supports the broader inference of discriminatory intent. More importantly, DePaul's arguments reflect exactly the kind of fragmented analysis *Ortiz* prohibits. The proper inquiry is whether the totality of the evidence would allow a reasonable jury to conclude that race was the cause of the adverse employment actions. Viewed together, these six items form a compelling picture of pretext and discrimination.

DePaul's repeated assertions throughout its brief that Plaintiff has "waived" arguments by presenting them in a "perfunctory" or "underdeveloped" manner are meritless and misstate the governing standard. Saud's Opening Brief clearly identified each argument, cited supporting evidence and authority, and gave DePaul full opportunity to respond. These were not bare conclusions or unsupported claims. This is not waiver. See *Guzman v. City of Chicago*, 689 F.3d 740, 744 n.3 (7th Cir. 2012) (quoting *Spath v. Hayes Wheels Int'l–Ind. Inc.*, 211 F.3d 392, 397 (7th Cir. 2000)) ("Perfunctory and undeveloped arguments are waived, especially when...a party

fails to develop the factual basis of a claim on appeal and instead merely draws and relies upon bare conclusion."). Moreover, DePaul fails to identify with specificity which arguments it believes were waived or how it was prejudiced—rendering its waiver objections an attempt to divert attention from the strength of the evidentiary record. No such showing has been made here.

### a. Cheryl Wayne's Testimony and Affidavit Were Admissible and Ignored by the District Court

DePaul repeatedly claims that Wayne's affidavit was "waived" or irrelevant. This is incorrect. Plaintiff cited Wayne's sworn statements in all summary judgment briefs, and the court failed to address them. See e.g. Dkt. 221 pp.13–14. Wayne was involved in the first iteration of the Title IX process that led to Saud's ban and was deposed in that context. Her testimony is consistent with her affidavit and based on personal knowledge of OIDE practices, including observations that white faculty received more favorable treatment than minority faculty.

DePaul's argument that Wayne lacked supervisory authority over Tamburro is irrelevant. FRE 701 permits lay testimony based on personal observation and allows her testimony as a person with knowledge about OIDE's practices. Her testimony about the office's patterns and practices is precisely the kind of contextual evidence courts regularly admit to show institutional bias. DePaul's responses—most of which amount to "this is irrelevant" or "this contradicts her affidavit"—are unsupported by the record and plainly designed to avoid engaging with material evidence a jury could credit. This evidence was not addressed by the court and should have been considered.

**b. Flagging Saud for a Muslim Civil Liberties Event Supports Inference of Bias**

DePaul attempts to minimize the significance of Saud being flagged after a January 2017 panel on Muslim civil liberties, framing it as a misunderstanding or irrelevant administrative concern. This misses the point. The record shows DePaul administrators flagged Saud internally based on vague concerns about his speech and described him as "vocal about Trump." Dkt. 248 ¶7. This is not idle speculation. It is evidence of institutional discomfort with an Arab professor engaging in political speech—particularly on issues related to Islam and civil rights.

DePaul's only response is that no one "recalls" flagging him, but lack of recollection does not erase the fact that it happened or the inferences a jury could draw from it. Def. Br. at 42. This incident supports the broader pattern of disproportionate scrutiny Saud faced compared to white colleagues and contributes directly to the pretext analysis.

**c. The Campus Watch Article and Its Aftermath Are Part of the Discriminatory Context**

DePaul downplays the April 6, 2017 Campus Watch article, yet the timing of events following its publication is highly probative. The article—a known tactic used to target Arab-American faculty—was published just days before Tamburro opened her Title IX investigation. Keshk testified that Campus Watch exists to make Arab faculty's "life miserable," and DePaul contracts with a third-party service to monitor such media mentions. Dkt. 248 ¶¶9-10.

Within days of the article's publication, Tamburro began investigating Saud based on two vague, unsubstantiated complaints. The timing strongly suggests a discriminatory institutional response. DePaul ignores this context and relies on administrator "non-recollection" to obscure what a jury could reasonably infer. This inference is further bolstered by A.R.'s testimony that Tamburro appeared to be "looking for something" against Saud. Dkt. 248 ¶19. The court failed to weigh this sequence of events in its pretext analysis, which was error.

### d.  The A.R. Affidavit Undermines DePaul's "Honest Belief" Defense

DePaul argues A.R.'s affidavit is irrelevant because, "even if credited," it wouldn't alter the outcome since it reflects A.R.'s belief. That misstates the law. First, A.R.'s statements were based on Tamburro's behavior during her interview, which included Tamburro was "insistent on seeing A.R. even though A.R. was "adamant there was no concern". Dkt. 248, ¶19; Dkt. 223, ¶1. A.R. also observed Tamburro's "pointed tone", repeated questions, and repeatedly asking whether she "felt comfortable" around Saud. Dkt. 248, ¶19; Dkt. 223, ¶2. At summary judgment, the court must credit the plaintiff's evidence, not weigh its credibility or value. *Reeves*, at 151. A.R. affirmed that nothing inappropriate occurred with Saud and that Tamburro was pursuing an outcome regardless of facts—a textbook challenge to DePaul's claimed "honest belief" in its Title IX findings.

This is core pretext evidence: it undermines DePaul's narrative that Tamburro acted in good faith and reflects a predetermined effort to find Saud culpable. A reasonable jury could conclude from A.R.'s affidavit that the investigation lacked neutrality and was driven by discriminatory purpose. The court did not address this, and DePaul's attempt to minimize it is unavailing.

### e.  The DePaulia Article and Tamburro's Admission Undermine DePaul's Policy Justification

DePaul attempts to downplay the significance of the April 2018 *The DePaulia* article in which Title IX investigator Tamburro stated DePaul does not prohibit consensual faculty-student relationships. This directly contradicts the basis for the Title IX finding against Saud and undermines DePaul's post hoc claim that he violated the ADAH policy. Tamburro's own notes from her May 2, 2017 interview with Saud do not indicate that the relationship violated policy or that she corrected any misunderstanding. Dkt. 248 ¶21, Dkt. 232-12, Pl. MSJ Ex.25. At the time,

no finding was made against Saud, and the matter was initially cleared. Dkt. 248 ¶22. That DePaul later ignored Tamburro's public admission while retroactively applying a contradictory interpretation to Saud supports an inference of pretext. The court erred by failing to consider this contradiction.

### f. Evidence of Institutional Discrimination and Weaponization of OIDE Supports the Pattern

Finally, DePaul argues that the broader evidence of institutional discrimination and weaponization of OIDE should be disregarded as "generalized" or lacking specificity. This reflects the same error made by the court: failing to evaluate the evidence holistically as required by Ortiz. Rather than engaging with the substance, DePaul defaults to assertions of waiver and irrelevance. But these facts were properly cited in the record and support a clear inference of institutional bias that a reasonable jury could consider.

The record shows a consistent pattern of OIDE being used to target faculty of color. In 2016, after student protests over a pro-Trump speaker known for racist and Islamophobic remarks, faculty of color who criticized the university were investigated by OIDE—including two law professors who later sued DePaul for discrimination. Dkt. 248 ¶¶69-70. Meanwhile, threats against those faculty—including racial slurs and death threats—were not investigated. Keshk also received reports from faculty that they were being racially targeted and failed to address them. *Id.* ¶72. Professor Amina McCloud reported receiving such threats to Keshk, but no action was taken. Dkt. 248 ¶¶71-72. Colleagues described Keshk as unsupportive when concerns about discrimination arose. *Id.* Saud also reported potential discrimination to Keshk, which Keshk dismissed as a joke. Dkt. 253, Pl. Add. SMF ¶34.

Cheryl Wayne testified that OIDE investigators, including Tamburro, treated white faculty more favorably by offering greater protections and subjecting their cases to closer

internal oversight. Dkt. 248 ¶76. This institutional history reinforces Saud's claim that race was

the but-for causes of the scrutiny, selective enforcement, and exclusion he faced. DePaul's

attempt to dismiss this pattern as "background" defies controlling precedent requiring

discrimination claims to be evaluated holistically.

## CONCLUSION

DePaul has failed to engage with core arguments, waived several defenses, and relied on

inconsistent, unsupported explanations for its conduct. The record contains ample evidence from

which a jury could conclude that Saud's Arab race was the but-for cause of his non-rehire,

adverse Title IX finding, and exclusion from future employment. The judgment should be

reversed.


Respectfully Submitted,

s/Christina Abraham
_____
Attorney for the Plaintiff-Appellant


Christina Abraham
Abraham Law & Consulting, LLC
33 N. Dearborn, Suite 1000
Chicago, IL 60602
(312) 588-7150

## <u>CERTIFICATE OF COMPLIANCE WITH F.R.A.P. 32(A)(7)</u>

The undersigned, counsel of record for the Plaintiff-Appellant, furnishes the following in

compliance with F.R.A.P. Rule 32(a)(7). I hereby certify that this brief conforms to the rules

contained in F.R.A.P. Rule 32(a)(7) for a brief produced with a proportionately spaced font.  The

length of this brief is **<u>6,998</u>** words.


s/Christina Abraham
_____
Attorney for the Petitioner

Christina Abraham
Abraham Law & Consulting, LLC
161 N. Clark Street, Suite 1600
Chicago, IL 60601
(312) 588-7150

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, counsel for Plaintiff-Appellant, hereby certifies that she caused a copy of the foregoing **Reply Brief of Plaintiff-Appellant** to be served upon the parties listed below through the Seventh Circuit's CMS/ECF electronic system on **June 20, 2025**. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the Seventh Circuit CM/ECF system.

s/Christina Abraham
_____
Attorney for the Plaintiff-Appellant

Christina Abraham
Abraham Law & Consulting, LLC
161 N. Clark Street, Suite 1600
Chicago, IL 60601
(312) 588-7150